**DUANE MORRIS LLP**
Lawrence J. Kotler, Esq. (LK-8177)
1540 Broadway, 14th Floor
New York, NY 10036
Telephone: (212) 692-1000
Facsimile: (215) 692-1020

Meagen E. Leary, Esq. (admitted *pro hac vice*)
One Market Plaza
Spear Street Tower, Suite 200
San Francisco, CA 94105
Telephone: (415) 957-3000
Facsimile: (415) 957-3001

Paul E. Chronis, Esq. (admitted *pro hac vice*)
190 South LaSalle Street, Suite 3700
Chicago, IL 60603
Telephone: (312) 499-6700
Facsimile: (312) 499-6701

*Counsel for Museum Building Holdings, LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT NEW YORK**

|  |  |
|---|---|
| In re:<br><br>  BROADBRIDGE LA LLC,<br><br>           Debtor. | Chapter 11<br><br>Case No. 8-22-72048-las |

## <u>NOTICE OF MOTION TO DISMISS CHAPTER 11 CASE</u>

  **PLEASE TAKE NOTICE** that, upon the annexed *Motion to Dismiss Chapter 11 Case* (the "Motion"), filed on behalf of Museum Building Holdings, LLC ("Secured Creditor"), a hearing will be held before the Honorable Louis A. Scarcella, United States Bankruptcy Judge, to consider the Motion for an order (the "Order") dismissing the above-captioned chapter 11 case.

|  |  |
|---|---|
| **Date and Time of hearing:** | September 22, 2022 at 11:00 a.m. (EST) |
| **Location:** | U.S. Bankruptcy Court for the Eastern District of New York<br>290 Federal Plaza,<br>Central Islip, New York 11722<br>Courtroom #970 |

**PLEASE TAKE FURTHER NOTICE** that, responses and objections, if any, to the Motion shall (i) be in writing; (ii) comply with the Federal Rules of Bankruptcy Procedure; (iii) be filed with the Bankruptcy Court electronically in accordance with General Order 559 (a copy of which can be found at *www.nyeb.uscourts.gov*, the official website for the United States Bankruptcy Court for the Eastern District of New York) by registered user of the Bankruptcy Court's case filing system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers); and (iv) be served upon: (1) counsel for Secured Creditor, (a) Lawrence J. Kotler, Esq., Duane Morris LLP, 1540 Broadway, 14th Floor, New York, NY 10036, (b) Meagen E. Leary, Esq., Duane Morris LLP, One Market Plaza, Spear Street Tower, Suite 200, San Francisco, CA 94105, and (c) Paul E. Chronis, Esq., Duane Morris LLP, 190 South LaSalle Street, Suite 3700, Chicago, IL 60603; (2) Office of the United States Trustee, Long Island Federal Courthouse, 560 Federal Plaza, Room 560, Central Islip, New York 11722; and (3) all parties who have filed a notice of appearance and request for service of documents, so as to be actually received by no later than September 15, 2022 at 4:00 p.m. (EST).

Dated: August 24, 2022     DUANE MORRIS LLP

        /s/ *Lawrence J. Kotler*
        Lawrence J. Kotler, Esq. (LK-8177)
        1540 Broadway, 14th Floor
        New York, NY 10036
        Telephone: (212) 692-1000
        Facsimile: (215) 692-1020
        Email: ljkotler@duanemorris.com

Hearing Date and Time: September 22, 2022 at 11:00 a.m. (ET)

Objection Deadline and Time: September 15, 2022 at 4:00 p.m. (ET)

**DUANE MORRIS LLP**
Lawrence J. Kotler, Esq. (LK-8177)
1540 Broadway, 14th Floor
New York, NY 10036
Telephone: (212) 692-1000
Facsimile: (215) 692-1020

Meagen E. Leary, Esq. (admitted *pro hac vice*)
One Market Plaza
Spear Street Tower, Suite 200
San Francisco, CA 94105
Telephone: (415) 957-3000
Facsimile: (415) 957-3001

Paul E. Chronis, Esq. (admitted *pro hac vice*)
190 South LaSalle Street, Suite 3700
Chicago, IL 60603
Telephone: (312) 499-6700
Facsimile: (312) 499-6701

*Counsel for Museum Building Holdings, LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT NEW YORK**

|  |  |
|---|---|
| In re:<br><br>    BROADBRIDGE LA LLC,<br><br>                    Debtor. | Chapter 11<br><br>Case No. 8-22-72048-las |

## MOTION TO DISMISS CHAPTER 11 CASE

Secured creditor Museum Building Holdings, LLC ("Secured Creditor") submits this motion ("Motion") for the entry of an order substantially in the form attached hereto as **Exhibit A** ("Proposed Order"): i) dismissing the above-captioned chapter 11 case ("Chapter 11 Case") for cause pursuant to 11 U.S.C. §§ 105(a) and 1112(b)(1); and ii) prohibiting the above-captioned debtor Broadbridge LA LLC ("Debtor") from filing any further voluntary petition for relief under

1

any chapter of title 11 of the United States Code for 180 days pursuant to 11 U.S.C. §§ 105(a) and 349(a).

## Summary of this Motion

### Debtor's Sworn Declaration And Other Undisputed Records Confirm That This Case Was Filed in Bad Faith and Without Corporate Authority

This Motion respectfully seeks the dismissal of the voluntary petition [Dkt. No. 21] ("Petition")[1] filed by Debtor. Dismissal is warranted for two separate and independent reasons. First, this case was filed in bad faith. Second, this case was filed without corporate authority. Either of these bases, standing alone, justifies dismissal.

As to bad faith, this Chapter 11 Case presents the relatively novel scenario where *every one* of the eight Second Circuit factors used in determining bad faith has been met. Moreover, the significant majority of the facts used to establish those factors *come from Debtor's own sworn declaration* (such declaration, the "Schreiber Declaration").[2] The specific bad faith factors which have been proven by Debtor's own testimony and other undisputed records are as follows:

- This is a single asset real estate case. Debtor's sole asset is commercial real property located at 826 and 832 South Hill Street and 801 South Broadway, Los Angeles, California and is comprised of approximately one million square feet of commercial space (the "Property"). (Schreiber Decl. ¶¶ 2, 8).

- Debtor has few, if any, unsecured creditors. Any such claims would likely be small compared to over $270 million in secured debt.[3]

- The Property is the subject of a non-judicial foreclosure action that Secured Creditor commenced after Debtor defaulted on its loan obligations. (Schreiber Decl. ¶ 2).

---

[1] Debtor refiled the Petition without its attachments at Dkt. No. 4 to address a corrective entry requiring the signing and filing attorneys to be the same person.

[2] The Schreiber Declaration is attached to the Petition.

[3] Debtor's list of its 20 largest unsecured creditors was due on the petition date. FED. R. BANKR. P. 1007(a). Debtor did not attach that list to its Petition notwithstanding Debtor's averment that it did. (Schreiber Decl. ¶ 6).

- Debtor's financial condition is, in essence, a two-party dispute between Debtor and Secured Creditor. Further, Debtor filed its Petition "after all efforts at obtaining a further extension from [Secured Creditor] were unsuccessful." (*Id.* ¶ 4).

- Debtor filed its Petition on the same day as the scheduled foreclosure sale to occur "to prevent an immediate foreclosure." (*Id.* ¶¶ 3–4).

- The Property has no discernable cash flow. (*Id.* ¶ 11).

- Debtor can't meet current expenses. Debtor's sole asset is a vacant and unfinished building. Debtor failed to pay Los Angeles County Property taxes in the combined total amount of $1,861,141.75 (Cowart Decl. ¶ 27; *id.* Ex. X).[4] Debtor also allowed its insurance policies to lapse for nonpayment (Cowart Decl. ¶ 28; *id.* Ex. 17).[5] Further, the receiver of the Property estimates that it will cost $404,654.00 to administer and manage the Property from July, 2022 to October 31, 2022, but Debtor has no ability to pay that amount and the Property has no current ability to generate revenue. (Singer Decl. ¶ 9; *id.* Ex. 3; Schreiber Decl., ¶ 11).[6]

- Debtor has no employees (Schreiber Decl. ¶ 10).

*See C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310 (2d Cir. 1997) (providing the eight-factor bad faith filing test).

Not only does Debtor meet all eight bad faith filing factors, it also readily admits that the purposes of this bankruptcy filing were: i) to prevent "an immediate foreclosure" and the "forfeiture of a sizeable investment of approximately $100 million" and ii) to "gain one last opportunity to salvage the project" through further efforts to find a purchaser. (Schreiber Decl. ¶¶ 2, 4). These admitted "purposes" further demonstrate the extreme bad faith nature of Debtor's

---

[4] A true and correct copy of the Declaration of Jay Cowart in Support of Motion to Dismiss Chapter 11 Case ("Cowart Declaration") is attached as **Exhibit B** to this Motion and incorporated by reference as if fully set forth herein.

[5] Exhibit 17 of the Cowart Declaration contains true and correct copies of emails from Debtor's insurance broker showing that Debtor's insurance policies lapsed due to the nonpayment of premiums.

[6] A true and correct copy of the Declaration of Kevin Singer in Support of Motion to Dismiss Chapter 11 Case ("Singer Declaration") is attached as **Exhibit C** to this Motion and incorporated herein by reference. Exhibit 3 to the Singer Declaration is a budget ("Receiver's Budget") projecting the Property administration costs through October 31, 2022.

filing. *In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 759 (Bankr. S.D.N.Y. 1997) ("[A] debtor shows bad faith when it uses bankruptcy protection for risk-free speculation in the single asset"); *see also In re Am. Prop. Cor.*, 44 B.R. 180, 182 (Bankr. M.D. Fla. 1984) ("Clearly, bad faith is shown if the purpose of a chapter 11 debtor is to hold a single asset 'hostage' in order to speculate that such asset may increase in value in order to recover its original investment at the creditor's risk.").

As to the lack of corporate authority to file this case, that is easily proven by the corporate resolution Debtor attached to its Petition (the "Schreiber Resolution"). Specifically, that resolution demonstrates that Schreiber failed to secure the required pre-filing unanimous consent from the independent managers and Debtor's other members. (Schreiber Resolution at 1). Finally, he ignored that at least one member *affirmatively did not consent to the filing*. All of these failings demonstrate that this case was filed without corporate authority.

In short, this case should never have been filed. It should be promptly dismissed for cause.

### Jurisdiction, Venue, and Statutory Predicates

1.       The U.S. Bankruptcy Court for the Eastern District of New York ("Court") has jurisdiction to consider the Motion under: i) 28 U.S.C. §§ 157 and 1334; ii) Administrative Order #264 entered in *In re The Referral of Matters to the Bankruptcy Judges* (E.D.N.Y. Aug. 28, 1986); and iii) the Order entered in *In re The Referral of Matters to the Bankruptcy Judges* (E.D.N.Y. Dec. 5, 2012).

2.       Venue is proper in this district under 28 U.S.C. §§ 1408–1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2). The Court is authorized to grant the requested relief under i) 11 U.S.C. §§ 105(a), 349(a), 362(d)(4) and 1112(b); ii) Rules 1017(f) and 9014 of the

Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"); and iii) Rules 9014-1 and 9014-2 of the Local Bankruptcy Rules for the Eastern District of New York ("Local Rules").

**Relevant Background**

**A.    The Loan and the Notes Securing the Loan**

3.      Debtor owns the Property commonly known as "The Museum Building."   Secured Creditor holds a perfected, first-priority lien on the Property and related collateral which secures a loan in the original principal amount of $218,701,154.

4.      Specifically, on June 8, 2018, Debtor executed and delivered two interest-bearing promissory notes to SPT CA Fundings 2, LLC ("Original Lender"). Each promissory note evidenced Debtor's indebtedness to Original Lender and was secured by, among other things, the Property. The promissory notes were in the principal amounts of $173,675,733.00 for Promissory Note A-1 ("Note A-1"), and $40,025,421.00 for Promissory Note A-2 ("Note A-2") (collectively "Debt"). On December 9, 2019, Debtor executed an Amended and Restated Promissory Note A-2 in the principal amount of $45,025,421.00 ("Amended Note A-2," and together with Note A-1, the "Notes"). Amended Note A-2 increased the Debt by $5,000,000.00 to a total of $218,701,154.00. (Cowart Decl. ¶ 6; *id*. Ex. 1).

5.      The loan is further evidenced by a June 8, 2018 Mortgage Loan and Security Agreement ("Original Loan Agreement"). The Original Loan Agreement was executed by Debtor, the Original Lender, and the Original Lender as administrative agent. (*id*. ¶ 9; *id*. Ex. 3).   The parties thereafter amended the Original Loan Agreement on July 16, 2018, and on December 9, 2019 (the Original Loan Agreement together with, and as amended by, such amendments, the "Loan Agreement").

### B.    The Deed of Trust

6.      On June 8, 2018, Debtor also executed a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing in favor of First American Title Insurance Company, as trustee for the benefit of Original Lender as administrative agent ("Original Deed of Trust"). (*id.* ¶ 7; *id.* Ex. 2). The parties amended the Deed of Trust on December 10, 2019 to, among other things, memorialize the increase in the Debt. (*id.* ¶ 8; *id.* Ex. 3).

7.      The Deed of Trust also serves as a security agreement and fixture filing pursuant to the Uniform Commercial Code with respect to certain personal property located on and/or related to the Property ("Additional Collateral"). (*id.* ¶ 12).

8.      The Debt is secured by, *inter alia*, the Property and the Additional Collateral pursuant to the Deed of Trust.

### C.    Assignment to Secured Creditor

9.      The Notes, Deed of Trust, Loan Agreement, and additional related loan documents including the Standstill Agreement (defined below) (collectively, "Loan Documents") are more fully described in the Cowart Declaration. (*see* Cowart Decl. ¶¶ 1–20; *id.* Exs. 1–14).

10.     Through a series of assignments and allonges by and between the Original Lender and subsequent entities, Secured Creditor is the current beneficiary under the Deed of Trust, the holder and payee of the Notes, and the assignee of the other Loan Documents. (Cowart Decl. ¶ 11, *id.* Exs. 6–10).

### D.    Debtor's Default, Secured Creditor's Forbearance, and Amounts Due

11.     Debtor defaulted under the Loan Documents by, among other things, failing to pay the loan in full on or before the June 9, 2020 maturity date. (*id.* ¶ 16).

12.     In connection with that default, Debtor and Starwood Property Mortgage Sub-14-A, LLC (Secured Creditor's predecessor-in-interest) entered into a Standstill Agreement on August 7, 2020 (effective June 9, 2020) ("Original Standstill Agreement"). (*id.* ¶ 17; *id.* Ex. 11).[7] Secured Creditor agreed in the Original Standstill Agreement that it would not exercise its rights and remedies under the Loan Documents during a "Standstill Period" unless a "Termination Event" occurred. (*id.* ¶ 23).

13.     The parties amended the Standstill Period three times: (i) on April 9, 2021 (effective March 9, 2021); (ii) on September 14, 2021 (effective August 9, 2021); and (iii) on October 22, 2021 (the Original Standstill Agreement, together with and as amended by such amendments (i.e., the First, Second and Third Amendments to the Standstill Agreement), collectively, the "Standstill Agreement"). (*id.* ¶¶ 18–24; *id.* Exs. 12–14).   Among other things, the Standstill Agreement provided that Secured Creditor would not exercise certain of its rights and remedies under the Loan Documents prior to December 31, 2021, provided that no Termination Event occurred. (*Id.* Ex. 12–14).

14.     Multiple Termination Events[8] under the Standstill Agreement occurred and continue to occur because Debtor failed to make at least the following payments: i) the Deferred Second Extended Standstill Period Payments, together with all interest accrued thereon at the Second Extended Standstill Period Interest Rate, due on November 1, 2021; ii) the Second Extended Standstill Period Payments due on November 9, 2021; iii) the Second Extended

---

[7] Schreiber and Jack Jangana—both indirect owners of Debtor and guarantors of the Debt—also executed the Original Standstill Agreement and each of the amendments thereto in their individual capacities.

[8] The term "Termination Events" is defined in § 10 of the Original Standstill Agreement. The term "Deferred Second Extended Standstill Period Payment" is defined in § 1.4(a) of the Second Amendment to Standstill Agreement dated September 14, 2021. The term "Second Extended Standstill Period Payment" is defined in § 1.3(a) of the First Amendment to Standstill Agreement dated April 9, 2021.

Standstill Period Payment due on December 9, 2021; iv) Property taxes that were due and payable to Los Angeles County by November 1, 2021; and v) the Debt in full on or before December 31, 2021. (*id.* ¶ 24).

15.     Additional Events of Default[9] under the Loan Agreement and Termination Events occurred and continue to occur. Those events include, among possible others, Debtor's failure to: i) pay Property taxes that were due and payable to Los Angeles County by April 10, 2022 and ii) maintain insurance. (*id.* ¶ 26).

16.     As a result of the Debtor's failures, Secured Creditor advanced amounts under the Loan Documents to pay the Property taxes to avoid additional penalties and fees that would have resulted from non-payment, as well as to force-place insurance and pay the accompanying insurance premiums to ensure that the Property would be insured. (*id.*). Specifically, Secured Creditor advanced $1,861,141.75 for the Property taxes and $838,706 for the insurance premiums. (*id.* ¶¶ 27, 29).

17.     As of August 9, 2022, the outstanding principal balance (inclusive of protective advances) of Note A-1 is $176,655,577.48 and of Amended Note A-2 is $45,797,945.48, for a total combined outstanding amount of $222,453,522.96. (Cowart Decl. ¶ 36).

18.     Additional amounts are due and owing and continue to be due and owing under the Loan Documents for, *inter alia*, non-default rate interest; default interest; and legal, administrative, and other fees and costs. (*id.* ¶ 37).

19.     These additional amounts, together with the aggregate outstanding principal balance of the Notes, bring the total amount of Secured Creditor's claim against Debtor to no less than $271,557,168.37 as of August 9, 2022. (*id.* ¶ 38).

---

[9] The term "Events of Default" is defined in § 18.1(a) of the Loan Agreement.

DM3\8962557.1

**E.    Commencement of Parallel Foreclosure and Receivership Proceedings**

20.    Secured Creditor commenced non-judicial foreclosure proceedings by recording a notice of default against the Property on April 5, 2022. (*id.* ¶ 30; *id.* Ex. 19).

21.    Secured Creditor also commenced a parallel Receivership Action in the State Court on May 26, 2022. (*id.* ¶ 31; *id.* Ex. 20). In its application ("Receivership Application"), Secured Creditor outlined several reasons for seeking a receiver:

> (i) the Property is 100% vacant and susceptible to break-ins and vandalism, (ii) security and preservation of the Property are of great, and immediate concern, (iii) Borrower is unable to pay operating expenses to maintain, protect and preserve the Property, (iv) the current status of the entitlements and permits for the redevelopment of the Property are presently unknown.

(Receivership Application at 20 ll. 4–8).

22.    The Court entered the Receivership Order on June 8, 2022. (Cowart Decl. ¶ 32; *id.* Ex. 21). The next day, the Receiver inspected and took possession of the Property.

23.    On July 8, 2022, the Receiver filed an inventory report ("Inventory Report") which included pictures from his inspection. (Singer Decl. ¶ 5; *id.* Ex. 1).[10] The pictures confirmed that the Property is in poor physical condition with graffiti, unfinished interiors, and debris.

24.    The Receiver's senior project manager, Rick Marquis, took more pictures of the Property on July 9 and July 21, 2022. The Receiver included those pictures in his monthly report filed on August 10, 2022 (the "July 2022 Report"). (*id.* ¶¶ 6–7; *id.* Ex. 2).[11] These pictures confirmed that the Property remained in disrepair.

---

[10] The photographs are attached as Exhibit 1 to the Inventory Report.

[11] The photographs are attached as Exhibits 2, 6 to the Inventory Report.

25.     The Receiver also reported that he had met with Los Angeles officials on July 13, 2022.  The officials demanded that the Receiver remove the exterior temporary scaffolding and associated wood canopies from the Property because they were obstructing the sidewalk.  The officials also advised that the applicable scaffolding permit had expired in December 2021.  The July 2022 report also noted that "the City also expressed concern about security issues at the Property due to increased trespassing in the downtown area, which we will address via on-site security and by having the Property's entrances boarded up."  (*id*. Ex. 2 at 7).  Further, the Receiver reported that "[s]ecuring the Property from homeless encampments is a top priority." (*id*. Ex. 2 at 6).

26.     On August 15, 2022, the Receiver prepared a budget ("Receiver's Budget") for Secured Creditor. (*id*. ¶ 9; *id*. Ex. 3).  The Receiver's Budget estimates the costs of administering and maintaining the Property from July 1 through October 31, 2022.  These costs total approximately $404,654.00, of which $146,519.00 is allocated for removing the scaffolding and boarding up the Property.  The Receiver's Budget also shows that Debtor has $0.00 and the Property will generate $0.00 in revenue over the same period.

27.     Because Debtor has no funds and the Property is generating no revenue, the Receiver requested that Secured Creditor pay for the administration and management costs required for the Property. (*id*. ¶ 9).

28.     On August 24, 2022, Secured Creditor filed a stipulation entered into by and among counsel for Secured Creditor, Debtor, and Receiver [Dkt. No. 27] ("Receiver Stipulation") with this Court.  The Receiver Stipulation provides, *inter alia*, that "Secured Creditor is hereby authorized to pay and/or advance funds to pay for all operational, maintenance or other costs and expenses arising in connection with the Property." (Receiver Stipulation ¶ 6). It further provides

that Debtor acknowledges that such payments are protective advances under the Loan Documents and section 364 of the Bankruptcy Code. (*id.* ¶ 7).

### F.    Debtor's Bankruptcy Filing to Block Foreclosure

29.    On July 7, 2022, Secured Creditor recorded a foreclosure sale notice against the Property.    (Cowart Decl. ¶ 34; *id.* Ex. 22).    The Property was ultimately scheduled for public auction on August 9, 2022, at 11:00 a.m. PT. (*id.*).

30.    On August 9, 2022, at 10:11 a.m. PT, Debtor filed its Petition (*i.e.*, just 49 minutes before the public auction would have begun).[12]    The auction is now stayed under 11 U.S.C. § 362.

31.    To date, Debtor has not filed its list of the 20 largest unsecured creditors, which was due on the petition date.

32.    On August 23, 2022, Debtor filed its statement of financial affairs ("SOFA") and schedules [Dkt. No. 26].

33.    Debtor answered "none" to nearly every question in its SOFA,[13] including as to whether Debtor generates any gross revenue from either its business or any other non-business related activities.

34.    Debtor's Schedule A/B asserts that Debtor's only assets are the Property and $100.00 in cash.[14]

---

[12] Debtor designated its business to comprise single-asset real estate ("SARE") (Pet. § 7).

[13] The only questions answered differently in the SOFA are i) whether there is any pending legal action, ii) the payments made on account of the bankruptcy; and iii) the identity of the people who are holding Debtor's books and records.

[14] The Receiver, who has been operating the Property for nearly (3) months, instead confirms that Debtor in fact has $0.00 in cash on hand, as reflected in the Receiver's Budget.  Nevertheless, Debtor's schedules confirm that, to the extent Debtor does have any cash, it is very little.

DM3\8962557.1

35.     Schedule D confirms that Secured Creditor is Debtor's one and only secured creditor.

36.     With respect to Debtor's unsecured creditors, Schedule E/F lists only seven creditors.  Two of these creditors are listed for notice purposes only, with $0.00 unliquidated, disputed claims.  The remaining five (5) unsecured creditors include Receiver, Debtor's counsel, and Schreiber himself.   The total amount of unsecured claims listed on Schedule E/F is approximately $15.8 million, more than $15.6 million of which is purportedly owed to Schreiber on account of "loans."

**G.      Lack of Authority to File**

37.     Schreiber executed the Petition as the "authorized representative of debtor" with the title of "Manager" (Pet. § 17), but he is not the manager of Debtor and therefore lacked such authorization.

38.     Schreiber has only partial, indirect control over Debtor as the indirect owner and co-manager of Western LA Holdco LLC ("Western LA"), which is the sole member of Broadbridge LA Member LLC ("Broadbridge Member"), which is the sole member of Debtor.

39.     Jack Jangana[15] is the other co-manager of Western LA, and Mr. Jangana, Jenny Haim,[16] and Joyce Reiss[17] (collectively, "Jangana Members") are members of Western LA.

---

[15] A true and correct copy of the Declaration of Jack Jangana in Support of Motion to Dismiss Chapter 11 Case ("Jack Jangana Declaration") is attached as **Exhibit D** to this Motion and incorporated by reference as if fully set forth herein.

[16] A true and correct copy of the Declaration of Jenny Haim in Support of Motion to Dismiss Chapter 11 Case ("Jenny Haim Declaration") is attached as **Exhibit E** to this Motion and incorporated by reference as if fully set forth herein.

[17] A true and correct copy of the Declaration of Joyce Reiss in Support of Motion to Dismiss Chapter 11 Case ("Joyce Reiss Declaration") is attached as **Exhibit F** to this Motion and incorporated by reference as if fully set forth herein.

40.     Western LA's operating agreement ("Western LA OA"), which incorporates a separate memorandum of understanding ("Western LA MOU"),[18] requires the Jangana Members' consent to take "Major Acts," "which consent shall not be unreasonably withheld, unconditioned, or delayed." (Western LA OA § 6.2(a)).

41.     "Major Acts" include "causing [Debtor] to initiate any Bankruptcy proceedings." (*id.* § 6.2(a)(xi)).

42.     Further, Debtor's operating agreement ("Debtor OA")[19] *additionally* requires the prior unanimous written consent of all of Debtor's independent managers, of which there must be at least two (2) serving in such capacity, for Debtor to be permitted to take any "Material Action" so long as any "Obligation"[20] (i.e., the Debt) remains outstanding.  (Debtor OA § 9(c)(iii)).

43.     A "Material Action" includes any action to "file a voluntary bankruptcy petition with respect to [Debtor]." (*id.* Sched. A).

44.     The Debtor OA identifies Debtor's independent managers as C. Anthony Shippam and Gregory S. Harrison.  (*id.* at 1).

45.     The undisputed facts recited in the Schreiber Resolution are that i) on August 8, 2022, Schreiber held a special meeting ("Special Meeting") to solicit the consent of all of Debtor's members and managers to a bankruptcy filing on Debtor's behalf; ii) none of Debtor's independent managers attended this Special Meeting; and iii) the Jangana Members, each of whom did attend

---

[18] A true and correct copy of each of the Western LA OA and the Western LA MOU is attached to the Jack Jangana Declaration as Exhibit 1 and Exhibit 2, respectively.

[19] A true and correct copy of the Debtor OA is attached to the Jack Jangana Declaration as Exhibit 3.

[20] Obligations are defined in the Debtor OA as "the indebtedness, liabilities and obligations of the Company under or in connection with the Basic Documents or any related document in effect as of any date of determination." (*See* Debtor OA, Sched. A). The Loan Documents are included in the definition of "Basic Documents." (*Id.*).

the Special Meeting, "remained opposed to the filing of a Chapter 11 petition." (Schreiber Resolution at 1-2).

46.     Debtor has submitted no evidence (because it cannot) that it otherwise obtained the consent of its independent managers.

47.     Despite failing to obtain the required consent of all of Debtor's independent managers and all of the Jangana Members to the filing of this instant bankruptcy case, Schreiber nevertheless unilaterally directed the bankruptcy filing without this consent because it "*appear[ed] that the Jangana Members ha[d] acted unreasonably* in withholding consent to facilitate their personal interest as opposed to the Company's overriding interests." (*id.* at 2 (emphasis added)).

### Relief Requested

48.     By this Motion, Secured Creditor respectfully asks this Court to dismiss this Chapter 11 Case for cause pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code and prohibit the Debtor from filing any further voluntary petition for relief under any chapter of the Bankruptcy Code for 180 days pursuant to sections 105(a) and 349(a) of the Bankruptcy Code.

### Bases for Relief Requested

49.     Under section 1112(b)(1) of the Bankruptcy Code, a bankruptcy court "shall" convert a chapter 11 case to a case under chapter 7 or dismiss the case, "whichever is in the best interests of creditors and the estate, *for cause*, unless the court determines that the appointment . . . of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b) (emphasis added).

50.     Section 1112(b) is generally subject to a two-step analysis in which the court determines first whether "cause" exists, and second, if so, whether conversion or dismissal would be in the best interests of the creditors and the estate. *See, e.g.*, *In re MF Glob. Hldgs. Ltd.*, 465 B.R. 736, 742 (Bankr. S.D.N.Y. 2012) ("Once the movant has established cause, the burden shifts

to the respondent to demonstrate by evidence the unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors and the estate." (internal citation omitted)).

51.     Here, there are multiple separate and distinct grounds to dismiss this case for cause.

52.     First, this case was filed in bad faith.

53.     Second, Debtor did not have the corporate authority to file this case.

54.     Dismissal is therefore appropriate because Debtor improperly invoked the jurisdiction of this Court. *See In re SGL Carbon Corp.*, 200 F.3d 154, 159 n.8 (3d Cir. 1999) ("In bad faith cases … . . . [section] 1112(b)'s conversion/dismissal choice is inappropriate. The proponent of an abusive petition does not belong in bankruptcy so it is unnecessary to ask whether dismissal or conversion is in the interest of the creditors."); *In re Adamo*, No. 14-73640-LAS, 2016 WL 859349, at *18 n. 23 (Bankr. E.D.N.Y. Mar. 4, 2016) ("Dismissal is generally the remedy sought for a bad faith filing as the allegation centers on the very filing itself, i.e., that the chapter 11 petition was improper in the first instance."); *Clear Blue Water, LLC v. Oyster Bay Mgmt. Co., LLC*, 476 B.R. 60, 68 (E.D.N.Y. 2012) ("This standard of good faith protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with 'clean hands.'" (internal quotation marks and citation omitted)); *Price v. Gurney*, 324 U.S. 100, 106 (1945) (holding that when a court "finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition").

55.     Dismissal is also in the best interests of other possible creditors. Indeed, Debtor has little or no cash or other revenue source to pay the ongoing expenses necessary to preserve and maintain the Property, much less to fund this SARE case or a feasible plan.

**A.     The Court Should Dismiss This Case for Cause Because Debtor's Petition Was Filed in Bad Faith.**

56.     Section 1112(b)(4) contains sixteen examples of what may constitute "cause," but this list is non-exhaustive, and bankruptcy courts have "discretion to determine what additional circumstances, not enumerated in the statute, may constitute cause." *Clear Blue Water*, 476 B.R. at 67; *see also MF Glob.*, 465 B.R. at 742 ("The bankruptcy judge has wide discretion to determine whether cause exists to dismiss or convert a case under section 1112(b)."); *In re BH S & B Hldgs., LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010); *In re TCR of Denver, LLC*, 338 B.R. 494, 500–01 (Bankr. D. Colo. 2006) ("[T]he Court may dismiss a Chapter 11 case for reasons other than those specified in section 1112(b) as long as those reasons satisfy 'cause.'").

57.     It is well-established that "bad faith may serve as a ground for dismissal of a bankruptcy petition." *In re Island Helicopters, Inc.*, 211 B.R. 453, 461 (Bankr. E.D.N.Y. 1997); *see also C-TC*, 113 F.3d at 1310 (discussing the importance and purpose of the "good faith standard applied to bankruptcy petitions").

58.     In deciding whether a debtor filed its case in bad faith, courts within the Second Circuit consider whether:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses

16

including the payment of personal property and real estate taxes; and
(8) the debtor has no employees.

*C-TC*, 113 F.3d at 1311 (citation omitted).

59.  *In re Gel, LLC*, another SARE case, is instructive as to the consideration of various of these factors in determining whether a bankruptcy case was filed in bad faith. Specifically, the *Gel* court found it to be "obvious that . . . each of the Debtors filed its petition in bad faith" where (1) the "initial petitions were filed on the very day the foreclosure sales were scheduled to take place, effective preventing these sales," and, after dismissal of the initial petitions, the debtors "re-filed within one month in another district to prevent [mortgagee] from scheduling a new foreclosure sale;" (2) "neither of the Debtors have any employees or cash flow;" and (3) the bankruptcy cases were "essentially two-party disputes between the Debtors, on the one hand, and [mortgagee], on the other."  495 B.R. 240, 246 (Bankr. E.D.N.Y. 2012). Thus, dismissal was deemed appropriate based on less than all of the eight *C-TC* factors.

60.  In the present case, however, Debtor meets *each and every one* of the *C-TC* factors thereby providing an overwhelming basis for dismissal.

61.  <u>First</u>, the Property is Debtor's only asset. Indeed, Debtor self-designated as a SARE business.  (*See* Pet. § 7).  Schreiber confirmed the same by averring that the Property is Debtor's "sole asset." (Schreiber Decl. ¶ 8).

62.  <u>Second</u>, aside from Secured Creditor, Debtor's schedules list only seven creditors, two of which are listed solely for notice purposes. (Sched. E/F at 1-2). The largest by far of these listed creditors is Schreiber himself. Schreiber is purportedly owed more than $15.6 million, despite Schreiber not being listed on Debtor's creditor matrix list and Schreiber's own sworn

declaration referencing no debt other than Debtor's loan obligations to Secured Creditor.[21] (*See* Schreiber Decl. ¶ 2). Even if Schreiber and the other unsecured creditors in the schedules do hold valid, enforceable claims against Debtor, Secured Creditor's more than $270 million claim far exceeds that of any other actual or possible creditors in this case.

63.    <u>Third</u>, it is undisputed that the Property is the subject of a foreclosure action which resulted from Debtor's multiple loan defaults. It is similarly undisputed that Debtor filed this case to avoid foreclosure. *See* Schreiber Decl. ¶¶ 2, 4 ("the Debtor . . . has elected to commence this Chapter 11 case to prevent an immediate foreclosure . . ."). Indeed, Debtor filed its bankruptcy case a mere forty-nine minutes before the scheduled foreclosure sale.

64.    <u>Fourth</u>, like *In re Gel, LLC*, this Chapter 11 Case is essentially a two-party dispute between Debtor and Secured Creditor. On the one hand, there is Debtor who has failed to maintain the Property, service its Debt, or take any affirmative steps to monetize the Property. On the other hand, there is Secured Creditor, which has been substantially delayed in exercising its rights and remedies and has had to spend at least $1,861,141.75 to pay real estate taxes and $838,706 in forced-place insurance premiums to preserve the Property while receiving virtually no payments from Debtor. (Cowart Decl., ¶¶ 27, 29).

65.    <u>Fifth</u>, Debtor's decision to file its Petition immediately before the long-pending foreclosure sale evidences Debtor's clear intent to delay and frustrate Secured Creditor's legitimate and lawful efforts to enforce its rights. But Secured Creditor does not need to solely rely on an analysis of Debtor's intent because Debtor *admitted* that the purpose of the filing was to avoid immediate foreclosure, and that doing so was in bad faith. To be sure, Schreiber caused

---

[21] With the sole exception of Schreiber, all of the creditors identified in Debtor's schedules are also identified on Debtor's creditor matrix. The only party listed on the matrix list but not in the schedules is Secured Creditor's counsel. This is rightly so because Secured Creditor's counsel is obviously <u>not</u> a creditor.

Debtor to file its Petition even though Debtor and Schreiber expressly agreed in writing that doing so "would be in bad faith and solely for purposes of delaying, inhibiting or otherwise impeding the exercise by [Secured Creditor] of [Secured Creditor's] rights and remedies against Borrower and the Property pursuant to the Loan Documents, at law or in equity." (Original Standstill Agreement § 8). In other words, it was a knowingly bad faith filing.

66.     <u>Sixth</u>, Debtor is a non-operating, partially-developed SARE business that never made the transition from concept to reality. Further, Debtor's SOFA and schedules, as well as the Receiver's Budget, confirm that Debtor has little or no cash and that the Property generates no revenue. (*See* SOFA at 1; Sched. A/B at 1; Receiver's Budget).

67.     <u>Seventh</u>, Debtor has little to no cash and is unable to pay even the smallest obligations, let alone the nearly $405,000 that the Receiver budgeted for administering and maintaining the Property through October 2022. (Schreiber Decl., ¶ 10; Singer Decl., ¶ 9). Indeed, Debtor's lack of funds has forced Secured Creditor to make increasingly higher protective advances including paying Debtor's delinquent Los Angeles County Property taxes, and the insurance premiums for the Property since Debtor's policies lapsed in April 2022. (Cowart Decl., ¶¶ 27-29).

68.     <u>Eighth</u>, Debtor has no employees. (Schreiber Decl. ¶ 10).

69.     Not only does this case have <u>all</u> of the *C-TC* factors, but Schreiber also freely admits that the purposes of this bankruptcy filing were to prevent the "forfeiture of a sizeable investment" and to "gain one last opportunity to salvage the project." (Schreiber Decl. ¶¶ 2, 4).

70.     However, Debtor has unsuccessfully tried to market and realize value from the Property for two years. Accordingly, Debtor is simply gambling with Secured Creditor's money, and preventing Secured Creditor from exercising its lawful rights and remedies. To be sure,

DM3\8962557.1

Debtor is doing both without having demonstrated in any way that can actually find that forever elusive "one last opportunity" to salvage the Property. The law does not support this type of costly frolic. *See In re 652 W. 160th LLC.*, 330 B.R. 455, 467 (Bankr. S.D.N.Y. 2005) ("[A] bankruptcy filing is not in good faith if the debtor seeks in effect to obtain time during which to speculate that the market value will increase and make its investment worthwhile."); *234-6 W. 22nd St*, 214 B.R. at 759–60 (Bankr. S.D.N.Y. 1997) ("[A] debtor shows bad faith when it uses bankruptcy protection for risk-free speculation in the single asset. A court must vigilantly protect the integrity of the judicial process and the interests of secured creditors to ensure that reorganization is being sought and that the debtor is not simply gambling with the creditor's money.").

71.     The Court should therefore dismiss this case for cause because it was filed in bad faith.

**B.    The Court Should Dismiss This Case for Cause Because Schreiber Lacked Authority to Cause the Bankruptcy Filing.**

72.     It is well-established in this District that a lack of authority to file a voluntary chapter 11 petition creates an independent cause for dismissal under § 1112(b). *See, e.g., In re E. End Dev., LLC*, 491 B.R. 633, 638 (Bankr. E.D.N.Y. 2013) ("As a threshold issue, the Court must determine whether the Managing Member possessed the requisite authority to file the petition in bankruptcy on behalf of the Debtor.") (citing *Price*, 324 U.S. at 104); *see also In re 167 W. 133rd St. Hous. Dev. Fund Corp.*, No. 18-12043, 2018 WL 4637460, at *6 (Bankr. S.D.N.Y. Sept. 25, 2018); *In re Pasta Barby Scotto II, LLC*, No. 15-12766, 2015 WL 7307246, at *3 (Bankr. S.D.N.Y. Nov. 19, 2015); *In re ComScape Telecommunications, Inc.*, 423 B.R. 816, 829 (Bankr. S.D. Ohio 2010).

73.     Further, "[s]tate law governs whether a business entity is authorized to file a petition in bankruptcy." *E. End. Dev.*, 491 B.R. at 638; *see also In re Quad-C Funding LLC*, 496

B.R. 135, 141 (Bankr. S.D.N.Y. 2013) ("In order to determine authority to file, bankruptcy courts initially look to the state law governing the entity."); *In re NNN 123 N. Wacker, LLC*, 510 B.R. 854, 858 (Bankr. N.D. Ill. 2014) ("The authority to file a bankruptcy petition on behalf of a corporation must derive from state corporate governance law." (internal citations and quotations omitted)).

74.    In this case, Debtor and Western LA are Delaware limited liability companies whose operating agreements are governed by Delaware law. (*See* Debtor OA § 30; Western LA OA § 11.5; Western LA MOU § 10).

75.    The Delaware Limited Liability Company Act generally provides that a limited liability company's operating agreement identifies the rights and duties of its members and managers. *See, e.g.*, DEL. CODE. ANN. §§ 18–215, 18–302; *see also In re Quad-C Funding, LLC*, 496 B.R. at 141 n. 6 (discussing Delaware Limited Liability Company Act); *In re 3P Hightstown, LLC*, 631 B.R. 205, 211 (Bankr. D.N.J. 2021) (dismissing Delaware limited liability company's bankruptcy case where, under the terms of debtor's limited liability company agreement, debtor had no authority to commence bankruptcy proceedings).

76.    Thus, the clear and unambiguous terms of the operating agreements governing Debtor and its members and managers determine whether the requisite corporate authority for the filing of this Chapter 11 Case existed at the time of the filing. *See Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (stating that "the "words and phrases" in a contract "should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."); *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) ("The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed

by the language of their agreement."); *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) ("A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties.").

77.    Here, and as set forth below, there are two separate and independent reasons why this case was filed without corporate authority.  First, Debtor failed to obtain the consent of Debtor's independent managers as required by the Debtor OA.  Second, Debtor failed to obtain the consent of the Jangana Members as required by the Western LA OA.

> 1.    *Schreiber Failed To Obtain the Requisite Consent of the Independent Managers*

78.    As discussed above, the Debtor OA provides that, so long as the Debt is outstanding, Debtor shall not be permitted to take any "Material Action," including commencing any bankruptcy case, unless (i) Debtor has at least two (2) independent managers serving in such capacity and (ii) all of such independent managers have provided their prior unanimous written consent to such Material Action.  (*See* Debtor OA § 9(c)(iii)).

79.    Notwithstanding the clear requirements in the Debtor OA, Schreiber acknowledges that he did not obtain the consent of any independent managers.  (Schreiber Resolution at 1).

80.    Schreiber attempts to justify this failure by asserting that: i) "Independent Director John Morrissey left … sometime in 2021 and has not been replaced;" and ii) "Independent Director Colleen DeVries" did not attend the Special Meeting despite Schreiber's email and voicemail message to her asking her to attend.  (Schreiber Resolution at 1).

81.     However, the Debtor OA clearly identifies C. Anthony Shippam and Gregory S. Harrison as Debtor's independent managers—*not* John Morrissey or Colleen DeVries. (*See* Debtor OA at 1).

82.     Regardless, Schreiber failed to obtain the consent of the *actual* independent managers whose consent was required *in writing* prior to the filing of this bankruptcy case.

83.     Accordingly, this bankruptcy case was not authorized for this separate and independent reason alone.

> 2.      *Schreiber Failed To Obtain The Requisite Consent of the Jangana Members.*

84.     Debtor does not dispute that the consent of all of the Jangana Members was required for Debtor to have authority to file this Chapter 11 Case. (Schreiber Resolution at 2).

85.     It is similarly undisputed that the Jangana Members withheld their consent to the filing. (Schreiber Resolution at 2).

86.     Debtor therefore attempts to vitiate the dispositive effect of the Jangana Members' lack of consent by arguing that: i) the Western LA Operating Agreement precludes the Jangana Members from unreasonably withholding consent; and ii) it "*appear[ed] that the Jangana Members ha[d] acted unreasonably*" in withholding their consent. (Schreiber Resolution 2 (emphasis added)).

87.     Schreiber's self-serving and factually unsupported conclusion (actually abject speculation) that the Jangana Members unreasonably withheld consent is insufficient to demonstrate that the filing of this case was somehow authorized. That is because Debtor cannot meet *its burden* of proving unreasonableness when the most it can do is surmise and speculate, on no facts, that "it appears" that the Jangana Members acted unreasonably. *Cypress Assocs., LLC v. Sunnyside Cogeneration Assocs. Project*, No. 1607-N, 2007 WL 148754, at *18 (Del. Ch.

Jan. 17, 2007) ("The burden of proving unreasonableness in failing to give consent on a matter rests on the party who challenges the reasonableness of the other's actions."); *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 101 (2d Cir. 2002) (finding that "conclusory, unsupported statement falls far short of meeting the burden of proof…"); *Brown v. State Univ. of New York*, No. 3:12-CV-411 GLS/DEP, 2015 WL 729737, at *4 (N.D.N.Y. Feb. 19, 2015) ("[S]elf-serving and conclusory statements . . . are insufficient . . . on an issue as to which the nonmovant bears the ultimate burden of proof."); *see also AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, 268 A.3d 198, 216 (Del. 2021) ("The Seller . . . was simply required to seek consent before making the changes, and if consent was 'unreasonably' denied, the Seller could have challenged the Buyer's unreasonable denial of consent."). Accordingly, the Court need not further consider Debtor's unfounded unreasonableness argument.

88.     But solely to underscore the completely baseless nature of the Debtor's filing, Secured Creditor can confirm that the Jangana Members did not unreasonably withhold consent.

89.     Under Delaware law, courts look to the totality of the facts and circumstances known to the non-consenting party when it withheld its consent in determining unreasonableness. *See, e.g.*, *Hilco Cap., LP v. Fed. Ins. Co.*, 978 A.2d 174, 180–81 (Del. 2009); *Cirba Inc. v. Turbonomic, Inc.*, No. CV 2021-0454-SG, 2022 WL 985417, at *4–5 (Del. Ch. Apr. 1, 2022) ([T]he reasonableness of … refusal to consent must be assessed as of the time [the party] withheld consent, not at some later point in time under unanticipated facts.").

90.     Further, Delaware courts have held that a party may properly and reasonably "withhold consent to a transaction when the decision is made for a legitimate business purpose." *Union Oil Co. of California v. Mobil Pipeline Co.*, No. CIV.A. 19395-N, 2006 WL 3770834, at *11 (Del. Ch. Dec. 15, 2006).

91.     Here, the facts establishing that the Jangana Members' withholding of consent was reasonable are undisputed. For example, *prior to the Special Meeting*, the Jangana Members sent a letter to Schreiber dated August 1, 2022 (the "August 1 Letter")[22] confirming that they did not consent to his taking any action to initiate Debtor bankruptcy proceedings.

92.     The Jangana Members then sent another letter to Schreiber on August 8, 2022 (the "August 8 Letter"),[23] identifying various grounds for withholding their consent. Specifically, they believed that a bankruptcy filing could possibly cost millions of dollars in administrative expenses, United States Trustee fees, and legal fees arising from possible litigation with the Secured Creditor. The Jangana Members were also concerned that, even with the expenditure of exorbitant fees and costs, the benefits of a bankruptcy filing were speculative at best.

93.     At that time, the Jangana Members also knew that: i) Debtor already had at least two years, if not more, to market the Property, with no success; and ii) the Secured Creditor advanced one hundred percent (100%) of all of the requisite operating costs associated with the preservation and maintenance of the Property given that the Property had no cash flow.

94.     The Jangana Members' knowledge of these facts and circumstances at the time they withheld their consent demonstrates that they had many reasonable bases to do so.[24] *See In re Carolina Park Assocs., LLC*, 430 B.R. 744, 747-50 (Bankr. D.S.C. 2010) (dismissing Delaware company's bankruptcy case where a member whose consent was required withheld such consent

---

[22] A true and correct copy of the August 1 Letter is attached to the Jack Jangana Declaration as Exhibit 4. Jenny Haim sent the August 1 Letter to Schreiber by e-mail on August 4, 2022. (Jenny Haim Decl. ¶ 8).

[23] A true and correct copy of the August 8 Letter is attached to the Jack Jangana Declaration as Exhibit 5. Jenny Haim sent the August 8 Letter to Schreiber by e-mail on August 8, 2022. (Jenny Haim Decl. ¶ 16).

[24] Importantly, even if there were reasonable grounds on which the Jangana Members could have *given* their consent (there were not) that would not make their decision to withhold consent *unreasonable. See In re Malese 18 Corp.*, 426 B.R. 44, 52 (E.D.N.Y. 2010) (explaining that rejecting a settlement may be reasonable even where the settlement itself may have been objectively reasonable because "reasonable minds may differ").

based on, *inter alia*, a "concern over possible litigation," which concern the court "[could not] say . . . [was] not reasonable").

95.    Accordingly, Schreiber acted without the required authority in filing this case because he failed to obtain the independent managers' and Jangana Members' consent.

### C.    The Court Should Dismiss This Case for Cause with Prejudice.

96.    For all of the foregoing reasons, cause exists to dismiss this Chapter 11 Case. To prevent Debtor and Schreiber from engaging in this conduct a second time before the foreclosure sale is completed, the Court should enter a 180-day bar to Debtor filing another bankruptcy petition.    *See Casee v. Key Bank Nat'l Assoc. (In re Casse)*, 198 F.3d 327, 339 (2d Cir. 1999) (joining the majority of courts in "deriv[ing] from §§ 105(a) and 349(a) of the Code a bankruptcy court's power, in an appropriate case, to prohibit a serial filer from filing petitions for periods of time exceeding 180 days"); *Wenegieme v. Macco*, 580 B.R. 17, 24 (E.D.N.Y. 2018) ("It is well-established that courts have discretion to bar re-filing of a bankruptcy action for periods of a year or longer."); *In re D&G Constr. Dean Gonzalez, LLC*, 635 B.R. 232, 240 (Bankr. E.D.N.Y. 2021) (finding dismissal with prejudice to debtor's ability to refile under any chapter of the Bankruptcy Code warranted due to debtor's "use of the bankruptcy process merely as a platform to delay the lawful exercise of state law rights . . ."); *In re Van Eck*, 425 B.R. 54, 69 (Bankr. D. Conn. 2010) (finding "a sufficient pattern of abuse" to warrant dismissal with prejudice against the debtor's refiling for two years where, if case was "dismissed without such prejudice, the Debtor more likely than not will refile in bankruptcy shortly thereafter").

### Notice

97.    Notice of this Motion has been provided to (a) Debtor; (b) the Office of the United States Trustee for the Eastern District of New York; (c) all creditors of Debtor; and (d) all parties

requesting notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002. Secured Creditors respectfully submits that no further notice of this Motion is required or necessary.

<u>**No Prior Request**</u>

98.    No prior motion for the relief requested herein has been made to this or any other Court.

*[Remainder of page intentionally left blank]*

WHEREFORE, Secured Creditor respectfully asks the Court to enter an order substantially in the form of the Proposed Order i) dismissing the Chapter 11 Case, ii) barring Debtor against the filing of any further voluntary petition for relief under any chapter of the Bankruptcy Code for 180 days and iii) granting such other and further relief as this Court may deem appropriate and/or necessary.

Dated: August 24, 2022              DUANE MORRIS LLP

/s/ Lawrence J. Kotler
Lawrence J. Kotler, Esq. (LK-8177)
1540 Broadway, 14th Floor
New York, NY 10036
Telephone: (212) 692-1000
Facsimile: (215) 692-1020
Email: ljkotler@duanemorris.com

Meagen E. Leary, Esq. (admitted *pro hac vice*)
One Market Plaza
Spear Street Tower, Suite 200
San Francisco, CA 94105
Telephone: (415) 957-3000
Facsimile: (415) 957-3001
Email: meleary@duanemorris.com

Paul E. Chronis, Esq. (admitted *pro hac vice*)
190 South LaSalle Street, Suite 3700
Chicago, IL 60603
Telephone: (312) 499-6700
Facsimile: (312) 499-6701
Email: pechronis@duanemorris.com

*Counsel for Museum Building Holdings, LLC*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT NEW YORK**

In re:

    BROADBRIDGE LA LLC,

             Debtor.

Chapter 11

Case No. 8-22-72048-las

## ORDER GRANTING MOTION TO DISMISS CHAPTER 11 CASE

Upon the *Motion to Dismiss Chapter 11 Case* (the "Motion")[1] and this Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, the Administrative Order #264 entered by the U.S. District Court for the Eastern District of New York ("District Court") on August 28, 1986, *In re The Referral of Matters to the Bankruptcy Judges* (E.D.N.Y. Aug. 28, 1986), and the Order entered by the District Court on Dec. 5, 2012, *nunc pro tunc* to June 23, 2011, *In re The Referral of Matters to the Bankruptcy Judges* (E.D.N.Y. Dec. 5, 2012); and venue of this Chapter 11 Case and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided; and all objections (if any) to the Motion having been withdrawn or overruled on the merits; and this Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that the relief; and after due deliberation and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED.

---

[1] Capitalized terms used not but defined herein are to be given the same meanings ascribed to them in the Motion.

2.      Pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code, Debtor's Chapter 11 Case is hereby dismissed.

3.      Due to the bad faith filing, Debtor is barred pursuant to sections 105(a) and 349(a) of the Bankruptcy Code from filing any further bankruptcy case under any chapter of the Bankruptcy Code for a period of 180 days from the entry of this Order.

4.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation and/or enforcement of this Order.

Dated: _____

_____
The Honorable Louis A. Scarcella
United States Bankruptcy Judge