# EXHIBIT A

## LEGAL DESCRIPTION

REAL PROPERTY IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

PARCEL 1:

LOT "C" AS SHOWN ON MAP OF A RE-SUBDIVISION OF A PORTION OF BLOCK 52, OF HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 12 PAGE 1 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LOT "C" INCLUDED WITHIN THE BOUNDARIES DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 52, OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF HILL STREET, 92 FEET WIDE, DISTANT THEREON SOUTH 37° 42' WEST 177.25 FEET FROM THE SOUTHWESTERLY LINE OF EIGHTH STREET, 70 FEET WIDE, AS LOCATED BY THE CITY ENGINEER OF SAID CITY; THENCE ALONG HILL STREET SOUTH 37° 42' WEST 59.33 FEET TO THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO KATE VAN NUYS PAGE, RECORDED ON SEPTEMBER 17, 1923 AS INSTRUMENT NO. 943 IN, IN BOOK 2396 PAGE 242 OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG SAID NORTHEASTERLY LINE SOUTH 52° 11' 20' EAST 160.70 FEET; THENCE NORTH 37° 56' EAST 59.38 FEET TO A LINE HAVING A BEARING OF NORTH 52° 12' 30" WEST WHICH PASSES THROUGH THE POINT OF BEGINNING; THENCE ALONG SAID LINE NORTH 52° 12' 30' WEST 160.94 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LOT "C" INCLUDED WITHIN THE PORTION OF THE SOUTHEASTERLY 6.00 FEET OF HILL STREET 92.00 FEET WIDE WHICH LIES NORTHWESTERLY OF AND ADJOINING THE LAND ABOVE EXCEPTED.

PARCEL 1A:

LOT 20 IN BLOCK 52, OF HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:

LOT "B" OF TRACT 2698, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 29 PAGE 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2A:

THAT PORTION OF LOUISA KALISHER'S HILL STREET LOT, AS PER MAP RECORDED IN BOOK 8 PAGE 34, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

A STRIP OF LAND LYING ADJACENT TO THE NORTHERLY LINE OF LOT "B" OF TRACT 2698 ABOVE DESCRIBED, AND HAVING A FRONTAGE OF 15 9/16 INCHES ALONG THE EASTERLY LINE OF HILL STREET AND A WIDTH OF 24 5/16 INCHES ON THE EASTERLY LINE OF SAID LOUISA KALISHER'S HILL STREET LOT AS SHOWN ON THE AFORESAID MAP.

PARCEL 3:

LOT "F" OF TRACT 2022, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 21 PAGE 92 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 4:

THE NORTH 1/2 OF LOT "E" OF TRACT 655, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 98 AND 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WHICH SAME LOT IS ALSO KNOWN AS THE NORTH 1/2 OF LOT "E" OF TRACT 419, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 14 PAGE 136 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 5:

THE SOUTH 1/2 OF LOT "E" OF TRACT 655, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 98 AND 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WHICH SAME LOT IS ALSO KNOWN AS THE SOUTH 1/2 OF LOT "E" OF TRACT 419, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 14 PAGE 136 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Exhibit A

PARCEL 6:

PARCEL A:

THAT PORTION OF BLOCK 52, OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF HILL STREET, 92 FEET WIDE, DISTANT THEREON SOUTH 37° 42' WEST 177.25 FEET FROM THE SOUTHWESTERLY LINE OF EIGHTH STREET, 70 FEET WIDE, AS LOCATED BY THE CITY ENGINEER OF SAID CITY; THENCE ALONG HILL STREET SOUTH 37° 42' WEST 59.33 FEET TO THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO KATE VAN NUYS PAGE, RECORDED IN BOOK 2396 PAGE 242 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG SAID NORTHEASTERLY LINE SOUTH 52° 11' 20" EAST 160.70 FEET; THENCE NORTH 37° 56' EAST 59.38 FEET TO A LINE HAVING A BEARING OF NORTH 52° 12' 30" WEST WHICH PASSES THROUGH THE POINT OF BEGINNING; THENCE ALONG SAID LINE NORTH 52° 12' 30" WEST 160.94 FEET TO THE POINT OF BEGINNING.

PARCEL B:

LOUISA KALISHER'S HILL STREET LOT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 8 PAGE 34 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LOT PARTICULARLY DESCRIBED AS FOLLOWS:

A STRIP OF LAND LYING ADJACENT TO THE NORTHERLY LINE OF LOT "B" OF TRACT 2698, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 29 PAGE 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF COUNTY, AND HAVING A FRONTAGE OF 15 9/16THS INCHES ALONG THE EASTERLY LINE OF HILL STREET AND A WIDTH OF 24 5/16THS INCHES ON THE EASTERLY LINE OF SAID LOUISA KALISHER'S HILL STREET LOT.

APN:
5144-017-028 (affects Parcels 3, 4 and 5)
5144-017-029 (affects Parcels 2, 2A and 6A and 6B)
5144-017-030 (affects Parcels 1 and 1A)

Exhibit A

## EXHIBIT B

## FORM OF ASSIGNMENT AND ACCEPTANCE

Reference is made to that certain Mortgage Loan and Security Agreement (as the same may be amended, restated, extended, renewed, supplemented or otherwise modified from time to time, the "**Loan Agreement**;" the terms defined therein, unless otherwise defined herein, being used herein as therein defined), by and among Broadbridge LA LLC, a Delaware limited liability company ("**Borrower**"), the Lenders party thereto, and SPT CA Fundings 2, LLC, a Delaware limited liability company, as Administrative Agent for the benefit of the Lenders (in such capacity, and together with its successors and/or assigns, "**Administrative Agent**"). Capitalized terms used herein that are not specifically defined herein shall have the meanings ascribed thereto in the Loan Agreement.

Each "Assignor" referred to on Schedule 1 hereto (each, an "**Assignor**") and each "Assignee" referred to on Schedule 1 hereto (each, an "**Assignee**") agrees severally with respect to all information relating to it and its assignment hereunder and on Schedule 1 hereto as follows:

1.    Such Assignor hereby sells and assigns, without recourse except as to the representations and warranties made by it herein, to such Assignee, and such Assignee hereby purchases and assumes from such Assignor, an interest in and to such Assignor's rights and obligations under the Loan Agreement as of the date hereof equal to the percentage interest specified on Schedule 1 hereto of all outstanding rights and obligations under the Loan. After giving effect to such sale and assignment, such Assignee's Commitments and the amount of the Advances owing to such Assignee will be as set forth on Schedule 1 hereto.

2.    Such Assignor: (A) represents and warrants that its name set forth on Schedule 1 hereto is its legal name, that it is the legal and beneficial owner of the interest or interests being assigned by it hereunder and that such interest or interests are free and clear of any adverse claim; (B) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any of the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any of the Loan Documents or any other instrument or document furnished pursuant thereto; (C) makes no representation or warranty and assumes no responsibility with respect to the financial condition of either Borrower or Guarantor or the performance or observance by either Borrower or Guarantor of any of their respective obligations under the Loan Documents or any other instrument or document furnished pursuant thereto; and (D) attaches the Note or Notes held by such Assignor and requests that Administrative Agent exchange such Note or Notes for a new Note or Notes payable to such Assignee in an amount equal to the Commitments assumed by such Assignee pursuant hereto or new Notes payable to such Assignee in an amount equal to the Commitments assumed by such Assignee pursuant hereto and such Assignor in an amount equal to the Commitments retained by such Assignor under the Loan Agreement, respectively, as specified on Schedule 1 hereto.

3.    Such Assignee: (A) confirms that it has received a copy of the Loan Documents and such other documents and information as it has deemed appropriate to make its own credit

analysis and decision to enter into this Assignment and Acceptance; (B) agrees that it will, independently and without reliance upon Administrative Agent, any Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (C) represents and warrants that its name set forth on <u>Schedule 1</u> hereto is its legal name; (D) confirms that it is an Eligible Assignee; (E) appoints and authorizes Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to Administrative Agent by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; (F) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Loan Agreement are required to be performed by it as a Lender; and (G) attaches any U.S. Internal Revenue Service forms required under the Loan Agreement.

4.    Following the execution of this Assignment and Acceptance, it will be delivered to Administrative Agent for acceptance and recording by Administrative Agent. The effective date for this Assignment and Acceptance (the "**Effective Date**") shall be the date of acceptance hereof by Administrative Agent, unless otherwise specified on <u>Schedule 1</u> hereto.

5.    Upon such acceptance and recording by Administrative Agent, as of the Effective Date, (A) such Assignee shall be a party to the Loan Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder first occurring from and after the Effective Date, and (B) such Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Loan Agreement first occurring from and after the Effective Date (other than its rights and obligations under the Loan Documents that are specified under the terms of such Loan Documents to survive the payment in full of the Debt under the Loan Documents to the extent any claim thereunder relates to an event arising prior to the Effective Date of this Assignment and Acceptance), and if this Assignment and Acceptance covers all of the remaining portion of the rights and obligations of such Assignor under the Loan Agreement, such Assignor shall cease to be a party thereto.

6.    Upon such acceptance and recording by Administrative Agent, from and after the Effective Date, Administrative Agent shall make all payments under the Loan Agreement and the Note in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and commitment fees with respect thereto) to such Assignee. Such Assignor and such Assignee shall make all appropriate adjustments in payments under the Loan Agreement and the Note for periods prior to the Effective Date directly between themselves.

7.    This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

8.    This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of <u>Schedule 1</u> to this Assignment and Acceptance by telecopier or by e-mail in "pdf" format shall be effective as delivery of an original executed counterpart of this Assignment and Acceptance.

Exhibit B

IN WITNESS WHEREOF, each Assignor and each Assignee have caused <u>Schedule 1</u> to this Assignment and Acceptance to be executed by their officers thereunto duly authorized as of the date specified thereon.

[_____],
a [_____], as Assignor


By: _____
       Name:
       Title:


Dated: _____ __, _____


[_____],
a [_____], as Assignee


By: _____
       Name:
       Title:


Dated: _____ __, _____


**SPT CA FUNDINGS 2, LLC**,
a Delaware limited liability company, as Administrative Agent


By: _____
       Name:
       Title:


Dated: _____ __, _____


Exhibit B

## SCHEDULE 1

## TO

## ASSIGNMENT AND ACCEPTANCE

As to the Loan in respect of which an interest is being assigned:

| | |
|---|---|
| Percentage interest assigned: | _____ % |
| Assignee's Commitment | $ _____ |
| Aggregate outstanding principal amount of the Loan assigned: | $ _____ |
| Principal amount of Note payable to Assignee: | $ _____ |
| Principal amount of Note payable to Assignor: | $ _____ |
| Effective Date (if other than date of acceptance by Administrative Agent): *_____ __, 20[__] | |

Effective Date (if other than date of acceptance by Administrative Agent):

_____ __, ____ (*Note: This date should be no earlier than five (5) Business Days after the delivery of this Assignment and Acceptance to Administrative Agent.*)

[_____],
a [_____], as Assignor

By: _____
    Name:
    Title:

Dated: _____ __, ____

[_____],
a [_____], as Assignee

By: _____
    Name:
    Title:

Dated: _____ __, ____

Exhibit B Sch 1

**SPT CA FUNDINGS 2, LLC**,
a Delaware limited liability company, as Administrative
Agent


By: _____
    Name:
    Title:


Dated: _____ __, ____

Exhibit B Sch 1

**EXHIBIT C**
**FORM OF DRAW REQUEST**

BORROWER'S REQUISITION LETTER
Requisition No. ____

ADMINISTRATIVE AGENT:    SPT CA FUNDINGS 2, LLC
BORROWER:    BROADBRIDGE LA LLC
DATE:    _____
PERIOD COVERED:    _____ to _____

    *Pursuant to the Mortgage Loan and Security Agreement (the "Loan Agreement") by and among BROADBRIDGE LA LLC, a Delaware limited liability company ("Borrower"), and SPT CA FUNDINGS 2, LLC, a Delaware limited liability company, as administrative agent for the Lenders as defined therein, dated as of June 8, 2018, Borrower hereby authorizes and requests an advance, which is calculated as follows:*

| | | |
|---|---|---|
| 1. | Amount Requisitioned for the Period Covered: | $_____ |
| 2. | Less interest/fees already funded for the Period Covered: | (_____) |
| 3. | Amount of new loan proceeds (1) - (2): | $_____ |
| 4. | Less holdbacks for Reimbursements not paid by Borrower: | (_____) |
| 5. | Net Amount of Wire (3) - (4): | $_____ |

    *Borrower requests that the funds be wired on [DATE] in accordance with the following wire instructions:*

    *Amount:*

    *Bank:*

    *ABA #:*

    *Account Name:*

    *Account #:*

    *Attention:*

Exhibit C

*In connection with and in order to induce Lenders to advance the amounts requested on the previous page, Borrower hereby represents, warrants and stipulates as follows:*

    a.   The amounts and percentages set forth on Borrower's Requisition Spreadsheet attached hereto are true and correct to Borrower's knowledge.

    b.   All sums previously requisitioned have been applied to the payment of the Pre-Development Costs heretofore incurred.

    c.   Names, addresses, contract dates and amounts for the contractors party to contracts responsible for performing each item of Pre-Development Work on the Borrower's Requisition Spreadsheet have been heretofore or are herewith submitted to Administrative Agent and Construction Consultant and copies of any contracts not previously delivered to Administrative Agent or Construction Consultant are enclosed herewith.

    d.   All payment receipts required by the Loan Agreement as of the end of the Period Covered have been submitted to Agent or Construction Consultant, as applicable.

    e.   The loan proceeds from the requested Pre-Development Advance will be applied in accordance with the terms of the Loan Documents.

*Capitalized terms used but not defined in this Borrower's Requisition Letter shall have the respective meanings given to such terms in the Loan Agreement.*

Subscribed and sworn to
before me on _____, 20___.

_____
Notary Public

[Stamp and Seal]

Very truly yours,

**Broadbridge LA LLC,**
a Delaware limited liability company

By:   _____
Name:
Title:

Exhibit C

## EXHIBIT D

## FORM OF COLLATERAL ASSIGNMENT OF INTEREST RATE CAP AGREEMENT

**COLLATERAL ASSIGNMENT OF INTEREST RATE CAP AGREEMENT**, dated as of [_____, 20___] (this "**Assignment**"), made by **BROADBRIDGE LA LLC**, a Delaware limited liability company, having an address at c/o Continental Equities Group Inc., 45 North Station Plaza, Suite 402, Great Neck, New York 11021 ("**Assignor**") in favor of **SPT CA FUNDINGS 2, LLC**, a Delaware limited liability company, having an address at c/o Starwood Property Trust, Inc., 591 W. Putnam Avenue, Greenwich, Connecticut 06830 ("**Administrative Agent**") for the benefit of the Lenders (as defined below) (in such capacity, together with its successors and assigns, "**Assignee**"), and consented to by [_____], a [_____], as the counterparty under the Interest Rate Cap Agreement (as hereinafter defined) ("**Counterparty**").

## RECITALS:

**WHEREAS**, Assignor has obtained a mortgage loan in the original principal amount of $213,701,154.00 (the "**Loan**"), pursuant to that certain Mortgage Loan and Security Agreement, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), by and among Assignor, as borrower, SPT CA Fundings 2, LLC, a Delaware limited liability company, as a lender (in such capacity, together with its successors and assigns, "**Initial Lender**"), the lenders from time to time a party thereto (together with Initial Lender, collectively, the "**Lenders**") and Administrative Agent. All capitalized terms not defined herein shall have the respective meanings ascribed to such terms in the Loan Agreement; and

**WHEREAS**, pursuant to the terms of the Loan Agreement, Assignor is obligated to enter into this Assignment in favor of Assignee as consideration for Initial Lender making the Loan.

## AGREEMENT

For good and valuable consideration the parties hereto agree as follows:

1. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Assignor, Assignor hereby assigns, grants, delivers and transfers to Assignee, as collateral, all of its interest, whether now owned or hereafter acquired, now existing or hereafter arising, wherever located, in, to and under that certain Confirmation (Reference Number [_____]), dated [_____], between Assignor and Counterparty, attached as <u>Exhibit A</u> hereto (together with that certain ISDA Master Agreement form deemed to have been executed by Assignor and Counterparty concurrently with the Confirmation and Agreement pursuant to the terms of such Confirmation and Agreement, the "**Interest Rate Cap Agreement**"), including, but not limited to, any and all rights that such Assignor may now or hereafter have to any and all payments, disbursements, distributions or proceeds (collectively, "**Payments**") owing, payable or required to be delivered to Assignor on account of the Interest Rate Cap Agreement with respect to the period commencing on the date hereof and ending on

the date on which Assignor shall have repaid the Loan in its entirety, and all proceeds of any or all of the foregoing (collectively, the "**Cap Collateral**"). Assignor hereby grants to Assignee a security interest in and to the Interest Rate Cap Agreement, the Cap Collateral and all Proceeds (as defined in the Uniform Commercial Code adopted in the State of New York (the "**UCC**")) thereof, to have and to hold the same, unto Assignee, its successors and assigns, and Assignor hereby directs Counterparty to make all Payments directly to Assignee. This Assignment constitutes additional security for the obligations of Assignor evidenced by the Loan Agreement and secured or evidenced by the other Loan Documents.

2.    Counterparty hereby consents to the assignment contained in Paragraph 1 hereof and agrees that it will make any Payments that become payable under or pursuant to the Interest Rate Cap Agreement directly into the account described on Schedule 1 attached hereto, or such other account as Assignee may from time to time designate pursuant to written instructions to Counterparty at the address set forth under its signature hereto (or such other address as Counterparty may designate from time to time by written notice to Assignee and Assignor), in each case, until such time as this Assignment is terminated or otherwise canceled, at which time Counterparty will be instructed to make payments to or on behalf of Assignor.

3.    All Payments received by Assignee shall be held and applied in accordance with the terms of the Loan Agreement. During the continuance of an Event of Default, Assignee shall be entitled to exercise all remedies provided in the UCC with respect to the security interest being granted herein, subject to Section 5.1.8 of the Loan Agreement.

4.    Except in connection with permitted transfers or encumbrances that do not require Assignee's written consent or approval pursuant to the Loan Documents, Assignor hereby covenants and agrees that Assignor shall not, without first obtaining Assignee's written consent, convey, assign, sell, mortgage, encumber, pledge, hypothecate, grant a security interest in, grant an option or options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration) the Interest Rate Cap Agreement. Except as permitted under the Loan Agreement, Assignor and Counterparty hereby covenant and agree that neither Assignor nor Counterparty shall, without first obtaining Assignee's written consent, amend, modify, cancel, terminate, or consent to the termination of the Interest Rate Cap Agreement. Assignee agrees to be bound by all of the terms, covenants and conditions of the Interest Rate Cap Agreement to which Assignor is bound.

5.    In the event that for any reason the Interest Rate Cap Agreement ever expires, or is terminated, rescinded or revoked and, as a result thereof, a termination fee or such similar payment is owing to Assignor by Counterparty, such sum is and shall be considered a Payment and a part of the Cap Collateral and shall be held and disbursed by Assignee in accordance with the terms hereof; provided, however, that so long as no Event of Default has occurred and is continuing, Assignee will (a) make such termination fee or similar payment available to Assignor to be applied to the reasonable and customary costs and expenses payable by Assignor in connection with Assignor's replacement of the Interest Rate Cap Agreement and (b) disburse the balance of such termination fee or similar payment to Assignor if Assignor has replaced the Interest Rate Cap Agreement in accordance with the terms and provisions of this Assignment and

the other Loan Documents, and such replacement Interest Rate Cap Agreement is in fact in full force and effect.

6. Assignor represents and warrants that: (a) it has the full power, right and authority to assign its interest in the Cap Collateral, (b) Assignor owns the Cap Collateral free and clear of all liens and claims of others and Assignor has not transferred, assigned, granted a security interest in or otherwise encumbered its interest in and to the Cap Collateral other than in favor of Assignee, (c) no security agreement, financing statement or other document creating any lien or encumbrance on Assignor's interest in the Cap Collateral is on file or of record in any public office with respect to the Cap Collateral, other than in favor of Assignee, (d) the obligation of Counterparty under the Interest Rate Cap Agreement to make Payments is not subject to any defense or counterclaim arising from any act or omission of Assignor or any Affiliate of Assignor, (e) the location of its principal place of business is the address set forth in the caption to this Assignment and (f) to Assignor's knowledge, upon the filing of UCC Financing Statements naming Assignor as debtor and Assignee as secured party in the Office of the Secretary of State of the State of Delaware, Assignee will have a first priority perfected lien on the Cap Collateral, to the extent a lien may be perfected by the filing of a financing statement.

7. Assignor covenants and agrees with Assignee as follows: (a) it will comply with all terms of the Interest Rate Cap Agreement, (b) it will not (i) waive any material provision of the Interest Rate Cap Agreement, (ii) fail to deliver a copy of any notice of default received from Counterparty to Assignee, or (iii) without the prior written consent of Assignee, fail to exercise any material right thereunder and (c) it will not change the location of its state of organization from the location specified in the caption to this Assignment unless, in conjunction therewith, Assignor executes and delivers to Assignee such additional UCC Financing Statements as Assignee shall reasonably request to allow for Assignee's continued prior and perfected lien on the Cap Collateral.

8. Subject to Section 15.2(c) of the Loan Agreement, Assignor further covenants and agrees with Assignee that it will at any time and from time to time, upon the written request of Assignee, and at the sole expense of Assignor, promptly and duly execute and deliver such further instruments and documents and take such further action as Assignee may reasonably request for the purpose of obtaining or preserving the full benefits of this Assignment and of the rights and powers herein granted, including, without limitation, the filing of any financing or continuation statements under the UCC. Assignor also hereby authorizes Assignee to file any such financing or continuation statement without the signature of Assignor to the extent permitted by applicable law. A carbon, photographic or other reproduction of this Assignment shall be sufficient as a financing statement for filing in any jurisdiction.

9. This Assignment does not include the delegation to Assignee of any of Assignor's duties, responsibilities or obligations under the Interest Rate Cap Agreement, Assignor remaining liable to perform all duties, responsibilities and obligations to be performed by Assignor thereunder, and Assignee shall not have any obligation or liability under the Interest Rate Cap Agreement or by reason of or arising out of this Assignment or the receipt by Assignee of any Payment and Assignor specifically agrees to indemnify and forever hold Assignee harmless from any claim or liability on account thereof, including, without limitation, reasonable

attorneys' fees incurred, except to the extent arising from the fraud, gross negligence, illegal acts or willful misconduct of Assignee, its agents, employees or contractors.

10. Assignee shall only be accountable for Payments actually received by it hereunder. Assignee's sole duty with respect to the custody, safekeeping and physical preservation of the Cap Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Assignee deals with similar property for its own account. Neither Assignee nor any of its directors, officers, employees or agents (i) shall be liable for failure to demand, collect or realize upon all or any part of the Cap Collateral, or for any delay in doing so, or (ii) shall be under any obligation to (a) sell or otherwise dispose of any Cap Collateral upon the request of any Assignor or any other person or (b) take any other action whatsoever with regard to the Cap Collateral or any part thereof. The powers conferred on Assignee hereunder are solely to protect Assignee's interests in the Cap Collateral and shall not impose any duty upon Assignee to exercise any such powers. Assignee shall be accountable only for amounts it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Assignor for any act or failure to act hereunder, except for their own fraud, gross negligence, illegal acts or willful misconduct.

11. As between Assignor and Assignee, any notices required to be given under this Assignment shall be given in the manner provided in <u>Section 20.6</u> of the Loan Agreement. Any notices required to be given under this Assignment to Counterparty shall be sent to Counterparty at the address set forth under its signature hereto.

12. This Assignment may not be modified, amended or terminated except by a written agreement executed by all of the parties hereto.

13. Any provision of this Assignment that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

14. Assignee shall not by any act (except by a written instrument), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof. No failure by Assignee to exercise, nor any delay by Assignee in exercising any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Assignee of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Assignee may otherwise have on any future occasion. The rights and remedies of Assignee herein provided are cumulative, may be exercised singularly or concurrently, and are not exclusive of any rights or remedies provided by law.

15. The parties hereto hereby notify Counterparty of this Assignment and the security interests granted to Assignee hereunder and instruct Counterparty to make all payments

to be made under or pursuant to the terms of the Interest Rate Cap Agreement, without set-off, defense or counterclaim, to Assignee in accordance with Paragraph 2 hereof.

16. **THIS ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE.**

17. This Assignment shall terminate upon the earlier to occur of (a) the termination or expiration of the Interest Rate Cap Agreement and (b) the payment in full of the Loan.

18. This Assignment shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and assigns.

19. This Assignment may be executed in any number of counterparts each of which shall be an original, but all of which shall constitute one instrument.

20. Assignee shall have the right, to assign this Assignment and its obligations hereunder in connection with an assignment of the Loan in accordance with the terms of the Loan Agreement. The parties hereto acknowledge that following the execution and delivery of this Assignment, Assignee may sell, transfer and assign this Assignment, the Loan and the other Loan Documents, and the Lenders may assign the Loan, in each case, in accordance with the terms of the Loan Agreement. All references to "**Assignee**" hereunder shall be deemed to include the assigns of Assignee and the parties hereto acknowledge that actions taken by Assignee hereunder may be taken by Assignee's agents and by the agents of the assigns of Assignee.

21. The provisions of <u>Section 19.1</u> of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

22. In consideration of the foregoing agreement by Counterparty, Assignor and Assignee each agree that (a) Counterparty shall be entitled to conclusively rely (without any independent investigation) on any notice or instructions from Assignee in respect of the Interest Rate Cap Agreement and (b) Counterparty shall be held harmless and shall be fully indemnified by Assignor, from and against any and all claims, other than those arising out of the gross negligence or willful misconduct of Counterparty, and from and against any damages, penalties, judgments, liabilities, losses or expenses (including reasonable attorney's fees and disbursements) reasonably incurred by Counterparty as a result of the assertion of any claim, by any person or entity, arising out of, or otherwise related to, any actions taken or omitted to be taken by Counterparty in reliance upon any such instructions or notice provided by Assignee. As between Assignor and Assignee, Assignor agrees to give all written instructions to Counterparty in accordance with the terms of the Loan Agreement, and nothing contained herein shall be deemed to make Assignor responsible for Assignee's fraud, gross negligence, illegal acts or willful misconduct.

**[NO FURTHER TEXT ON THIS PAGE]**

Exhibit D

**IN WITNESS WHEREOF**, Assignor and Assignee have duly executed this Assignment on the day and year first written above.

ASSIGNOR:

**BROADBRIDGE LA LLC,**
a Delaware limited liability company

By: _____
Name:
Title:  Authorized Signatory

[Signatures Continue on Following Page]

Exhibit D

**ASSIGNEE:**

**SPT CA FUNDINGS 2, LLC,**
a Delaware limited liability company


By:_____
Name:
Title:


[Signatures Continue on Following Page]

Exhibit D

THE UNDERSIGNED HEREBY ACKNOWLEDGES RECEIPT OF NOTICE OF THE FOREGOING ASSIGNMENT AND CONSENTS THERETO AND AGREES THAT THE UNDERSIGNED SHALL HEREAFTER CAUSE ALL PAYMENTS REQUIRED TO BE MADE BY THE UNDERSIGNED PURSUANT TO THE TERMS OF THE INTEREST RATE CAP AGREEMENT TO BE MADE DIRECTLY TO ASSIGNEE, IN ACCORDANCE WITH PARAGRAPH 2 OF THE ASSIGNMENT. THE UNDERSIGNED FURTHER AGREES THAT ALL SUCH PAYMENTS SHALL BE MADE TO ASSIGNEE WITHOUT SET-OFF, DEFENSE OR COUNTERCLAIM. THE UNDERSIGNED AGREES THAT IT SHALL NOT AMEND OR MODIFY THE INTEREST RATE CAP AGREEMENT WITHOUT THE PRIOR WRITTEN CONSENT OF ASSIGNEE.

COUNTERPARTY:

[_____],
a [_____]

By:_____
Name:
Title:


By:_____
Name:
Title:

[INSERT NOTICE ADDRESS OF COUNTERPARTY]

Exhibit D

**Schedule 1**

Bank Name: Bank of America
ABA#: 026009593
Account Name: Starwood Property Trust
Account #: 1257365348
Reference/Loan #:   Museum Building/1383

# EXHIBIT A

## CONFIRMATION

(attached hereto)

**EXHIBIT E-1**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Mortgage Loan and Security Agreement dated as of June 8, 2018 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among BROADBRIDGE LA LLC, a Delaware limited liability company, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.16(c) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform Borrower, and (2) the undersigned shall have at all times furnished Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

NAME OF LENDER

By:_____
Name:
Title:
Date: _____ __, 20[ ]

**EXHIBIT E-2**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Mortgage Loan and Security Agreement dated as of June 8, 2018 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among BROADBRIDGE LA LLC, a Delaware limited liability company, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.16(c) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

NAME OF PARTICIPANT

By:_____
Name:
Title:
Date: _____ __, 20[  ]

## EXHIBIT E-3

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Mortgage Loan and Security Agreement dated as of June 8, 2018 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among BROADBRIDGE LA LLC, a Delaware limited liability company, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.16(c) of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

NAME OF PARTICIPANT

By:_____
Name:
Title:
Date: _____, 20[  ]

**EXHIBIT E-4**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Mortgage Loan and Security Agreement dated as of June 8, 2018 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among BROADBRIDGE LA LLC, a Delaware limited liability company, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.16(c) of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform Borrower, and (2) the undersigned shall have at all times furnished Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

NAME OF LENDER

By:_____
Name:
Title:
Date: _____ __, 20[ ]

# SCHEDULE I

## BORROWER ORGANIZATIONAL STRUCTURE

[Attached hereto]



**801 S. BROADWAY ORG CHART**

JACK JANGANA
(Co-Managing Member)

JOYCE REISS

JENNY HAIM

24.333%

24.333%

24.333%

JOEL SCHREIBER

JS WESTERN MEMBER II LLC
(DE)
File No.: 6167828

100%

50%

50%

JOEL SCHREIBER

50%

JS WESTERN HOLDCO MEMBER LLC
(DE)
(Co-Managing Member)
File No. 5585623
EIN: 47-1577973

27%

WESTERN LA HOLDCO LLC
(DE)
File No. 5585442
EIN: 47-1577532

100%

BROADBRIDGE LA MEMBER LLC
(DE)
File No. 5559954
EIN: 47-1219914

100%

Property Owner
BROADBRIDGE LA LLC
(DE)
File No. 5559949
EIN: 36-4788755

801 S. Broadway
(Los Angeles, CA)

Independent Managers
1) Gregory S. Harrison
2) C. Anthony Shippam

## SCHEDULE II

## DEFINITION OF SINGLE PURPOSE ENTITY

"**Single Purpose Entity**" means a Person, other than a natural person, which, since the date of its formation and at all times prior to, on and after the date hereof until such time as the Debt has been indefeasibly paid in full (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive the indefeasible satisfaction of the Note(s) in full), has complied with and shall at all times comply with the following requirements:

a.        was, is and will be formed solely for the purpose of (i) in the case of Borrower, acquiring, developing, constructing, owning, holding, selling, leasing, ground leasing, transferring, exchanging, managing and operating the Property, entering into this Agreement, the other Loan Documents with or for the benefit of Administrative Agent and the Lenders, entering into each Management Agreement and the Project Management Agreement, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary or appropriate to accomplish the foregoing; or (ii) in the case of any applicable SPE Constituent Entity, acting as the managing member of Borrower and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

b.        has not been, is not, and will not be engaged in any business unrelated to (i) in the case of Borrower, acquiring, developing, constructing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, entering into this Agreement, the other Loan Documents with or for the benefit of Administrative Agent and the Lenders, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, or (ii) in the case of any applicable SPE Constituent Entity, acting as the managing member of Borrower and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

c.        has not had, does not have and will not have any assets other than (i) in the case of Borrower, the Property and such incidental personal property necessary for the ownership, operation and development of the Property; or (ii) in the case of any applicable SPE Constituent Entity, its interest in Borrower;

d.        has not engaged, sought or consented to, and will, to the fullest extent permitted by law, not engage in, seek or consent to, (i) any dissolution, winding up, liquidation, consolidation, merger, or sale of all or substantially all of its assets, (ii) except as permitted under the terms of this Agreement, any transfer of membership interests, or (iii) any amendment of its certificate of formation or operating agreement with respect to the matters set forth in this definition without the written consent of Administrative Agent;

e.        has been, is and intends to remain solvent and has paid and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same have or shall become due, and has maintained, is currently

Schedule II

maintaining and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; *provided, however*, that in no event shall the foregoing create liability of Borrower on account of Borrower's insolvency due to insufficiency of capital or require any member of Borrower or any other Person to make any additional capital contribution, advance, loan or any other type of financing to Borrower;

      f.     has not failed, and will not fail, to correct any known misunderstanding regarding the separate identity of such entity;

      g.     has maintained and will maintain its accounts (except as otherwise provided to the contrary in the Loan Documents), books and records separate from any other Person and has filed and will file its own tax returns, except to the extent that it (i) has been or is required to file consolidated tax returns by law or (ii) is treated as a disregarded entity for federal or state tax purposes;

      h.     has maintained and will maintain its own resolutions and agreements, books and records;

      i.     other than as provided in this Agreement and the other Loan Documents, (i) has not commingled, and will not commingle, its funds or assets with those of any other Person and (ii) has not participated and will not participate in any cash management system with any other Person;

      j.     has held and will hold its assets in its own name;

      k.     has conducted and will conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in <u>Subsection (y)</u> below, as long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

      l.     has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted, and will not permit, its assets to be listed as assets on the financial statement of any other entity except as permitted by GAAP, *provided* that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

      m.     has paid and will pay its own liabilities and expenses, including the salaries of its own employees (if any), out of its own funds and assets, and has maintained and will maintain a sufficient number of employees (if any) in light of its contemplated business operations; *provided, however*, that in no event shall the foregoing create liability of Borrower on account of Borrower's insolvency due to insufficiency of capital or require any member of Borrower or any other Person to make any additional capital contribution, advance, loan or any other type of financing to Borrower;

n.     has observed and will observe in all material respects all partnership, corporate or limited liability company formalities, as applicable;

o.     has no and will have no Indebtedness (as defined herein) other than (i) in the case of Borrower, (A) the Debt, (B) the Permitted Debt, and (C) such other liabilities that are permitted pursuant to this Agreement, and (ii) in the case of any applicable SPE Constituent Entity, unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership of its limited liability company interests in the Borrower in amounts not to exceed $10,000, which liabilities are not due more than thirty (30) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances;

p.     except in connection with the Loan Documents, has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to this Agreement;

q.     has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate (other than the securities of Borrower held by any applicable SPE Constituent Entity);

r.     has allocated and will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including paying for shared office space and services performed by any employee of an Affiliate; *provided, however*, that in no event shall the foregoing create liability of Borrower on account of Borrower's insolvency due to insufficiency of capital or require any member of Borrower or any other Person to make any additional capital contribution, advance, loan or any other type of financing to Borrower;

s.     has maintained and used, now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name, and all stationery, invoices, and checks utilized by such Person or utilized to collect its funds or pay its expenses have borne and shall bear its own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being such Person's agent;

t.     unless otherwise specifically permitted under the Loan Documents, has not pledged and will not pledge its assets for the benefit of any other Person;

u.     has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subclause (y) below, as long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

v.     has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

Schedule II

w.      has not made and will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity) except that Borrower, from time to time in the ordinary course of business, may agree with Tenants under Leases of all or any portion of the Property to make certain tenant improvement allowances available to such Tenants;

x.      has not identified and will not identify its constituent partners, members or shareholders (as applicable), or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

y.      has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (i) in the ordinary course of its business and on terms which are arms-length, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party, (ii) in connection with this Agreement, the other Loan Documents and (iii) the Existing Affiliate Agreements;

z.      has not had and will not have any obligation to indemnify, and has not indemnified and will not indemnify, its partners, officers, directors, managers or members, as the case may be, unless such an obligation was and is fully subordinated to the Obligations and will not constitute a claim against the Obligations in the event that cash flow in excess of the amount required to pay the Obligations is insufficient to pay such obligation;

aa.      has considered and shall consider the interests of such Person, including its creditors, in connection with all company actions;

bb.      except as provided in the Loan Documents, does not and will not have any of its obligations guaranteed by any Affiliate;

cc.      if such entity is a limited partnership, has had, now has and will have (i) as its only general partners, Single Purpose Entities that are corporations or Acceptable LLCs that own at least one percent (1.00%) of the equity of the limited partnership, and (ii) a partnership agreement providing that (A) such entity will not dissolve upon the bankruptcy of any partner, including any general partner, (B) the vote of a majority-in-interest of the remaining partners is sufficient to, and such partners shall, continue the life of the partnership in the event of such bankruptcy of the general partner, and (C) if the vote of a majority-in-interest of the remaining partners to continue the life of the partnership following the bankruptcy of the general partner is not obtained, the partnership may not liquidate the Property without the consent of Administrative Agent for as long as the Loan is outstanding;

dd.      if such entity is a corporation, has had, now has and will have at least two (2) Independent Directors, and has not caused or allowed, and will not cause or allow, the board of directors of such entity to take any action that causes a Bankruptcy Action (as defined in clause (ee) below) (or to collude with, or otherwise assist, solicit, or cause to be solicited an involuntary Bankruptcy Action) or any other action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless at least two (2)

Schedule II

Independent Directors shall have participated in such vote and all of the directors have participated in such vote;

ee.        except as provided in clause (ff) below, if such entity is a limited liability company, has been, now is, and will be a limited liability company formed under the laws of the State of Delaware that will have an operating agreement which provides that as long as any portion of the Debt remains outstanding: (i) the company shall have at least two (2) Independent Managers, and the limited liability company shall not institute proceedings to have the company be adjudicated bankrupt or consent to the institution of bankruptcy or insolvency proceedings against the company or file a voluntary bankruptcy petition with respect to the company, to file or consent to the filing of any petition to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute or other laws relating to the relief from debts or the protection of debtors generally, with respect to the company, or to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the company or all or a portion of its property, or to make any assignment for the benefit of creditors of the limited liability company, or to admit in writing the company's inability to pay its debts generally as they become due, or to take action in furtherance of any such actions, or, to the fullest extent permitted by law, dissolve or liquidate the company (each such action, a "**Bankruptcy Action**") unless, (a) such Bankruptcy Action is approved by the prior unanimous written consent of the member of the limited liability company and each Independent Manager and (b) at the time of such action there are at least two (2) Independent Managers; each Independent Manager shall be a "manager" of the limited liability company within the meaning of Section 18-101(10) of the Delaware Limited Liability Company Act (the "**Act**"); *provided, however*, the Independent Managers shall only have the rights and duties expressly set forth in the limited liability company agreement; (ii) upon the occurrence of any event that causes the last member of the limited liability company to cease to be a member of such limited liability company (other than upon an assignment by such member of all of its limited liability company interest in such limited liability company and the admission of the transferee in accordance with the limited liability company agreement), (1) the person(s) acting as Independent Manager(s) of such limited liability company shall, without any action of any Person and simultaneously with such member ceasing to be a member of such limited liability company, automatically be admitted as the "**Special Member**" and shall preserve and continue the existence of such limited liability company without dissolution, and (2) without limiting the provisions of clause (1), upon the occurrence of any event that causes the last remaining member of the limited liability company to cease to be a member of the limited liability company or that causes the sole member to cease to be a member of the limited liability company (other than upon continuation of the limited liability company without dissolution upon an assignment by the member of all of its limited liability company interest in the limited liability company and the admission of the transferee in accordance with the limited liability company agreement), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in such limited liability company, agree in writing to continue the limited liability company without dissolution and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such limited liability company, effective as of the occurrence of the event that terminated the continued membership of such member in such limited liability company; (iii) no Special Member may voluntarily resign or transfer its rights as Special Member unless (A) a successor Special Member has been

admitted to such limited liability company as a Special Member, and (B) such successor Special Member has also accepted its appointment as an Independent Manager and executed a counterpart to the limited liability company agreement; *provided, however*, that the Special Member shall automatically cease to be a member of the limited liability company upon the admission to the limited liability company of a substitute member; the Special Member shall be a member of the limited liability company that has no interest in the profits, losses and capital of the limited liability company and has no right to receive any distributions of limited liability company assets; pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the limited liability company and shall not receive a limited liability company interest in the limited liability company; (iv) a Special Member, in its capacity as Special Member, may not bind the limited liability company; (v) except as required by any mandatory provision of the Act, a Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the limited liability company, including the merger, consolidation or conversion of the limited liability company; (vi) in order to implement the admission to the limited liability company of each Special Member, each Person acting as an Independent Manager shall execute a counterpart to the limited liability company agreement; (vii) prior to its admission to the limited liability company as Special Member, each Person acting as an Independent Manager shall not be a member of the limited liability company; (viii) such limited liability company shall be dissolved, and its affairs shall be would up only upon the first to occur of the following (but subject to clause (ii) above): (A) the termination of the legal existence of the last remaining member of such limited liability company or the occurrence of any other event which terminates the continued membership of the last remaining member of such limited liability company in such limited liability company unless the business of such limited liability company is continued in a manner permitted by its limited liability company agreement or the Act, or (B) the entry of a decree of judicial dissolution of the limited liability company under Section 18-802 of the Act; (ix) neither the bankruptcy of any member of the limited liability company or the Special Member shall cause such member or Special Member, respectively, to cease to be a member of such limited liability company and upon the occurrence of such an event, the business of such limited liability company shall continue without dissolution; (x) in the event of dissolution of such limited liability company, such limited liability company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of such limited liability company in an orderly manner), and the assets of such limited liability company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and (xi) to the fullest extent permitted by law, except as otherwise expressly provided in the limited liability company agreement, each member of the limited liability company and the Special Members shall irrevocably waive any right or power that they might have to cause such limited liability company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of such limited liability company, to compel any sale of all or any portion of the assets of such limited liability company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of such limited liability company (a limited liability company meeting the criteria of this clause (ee) is referred to herein as an "**Acceptable LLC**"); *provided, however*, that notwithstanding the foregoing, Administrative Agent and each Lender acknowledges and agrees that the provisions of subsection (xi) above are required to be included in the

organizational documents of such entity only from and after the Closing Date (and not during the period from the date of such entity's formation to the Closing Date);

ff.     if such entity is a limited liability company that is not an Acceptable LLC, has had, now has and will have at least one (1) member that is a Single Purpose Entity that is a corporation or an Acceptable LLC that owns at least one percent (1.00%) of the equity of the limited liability company;

gg.     the organizational documents of such entity shall further provide that:  (i) the board of directors or managers of such entity (if such entity has a board of directors or managers) and the constituent members or other direct equity owners of such entity (the "**Constituent Equity Members**") shall not take any action which, under the terms of any organizational documents of such entity, requires a unanimous written consent of the board of directors or managers of such entity (if applicable) or the Constituent Equity Members unless at the time of such action there shall be at least two (2) Independent Directors or Independent Managers engaged as provided by the terms hereof;  (ii) no Independent Director or Independent Manager may be removed or replaced except for Cause;  (iii) any resignation, removal or replacement of any Independent Director or Independent Manager shall not be effective without five (5) Business Days prior written notice to Administrative Agent (in each case, unless such resignation, removal or replacement occurs as a result of the death or incapacity of such Independent Director or Independent Manager, or the termination of such individual's employment with the applicable service provided, in which case Borrower shall provide written notice of the removal and replacement of such Independent Director or Independent Manager promptly following such resignation, removal or replacement) accompanied by a statement as to the reasons for such removal, the identity of the proposed replacement Independent Director or Independent Manager, and a certificate that the replacement Independent Director or Independent Manager satisfies the applicable terms and conditions of the definition of "Independent Director/Independent Manager";  (iv) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Directors or Independent Managers shall consider only the interests of the Constituent Equity Members and such entity (including such entity's creditors) in acting or otherwise voting on a Bankruptcy Action (which such fiduciary duties to the Constituent Equity Members and such entity's creditors, in each case, shall be deemed to apply solely to the extent of their respective economic interests in such entity exclusive of (x) all other interests of the Constituent Equity Members, (y) the interests of other affiliates of the Constituent Equity Members and such entity and (z) the interests of any group of affiliates of which the Constituent Equity Members or such entity is a part);  (v) other than as provided in subsection (iv) above, to the fullest extent permitted by law the Independent Directors or Independent Managers shall not have any fiduciary duties to (A) any Constituent Equity Members or (B) any Person bound by the operating agreement of such entity, provided that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and  (vi) to the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, an Independent Director or Independent Manager shall not be liable to such entity, any Constituent Equity Member or any other Person bound by the limited liability company agreement for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director or Independent Manager acted in bad faith or engaged in willful misconduct; *provided, however*, that notwithstanding the foregoing, Administrative Agent

Schedule II

and each Lender acknowledges and agrees that the provisions of this subsection (gg) are required to be included in the organizational documents of such entity only from and after the Closing Date (and not during the period from the date of such entity's formation to the Closing Date);

hh.        has complied and will comply in all material respects with all of the terms and provisions contained in its organizational documents;

ii.        intentionally omitted;

jj.        from and after the Closing Date, has and will have an express acknowledgment in its organizational documents that, during the Term of the Loan, Administrative Agent and the Lenders are intended third-party beneficiaries of the "single purpose/separateness/bankruptcy remote" provisions (as applicable) of such organizational documents; and

kk.        has not and will not knowingly consent to any other Person (i) operating its business in the name of such Person, (ii) acting in the name of such Person, (iii) using such Person's stationery or business forms, (iv) holding out its credit as being available to satisfy the obligations of such Person, or (v) having contractual liability for the payment of any of the liabilities of such Person (except pursuant to the limited extent provided under the Loan Documents).

As used in the definition of Single Purpose Entity, the following terms shall have the following meanings:

"**Indebtedness**" means, with respect to any Person at any time, (i) indebtedness or liability of such Person for borrowed money whether or not evidenced by bonds, debentures, notes or other instruments, or for the deferred purchase price of property or services (excluding trade obligations); (ii) obligations of such Person as lessee under leases which should have been or should be, in accordance with GAAP, recorded as capital leases; (iii) current liabilities of such Person in respect of unfunded vested benefits under plans covered by Title IV of ERISA; (iv) obligations issued for, or liabilities incurred on the account of, such Person; (v) obligations or liabilities of such Person arising under letters of credit, credit facilities or other acceptance facilities; (vi) obligations of such Person under any guarantees or other agreement to become secondarily liable for any obligation of any other Person, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person or otherwise to assure a creditor against loss; (vii) obligations of such Person secured by any Lien on any property of such Person, whether or not the obligations have been assumed by such Person; or (viii) obligations of such Person under any interest rate or currency exchange agreement.

## SCHEDULE III

## LITIGATION

1. JOHN KILEDJIAN; LUCY KILEDJIAN; Plaintiffs, v. WESTBRIDGE CAPITAL; BROADBRIDGE LA, LLC; BROADBRIDGE TRADE CENTER; Defendants (personal injury suit).

2. 152-154 Spring Street Retail LLC v. Joel Schreiber (Index No. 6550242017).

3. 182-186 Spring Street Lender, LLC v. Joel Schreiber (Index No. 8503802015).

## SCHEDULE IV

## MATERIAL CONTRACTS

NONE.

Schedule IV

## SCHEDULE V

## RESTRICTED TRANSFEREES

1.    Midtown Equities, Aurora Capital and any other member or affiliate of the Cayre family

2.    CIM and its affiliates

3.    Jamestown Properties and its affiliates

4.    Canyon Partners LLC and its affiliates

## SCHEDULE VI

## EXISTING CONSTRUCTION DOCUMENTS

1. Core and Shell Architect: Omgivning (OM) - January 30, 2015
2. Office Leasing Broker: CBRE - March 27, 2018
3. Retail Leasing Broker: CBRE - March 9, 2016
4. Structural Engineer: TTG / IMEG Corp. - October 14, 2014
5. MEP and FLS Engineer: TTG / IMEG Corp. - February 10, 2015
6. Civil Engineer: TTG / IMEG Corp. -  January 23, 2015
7. Land Use Entitlements: Elizabeth Peterson Group (EPG) - September 22, 2014
8. Historical consultants: Chattel Inc. - April 14, 2015
9. General Contractor: Swinerton Builders - December 4, 2017
10. Property Manager: CBRE - January 26, 2015
11. Project Manager: CBRE / KWDA Kevin Dennis - March 1, 2018
12. Owner Rep: Fred Lahijani - South Broadway Consulting LLC - September 1, 2014
13. Owner Rep: Shay Yadin -  South Broadway Consulting LLC - September 1, 2014
14. Structural Retrofitting Contractor: MDM Builders Group (M. Librush Construction Inc. dba MDM) - October 12, 2015
15. Façade and Windows Restoration Contractor: Spectra Company - January 29, 2015
16. Deputy Inspector Services: JCR Inspection - December 23, 2015

## SCHEDULE VII

## EXCEPTIONS TO REPRESENTATIONS AND WARRANTIES

NONE.

# SCHEDULE VIII
# BUDGET

| The Museum Building - 18 Months Bridge Loan - Detailed Reserves Breakdown | | |
|---|---|---|
| **Code** | **Cost Category - Description** | **Closing Budget** |
| **200 - HARD COSTS** | | |
| 200.010 | Various Building Materials [SBC] | $14,607 |
| 200.011 | Alpha Omega Contractors - Onsite Engineer | $198,000 |
| 200.012 | California Access Scaffolding | $18,583 |
| 200.013 | MDM (M. Librush) - Seismic retrofitting | $299,380 |
| 200.014 | Spectra Company - South Façade Restoration | $319,459 |
| 200.015 | Leasing Suite | $150,000 |
| | **Total HARD COSTS** | **$1,000,029** |

| **300 - SOFT COSTS** | | |
|---|---|---|
| 300.010 | KWDA - Kevind Dennis - Project Management | $153,000 |
| 300.011 | Chattel Inc. - Historic Consultant | $55,000 |
| 300.012 | Elizabeth Peterson Group (EPG) - Expediter | $35,000 |
| 300.013 | JCR Inspection Services - Deputy Inspector | $75,000 |
| 300.014 | Omgiving - Core and Shell Architects | $147,500 |
| 300.015 | Design Architect | $1,000,000 |
| 300.016 | Marketing Campaign | $100,000 |
| 300.017 | Lead Development Consulting - South Broadway Consulting | $595,000 |
| 300.018 | South Broadway Consulting - Permits/Reimbursable | $39,165 |
| 300.019 | TTG / IMEG - Tmad Taylor & Gaines - Structural and MEP Engineers | $439,579 |
| 300.020 | LADBS - Various Permit Fees | $45,000 |
| 300.021 | Parking Reimbursements CHG - Adjacent lot staging area | $34,080 |
| | **Total SOFT COSTS** | **$2,718,324** |
| | **TOTAL HARD & SOFT COSTS** | **$3,718,353** |

| **400 - CARRY COSTS - RE TAXES / INSURANCE / LEGAL / ACCOUNTING** | | |
|---|---|---|
| 400.010 | CBRE - PROPERTY MGMT [Eric Hassanjian, Diana Wyant, David Sandel] | $151,300 |
| 400.011 | Fire Protection | $9,720 |
| 400.012 | Janitorial | $7,756 |
| 400.013 | LADWP (Power, Water, and Sewer) | $243,304 |
| 400.014 | Continental Elevator - Construction Elevators maintenance | $130,990 |
| 400.015 | Elevator RM & Permits | $10,800 |
| 400.016 | Construction Elevator Operator | $45,000 |
| 400.017 | Lighting | $3,240 |
| 400.018 | Maintenance Payroll Engineers-Alpha Omega | $217,245 |
| 400.019 | Maintenance Payroll Engineers-Alpha Omega-Reimb. Expenses | $53,918 |
| 400.020 | Misc. Repairs & Maintenance | $200,000 |
| 400.021 | Security Cameras/DSL Line/Radios | $14,580 |
| 400.022 | Exterminating - Dewey Pest | $1,944 |
| 400.023 | Sandel, David - Site Materials reimbursements | $5,400 |
| 400.024 | Trash - Waste Disposal | $156,450 |
| 400.025 | United Site Services - Porta Poties | $61,219 |
| 400.026 | Universal Protection Services-SECURITY | $1,036,800 |
| 400.028 | Legal (Borrower and Lender) | $150,000 |
| 400.029 | Accounting | $50,000 |
| 400.031 | Tax Reserve | $2,550,000 |
| 400.032 | Insurance Reserve | $1,781,768 |
| | **TOTAL CARRY COSTS** | **$6,881,434** |

| **500 - MISCELLANEOUS** | | |
|---|---|---|
| 500.010 | Project Contingency | $1,367,096 |
| | **TOTAL MISCELLANEOUS** | **$1,367,096** |
| | **TOTAL** | **$11,966,883** |

| **600 - INTEREST RESERVE** | | |
|---|---|---|
| 600.010 | Interest Reserves | $28,058,538 |
| | **Total Interest Reserve** | **$28,058,538** |
| | **TOTAL PROCEEDS** | **$40,025,421** |

Schedule VIII

## FIRST AMENDMENT TO MORTGAGE LOAN AND SECURITY AGREEMENT, AMENDMENT TO LOAN DOCUMENTS AND REAFFIRMATION OF GUARANTEES AND ENVIRONMENTAL INDEMNITY

THIS FIRST **AMENDMENT TO MORTGAGE LOAN AND SECURITY AGREEMENT, AMENDMENT TO LOAN DOCUMENTS AND REAFFIRMATION OF GUARANTEES AND ENVIRONMENTAL INDEMNITY** (this "**Amendment and Reaffirmation**") is made as of July 16, 2018 (the "**Modification Closing Date**"), by and among **BROADBRIDGE LA LLC**, a Delaware limited liability company ("**Borrower**"), SPT CA FUNDINGS 2, LLC, a Delaware limited liability company (together with its successors and assigns, "**Initial Lender**"), SPT CA FUNDINGS 2, LLC, a Delaware limited liability company, as administrative agent for the Lenders (as hereinafter defined) (in such capacity, together with its successors and assigns, "**Administrative Agent**"), JACK JANGANA, an individual, and JOEL SCHREIBER, an individual (each, individually, a "**Guarantor**", and collectively, "**Guarantors**").

## RECITALS:

A.    Borrower, Initial Lender, the other Lenders (as defined in the Original Loan Agreement (as hereinafter defined)) from time to time party thereto and Administrative Agent are parties to that certain Mortgage Loan and Security Agreement, dated as of June 8, 2018 (the "**Original Loan Agreement**"; the Original Loan Agreement, as amended by this Amendment and Reaffirmation, and as the same may be further amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Loan Agreement**"), pursuant to which the Lenders made a mortgage loan to Borrower in the original principal amount of $213,701,154.00 (the "**Loan**").   Capitalized terms used but not defined herein shall have the meanings assigned to them in the Original Loan Agreement, as amended and modified by this Amendment and Reaffirmation.

B.    In connection with the Loan, Guarantors executed and delivered (i) that certain Guaranty of Recourse Obligations, dated as of June 8, 2018, made by Guarantors in favor of Administrative Agent for the benefit of the Lenders (as the same may be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Recourse Guaranty**"), (ii) that certain Guaranty of Carry Costs, dated as of June 8, 2018, made by Guarantors in favor of Administrative Agent for the benefit of the Lenders (as the same may be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Carry Guaranty**"), and (iii) that certain Environmental Indemnity Agreement, dated as of June 8, 2018, made by Borrower and Guarantors in favor of Administrative Agent for the benefit of the Lenders (as the same may be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Environmental Indemnity**"; and together with the Recourse Guaranty and Carry Guaranty, the "**Guarantor Documents**").

C.    Borrower has requested, and Administrative Agent and Lenders have agreed, subject to Borrower's and Guarantors' compliance with the Loan Documents (as modified by this Amendment and Reaffirmation), to, among other things, certain modifications of the terms of the Loan Documents.

D.    The parties hereto desire to (i) amend the Original Loan Agreement, (ii) amend each of the other Loan Documents (collectively, the "**Other Loan Documents**"), including, without limitation, the Carry Guaranty, and (iii) reaffirm the obligations of each Guarantor under the Guarantor Documents, in each case, as more particularly described in this Amendment and Reaffirmation.

**NOW THEREFORE**, in consideration of the foregoing recitals, the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**AGREEMENT:**

1.    AMENDMENTS TO LOAN AGREEMENT.  The Original Loan Agreement is amended as of the Modification Closing Date as follows:

(a)    Section 1.1 of the Original Loan Agreement is hereby amended as follows:

(i)    By adding the following new defined terms:

"**Contingency Advance**" means Advances made from the Contingency Allocation for purposes of funding Contingency Costs, subject to the terms of this Agreement.

"**Contingency Allocation**" means a portion of the Loan Amount in the amount of One Million Three Hundred Sixty Seven Thousand Ninety Six and 00/100 Dollars ($1,367,096.00).

"**Contingency Costs**" has the meaning set forth in Section 4.5(a).

(ii)    By deleting the following defined terms:

"**Contingency Reserve**" has the meaning set forth in Section 17.4.

"**Contingency Reserve Account**" has the meaning set forth in Section 17.4.

(iii)    By deleting the following definitions in their entirety and substituting the following corresponding definitions therefor:

"**Advances**" means, an advance (including the Floor Funding, a Pre-Development Advance, a Contingency Advance or an Interest/OpEx Advance) of any portion of the Loan Amount made pursuant to the provisions of this Agreement, which, with respect to Pre-Development Advances, shall be used by Borrower solely for application to Pre-Development Costs. An "**Advance**" means each of the Advances, individually.

"**Deficiency**" means, as of any date of determination, either the amount by which the sum of (i) such portion of the Loan as remains to be advanced as of such date (exclusive of funds allocated to the Contingency Allocation unless Administrative Agent has approved of the use of such funds for Pre-Development Costs), *plus* (ii) any unused Deficiency Collateral as of such date, *plus* (iii) funds in the Collateral Accounts as of such

2

date, *plus* (iv) such portion of the Required Equity Investment as remains unfunded as of such date (if any), is <u>less</u> <u>than</u> the actual sum, as estimated by Administrative Agent or Construction Consultant in its reasonable judgment, which will be required to pay all unpaid Pre-Development Costs, Impositions and Insurance Premiums, Operating Expenses and Debt Service. Such estimate shall be binding and conclusive, *provided* that it is made in good faith and absent manifest error.

"**Interest/OpEx Allocation**" means a portion of the Loan Amount in the amount of Thirty-Four Million Nine Hundred Thirty Nine Thousand Nine Hundred Seventy Two and 00/100 Dollars ($34,939,972.00).

"**Pre-Development Allocation**" means a portion of the Loan in the amount of Three Million Seven Hundred Eighteen Thousand Three Hundred Fifty Three and 00/100 Dollars ($3,718,353.00).

(b)    <u>Section 4.4.5(b)</u> of the Original Loan Agreement is hereby amended by deleting the provision in its entirety and by substituting in place thereof the following:

Administrative Agent agrees that interest due and payable on the Loan on any Payment Date and budgeted Operating Expense deficits shall be paid, as follows: (A) first, as an Interest/OpEx Advance to the extent of amounts remaining in the Interest/OpEx Allocation, (B) second, from the Interest/OpEx Reserve Account, to the extent of the amount then on deposit therein, (C) third, as a Contingency Advance to the extent of amounts remaining in the Contingency Allocation but only if Administrative Agent approves the use of such funds for such purpose in its sole but reasonable discretion, and (D) fourth, from a current payment from Borrower as and when monthly interest payments are due.

(c)    <u>Section 4.4.5(c)</u> of the Original Loan Agreement is hereby amended by deleting the provision in its entirety and by substituting in place thereof the following:

If, at any time and from time to time, Administrative Agent in its reasonable discretion determines that (A) the amount then remaining in the Interest/OpEx Allocation for interest on the Loan and Operating Expenses, plus (B) any funds then on deposit in the Interest/OpEx Reserve Account, plus (C) any funds allocated to the Contingency Allocation that Administrative Agent, in its sole but reasonable discretion, approves for use to pay Debt Service or Operating Expenses would be insufficient to pay Debt Service and Operating Expense deficits due through the date of projected repayment of the Loan as determined by Administrative Agent (the amount of any such shortfall, an "**Interest/OpEx Shortfall**"), Administrative Agent may require that Borrower deposit an Equity Payment into an interest reserve account established and maintained at the Additional Collateral Bank by Administrative Agent under the sole dominion and control of Administrative Agent for the benefit of the Lenders (the "**Interest/OpEx Reserve Account**"), in an amount determined by Administrative Agent to be sufficient to cover such Interest/OpEx Shortfall. Any such payment shall be due and payable to

233426822

Administrative Agent not later than ten (10) Business Days after Administrative Agent's delivery to Borrower of written demand for such payment.

(d)    Section 4.5 of the Original Loan Agreement is hereby amended by deleting the provision in its entirety and by substituting in place thereof the following:

**Contingency Advances**.

(a)    Borrower shall use Contingency Advances made by Lenders pursuant to this Agreement solely for the payment of certain costs and expenses approved of by Administrative Agent in its sole but reasonable discretion, including for Debt Service, Operating Expenses and Pre-Development Costs (collectively, "**Contingency Costs**").

(b)    The aggregate amount of all Contingency Advances shall not exceed the Contingency Allocation.

(c)    Contingency Advances shall be in the minimum amount of $50,000 (or, a lesser amount, if the total unfunded amount of the Contingency Allocation is less than $50,000).

(d)    Administrative Agent shall make Contingency Advances for the payment of Contingency Costs, but not more frequently than once in any thirty (30) day period, upon satisfaction by Borrower of each of the following conditions: (a) Borrower shall submit a written request to Administrative Agent at least ten (10) days prior to the date on which Borrower requests such Contingency Advance be made that specifies the item for which such Contingency Advance is requested; (b) on the date such request is received by Administrative Agent and on the date such disbursement of such Contingency Advance is to be made, no Default or Event of Default exists; (c) Administrative Agent shall have received an Officer's Certificate with all blanks completed and applicable attachments included; and (d) at Administrative Agent's option, Borrower shall furnish Administrative Agent with a Title Continuation that satisfies the requirements of Section 4.1(h).

(e)    Each Contingency Advances shall be advanced from time to time on the applicable Advance Date by transfer of such funds to Borrower's Disbursement Account or in such other manner as Administrative Agent and Borrower may agree.

(f)    Contingency Advances shall be made upon satisfaction of the conditions precedent to Advances set forth in this Article IV except to the extent that Administrative Agent may elect to waive any such conditions precedent in writing in its sole and absolute discretion. All conditions precedent to the obligation of Lenders to make Contingency Advances are imposed solely for the benefit of Administrative Agent and Lenders and no other party may require satisfaction of any such condition precedent or be entitled to assume that the Lenders will refuse to make the Loan or any Contingency Advance in the absence of strict compliance with such conditions precedent.

(e)    Section 4.7(c) of the Original Loan Agreement is hereby amended by deleting the provision in its entirety and by substituting in place thereof the following:

> If Borrower deposits Deficiency Collateral in the form of Cash with Administrative Agent, such deposit shall be held in the Deficiency Account, and all interest earned thereon shall become part of the Deficiency Collateral. Any Deficiency Collateral deposited in the form of Cash shall first be exhausted before Administrative Agent shall draw on any Deficiency Collateral deposited in the form of a Letter of Credit. Any Deficiency Collateral deposited in the form of a Letter of Credit may be drawn upon by Administrative Agent in accordance with and for the purposes set forth in this Agreement for as long as any amount remains available and undrawn under such Letter of Credit. The Deficiency Collateral (whether in the form of Cash, Letter of Credit, or any combination thereof) shall first be exhausted (in accordance with the terms hereof) before any further Pre-Development Advances or Contingency Advances pursuant to the Contingency Allocation shall be made and Lenders shall have no obligation to make Pre-Development Advances when the Loan is not In Balance. If Borrower shall fail to deliver Deficiency Collateral when required under Section 4.7(b)(ii), Administrative Agent shall have the right to make demand upon the Guarantor to deposit such Deficiency Collateral amount pursuant to the Carry Guaranty.

(f)    Section 5.1.1(vi) of the Original Loan Agreement is hereby amended by deleting the provision in its entirety and by substituting in place thereof the following:

> Intentionally Omitted.

(g)    Section 17.4 of the Original Loan Agreement is hereby deleted in its entirety.

> All references in the Original Loan Agreement to "this Agreement" shall be deemed to be references to the Original Loan Agreement as amended by this Amendment and Reaffirmation.

2.    AMENDMENTS TO OTHER LOAN DOCUMENTS. The Other Loan Documents are hereby amended as follows:

(a)    Any references to, and any definition of, the "Loan Agreement" in any of the Other Loan Documents shall mean, and such definition is hereby amended to refer to, the Original Loan Agreement as amended by this Amendment and Reaffirmation, and as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time.

(b)    Section 1.2 of the Carry Guaranty is hereby amended by deleting the provision in its entirety and by substituting in place thereof the following:

> **Definition of Guaranteed Obligations**. As used herein, the term "**Guaranteed Obligations**" shall mean, the sum of the following costs actually incurred and/or accrued during the Term of the Loan:  (i) all Operating Expenses and any other

charges, expenses and costs incurred in connection with the ownership, operation, management and maintenance of the Property (in excess of any such amount for the same advanced pursuant to a Pre-Development Advance, Interest Op/Ex Advance or Contingency Advance) (ii) all interest payable with respect to the Loan pursuant to the Loan Agreement, the Note and the other Loan Documents (in excess of any such amount for the same advanced pursuant to a Pre-Development Advance, Interest Op/Ex Advance or Contingency Advance); (iii) the cost of insurance premiums and other charges in connection with maintaining insurance for the Property in accordance with, and as required by, the Loan Agreement (in excess of any such amount for the same advanced pursuant to a Pre-Development Advance, Interest Op/Ex Advance or Contingency Advance); (iv) all Impositions levied or assessed or imposed against the Property or any part thereof, together with all interest and penalties thereon (in excess of any such amount for the same advanced pursuant to a Pre-Development Advance, Interest Op/Ex Advance or Contingency Advance); (v) all fees, costs and expenses of Lenders and Administrative Agent as and when due and payable by Borrower pursuant to the Loan Documents (in excess of any such amount for the same advanced pursuant to a Pre-Development Advance, Interest Op/Ex Advance or Contingency Advance); (vi) all of Borrower's obligations, as and when the same shall become due and payable under the Loan Agreement, to make deposits to the Tax Reserve Account, the Insurance Reserve Account, and the Interest/OpEx Reserve Account; and (vii) all of Borrower's obligations, as and when the same shall become due and payable under the Loan Agreement to make any Interest/OpEx Shortfall payments.

3.    REAFFIRMATION OF GUARANTEES AND ENVIRONMENTAL INDEMNITY. Each Guarantor, as to itself only, hereby:  (i) acknowledges and consents to this Amendment and Reaffirmation; (ii) ratifies and confirms all of the terms, covenants, conditions and obligations applicable to such Guarantor contained in each of the Guarantor Documents (as amended pursuant to this Amendment and Reaffirmation); (iii) reaffirms the continuing validity of the Guarantor Documents and reaffirms that, notwithstanding this Amendment and Reaffirmation, such Guarantor's obligations and rights under the Guarantor Documents are and shall remain in full force and effect and enforceable in accordance with their respective terms, and there are no claims, counterclaims, offsets, defenses, defaults or events which, with the passage of time or giving of notice, would constitute a default with respect to any of the Guarantor Documents; (iv) acknowledges and agrees that Administrative Agent's and Lender's request for Guarantors' acknowledgement and agreement to this Amendment and Reaffirmation shall not be construed as requiring consent by any Guarantor to any future modification or amendment of any documents or instruments pertaining to Borrower's obligations to Administrative Agent and/or the Lenders; (v) acknowledges and agrees that it has had the opportunity to review this Amendment and Reaffirmation, and all other documents, instruments and agreements executed in connection with the modifications contemplated hereby and thereby and is entering into this Amendment and Reaffirmation with full knowledge of each of the foregoing; and (vi) unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating any Guarantor to the rights of Administrative Agent or the Lenders), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations (as such term is defined in the

applicable Guarantor Documents) for any payment made by Guarantors under or in connection with the Guarantor Documents or otherwise, until the Loan is indefeasibly repaid in full.

4. BORROWER'S REAFFIRMATION. Borrower represents, warrants and covenants to Administrative Agent and the Lenders that the Loan Documents to which Borrower is a party (as modified by this Amendment and Reaffirmation) are in full force and effect and enforceable in accordance with their respective terms, and there are no claims, counterclaims, offsets, defenses, defaults or events which, with the passage of time or giving of notice, would constitute a default with respect to the Loan Documents or the obligations evidenced thereby.

5. AUTHORITY. Each party hereto represents and warrants that such party is (a) authorized to enter into this Amendment and Reaffirmation and (b) has obtained all necessary consents, if any, needed to enter into this Amendment and Reaffirmation.

6. PAYMENT OF TRANSACTION EXPENSES. Borrower shall pay all reasonable out-of-pocket costs and expenses incurred by Administrative Agent and the Lenders in connection with the transactions contemplated herein or otherwise outstanding as of the Modification Closing Date (the "**Transaction Expenses**"), including reasonable legal fees and disbursements of Administrative Agent and Lenders' counsel, any recording costs, taxes, and other charges, costs and fees actually incurred by Administrative Agent and Lenders in connection with the preparation, negotiation, execution and delivery of this Amendment and Reaffirmation.

7. ACKNOWLEDGMENT OF DEBT OWED. The parties hereto acknowledge and agree that as of July 16, 2018, the outstanding principal balance on the Loan, including all accrued and unpaid interest is $174,951,769.01 and $38,749,384.99 remains available to be advanced under the Loan.

8. CLAIMS OR DEFENSES; RELEASE. Borrower and each Guarantor, on behalf of themselves, each of their respective successors and assigns, and each of their Affiliates, acknowledge and agree that, as of the Modification Closing Date, they have no defenses, counterclaims, offsets, cross-complaints, causes of action, rights, claims or demands of any kind or nature whatsoever against Administrative Agent, any Lender, any loan participant, any servicer or any of their respective Affiliates, including, without limitation, any usury or lender liability claims or defenses, arising out of the Loan or the Loan Documents or, in connection with the Loan or this Amendment and Reaffirmation. Each of Borrower and Guarantor further acknowledges that to the extent that any claim as described above should in fact exist on the Modification Closing Date, including, without limitation, any usury or lender liability claim or defense, it is hereby fully, finally and irrevocably released by Borrower and Guarantor. Moreover and notwithstanding anything to the contrary contained herein or in any of the Loan Documents, in consideration of the execution and delivery of this Amendment and Reaffirmation, the Borrower Parties, on behalf of themselves and their respective successors and assigns, hereby fully, forever and irrevocably release, discharge and acquit the Released Parties (as defined below) of and from any and all rights, claims, demands, obligations, liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, debts, sums of money, accounts, compensations, contracts, controversies, promises, damages, costs, losses and expenses of every type, kind, nature, description or character, and irrespective of how, why by reason of what facts, whether on or before the Modification Closing Date, might, or may be

7

claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, claimed or unclaimed, whether based on contract, tort, breach of any duty, or other legal or equitable theory of recovery, each as though fully set forth herein at length that in any way arise from the Loan, or the administration thereof, the Loan Documents, or the collateral for the Loan, as well as any action or inaction of the Released Parties or any of them with respect to the Loan or the administration thereof. As used herein, the term "**Released Parties**" means Administrative Agent, each Lender and their respective past and present affiliates and participants, and their respective past and present constituent members, partners, participants, officers, directors, servicers, agents, attorneys (including its external counsel), accountants, and employees of each and all of the foregoing entities, and their respective successors, heirs and assigns. Each of the Borrower Parties acknowledge and agree that factual matters now unknown to them may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected for the period prior to the date hereof, and the Borrower Parties further agree, represent and warrant that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that the Borrower Parties nevertheless hereby intend to release, discharge and acquit the Released Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses.

9.    CONDITIONS PRECEDENT TO MODIFICATION CLOSING DATE.    The terms and provisions of this Amendment and Reaffirmation shall be deemed effective from and after the Modification Closing Date, subject to the satisfaction of each of the following conditions precedent:

(a)    Loan Documents.    Administrative Agent shall have received and approved fully executed originals of this Amendment and Reaffirmation.

(b)    Expenses.    Borrower shall have paid all of the Transaction Expenses.

10.    GOVERNING LAW.    This Amendment and Reaffirmation shall be governed in accordance with the terms and provisions of Section 20.3 of the Loan Agreement.

11.    CONFLICTS OR INCONSISTENCIES.    This Amendment and Reaffirmation is entered into pursuant to and subject to the terms set forth in the Loan Agreement. In the event of a conflict or inconsistency between the terms set forth in this Amendment and Reaffirmation and the Loan Agreement, the terms of this Amendment and Reaffirmation shall control.

12.    SEVERABILITY.    Wherever possible, each provision of this Amendment and Reaffirmation shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Amendment and Reaffirmation shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Amendment and Reaffirmation.

13.    COUNTERPARTS.    This Amendment and Reaffirmation may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one

233426822

document.  Signatures delivered by email (in.pdf format) shall be considered binding with the same force and effect as original signatures.

14.    <u>SUCCESSORS AND ASSIGNS</u>.  This Amendment and Reaffirmation shall inure to the benefit of and shall be binding on the parties hereto and their respective successors and assigns.

15.    <u>AMENDMENTS</u>.  This Amendment and Reaffirmation may not be modified, amended, waived, changed or terminated orally, but only by an agreement in writing signed by the party against whom the enforcement of the modification, amendment, waiver, change or termination is sought.

[NO FURTHER TEXT ON THIS PAGE]

233426822

IN WITNESS WHEREOF, the parties hereto have caused this Amendment and Reaffirmation to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**BROADBRIDGE LA LLC,**
a Delaware limited liability company

By: _____
    Name: Jack Tangana
    Title: Authorized Signatory

By: _____
    Name: Joel Schreiber
    Title: Authorized Signatory

[Signatures Continue on Following Page]

[Signature Page to First Amendment to Loan Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment and Reaffirmation to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**BROADBRIDGE LA LLC,**
a Delaware limited liability company

By: _____
    Name: Jack Jangana
    Title: Authorized Signatory

By: _____
    Name: Joel Schreiber
    Title: Authorized Signatory

[Signatures Continue on Following Page]

**INITIAL LENDER**:

**SPT CA FUNDINGS 2, LLC,**
a Delaware limited liability company

By: _____
       Name: Andrew J. Sossen
       Title: Authorized Signatory

[Signatures Continue on Following Page]

**ADMINISTRATIVE AGENT:**

**SPT CA FUNDINGS 2, LLC**
a Delaware limited liability company

By: _____
Name: Andrew J. Sossen
Title: Authorized Signatory

[Signatures Continue on Following Page]

233426822

**GUARANTOR**:

_____
**JACK JANGANA**, an individual


_____
**JOEL SCHREIBER**, an individual

[Signature Page to First Amendment to Loan Agreement]

**GUARANTOR**:

_____
**JACK JANGANA**, an individual

_____
**JOEL SCHREIBER**, an individual

## SECOND AMENDMENT TO MORTGAGE LOAN AND SECURITY AGREEMENT, AMENDMENT TO LOAN DOCUMENTS AND REAFFIRMATION OF GUARANTEES AND ENVIRONMENTAL INDEMNITY

THIS **SECOND AMENDMENT TO MORTGAGE LOAN AND SECURITY AGREEMENT, AMENDMENT TO LOAN DOCUMENTS AND REAFFIRMATION OF GUARANTEES AND ENVIRONMENTAL INDEMNITY** (this "**Amendment and Reaffirmation**") is made as of December 9, 2019 (the "**Modification Closing Date**"), by and among **BROADBRIDGE LA LLC**, a Delaware limited liability company ("**Borrower**"), **SPT CA FUNDINGS 2, LLC**, a Delaware limited liability company (together with its successors and assigns, "**Initial Lender**"), **STARWOOD PROPERTY MORTGAGE SUB-14-A, L.L.C.**, a Delaware limited liability company (together with its successors and assigns, "**Co-Lender**"), **STARWOOD PROPERTY MORTGAGE SUB-14-A, L.L.C.**, as successor-in-interest to Starwood Property Mortgage Sub-10-A, L.L.C., a Delaware limited liability company ("**Sub-10 Agent**"), as successor-in-interest to SPT CA Fundings 2, LLC, a Delaware limited liability company ("**Original Agent**"), as administrative agent for the Lenders (as such term is defined in the Loan Agreement (as hereinafter defined)) (in such capacity, together with its successors and assigns, "**Administrative Agent**"), **JACK JANGANA**, an individual, and **JOEL SCHREIBER**, an individual (each, individually, a "**Guarantor**", and collectively, "**Guarantors**").

### RECITALS:

A.      Borrower, Initial Lender, the other Lenders (as defined in the Original Loan Agreement (as hereinafter defined)) from time to time party thereto and Original Agent are parties to that certain Mortgage Loan and Security Agreement, dated as of June 8, 2018, as amended by that certain First Amendment to Mortgage Loan and Security Agreement, Amendment to Loan Documents and Reaffirmation of Guarantees and Environmental Indemnity, dated as of July 16, 2018, by and among Borrower, Initial Lender, Original Agent and Guarantors (as amended, the "**Original Loan Agreement**"; the Original Loan Agreement, as amended by this Amendment and Reaffirmation, and as the same may be further amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Loan Agreement**"), pursuant to which the Lenders made a mortgage loan to Borrower in the original principal amount of $213,701,154.00 (the "**Original Loan**").  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Original Loan Agreement, as amended and modified by this Amendment and Reaffirmation.

B.      In connection with the Original Loan, Guarantors executed and delivered (i) that certain Guaranty of Recourse Obligations, dated as of June 8, 2018, made by Guarantors in favor of Original Agent for the benefit of the Lenders, which was assigned by Original Agent to Sub-10 Agent pursuant to that certain Assignment and Assumption of Agreements and Accounts dated as of September 12, 2018 (the "**Sub-10 Assignment**") and was further assigned by Sub-10 Agent to Administrative Agent pursuant to that certain Omnibus Assignment dated as of September 26, 2018 (the "**Sub-14 Assignment**") (as assigned, and as the same may be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Recourse Guaranty**"), (ii) that certain Guaranty of Carry Costs, dated as of June 8, 2018, made by Guarantors in favor of Original Agent for the benefit of the Lenders, which was assigned by Original Agent to Sub-10 Agent pursuant to the Sub-10 Assignment and was further assigned by

Sub-10 Agent to Administrative Agent pursuant to the Sub-14 Assignment (as assigned, and as the same may be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Carry Guaranty**"), and (iii) that certain Environmental Indemnity Agreement, dated as of June 8, 2018, made by Borrower and Guarantors in favor of Original Agent for the benefit of the Lenders, which was assigned by Original Agent to Sub-10 Agent pursuant to the Sub-10 Assignment and was further assigned by Sub-10 Agent to Administrative Agent pursuant to the Sub-14 Assignment (as assigned, and as the same may be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Environmental Indemnity**"; and together with the Recourse Guaranty and Carry Guaranty, the "**Guarantor Documents**").

C.      The Original Loan is evidenced by (i) that certain Promissory Note A-1 dated as of June 8, 2018, made by Borrower in favor of Initial Lender in the stated maximum principal amount of $173,675,733.00, as assigned to Starwood Property Mortgage Sub-10-A, L.L.C. pursuant to the Sub-10 Assignment and as further assigned to Co-Lender pursuant to the Sub-14 Assignment (as assigned, "**Original Note A-1**") and (ii) that certain Promissory Note A-2 dated as of June 8, 2018, made by Borrower in favor of Initial Lender in the stated maximum principal amount of $40,025,421.

D.      The parties have agreed to increase the principal amount of the Original Loan to a stated maximum principal amount of $218,701,154 (the "**Upsizing**").

E.      In connection with the Upsizing, Borrower has executed and delivered that certain Amended and Restated Promissory Note A-2, dated as of the date hereof, in favor of Initial Lender in the stated maximum principal amount of $45,025,421 which, together with Original Note A-1, shall evidence Borrower's indebtedness in the aggregate maximum principal amount of $218,701,154 (the "**Loan**").

F.      Borrower has requested that Administrative Agent extend the Term of the Loan for an additional six (6) month period to the Extended Maturity Date.

G.      The parties hereto desire to (i) extend the Term of the Loan to the Extended Maturity Date, (ii) amend the Original Loan Agreement, (iii) amend each of the other Loan Documents (collectively, the "**Other Loan Documents**"), and (iv) reaffirm the obligations of each Guarantor under the Guarantor Documents, in each case, as more particularly described in this Amendment and Reaffirmation.

**NOW THEREFORE**, in consideration of the foregoing recitals, the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AGREEMENT:

1.      EXTENSION. The obligation of Administrative Agent to extend the Term of the Loan to the Extended Maturity Date is subject to the fulfillment by Borrower of all of the conditions precedent to extension of the Loan set forth in Section 2.5(b) of the Original Loan Agreement. Administrative Agent acknowledges that as of the Modification Closing Date, after

251360745

giving effect to this Amendment and Reaffirmation, Borrower has satisfied the conditions precedent to the extension of the Loan set forth in Section 2.5(b) of the Original Loan Agreement.

2.    AMENDMENTS TO LOAN AGREEMENT. The Original Loan Agreement is amended as of the Modification Closing Date as follows:

(a)    The following definitions in <u>Section 1.1</u> of the Original Loan Agreement are hereby deleted in their entirety and the following corresponding definitions are substituted therefor:

"**Contingency Allocation**" means a portion of the Loan Amount in the amount of One Million Nine Hundred Forty-Nine Thousand Two Hundred Fifty-Five and 00/100 Dollars ($1,949,255.00).

"**Interest/OpEx Allocation**" means a portion of the Loan Amount in the amount of Thirty Nine Million Eight Hundred Fifty-Eight Thousand Eight Hundred Twenty-Seven and 00/100 Dollars ($39,858,827.00).

"**Loan**" means $218,701,154.

"**Loan Amount**" means $218,701,154.

"**Note A-2**" means that certain Amended and Restated Promissory Note A-2, dated as of December 9, 2019, in the principal amount of the Note A-2 Amount, made by Borrower to the order of Note A-2 Holder, as the same may be amended, restated, replaced, supplemented, extended or otherwise modified from time to time.

"**Note A-2 Amount**" means the sum of Forty-Five Million Twenty-Five Thousand Four Hundred Twenty-One and No/100 Dollars ($45,025,421.00).

"**Pre-Development Allocation**" means a portion of the Loan in the amount of Three Million Two Hundred Seventeen Thousand Three Hundred Thirty-Nine and 00/100 Dollars ($3,217,339.00).

(b)    Any references to, and the definition of, the "Loan" shall mean, and such definition is hereby amended to refer to, the Original Loan made by Lenders to Borrower pursuant to the Original Loan Agreement, as *increased* to the stated maximum principal amount of $218,701,154.00.

(c)    All references in the Original Loan Agreement to "this Agreement" shall be deemed to be references to the Original Loan Agreement as amended by this Amendment and Reaffirmation.

3.    CLOSING COSTS. Administrative Agent and Borrower hereby acknowledge and agree that the amount of $662,110.64 from the Contingency Allocation shall be used to pay for all third party costs and expenses incurred in connection with the Upsizing (including, without limitation, the fees, costs and expenses of outside legal counsel in connection with the

3

negotiation and preparation of this Amendment and Reaffirmation), which such closing costs shall be approved by Administrative Agent in its reasonable discretion.

4.    BORROWER'S QUALIFICATION IN CALIFORNIA.    Borrower hereby represents, warrants and covenants to Administrative Agent that (i) prior to the Modification Closing Date, Borrower has submitted all completed documentation and paid all fees required by the Secretary of State of the State of California (the "**SOS**") to reinstate the qualification of Borrower to transact business in the State and to be in good standing in the State, (ii) no later than thirty (30) days after the Modification Closing Date, Borrower shall deliver to Administrative Agent a certificate of status from the SOS certifying that Borrower is qualified to transact business in the State and is in good standing in the State (the "**CA Good Standing Certificate**"), and (iii) no later than ten (10) days after the date of the CA Good Standing Certificate, Borrower shall deliver to Administrative Agent a legal opinion from Greenberg Traurig, LLP stating that Borrower is qualified to transact business in the State and is in good standing in the State.

5.    AMENDMENTS TO OTHER LOAN DOCUMENTS.    The Other Loan Documents are hereby amended as follows:

(a)    Any references to, and any definition of, the "Loan" in any of the Other Loan Documents shall mean, and such definition is hereby amended to refer to, the Original Loan made by Lenders to Borrower pursuant to the Original Loan Agreement, as *increased* to the stated maximum principal amount of $218,701,154.00.

(b)    Any references to, and any definition of, the "Loan Agreement" in any of the Other Loan Documents shall mean, and such definition is hereby amended to refer to, the Original Loan Agreement as amended by this Amendment and Reaffirmation, and as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time.

6.    REAFFIRMATION OF GUARANTEES AND ENVIRONMENTAL INDEMNITY.    Each Guarantor, as to itself only, hereby:  (i) acknowledges and consents to the Upsizing and the execution and delivery of this Amendment and Reaffirmation and all other documents executed and delivered by Borrower in connection with the Upsizing (collectively, the "**Upsizing Documents**"); (ii) ratifies and confirms all of the terms, covenants, conditions and obligations applicable to such Guarantor contained in each of the Guarantor Documents (as amended pursuant to this Amendment and Reaffirmation); (iii) reaffirms the continuing validity of the Guarantor Documents and reaffirms that, notwithstanding the Upsizing and this Amendment and Reaffirmation, such Guarantor's obligations and rights under the Guarantor Documents are and shall remain in full force and effect and enforceable in accordance with their respective terms, and there are no claims, counterclaims, offsets, defenses, defaults or events which, with the passage of time or giving of notice, would constitute a default with respect to any of the Guarantor Documents; (iv) acknowledges and agrees that the Upsizing will result in the increase of Guarantor's obligations and potential liability under the Guarantor Documents; (v) acknowledges and agrees that Administrative Agent's and Lenders' request for Guarantor's consent to the Upsizing and the execution and delivery of the Upsizing Documents shall not be construed as requiring consent by any Guarantor to any future modification or amendment of any documents or instruments pertaining to Borrower's obligations to Administrative Agent and/or the Lenders;

251360745

(vi) acknowledges and agrees that he has had the opportunity to review this Amendment and Reaffirmation, and all other documents, instruments and agreements executed in connection with the modifications contemplated hereby and thereby and is entering into this Amendment and Reaffirmation with full knowledge of each of the foregoing and (vii) unconditionally and irrevocably waives, releases and abrogates any and all rights he may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating any Guarantor to the rights of Administrative Agent or the Lenders), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations (as such term is defined in the applicable Guarantor Documents) for any payment made by Guarantors under or in connection with the Guarantor Documents or otherwise, until the Loan is indefeasibly repaid in full.

7. <u>BORROWER'S REAFFIRMATION</u>. Borrower represents, warrants and covenants to Administrative Agent and the Lenders that the Loan Documents to which Borrower is a party (as modified by this Amendment and Reaffirmation) are in full force and effect and enforceable in accordance with their respective terms, and there are no claims, counterclaims, offsets, defenses, defaults or events which, with the passage of time or giving of notice, would constitute a default with respect to the Loan Documents or the obligations evidenced thereby.

8. <u>AUTHORITY</u>. Each party hereto represents and warrants that such party is (a) authorized to enter into this Amendment and Reaffirmation and (b) has obtained all necessary consents, if any, needed to enter into this Amendment and Reaffirmation.

9. <u>PAYMENT OF TRANSACTION EXPENSES</u>. Borrower shall pay all reasonable out-of-pocket costs and expenses incurred by Administrative Agent and the Lenders in connection with the transactions contemplated herein or otherwise outstanding as of the Modification Closing Date (the "**Transaction Expenses**"), including reasonable legal fees and disbursements of Administrative Agent and Lenders' counsel, any recording costs, taxes, and other charges, costs and fees actually incurred by Administrative Agent and Lenders in connection with the preparation, negotiation, execution and delivery of this Amendment and Reaffirmation.

10. <u>ACKNOWLEDGMENT OF DEBT OWED</u>. The parties hereto acknowledge and agree that on the Modification Closing Date, a payment of interest in the amount of $1,443,863.35 has been made, the outstanding principal balance on the Loan is $206,536,602.70 and $10,720,687.95 remains available to be advanced under the Loan.

11. <u>CLAIMS OR DEFENSES; RELEASE</u>. Borrower and each Guarantor, on behalf of themselves, each of their respective successors and assigns, and each of their Affiliates, acknowledge and agree that, as of the Modification Closing Date, they have no defenses, counterclaims, offsets, cross-complaints, causes of action, rights, claims or demands of any kind or nature whatsoever against Administrative Agent, any Lender, any loan participant, any servicer or any of their respective Affiliates, including, without limitation, any usury or lender liability claims or defenses, arising out of the Loan or the Loan Documents or, in connection with the Loan or this Amendment and Reaffirmation. Each of Borrower and Guarantor further acknowledges that to the extent that any claim as described above should in fact exist on the Modification Closing Date, including, without limitation, any usury or lender liability claim or defense, it is hereby fully, finally and irrevocably released by Borrower and Guarantor. Moreover and notwithstanding

5

anything to the contrary contained herein or in any of the Loan Documents, in consideration of the execution and delivery of this Amendment and Reaffirmation, the Borrower Parties, on behalf of themselves and their respective successors and assigns, hereby fully, forever and irrevocably release, discharge and acquit the Released Parties (as defined below) of and from any and all rights, claims, demands, obligations, liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, debts, sums of money, accounts, compensations, contracts, controversies, promises, damages, costs, losses and expenses of every type, kind, nature, description or character, and irrespective of how, why by reason of what facts, whether on or before the Modification Closing Date, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, claimed or unclaimed, whether based on contract, tort, breach of any duty, or other legal or equitable theory of recovery, each as though fully set forth herein at length that in any way arise from the Loan, or the administration thereof, the Loan Documents, or the collateral for the Loan, as well as any action or inaction of the Released Parties or any of them with respect to the Loan or the administration thereof. As used herein, the term "**Released Parties**" means Administrative Agent, each Lender and their respective past and present affiliates and participants, and their respective past and present constituent members, partners, participants, officers, directors, servicers, agents, attorneys (including its external counsel), accountants, and employees of each and all of the foregoing entities, and their respective successors, heirs and assigns. Each of the Borrower Parties acknowledge and agree that factual matters now unknown to them may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected for the period prior to the date hereof, and the Borrower Parties further agree, represent and warrant that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that the Borrower Parties nevertheless hereby intend to release, discharge and acquit the Released Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses.

    12.   <u>CONDITIONS PRECEDENT TO MODIFICATION CLOSING DATE</u>. The terms and provisions of this Amendment and Reaffirmation shall be deemed effective from and after the Modification Closing Date, subject to the satisfaction of each of the following conditions precedent:

    (a)   <u>Loan Documents</u>. Administrative Agent shall have received and approved fully executed originals of this Amendment and Reaffirmation.

    (b)   <u>Extension Fee</u>. Borrower shall have paid to Administrative Agent an extension fee equal to $546,752.89.

    (c)   <u>Expenses</u>. Borrower shall have paid all of the Transaction Expenses.

    13.   <u>GOVERNING LAW</u>. This Amendment and Reaffirmation shall be governed in accordance with the terms and provisions of <u>Section 20.3</u> of the Loan Agreement.

    14.   <u>CONFLICTS OR INCONSISTENCIES</u>. This Amendment and Reaffirmation is entered into pursuant to and subject to the terms set forth in the Loan Agreement. In the event of a conflict

or inconsistency between the terms set forth in this Amendment and Reaffirmation and the Loan Agreement, the terms of this Amendment and Reaffirmation shall control.

15.    SEVERABILITY.    Wherever possible, each provision of this Amendment and Reaffirmation shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Amendment and Reaffirmation shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Amendment and Reaffirmation.

16.    COUNTERPARTS.    This Amendment and Reaffirmation may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.  Signatures delivered by email (in pdf format) shall be considered binding with the same force and effect as original signatures.

17.    SUCCESSORS AND ASSIGNS.    This Amendment and Reaffirmation shall inure to the benefit of and shall be binding on the parties hereto and their respective successors and assigns.

18.    AMENDMENTS.    This Amendment and Reaffirmation may not be modified, amended, waived, changed or terminated orally, but only by an agreement in writing signed by the party against whom the enforcement of the modification, amendment, waiver, change or termination is sought.

[NO FURTHER TEXT ON THIS PAGE]

251360745

IN WITNESS WHEREOF, the parties hereto have caused this Amendment and Reaffirmation to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**BROADBRIDGE LA LLC,**
a Delaware limited liability company

By: _____
    Name:  Jack Jangana
    Title:  Co-Manager

By: _____
    Name:  Joel Schreiber
    Title:  Co-Manager

[Signatures Continue on Following Page]

[Signature Page to Second Amendment to Loan Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment and Reaffirmation to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**BROADBRIDGE LA LLC,**
a Delaware limited liability company


By: _____
      Name:  Jack Jangana
      Title:  Co-Manager


By: _____
      Name:  Joel Schreiber
      Title:  Co-Manager


[Signatures Continue on Following Page]

[Signature Page to Second Amendment to Loan Agreement]

251360745

**INITIAL LENDER:**

**SPT CA FUNDINGS 2, LLC,**
a Delaware limited liability company

By: _____
Name: Farid Maluf
Title: Vice President

[Signatures Continue on Following Page]

**CO-LENDER**:

**STARWOOD PROPERTY MORTGAGE SUB-14-A, L.L.C.,**
a Delaware limited liability company

By: _____
Name: Farid Maluf
Title: Vice President

[Signatures Continue on Following Page]

251360745

ADMINISTRATIVE AGENT:

STARWOOD PROPERTY MORTGAGE SUB-14-A, L.L.C.,
a Delaware limited liability company

By: _____
Name: Farid Maluf
Title: Vice President

[Signatures Continue on Following Page]

[Signature Page to Second Amendment to Loan Agreement]

251360745

**GUARANTORS**:

_____
**JACK JANGANA**, an individual


_____
**JOEL SCHREIBER**, an individual

[Signature Page to Second Amendment to Loan Agreement]

251360745

**GUARANTORS**:

_____

**JACK JANGANA,** an individual

_____

**JOEL SCHREIBER,** an individual

251360745

Exhibit 5

This page is part of your document - DO NOT DISCARD



# 20180574047

Pages:
0017

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**06/11/18 AT 08:00AM**

| | |
|---|---|
| FEES: | 85.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 85.00 |



**L E A D S H E E T**



201806110210007

00015349031



009141831

**SEQ:
17**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

R38

**FIRST AMERICAN TITLE INSURANCE COMPANY**
**RECORDING REQUESTED BY AND**
**WHEN RECORDED MAIL DOCUMENT TO:**

**Sidley Austin LLP**
**787 Seventh Avenue**
**New York, New York 10019**
**Attention: Alan S. Weil, Esq.**
**NCS-906023-SF**
**APN(s): 5144-017-028, 5144-017-029,**
**5144-017-030**



06/11/2018

*20180574047*

2

SPACE ABOVE FOR RECORDER'S USE ONLY

## ASSIGNMENT OF LEASES AND RENTS

Title of Document

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer subject to the imposition of documentary transfer tax (DTT).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier.

☒ Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.

☐ Exempt from the fee per GC 27388.1 (a) (1); not related to real property.

**THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**($3.00 Additional Recording Fee Applies)**

17B

FIRST AMERICAN TITLE INSURANCE COMPANY

THIS INSTRUMENT WAS
PREPARED BY AND UPON
RECORDING SHOULD BE
RETURNED TO:

Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
Attention:  Alan S. Weil, Esq.
NCS-906023-SF
APN(s):  5144-017-028, 5144-017-029, 5144-017-030

## ASSIGNMENT OF LEASES AND RENTS

**BROADBRIDGE LA LLC,**
a Delaware limited liability company
**("Assignor")**

to

**SPT CA FUNDINGS 2, LLC,**
a Delaware limited liability company, as Administrative Agent for the benefit of the Lenders
**("Assignee")**

Dated: As of June 8, 2018

Location: 801 S. Broadway, Los Angeles, California 90014

231765620

158

4

## ASSIGNMENT OF LEASES AND RENTS

THIS ASSIGNMENT OF LEASES AND RENTS (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, this "**Assignment**") is made as of the 8th day of June, 2018, by **BROADBRIDGE LA LLC**, a Delaware limited liability company, having an address at c/o Continental Equities Group Inc., 45 North Station Plaza, Suite 402, Great Neck, New York 11021, as assignor ("**Assignor**"), in favor of **SPT CA FUNDINGS 2, LLC**, a Delaware limited liability company ("**Administrative Agent**"), having an address at c/o Starwood Property Trust, Inc., 591 W. Putnam Avenue, Greenwich, Connecticut 06830, as Administrative Agent for the Lenders (as hereinafter defined), as assignee (in such capacity, and together with its successors and assigns, "**Assignee**").

### W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, this Assignment is given in connection with a mortgage loan in the maximum principal amount of $213,701,154.00 (the "**Loan**") made pursuant to that certain Mortgage Loan and Security Agreement, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, extended or otherwise modified from time to time, the "**Loan Agreement**"), by and among Assignor, as borrower, SPT CA Fundings 2, LLC, a Delaware limited liability company, as a lender (in such capacity, together with its successors and assigns, "**Initial Lender**"), the lenders from time to time a party thereto (together with Initial Lender, collectively, the "**Lenders**") and Administrative Agent. All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement;

*Deed of Trust Recording Concurrently Herewith*

WHEREAS, the Loan is evidenced by that certain Promissory Note A-1, dated as of the date hereof, in the maximum principal amount of $173,675,733.00, made by Assignor in favor of Initial Lender (as the same may be amended, restated, replaced (whether by one or more replacement notes), supplemented, extended or otherwise modified from time to time, "**Note A-1**"), and that certain Promissory Note A-2, dated as of the date hereof, in the maximum principal amount of $40,025,421.00, made by Assignor in favor of Initial Lender (as the same may be amended, restated, replaced (whether by one or more replacement notes), supplemented, extended or otherwise modified from time to time, "**Note A-2**"; together with Note A-1, the "**Notes**");

WHEREAS, the Loan is secured by, *inter alia*, the lien and security interest created by that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Security Instrument**"), given by Assignor in favor of Administrative Agent for the benefit of the Lenders, which Security Instrument encumbers Assignor's fee simple interest in and to those certain lots or parcels of land more particularly described on Exhibit A attached hereto and made a part hereof (the "**Land**"), together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon or relating thereto (collectively, the "**Property**"), and which Loan is further evidenced and/or secured by the documents referenced in the Loan Agreement as the "Loan Documents" (together with the Notes, the Loan Agreement and the Security Instrument, collectively, the "**Loan Documents**");

231765620

*5*

WHEREAS, Assignor desires to secure the payment of the Debt and the performance of all of its obligations under the Notes, the Loan Agreement and the other Loan Documents; and

WHEREAS, this Assignment is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Assignor of its obligations thereunder and under the other Loan Documents is secured hereby, and each and every term and provision of the Loan Agreement and the Notes, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Assignment.

NOW THEREFORE, in consideration of the making of the Loan by the Lenders and the covenants, agreements, representations and warranties set forth in this Assignment and for such other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## ASSIGNMENT

Section 1.1 <u>Property Assigned</u>. Assignor hereby absolutely and unconditionally assigns and grants to Assignee all of Assignor's right, title and interest in and to the following property, rights, interests and estates, now owned, or hereafter acquired by Assignor:

(a) <u>Leases</u>. Any and all existing and future leases (including the right to enforce such leases at law, in equity, or by other means), subleases or sub-subleases, lettings, licenses, concessions or other agreements whether written or oral, now or hereafter in effect, and whether made before or after the filing by or against Assignor of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**"), pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, as each of such leases, subleases, sub-subleases, or other agreements may be amended, modified, supplemented, renewed, extended, replaced and/or restated (collectively, the "**Leases**") and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the Tenant thereunder, and the right, title and interest of Assignor, its successors and assigns, therein and thereunder. This Assignment shall be effective as to any and all present and future Leases and effective without further or supplemental assignment.

(b) <u>Rents</u>. All rents, percentage rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, all other amounts payable as rent under any Lease or other agreement relating to the Property (including, without limitation, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, other required pass-throughs or reimbursements paid by

2

Tenants under Leases of any nature, and interest on reserve funds, if any), business interruption or other loss of income or rental insurance proceeds, and other income or consideration of whatever form or nature, in each case received by or paid to or for the account of or benefit of Assignor from any and all sources arising from or attributable to the Property (collectively, the "**Rents**").

(c)    Bankruptcy Claims.    All of Assignor's claims and rights (the "**Bankruptcy Claims**") to the payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code.

(d)    Lease Guaranties.    All of Assignor's right, title and interest in and claims under any and all lease guaranties, letters of credit and any other credit support (individually, a "**Lease Guaranty**", and collectively, the "**Lease Guaranties**") given by any guarantor in connection with any of the Leases or leasing commissions (individually, a "**Lease Guarantor**", and collectively, the "**Lease Guarantors**") to Assignor.

(e)    Proceeds.    All proceeds from the sale or other disposition of the Leases, the Rents, the Lease Guaranties and the Bankruptcy Claims.

(f)    Other.    All rights, powers, privileges, options and other benefits of Assignor as lessor under the Leases and beneficiary under the Lease Guaranties, including without limitation the immediate and continuing right to make claim for, receive and collect all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt), and to do all other things which Assignor or any lessor is or may become entitled to do under the Leases or the Lease Guaranties.

(g)    Entry.    The right, at Assignee's option, during an Event of Default, upon automatic revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents.

(h)    Power of Attorney.    Effective upon the occurrence and during the continuance of an Event of Default, Assignor's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in Section 2.1 of this Assignment and any or all other actions designated by Assignee for the proper management and preservation of the Property.

(i)    Other Rights and Agreements.    Any and all other rights of Assignor in and to the items set forth in Sections 1.1(a) through (h) above, and all amendments, modifications, replacements, renewals and substitutions thereof.

ARTICLE II

TERMS OF ASSIGNMENT

Section 2.1    Present Assignment And License Back.    It is intended by Assignor that this Assignment constitute a present, absolute assignment of the Leases, Rents, Lease Guaranties and Bankruptcy Claims, and not an assignment for additional security only.

3

7

Nevertheless, subject to the terms of this Section 2.1 and the Loan Agreement, Assignee grants to Assignor a revocable license to collect, receive, use and enjoy the Rents and other sums due under the Leases and the Lease Guaranties and Assignor shall hold such Rents and all sums received pursuant to any Lease or Lease Guaranty, or a portion thereof sufficient to discharge all current sums due on the Debt, in trust for the benefit of Assignee and Lenders for use in the payment of such sums.

Section 2.2    Notice To Lessees.  Assignor hereby authorizes and directs the lessees named in the Leases or any other future lessees or occupants of the Property and all Lease Guarantors to pay over to Assignee or to such other party as Assignee directs all Rents and all sums due under any Lease Guaranties upon receipt from Assignee of written notice to the effect that Assignee is then the holder of this Assignment and that an Event of Default exists, and to continue so to do until otherwise notified by Assignee.

Section 2.3    Incorporation By Reference.   All representations, warranties, covenants, conditions and agreements contained in the Loan Agreement and the other Loan Documents as same may be modified, renewed, substituted or extended are hereby made a part of this Assignment to the same extent and with the same force as if fully set forth herein.

ARTICLE III

REMEDIES

Section 3.1    Default.  The occurrence of a default of any of the terms, provisions or covenants under this Assignment and/or a breach of any representation or warranty under this Assignment shall constitute an Event of Default under the Loan Agreement.  The occurrence of an Event of Default under the Loan Agreement or any other Loan Document shall constitute an "Event of Default" under this Assignment.

Section 3.2    Remedies of Assignee and Lenders.  Upon or at any time after the occurrence of an Event of Default, the license granted to Assignor in Section 2.1 of this Assignment shall automatically be revoked and Assignee shall immediately be entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Assignee enters upon or takes control of the Property.  In addition, effective upon the occurrence and during the continuance of an Event of Default, Assignee may, at its option, without waiving such Event of Default, without regard to the adequacy of the security for the Debt, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Assignor and its agents and servants from the Property, without liability for trespass, damages or otherwise and exclude Assignor and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto and have, hold, manage, lease and operate the Property on such terms and for such period of time as Assignee may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and sums due under all Lease Guaranties, including those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as Assignee may deem proper and may apply the Rents and sums received pursuant to any Lease Guaranties to the payment of the following in such order and proportion as Assignee

4

in its sole discretion may determine, any law, custom or use to the contrary notwithstanding: (a) all expenses of managing and securing the Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees or agents as Assignee may deem necessary or desirable and all expenses of operating and maintaining the Property, including, without being limited thereto, all taxes, charges, claims, assessments, water charges, sewer rents and any other liens, and premiums for all insurance which Assignee may deem necessary or desirable, and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Property; and (b) the Debt, together with all costs and reasonable attorneys' fees. In addition, upon the occurrence of an Event of Default, Assignee, at its option, may (i) complete any construction on the Property in such manner and form as Assignee may deem advisable, (ii) exercise all rights and powers of Assignor, including, without limitation, the right to negotiate, execute, cancel, enforce or modify any Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums due under any Lease Guaranties, (iii) require Assignor to pay monthly in advance to Assignee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in possession of Assignor or (iv) require Assignor to vacate and surrender possession of the Property to Assignee or to such receiver and, in default thereof, Assignor may be evicted by summary proceedings or otherwise.

Section 3.3    Other Remedies. Nothing contained in this Assignment and no act done or omitted by Assignee or the Lenders pursuant to the power and rights granted to Assignee hereunder shall be deemed to be a waiver by Assignee or the Lenders of any of their respective rights and remedies under the Loan Agreement, the Notes, or the other Loan Documents and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee and the Lenders under the terms thereof. The right of Assignee to collect the Debt and to enforce any other security therefor held by it may be exercised by Assignee and/or the Lenders either prior to, simultaneously with, or subsequent to any action taken by it hereunder. Assignor hereby absolutely, unconditionally and irrevocably waives any and all rights to assert any setoff, counterclaim or crossclaim of any nature whatsoever with respect to the obligations of Assignor under this Assignment, the Loan Agreement, the Notes, the other Loan Documents or otherwise with respect to the Loan in any action or proceeding brought by Assignee and/or the Lenders to collect same, or any portion thereof, or to enforce and realize upon the lien and security interest created by this Assignment, the Loan Agreement, the Notes, or any of the other Loan Documents (provided, however, that the foregoing shall not be deemed a waiver of Assignor's right to assert any compulsory counterclaim if such counterclaim is compelled under applicable law or rule of procedure, nor shall the foregoing be deemed a waiver of Assignor's right to assert any claim which would constitute a defense, setoff, counterclaim or crossclaim of any nature whatsoever against Assignee and/or the Lenders in any separate action or proceeding).

Section 3.4    Other Security. Assignee may take or release other security for the payment of the Debt, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the reduction or satisfaction of the Debt without prejudice to any of its rights under this Assignment.

Section 3.5    Non-Waiver. The exercise by Assignee of the option granted it in Section 2.1 of this Assignment and the collection of the Rents and sums due under the Lease

5

Guaranties and the application thereof as herein provided shall not be considered a waiver of any Default or Event of Default by Assignor under the Notes, the Loan Agreement, the Leases, this Assignment or the other Loan Documents. The failure of Assignee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment. Assignor shall not be relieved of Assignor's obligations hereunder by reason of (a) the failure of Assignee or any Lender to comply with any request of Assignor or any other party to take any action to enforce any of the provisions hereof or of the Loan Agreement, the Notes or the other Loan Documents, (b) the release, regardless of consideration, of the whole or any part of the Property, or (c) any agreement or stipulation by Assignee extending the time of payment or otherwise modifying or supplementing the terms of this Assignment, the Loan Agreement, the Notes, or the other Loan Documents. Assignee may resort for the payment of the Debt to any other security held by Assignee in such order and manner as Assignee, in its discretion, may elect. Assignee may take any action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the rights of Assignee thereafter to enforce their rights under this Assignment. The rights of Assignee under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Assignee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

    Section 3.6    Bankruptcy.  (a) Upon or at any time after the occurrence of an Event of Default, Assignee shall have the right to proceed in its own name or in the name of Assignor in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Assignor, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

    (b)    If there shall be filed by or against Assignor a petition under the Bankruptcy Code, and Assignor, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Assignor shall give Assignee not less than ten (10) days' prior notice of the date on which Assignor shall apply to the bankruptcy court for authority to reject the Lease. Assignee shall have the right, but not the obligation, to serve upon Assignor within such ten (10) day period a written notice stating that (i) Assignee demands that Assignor assume and assign the Lease to Assignee pursuant to Section 365 of the Bankruptcy Code and (ii) Assignee covenants to cure or provide adequate assurance of future performance under the Lease. If Assignee serves upon Assignor the notice described in the preceding sentence, Assignor shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Assignee of the covenant provided for in clause (ii) of the preceding sentence.

## ARTICLE IV

## NO LIABILITY, FURTHER ASSURANCES

    Section 4.1    No Liability of Assignee or Lenders. This Assignment shall not be construed to bind Assignee or the Lenders to the performance of any of the covenants, conditions or provisions contained in any Lease or Lease Guaranty or otherwise impose any obligation upon

6

231765620

10

Assignee or the Lenders. Neither Assignee nor any Lender shall be liable for any loss sustained by Assignor resulting from Assignee's failure to let the Property after an Event of Default or from any other act or omission of Assignee or the Lenders in managing the Property after an Event of Default unless such loss is caused by the gross negligence, illegal acts, willful misconduct, fraud or bad faith of Assignee or the Lenders. Neither Assignee nor the Lenders shall be obligated to perform or discharge any obligation, duty or liability under the Leases or any Lease Guaranties or under or by reason of this Assignment and Assignor shall and hereby agrees to, indemnify Assignee and the Lenders for, and to hold Assignee and the Lenders harmless from, any and all liability, loss or damage (but excluding any special, consequential or punitive damages unless asserted against Administrative Agent or Lenders by a third party) incurred under the Leases, any Lease Guaranties or under or by reason of this Assignment and from any and all claims and demands whatsoever, including the defense of any such claims or demands which may be asserted against Assignee or the Lenders by reason of any alleged obligations and undertakings on their part to perform or discharge any of the terms, covenants or agreements contained in the Leases or any Lease Guaranties. Should Assignee or the Lenders incur any such liability, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured by this Assignment and the other Loan Documents and Assignor shall reimburse Assignee or the Lenders, as applicable, within ten (10) Business Days after written demand therefor by Assignee or the Lenders and upon the failure of Assignor so to do Assignee or the Lenders may, at their option, declare all sums secured by this Assignment and the other Loan Documents immediately due and payable. This Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Assignee or the Lenders, nor for the carrying out of any of the terms and conditions of the Leases or any Lease Guaranties; nor shall it operate to make Assignee or the Lenders responsible or liable for any waste committed on the Property by the tenants or any other parties, or for any dangerous or defective condition of the Property including, without limitation, the presence of any Hazardous Materials, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.

Section 4.2    No Mortgagee in Possession. Nothing herein contained shall be construed as constituting Assignee or any Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Assignee. In the exercise of the powers herein granted Assignee and the Lenders, no liability shall be asserted or enforced by Assignor against Assignee or any Lender, all such liability being expressly waived and released by Assignor, except to the extent such liability arises as a result of the gross negligence, fraud, illegal acts, willful misconduct or bad faith of Assignee or Lenders.

Section 4.3    Further Assurances. Assignor will, at the cost of Assignor, and without expense to Assignee and the Lenders, do, execute, acknowledge and deliver all further acts, conveyances, assignments, notices of assignments, transfers and assurances as Assignee shall, from time to time, require for the better assuring, conveying, assigning, transferring and confirming unto Assignee the property and rights hereby assigned or intended now or hereafter so to be or which Assignor may be or may hereafter become bound to convey or assign to Assignee, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering or recording this Assignment and, on written demand therefor, will execute and deliver and hereby authorizes Assignee to execute in the name of Assignor to the extent Assignee may lawfully do so, one or more financing statements, chattel

7

mortgages or comparable security instruments, to evidence more effectively the lien and security interest hereof in and upon the Leases.

ARTICLE V

MISCELLANEOUS PROVISIONS

Section 5.1    Conflict of Terms.  In case of any conflict between the terms of this Assignment and the terms of the Loan Agreement, the terms of the Loan Agreement shall prevail.

Section 5.2    No Oral Change.  This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Assignor or Assignee (or any Lender), but only by an agreement in writing signed by Assignor and Assignee.

Section 5.3    General Definitions.   Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "Assignor" shall mean "each Assignor and any subsequent owner or owners (or ground lessee or ground lessees) of the Property or any part thereof or interest therein," the word "Lender" shall mean "each Lender and any subsequent holders of any Note," the word "Notes" shall mean "the Notes and any other evidence of indebtedness secured by the Loan Agreement," the word "Property" shall include any portion of the Property and any interest therein," the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorney's, paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Assignee in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder; whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 5.4    Inapplicable Provisions.  If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

Section 5.5    Governing Law; Jurisdiction; Service of Process.   WITH RESPECT TO MATTERS RELATING TO THE CREATION, PERFECTION AND PROCEDURES RELATING TO THE ENFORCEMENT OF THE LIENS CREATED PURSUANT TO THIS ASSIGNMENT (INCLUDING, WITHOUT LIMITATION, FORECLOSURE), THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED (WITHOUT REGARD TO CONFLICT OF LAW PROVISIONS THEREOF), IT BEING UNDERSTOOD THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS PARAGRAPH AND TO THE FULLEST EXTENT PERMITTED BY THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, AND EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE LOAN DOCUMENTS, THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS (OTHER

8

*12*

THAN §§ 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW))
SHALL GOVERN ALL MATTERS RELATING TO THIS ASSIGNMENT AND THE OTHER
LOAN DOCUMENTS AND ALL OF THE INDEBTEDNESS OR OBLIGATIONS ARISING
HEREUNDER OR THEREUNDER PURSUANT TO SECTION 5 1401 OF THE NEW YORK
GENERAL OBLIGATIONS LAW.    ALL PROVISIONS OF THE LOAN AGREEMENT
INCORPORATED HEREIN BY REFERENCE SHALL BE GOVERNED BY, AND
CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK
(WITHOUT REGARD TO CONFLICT OF LAW PROVISIONS THEREOF) PURSUANT TO
SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.  ASSIGNOR (A)
AGREES THAT ANY SUIT, ACTION OR OTHER LEGAL PROCEEDING ARISING OUT
OF OR RELATING TO THIS ASSIGNMENT MAY BE BROUGHT IN A COURT OF
RECORD IN THE COUNTY WHERE THE PROPERTY IS LOCATED OR IN THE COURTS
OF THE UNITED STATES OF AMERICA LOCATED IN SAID COUNTY, (B) CONSENTS
TO THE JURISDICTION OF EACH SUCH COURT IN ANY SUCH SUIT, ACTION OR
PROCEEDING AND (C) WAIVES ANY OBJECTION WHICH IT MAY HAVE TO THE
LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY OF
SUCH COURTS AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING
HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  ASSIGNOR IRREVOCABLY
CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH SUIT,
ACTION OR PROCEEDING BY SERVICE OF COPIES OF SUCH PROCESS TO
ASSIGNOR AT ITS ADDRESS PROVIDED IN SECTION 20.6 OF THE LOAN
AGREEMENT.    NOTHING CONTAINED IN THIS ASSIGNMENT SHALL PREVENT
ASSIGNEE FROM BRINGING AN ACTION, ENFORCING ANY AWARD OR JUDGMENT,
OR EXERCISING ANY RIGHT OR REMEDY AGAINST ASSIGNOR, OR AGAINST ANY
SECURITY OR COLLATERAL FOR THE DEBT, WITHIN ANY OTHER COUNTY, STATE
OR ANY OTHER FOREIGN OR DOMESTIC JURISDICTION.

      Section 5.6    Termination of Assignment.  Upon payment in full of the Debt,
this Assignment shall become and be void and of no effect.

      Section 5.7    Notices.  All notices or other written communications hereunder
shall be delivered in accordance with Section 20.6 of the Loan Agreement.

      Section 5.8    Waiver of Trial by Jury.  ASSIGNOR, ASSIGNEE AND EACH
LENDER (BY THEIR ACCEPTANCE OF THIS ASSIGNMENT) HEREBY WAIVES, TO
THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN
ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT
OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS ASSIGNMENT,
THE NOTES, OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF
LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION
THEREWITH.

      Section 5.9    Exculpation.    The provisions of Section 19.1 of the Loan
Agreement are hereby incorporated by reference in this Assignment to the same extent and with
the same force as if fully set forth herein.

*13*

Section 5.10   <u>Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns forever.

Section 5.11   <u>Headings, Etc.</u>  The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

ARTICLE VI

STATE-SPECIFIC PROVISIONS

Section 6.1   In the event of any inconsistencies between the other terms and conditions of this Assignment and this <u>Article VI</u>, the terms and conditions of this <u>Article VI</u> shall control and be binding.  Notwithstanding anything to the contrary contained in this Assignment or any of the other Loan Documents, Assignee shall have the right to exercise any and all of its rights and remedies granted it under this Assignment as well as all remedies available to it under California Civil Code Section 2938 or any successor statute.

Section 6.2   <u>Guarantees Unsecured</u>.   Anything to the contrary herein or elsewhere notwithstanding, the Guarantees and all obligations arising under any of them are not and shall not be secured by this Assignment, any separate assignment of leases or assignment of rents, or any other lien encumbering the Property.

**[NO FURTHER TEXT ON THIS PAGE]**

231765620

*14*

IN WITNESS WHEREOF, Assignor has executed this Assignment the day and year first above written.

**BROADBRIDGE LA LLC,**
a Delaware limited liability company

By: _____
Name:  Jack Jangana
Title:  Authorized Signatory

## ACKNOWLEDGMENT

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF  New York                )
                                                    )  ss:
COUNTY OF  Queens               )

On  Thursday May 31st , 2018, before me,  Eze Bashi  (here insert name of the officer), Notary Public, personally appeared Jack Jangana, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of  New York that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

**EZE BASHI**
Notary Public, State of New York
No.01BA5088717
Qualified in Queens County
Commission Expires November 24, 20 21

231765620

[Signature Page to Assignment of Leases and Rents]

15

**Exhibit A**

**Legal Description**

REAL PROPERTY IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

PARCEL 1:

LOT "C" AS SHOWN ON MAP OF A RE-SUBDIVISION OF A PORTION OF BLOCK 52, OF HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 12 PAGE 1 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LOT "C" INCLUDED WITHIN THE BOUNDARIES DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 52, OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF HILL STREET, 92 FEET WIDE, DISTANT THEREON SOUTH 37° 42' WEST 177.25 FEET FROM THE SOUTHWESTERLY LINE OF EIGHTH STREET, 70 FEET WIDE, AS LOCATED BY THE CITY ENGINEER OF SAID CITY; THENCE ALONG HILL STREET SOUTH 37° 42' WEST 59.33 FEET TO THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO KATE VAN NUYS PAGE, RECORDED ON SEPTEMBER 17, 1923 AS INSTRUMENT NO. 943 IN, IN BOOK 2396 PAGE 242 OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG SAID NORTHEASTERLY LINE SOUTH 52° 11' 20' EAST 160.70 FEET; THENCE NORTH 37° 56' EAST 59.38 FEET TO A LINE HAVING A BEARING OF NORTH 52° 12' 30" WEST WHICH PASSES THROUGH THE POINT OF BEGINNING; THENCE ALONG SAID LINE NORTH 52° 12' 30" WEST 160.94 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LOT "C" INCLUDED WITHIN THE PORTION OF THE SOUTHEASTERLY 6.00 FEET OF HILL STREET 92.00 FEET WIDE WHICH LIES NORTHWESTERLY OF AND ADJOINING THE LAND ABOVE EXCEPTED.

PARCEL 1A:

LOT 20 IN BLOCK 52, OF HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP

231765620

RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:

LOT "B" OF TRACT 2698, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 29 PAGE 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2A:

THAT PORTION OF LOUISA KALISHER'S HILL STREET LOT, AS PER MAP RECORDED IN BOOK 8 PAGE 34, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

A STRIP OF LAND LYING ADJACENT TO THE NORTHERLY LINE OF LOT "B" OF TRACT 2698 ABOVE DESCRIBED, AND HAVING A FRONTAGE OF 15 9/16 INCHES ALONG THE EASTERLY LINE OF HILL STREET AND A WIDTH OF 24 5/16 INCHES ON THE EASTERLY LINE OF SAID LOUISA KALISHER'S HILL STREET LOT AS SHOWN ON THE AFORESAID MAP.

PARCEL 3:

LOT "F" OF TRACT 2022, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 21 PAGE 92 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 4:

THE NORTH 1/2 OF LOT "E" OF TRACT 655, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 98 AND 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WHICH SAME LOT IS ALSO KNOWN AS THE NORTH 1/2 OF LOT "E" OF TRACT 419, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 14 PAGE 136 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 5:

THE SOUTH 1/2 OF LOT "E" OF TRACT 655, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 98 AND 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WHICH SAME LOT IS ALSO KNOWN AS THE SOUTH 1/2 OF LOT "E" OF TRACT 419, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED

17

IN BOOK 14 PAGE 136 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 6:

PARCEL A:

THAT PORTION OF BLOCK 52, OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF HILL STREET, 92 FEET WIDE, DISTANT THEREON SOUTH 37° 42' WEST 177.25 FEET FROM THE SOUTHWESTERLY LINE OF EIGHTH STREET, 70 FEET WIDE, AS LOCATED BY THE CITY ENGINEER OF SAID CITY; THENCE ALONG HILL STREET SOUTH 37° 42' WEST 59.33 FEET TO THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO KATE VAN NUYS PAGE, RECORDED IN BOOK 2396 PAGE 242 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG SAID NORTHEASTERLY LINE SOUTH 52° 11' 20" EAST 160.70 FEET; THENCE NORTH 37° 56' EAST 59.38 FEET TO A LINE HAVING A BEARING OF NORTH 52° 12' 30" WEST WHICH PASSES THROUGH THE POINT OF BEGINNING; THENCE ALONG SAID LINE NORTH 52° 12' 30" WEST 160.94 FEET TO THE POINT OF BEGINNING.

PARCEL B:

LOUISA KALISHER'S HILL STREET LOT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 8 PAGE 34 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LOT PARTICULARLY DESCRIBED AS FOLLOWS:

A STRIP OF LAND LYING ADJACENT TO THE NORTHERLY LINE OF LOT "B" OF TRACT 2698, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 29 PAGE 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF COUNTY, AND HAVING A FRONTAGE OF 15 9/16THS INCHES ALONG THE EASTERLY LINE OF HILL STREET AND A WIDTH OF 24 5/16THS INCHES ON THE EASTERLY LINE OF SAID LOUISA KALISHER'S HILL STREET LOT.

APN:
5144-017-028 (affects Parcels 3, 4 and 5)
5144-017-029 (affects Parcels 2, 2A and 6A and 6B)
5144-017-030 (affects Parcels 1 and 1A)

231765620