Exhibit 1

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

WESTERN LA HOLDCO LLC

DATED: AUGUST 20, 2014

# TABLE OF CONTENTS

**Page**

ARTICLE 1 ORGANIZATION, TERM, PURPOSE, POWERS, ETC. ......................................... 2

    SECTION 1.1   Formation. .................................................................... 2
    SECTION 1.2   Name ............................................................................. 2
    SECTION 1.3   Term ............................................................................. 2
    SECTION 1.4   Registered Agent and Office ....................................... 2
    SECTION 1.5   Principal Office ........................................................... 3
    SECTION 1.6   Other Instruments ....................................................... 3
    SECTION 1.7   Purpose ....................................................................... 3
    SECTION 1.8   Members; Membership Lists; Obligation to Update ..................... 3

ARTICLE 2 DEFINITIONS ............................................................................. 3

ARTICLE 3 CAPITAL CONTRIBUTIONS ............................................................ 13

    SECTION 3.1   Initial Capital Contributions. ...................................... 13
    SECTION 3.2   Additional Capital Contributions. .............................. 13
    SECTION 3.3   Limitation on Liability of Members ............................ 15
    SECTION 3.4   No Withdrawal of Capital Contributions .................... 16
    SECTION 3.5   Return of Capital Contributions. ................................ 16
    SECTION 3.6   No Priority ................................................................. 16
    SECTION 3.7   Payments Under Guaranties. ...................................... 16
    SECTION 3.8   Indemnification; Liability .......................................... 17

ARTICLE 4 ALLOCATION OF PROFITS AND LOSSES ......................................... 17

    SECTION 4.1   Allocation of Profits and Losses. ............................... 17
    SECTION 4.2   Special Allocations .................................................... 18
    SECTION 4.3   Other Allocation Rules .............................................. 20
    SECTION 4.4   Tax Allocations:  Code Section 704(c). ..................... 20

ARTICLE 5 CASH DISTRIBUTIONS .................................................................. 21

    SECTION 5.1   Distribution of Available Net Cash Flow and Capital Event Proceeds ........ 21
    SECTION 5.2   Distributions. ............................................................. 22
    SECTION 5.3   Withholding ................................................................ 22

ARTICLE 6 MANAGEMENT AND RIGHTS, OBLIGATIONS AND POWERS OF THE
MEMBERS ................................................................................................... 22

    SECTION 6.1   Management. .............................................................. 22
    SECTION 6.2   Major Acts .................................................................. 23

1346741 v4
17994.00022

SECTION 6.3     Request for Consent to Major Act.................................................. 26
SECTION 6.4     Operating Budget................................................................................ 26
SECTION 6.5     Development Budget............................................................................ 26
SECTION 6.6     Exculpation......................................................................................... 27
SECTION 6.7     Time Devoted by Members; Competing Ventures........................... 27
SECTION 6.8     Other Duties and Obligations of the Members................................ 28

ARTICLE 7 TRANSFERABILITY OF MEMBERS' INTERESTS ......................... 28

SECTION 7.1     Prohibited Transfers. ......................................................................... 28
SECTION 7.2     Permitted Transfers ........................................................................... 28
SECTION 7.3     Admission of a Substituted Member ................................................ 29
SECTION 7.4     Withdrawal of a Member ................................................................... 29
SECTION 7.5     Dissolution of Member; Other Termination of Membership. .......... 29
SECTION 7.6     Forced Sale. ........................................................................................ 30
SECTION 7.7     Certain Prohibited Transfers ............................................................. 31

ARTICLE 8 DISSOLUTION AND LIQUIDATION OF THE COMPANY ............. 32

SECTION 8.1     Events Causing Dissolution............................................................... 32
SECTION 8.2     Liquidating Trustee ........................................................................... 32
SECTION 8.3     Liquidation ......................................................................................... 32
SECTION 8.4     Termination ........................................................................................ 33
SECTION 8.5     Claims of the Members ..................................................................... 33

ARTICLE 9 REPRESENTATIONS AND WARRANTIES..................................... 33

SECTION 9.1     Representations and Warranties of JS Member .............................. 33
SECTION 9.2     Representations and Warranties of Jangana Members................... 34

ARTICLE 10 BOOKS AND RECORDS, ACCOUNTING, REPORTS, TAX ELECTIONS .... 34

SECTION 10.1    Books of Account; Records............................................................... 34
SECTION 10.2    Financial Reports............................................................................... 34
SECTION 10.3    Tax Returns and Advances............................................................... 35
SECTION 10.4    Tax Elections ..................................................................................... 35

ARTICLE 11 MISCELLANEOUS PROVISIONS.................................................... 35

SECTION 11.1    Notices................................................................................................ 35
SECTION 11.2    Confidentiality................................................................................... 37
SECTION 11.3    Signatures; Amendments.................................................................. 38
SECTION 11.4    Binding Provisions ............................................................................ 38
SECTION 11.5    Applicable Law .................................................................................. 38
SECTION 11.6    Counterparts ...................................................................................... 38
SECTION 11.7    Severability of Provisions ................................................................. 38
SECTION 11.8    Interpretation ..................................................................................... 38
SECTION 11.9    No Benefit to Third Parties ............................................................... 38

1346741 v4
17994.00022

SECTION 11.10  Remedies Not Exclusive ........................................................................ 38
SECTION 11.11  Brokerage Representation and Indemnity ................................................. 39
SECTION 11.12  Jangana Members ................................................................................... 39
SECTION 11.13  Joint and Several Obligations ................................................................. 39

Schedule A – Name and Address of the Members
Exhibit A – Legal Description of the Property
Exhibit B – Initial Business Plan of the Company
Exhibit C – Initial Operating Budget
Exhibit D – Initial Development Budget
Exhibit E – Property Management Agreement

1346741 v4
17994.00022

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT**

**OF**

**WESTERN LA HOLDCO LLLC**

This Amended and Restated Limited Liability Company Operating Agreement of **WESTERN LA HOLDCO LLLC**, a Delaware limited liability company (the "Company") (this "Agreement"), is made as of August 20, 2014 (the "Effective Date") among JS WESTERN HOLDCO MEMBER LLC, a Delaware limited liability company ("JS Member"), and JACK JANGANA, an individual ("Jack"), JENNY HAIM, an individual ("Jenny") and JOYCE REISS, an individual ("Joyce") (Jack, Jenny and Joyce, collectively, the "Jangana Members") (JS Member and the Jangana Members, each, a "Member", and collectively, the "Members").

**WITNESSETH:**

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in Article 2;

WHEREAS, Western Development Group, a New York limited liability company ("WDG"), formed the Company, as its sole member, on August 12, 2014;

WHEREAS, WDG transferred all of its right, title and interest, as a member in the Company to 53 Murray LLC, a New York limited liability company ("53 Murray");

WHEREAS, 53 Murray thereafter transferred all of its right, title and interest in the Company to the Jangana Members;

WHEREAS, the Company is the sole member and manager of Broadbridge LA Member LLC, a Delaware limited liability company ("Broadbridge Member"), pursuant to the Limited Liability Company Operating Agreement of Broadbridge Member, dated as of the date hereof (the "Broadbridge Member Operating Agreement");

WHEREAS, Broadbridge Member is the sole member and manager of Broadbridge LA LLC, a Delaware limited liability company ("Property Owner"), pursuant to the Limited Liability Company Operating Agreement of Property Owner, dated as of the date hereof (the "Property Owner Operating Agreement")';

WHEREAS, JS Member caused its affiliate, Waterbridge Capital LL, to contribute to Property Owner all of its right, title and interest, as purchaser, in and to a sale-purchase agreement (the "SPA") for the acquisition of premises known as 801 South Broadway, Los Angeles, California (the "Property"), which Property are more particularly described in Exhibit A annexed hereto; and

WHEREAS, as consideration for the assignment of the SPA to Property Owner and other good and valuable consideration, Jangana Members wish to admit JS Member as a Member of the Company;

WHEREAS, Property Owner has on this date closed the acquisition of the Property pursuant to the SPA; and

WHEREAS, the Members wish to memorialize (i) the admission of JS Member as a member of the Company and (ii) their respective rights and obligations, as Members of the Company.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the Members hereby agree as follows:

# ARTICLE 1
## ORGANIZATION, TERM, PURPOSE, POWERS, ETC.

SECTION 1.1    Formation.

(a)    The Company was formed as a limited liability company pursuant to the LLCA by the filing of the Certificate.

(b)    To maintain the Company as a limited liability company under the laws of the State of Delaware, the Company shall from time to time take appropriate action, including the preparation and filing of such amendments to the Certificate and such other assumed name certificates, documents, instruments and publications as may be required by or desirable under law.

SECTION 1.2    Name. The name of the Company is WESTERN LA HOLDCO LLC.

SECTION 1.3    Term. The term of the Company shall continue in full force and effect until the earliest of the following (each of the following being herein referred to as a "Dissolution Event"):

(a)    the later of (x) the sale or disposition of all or substantially all of the Property in accordance with the terms of this Agreement and (y) the satisfaction in full of the obligations of Property Owner and Broadbridge Member under the Canyon Loan Documents;

(b)    the dissolution of the Company by the unanimous written agreement of the Members in accordance with the terms of this Agreement;

(c)    the entry of a decree of judicial dissolution under the LLCA; and

(d)    the happening of any event which makes it unlawful for the Company business to be continued.

SECTION 1.4    Registered Agent and Office. The address of the registered office of the Company in the State of Delaware is c/o Vcorp Services, LLC, 1811 Silverside Road,

2

Wilmington, Delaware 19810, County of New Castle. The name and address of the registered agent of the Company for the service of process is Vcorp Services, LLC, 1811 Silverside Road, Wilmington, Delaware 19810, County of New Castle.

SECTION 1.5    Principal Office. The principal office of the Company is c/o  45 North Station Plaza, Ste 402, Great Neck, NY 11021, Attention: Jack Jangana ("Principal Office"). Such office may be changed upon the mutual agreement of the Members.

SECTION 1.6    Other Instruments. Each Member shall execute and deliver to the Company, within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and take such other action as the Company shall reasonably deem necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company or any Member to fulfill its responsibilities under this Agreement.

SECTION 1.7    Purpose. The principal purpose and character of the business of the Company is to engage in any lawful activities for which a limited liability company may be formed under the LLCA, including, without limitation, (i) maintaining the Company's interest in Broadbridge Member and exercising its rights, and performing its obligations, as a member of Broadbridge Member pursuant to the Broadbridge Member Operating Agreement; (ii) causing Broadbridge Member to maintain its interest in Property Owner and causing Broadbridge Member to exercise its rights, and perform its obligations, as member of the Property Owner Operating Agreement; and (iii) causing Property Owner to own, redevelop, hold, lease, manage, operate, finance, refinance, sell or otherwise dispose of the Property and (iv) doing all things necessary, suitable or proper for the accomplishment of, or in furtherance of, any of the purposes set forth herein and to do every other act or acts incidental to or arising from, or connected with, any of such purposes. The Company shall not engage in any other businesses or activities, except with the consent of the Members.

SECTION 1.8    Members; Membership Lists; Obligation to Update. The names and addresses of the Members (together with their respective interests in the Company) are set forth on Schedule A hereto. The Company shall maintain a list of all Members, and their last known business, residence or mailing address.

## ARTICLE 2
## DEFINITIONS

Defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article 2. Certain additional defined terms are set forth elsewhere in this Agreement. Unless the context requires otherwise, the singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires, and Article and Section references are references to the Articles and Sections of this Agreement.

"Additional Capital Contributions" shall have the meaning given in Section 3.2(a) hereof.

1346741 v4
17994.00022

"<u>Adjusted Capital Account</u>" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

      (a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to the terms of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

      (b)    Debit to such Capital Account the items described in paragraphs (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations to the extent relevant thereto and shall be interpreted consistently therewith.

"<u>Affiliate</u>" means, when used with reference to a particular Person, (a) any Person or group of Persons acting in concert that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person, (b) any Person that is an officer, partner or trustee of, or serves in a similar capacity with respect to, such Person or of which such Person is an officer, partner or trustee or with respect to which such Person serves in a similar capacity, (c) any Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of voting securities of, or otherwise has an equivalent beneficial interest in, such Person or of which such Person is directly or indirectly the owner of 10% or more of any class of voting securities or in which such Person has an equivalent beneficial interest or (d) any relative or spouse of such Person.

"<u>Agreement</u>" has the meaning defined in the Preamble to this Agreement.

"<u>Allocated ROFO Purchase Price</u>" shall have the meaning given in Section 7.6(b) hereof.

"<u>Applicable Companies</u>" means, collectively, the Company, Broadbridge Member and Property Owner.

"<u>Available Net Cash Flow</u>" shall have the meaning given in <u>Section 5.1(a)</u> hereof.

"<u>Bankruptcy</u>" or "<u>Bankrupt</u>", as to any Person, means the filing of a petition for relief as to any such Person as debtor or bankrupt under the Bankruptcy Code of 1978 or like provision of law (except if such petition is filed by a Person other than the Person that is the debtor or bankrupt, such filing is contested by the Person that is the debtor or bankrupt, and such petition has been dismissed within one hundred twenty (120) days); insolvency of such Person as finally determined by a court proceeding; filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of such Person's assets; or commencement of any proceedings relating to such Person under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereafter in effect, either by such Person or by another, provided that if such proceeding is commenced by another, such Person indicates such Person's approval of such proceeding, consents thereto or acquiesces therein, or

1346741 v4
17994.00022

such proceeding is contested by such Person and has not been finally dismissed within one hundred twenty (120) days.

"Broadbridge Member" has the meaning given in the Recitals to this Agreement.

"Broadbridge Member Operating Agreement" has the meaning given in the Recitals to this Agreement.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banks in New York are required or permitted to be closed.

"Business Plan" shall mean a plan for the redevelopment, management, leasing and operation the Property.

"Canyon Loan" shall mean that certain loan in the maximum principal amount of $140,000,000 by Canpartners Realty Holding Company IV LLC, as lender, and Property Owner, as borrower, which Canyon Loan is evidenced, secured and/or guarantied by the Canyon Loan Documents.

"Canyon Loan Agreement" shall mean that certain Loan Agreement, dated as of the date hereof, between Canpartners Realty Holding Company IV LLC, as lender, and Property Owner, as borrower.

"Canyon Loan Documents" shall mean the documents and instruments which evidence, secure and/or guaranty the Canyon Loan.

"Capital Account" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv) and the following provisions:

(a)     To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's share of Profits, and any items in the nature of income or gain that are specially allocated to such Member pursuant to Section 4.2 hereof, and the amount of any Company liabilities that are assumed by such Member (other than liabilities that are secured by any Company property distributed to such Member).

(b)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to), such Member's share of Losses, and any items in the nature of expenses or losses that are specially allocated to such Member pursuant to Section 4.2 hereof, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities that are secured by any property contributed by such Member to the Company).

(c)     In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest; provided, however, that if such transfer causes a

termination of the Company within the meaning of Code Section 708(b)(1)(B), the Capital Accounts of the Members shall govern the constructive liquidation under Treasury Regulations Section 1.708-1(b)(1)(iv), and, upon constructive reformation, the Capital Account of each Member shall be redetermined in accordance with the provisions of this definition. In the case of a sale or exchange of an interest in the Company at a time when an election under Code Section 754 is in effect, the Capital Account of the transferee Member shall not be adjusted to reflect the adjustments to the adjusted tax bases of Company property required under Code Sections 754 and 743, except as otherwise permitted by Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)    In determining the amount of any liability for purposes of clauses (a) and (b) of this definition, there shall be taken into account Code Section 752(c) and the Treasury Regulations promulgated thereunder, and any other applicable provisions of the Code and Regulations.

(e)    In the event the Gross Asset Values of Company assets are adjusted pursuant to the definition of Gross Asset Value, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the manner in which unrealized income, gain, loss and deduction inherent in all Company assets (that has not been previously reflected in the Capital Accounts) would be allocated pursuant to Article 4 if there were a taxable disposition of Company property at fair market value. Similarly, in the event of a distribution of Company assets to a Member (whether in connection with a liquidation or otherwise), the Capital Accounts shall be adjusted to reflect the manner in which unrealized income, gain, loss and deduction inherent in such distributed assets (not previously reflected in Capital Accounts) would be allocated pursuant to Article 4 if there were a taxable disposition of such distributed assets at fair market value.

(f)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company.

"Capital Call" shall have the meaning given in Section 3.2(a) hereof.

"Capital Contributions" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property contributed (or deemed contributed) by such Member to the Company (net of any liabilities secured by such property or to which such property is otherwise subject) including, without limitation, the Initial Capital Contributions and any Additional Capital Contributions. The Initial Capital Contributions of the Members are set forth in Schedule A annexed hereto.

"Capital Event Proceeds" shall have the meaning given in Section 5.1(b) hereof.

6

"Capital Proceeds" shall mean all cash received by the Company (including principal but not interest, except in the case of a sale of all or substantially all of the Property, received with respect to any deferred payment obligation received by the Company in connection with a sale or other disposition) (i) from the sale or other disposition (including any condemnation or a disposition in lieu thereof) of all or any portion of the Property, (ii) the financing or refinancing of all or any portion of any Indebtedness of any of the Applicable Companies, (iii) from the settlement of any insurance claim respecting a casualty to the Property (excluding any business interruption claims) which is not used to repair, restore or replace the Property, or (iv) which would be considered "capital proceeds" in accordance with GAAP, consistently applied, decreased by (in the case of each of clauses (i)-(iv)) the sum of (a) the amount thereof applied to the payment of any closing, transaction and other costs incurred by the Company in connection therewith; (b) the amount thereof applied to the retirement of any outstanding Indebtedness; and (c) the amount thereof applied to fund any Reserves. In addition, any reduction in Reserves shall, up to the amount of Reserves funded with Capital Proceeds pursuant to clause (c) of the preceding sentence, be deemed to be Capital Proceeds.

"Jangana Guarantor" means any Affiliate of Jangana Members that shall from time to time deliver a Guaranty, including, without limitation, Jack Jangana.

"Certificate" shall have the meaning given in the Recitals.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision or provisions of succeeding law.

"Company" shall have the meaning given in the Recitals to this Agreement.

"Company Interest" means the entire membership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which such Member may be entitled as provided in this Agreement or under the LLCA, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

"Company Minimum Gain" shall have the same meaning as "Partnership Minimum Gain" set forth in Treasury Regulations Section 1.704-2(d).

"Contributing Member" shall have the meaning given in Section 3.2(b)(i) hereof.

"Conversion Date" shall have the meaning given in Section 3.2(b)(v) hereof.

"Conversion Notice" shall have the meaning given in Section 3.2(b)(iv) hereof.

"Depreciation" shall mean, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis. If the federal income tax depreciation, amortization, or other cost recovery deduction for the year is

7

zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Members.

"Development Budget" shall mean a budget setting forth all Development Costs required for the Redevelopment (or the applicable phase thereof).

"Development Costs" shall mean all hard and soft costs incurred in connection with the Redevelopment.

"Dissolution Event" shall have the meaning given in Section 1.3 hereof.

"Distribution" means a transfer of cash or property of the Company to a Member on account of the Company Interest held by such Member, as described in Sections 5.1 and 8.3(c) hereof.

"Emergency Expenses" means any expenditures or costs for repairs to the Property which (i) are not included in any Operating Budget and (ii) in any Member's business judgment, are immediately required to be made (x) to preserve and avoid material damage to the Property, (y) to avoid suspension of any essential services to the Property or (z) to avoid personal injury or death at the Property.

"Entity" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association.

"Escrow Agent" shall mean such reputable escrow agent as Forced Sale Initiating Member shall select to act as escrow agent (pursuant to an escrow agreement in form reasonably acceptable to Forced Sale Initiating Member, Forced Sale Responding Member and Escrow Agent) in respect of the ROFO Deposit.

"Failed Capital Contribution" shall have the meaning given in Section 3.2(b)(i) hereof.

"GAAP" means United States generally accepted accounting principles, in effect from time to time.

"Government Entity" means the United States, the State of Delaware, the State of New York and any other state that may have jurisdiction over any of the Applicable Companies or the Property, any municipality, and political subdivision of any of the foregoing, and any agency, authority, department, court, commission or other legal entity of any of the foregoing.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as set forth herein;

(b)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Members, as of the following times:  (i) the acquisition of an interest or an additional interest in the Company by any

new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of property or money as consideration for an interest in the Company; (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (iv) in any other circumstances as permitted by the Code or the Treasury Regulations as determined by the Members; provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Members shall reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members;

   (c) The Gross Asset Value of any Company asset distributed to a Member shall be the gross fair market value of such asset on the date of distribution; and

   (d) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (d) to the extent the Members determine that an adjustment pursuant to clause (b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d).

   (e) If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (a), (b), or (d), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

  "Guaranty" means any guaranty and/or indemnity, including, without limitation, a completion guaranty, a payment guaranty, a guaranty of Nonrecourse Carve-outs and/or an environmental indemnity, given by any Guarantor to any Lender.

  "Guarantor" means, individually and collectively, Joel Schreiber and Jack Jangana.

  "Indebtedness" means any and all secured and unsecured borrowings or other indebtedness by any of the Applicable Companies (excluding trade payables and other monthly payables), including, without limitation, any secured or unsecured revolving lines of credit, any construction loans, permanent loans or other forms of indebtedness encumbering the Property or any portion thereof.

  "Indemnified Losses" shall have the meaning given in Section 3.11(a) hereof.

  "Indirect Interest" shall mean an ownership interest (whether direct or indirect) in a Member (as opposed to a Member's ownership interest in the Company).

  "Indirect Owner" means a Person holding an Indirect Interest.

  "Initial Capital Contributions" shall mean the Capital Contributions made, or deemed made, pursuant to Section 3.1.

1346741 v4
17994.00022

"Initial Post-Closing Capital Improvements" shall have the meaning given in the Canyon Loan Agreement.

"Jangana Guarantor" shall mean a Guarantor which is an Affiliate of a Jangana Member, including, without limitation, Jack Jangana.

"JS Guarantor" shall mean a Guarantor which is an Affiliate of JS Member, including, without limitation, Joel Schreiber.

"JS Member" shall have the meaning given in the Recitals to this Agreement.

"Leases" means any lease, license or occupancy agreement affecting the Property.

"Lender" means the holder of any Permitted Indebtedness.

"Liquidating Trustee" shall have the meaning given in Section 8.2 hereof.

"LLCA" shall have the meaning given in the Recitals to this Agreement.

"Lock-Out Period" shall mean the five (5) year period commencing on the Effective Date.

"Major Act" shall have the meaning given in Section 6.2(a) hereof.

"Manager" shall have the meaning given in Section 6.1 hereof.

"Member" and "Members" shall have the meaning given in the Preamble to this Agreement.

"Member Loan" shall have the meaning given in Section 3.2(b)(ii) hereof.

"Member Nonrecourse Debt Minimum Gain" shall have the same meaning as "partner nonrecourse debt minimum gain" as defined in Treasury Regulations Section 1.704-2(i)(2) and (3).

"Minimum Purchase Price" shall have the meaning given in Section 7.6(d) hereof.

"Necessary Expenditures" shall mean all expenses of any of the Applicable Companies, whether or not of a recurring nature, that are necessary to operate the Property or otherwise to prevent a default by any of the Applicable Companies under, or an assessment of a fine or late payment charge against any of the Applicable Companies in connection with, any contractual obligations of any of the Applicable Companies, including, without limitation, payments in respect of liens (such as real estate taxes), debt service and other required payments under any Permitted Loan Documents, payments of mechanics' liens, insurance premiums, utility costs and costs of compliance with federal, state and local laws, codes, rules or regulations.

"Non-Contributing Member" shall have the meaning given in Section 3.2(b)(i) hereof.

"Nonrecourse Carve-outs" shall mean those acts or omissions which limit or qualify the non-recourse nature of Permitted Indebtedness, as set forth in any Permitted Loan Documents.

Examples of Nonrecourse Carve-outs include, without limitation, fraud, intentional misrepresentation, misappropriation of funds, misappropriation of insurance proceeds and matters relating to contamination or violation of environmental laws.

"Nonrecourse Deductions" shall have the meaning given in Treasury Regulations Section 1.704-2(b)(1).

"Operating Budget" means a Budget setting forth all Operating Expenses relating to the Property.

"Operating Expenses" means, for any period, all costs and expenses (including capital expenses) anticipated to be incurred in connection with the ownership, operation, maintenance, repair and leasing of the Property (other than Development Costs), including, without limitation, real estate taxes, insurance premiums, utility charges, maintenance expenses, sales and marketing expenses, leasing costs, management fees and other ordinary and customary expenses relating to the Property.

"Operating Year" means the Initial Operating Year and each ensuing calendar year (or portion thereof) during the term of the Property Owner's ownership of the Property.

"Partially Adjusted Capital Account" shall have the meaning given in Section 4.1(a) hereof.

"Percentage Interest" means, with respect to each Member, the ratio of such Member's Capital Contributions to the aggregate Capital Contributions made by all of the Members from time to time, as the same may be adjusted in accordance with the terms of this Agreement. The initial Percentage Interests of the Members are set forth in Schedule A annexed hereto. The Members shall amend Schedule A attached hereto from time to time to account for admissions, transfers and conveyances made in accordance with Article 7 hereof, and any adjustment to the Percentage Interests of the Members made in accordance with the terms of this Agreement.

"Permitted Indebtedness" means, for so long as the indebtedness evidenced by the Canyon Loan Documents remains outstanding, the Canyon Loan, and thereafter, such other Indebtedness for which any of the Applicable Companies contracts in accordance with the terms of this Agreement.

"Permitted Loan Documents" means, for long as the indebtedness evidenced by the Canyon Loan Documents remains outstanding, the Canyon Loan Documents, and thereafter, such documents and instruments, in form and substance acceptable to the Members, evidencing any other Permitted Indebtedness.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and permitted assigns of such Person where the context so permits.

"Plans" shall mean the plans and specifications for the Redevelopment.

"Principal Office" shall have the meaning given in Section 1.5 hereof.

11

"Profits" and "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income and gain for such Fiscal Year or period determined in accordance with Section 703(a) of the Code (including all items of income and gain required to be stated separately under Section 703(a)(1) of the Code with the following adjustment:

    (a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definitional Section shall be added to such taxable income or loss;

    (b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

    (c)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

    (d)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the provisions of the definition of Depreciation; and

    (e)    Notwithstanding any other provision of this definitional section, any items which are specially allocated pursuant to Section 4.2 hereof shall not be taken into account in computing Profits or Losses.

"Property" shall have the meaning given in the Recitals to this Agreement.

"Property Owner" shall have the meaning given in the Recitals to this Agreement.

"Property Owner Operating Agreement" shall have the meaning given in the Recitals to this Agreement.

"Redevelopment" shall mean the refurbishment and redevelopment of the Property as a mixed-use retail and office property in accordance with the Business Plan, including without limitation, the Initial Post-Closing Capital Improvements and the Redevelopment Work..

"Redevelopment Work" shall have the meaning set forth in the Canyon Loan Agreement.

"Representatives" means, with respect to any Member, such Member's, officers, employees, affiliates, partners, members, shareholders, brokers, agents or other representatives, including, without limitation, attorneys, accountants, contractors, consultants, engineers and financial advisors.

"Reserves" means, with respect to the Property, reasonable cash reserves established and maintained from time to time by Manager for the benefit of the Applicable Companies, as set

1346741 v4
17994.00022

forth in an approved Operating Budget, as applicable, or which are otherwise approved by the Members as a Major Act, which amounts (i) are required to pay anticipated capital improvements in respect of the Property, (ii) are required to be maintained under any Permitted Loan Documents, (iii) are required to pay any other current or anticipated expenses under any Condominium Documents or (iv) are required to pay any other current or anticipated expenses permitted under this Agreement.

"ROFO" shall have the meaning given in Section 7.6(a) hereof.

"ROFO Closing" shall have the meaning given in Section 7.6(b) hereof.

"ROFO Deposit" shall mean an amount equal to ten percent (10%) of the Allocated ROFO Purchase Price.

"ROFO Election Notice" shall have the meaning given in Section 7.6(b) hereof.

"ROFO Notice" shall have the meaning given in Section 7.6(b) hereof.

"ROFO Purchase Price" shall have the meaning given in Section 7.6(b) hereof.

"Substitute Capital Contribution" shall have the meaning given in Section 3.2(b)(v) hereof.

"Substituted Member" means a person who is admitted to the Company as a Substituted Member in accordance with Article 7 hereof.

"Target Capital Account" shall have the meaning given in Section 4.1(a) hereof.

"Tax Matters Partner" shall have the meaning given in Section 10.4 hereof.

"Transfer" shall have the meaning given in Section 7.1(a) hereof.


## ARTICLE 3
## CAPITAL CONTRIBUTIONS

SECTION 3.1    Initial Capital Contributions.

(a)    Prior to, or as of, the Effective Date, each of the Members have made Initial Capital Contributions in the amounts set forth on Schedule A; and

(b)    The names, addresses, Initial Capital Contributions and Percentage Interest of the Members are as set forth on Schedule A, as from time to time amended.

SECTION 3.2    Additional Capital Contributions.

(a)    Subsequent to the funding of the Initial Capital Contributions, Manager may, upon notice to the Members (a "Capital Call"), call for additional Capital Contributions, to the

extent required to fund (after the application of the proceeds of any Indebtedness), (i) Emergency Expenses, (ii) Necessary Expenditures or (iii) expenses contemplated by an approved Operating Budget or an approved Development Budget. Capital Contributions required pursuant to this Section 3.2(a) are herein referred to as "Additional Capital Contributions". Members shall fund Additional Capital Contributions *pro rata*, in accordance with their respective Percentage Interests. Each Member shall pay its Additional Capital Contribution by wire transfer of immediately available funds to an account designated by the Manager within ten (10) Business Days of such Member's receipt of the applicable Capital Call.

(b)    Failure to Fund Additional Capital Contributions.

(i)    If a Member fails to timely make an Additional Capital Contribution required pursuant to Section 3.2(a) in the amount specified therein (such Member is hereinafter referred to as a "Non-Contributing Member"), the non-defaulting Member shall give notice of such failure to the Non-Contributing Member, which notice shall state the amount of the Capital Contribution not funded by the Non-Contributing Member (such amount is hereinafter referred to as the "Failed Capital Contribution". Thereafter, the non-defaulting Members may, as the sole and exclusive remedy of the Company and the non-defaulting Members on account of the failure of the Non-Contributing Member to make the applicable Capital Contribution (other than as set forth in Section 3.2(b)(ii) hereof), either (A) fund all or part of the Failed Capital Contribution (the funding Member is hereinafter referred to as a "Contributing Member") or (B) demand from the Company reimbursement of the amount contributed, whereupon the Company shall promptly repay the amount of such withdrawn contribution to the non-defaulting Member. If more than one non-defaulting Member elects to fund the Failed Capital Contribution, the electing Members shall fund the same in proportion to their relative Percentage Interests, or in such other proportion as they mutually agree.

(ii)    If a Contributing Member funds a Failed Capital Contribution as provided in clause (A) of Section 3.2(b)(i) hereof, the portion of the Failed Capital Contribution funded by the Contributing Member shall be treated as a loan (a "Member Loan") by the Contributing Member to the Non-Contributing Member, bearing interest at the rate of twenty (20%) per annum compounded annually, followed by a Capital Contribution in the amount of the Member Loan by the Non-Contributing Member. Any Member Loan (to the extent of unpaid principal and interest) shall be (A) prepayable at any time prior to the Conversion Date, without penalty or premium and (B) recourse only to the Non-Contributing Member's Company Interest. Until a Member Loan and accrued, unpaid interest thereon is paid in full, the Company shall pay to the Contributing Member, on behalf of the Non-Contributing Member, all funds otherwise distributable to the Non-Contributing Member pursuant to Section 5.1 and Section 8.3 hereof, in reduction of the Member Loan and accrued, unpaid interest thereon. Any payment of a Member Loan and accrued, unpaid interest thereon made by or on behalf of a Non-Contributing Member to a Contributing Member shall be applied first to accrued, unpaid interest on the Member Loan and then to the principal amount of the Member Loan.

(iii)    Repayment of any Member Loan shall be secured by the Non-Contributing Member's Company Interest, and the Non-Contributing Member hereby grants a security interest in such Company Interest to the Contributing Member advancing such Member Loan and hereby irrevocably appoints such Contributing Member and any of its Representatives

14

as its attorneys-in-fact, coupled with an interest, with full power and authority to prepare and execute any documents, instruments and agreements, including, without limitation, any note evidencing the Member Loan, and such Uniform Commercial Code financing statements, continuation statements and other security instruments as may be appropriate to perfect and continue such security interest in favor of such Member.

(iv)    If a Contributing Member shall make a Member Loan to a Non-Contributing Member and such Member Loan and accrued, unpaid interest thereon shall not have been repaid within ninety (90) days after the making of such Member Loan, the Contributing Member may, upon notice to the Non-Contributing Member at any time after the expiration of such ninety (90) period, elect to convert the Member Loan into an Additional Capital Contribution by the Contributing Member (a "Conversion Notice").  The Non-Contributing Member shall have the right, during the ten (10) day period following its receipt of a Conversion Notice, to repay in full the Member Loan and accrued, unpaid interest thereon.  If the Non-Contributing Member repays the Member Loan and accrued, unpaid interest thereon in the time and in the manner hereinbefore prescribed, the Contributing Member shall have no further rights under this Section 3.2(b)(iv) or Section 3.2(b)(v) below with respect to the Member Loan.

(v)    If a Non-Contributing Member fails to repay a Member Loan and accrued, unpaid interest thereon within ten (10) days after its receipt of a Conversion Notice, then, effective as of the day immediately succeeding the expiration of such ten (10) day period (the "Conversion Date"), (A) the Contributing Member shall be credited with an Additional Capital Contribution in an amount equal to the Member Loan plus accrued, unpaid interest thereon (a "Substitute Capital Contribution"), (B) the Capital Contribution credited to the Non-Contributing Member by Section 3.2(b)(ii) hereof shall be deducted from the aggregate Capital Contributions made by the Non-Contributing Member by an amount equal to the Substitute Capital Contribution, (C) the Percentage Interest of the Contributing Member shall be increased by an amount equal to a fraction, (I) the numerator of which is equal to 150% of the Substitute Capital Contribution and (II) the denominator of which is equal to the aggregate amount of all Capital Contributions theretofore made by the Members (including the Substitute Capital Contribution) and (D) the Percentage Interest of the Non-Contributing Member shall be reduced by the percentage by which the Contributing Member's Percentage Interest was increased pursuant to the preceding clause (C).  Any conversion of a Member Loan as provided in this Section 3.2 shall constitute the payment in full of such Member Loan and accrued, unpaid interest thereon.  Notwithstanding any contrary term set forth in this Agreement, so long as the indebtedness evidenced by the Canyon Loan Documents remains outstanding, any conversion of a Member Loan as hereinbefore provided shall constitute a Transfer subject to the terms of the Canyon Loan Agreement, including, without limitation, the provisions of Section 5.16 thereof.

SECTION 3.3    Limitation on Liability of Members.  The liability of each Member shall be limited to the aggregate Capital Contribution made by it, and no Member shall, except as expressly provided in this Agreement, have any personal liability in respect of any liabilities or obligations of the Company or the Members, beyond the amount that it shall contribute, or be required to contribute, to the capital of the Company in accordance with this Agreement. Notwithstanding the foregoing, each Member shall be personally liable to any other Member, but not to third parties, for all loss, cost, damage or expense resulting from such Member's gross negligence, willful misconduct, fraud or bad faith.

15

SECTION 3.4    No Withdrawal of Capital Contributions.  Except upon dissolution and liquidation of the Company or as otherwise provided herein, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contribution, or any part thereof, or any distribution thereon.  No Member shall have the right to receive property, other than cash in connection with a distribution or return of capital.  No Member shall be entitled to receive interest on such Member's Capital Contributions to the Company.

SECTION 3.5    Return of Capital Contributions.

Except upon dissolution and liquidation of the Company or as provided in Article 5 hereof, there is no agreement, nor time set, for the return of any Capital Contribution of any Member.

SECTION 3.6    No Priority.  Except as otherwise provided herein, no Member shall have priority over another with respect to the return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

SECTION 3.7    Payments Under Guaranties.

(a)    Subject to the terms of Section 3.11(b) hereof, if a Guarantor shall make a payment under a Guaranty, such Guarantor (or if such Guarantor is not a Member, the Member that is an Affiliate of the Guarantor) shall promptly notify the other Member of such fact, which notice shall (i) state the amount of the payment made under the Guaranty and (ii) evidence payment of same by the Guarantor.  Within thirty (30) days after its receipt of such notice, the other Member (i.e., the Member which is not the Guarantor or an Affiliate of the Guarantor) shall reimburse the Guarantor in an amount equal to the product obtained by multiplying such other Member's Percentage Interest by the amount of the payment.  If such other Member fails timely to reimburse the Guarantor as aforesaid, the Guarantor (or the Member which is an Affiliate of the Guarantor) shall be deemed, as of the expiration of the aforesaid thirty (30) day period, to have made a Member Loan to the other Member in the delinquent amount, whereupon the provisions of Section 3.2(b) hereof in respect of Member Loans shall apply.

(b)    Notwithstanding any contrary term set forth in this Agreement, if (i) a JS Guarantor shall make a payment under a Guaranty of Nonrecourse Carve-outs, and such payment shall be caused by a breach of the Nonrecourse Carve-outs by Jangana Members (or an Affiliate of Jangana Members), then Jangana Members shall, within five (5) Business Days after demand, repay such amount to JS Guarantor and indemnify, defend and hold JS Guarantor harmless from and against any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against such JS Guarantor resulting from such breach and (ii) a Jangana Guarantor shall make a payment under a Guaranty of Nonrecourse Carve-outs and such payment shall be caused by a breach of the Nonrecourse Carve-outs by JS Member (or an Affiliate of JS Member), then JS Member shall, within five (5) Business Days after demand, repay such amount to Jangana Guarantor and indemnify, defend and hold Jangana Guarantor harmless from and against any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against such Jangana Guarantor resulting from such breach.  It is hereby agreed that any payments made to a Guarantor by a Member and/or any of its Affiliates pursuant to this Section 3.7(b) (i) shall not increase the Capital Account of any Member and (ii) shall not be deemed to be a Capital

16

Contribution. If a Member shall fail to make such repayment to a Guarantor pursuant to this Section 3.7(b) and/or shall fail to so indemnify such Guarantor, then such Guarantor (or if such Guarantor is not a Member, the Member that is an Affiliate of such Guarantor) shall be deemed to have made a Member Loan to the defaulting Member in the amount of (i) the payment by such Guarantor under the Guaranty of Nonrecourse Carve-outs (to the extent such other Member shall fail to make such repayment) and (ii) any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against such Guarantor caused by such breach (to the extent such other Member shall fail to indemnify the Guarantor), whereupon the provisions of Section 3.2(b) hereof in respect of Member Loans shall apply.

(c)    Any payments that a Guarantor shall make pursuant to a Guaranty of Nonrecourse Carve-outs on account of a breach of a Nonrecourse Carve-out by such Guarantor or, if the Guarantor is not a Member, on account of a breach of a Nonrecourse Carve-out by the Member that is an Affiliate of such Guarantor, (i) shall not increase the Capital Account of the Member or, if the Guarantor is not a Member, of the Member that is an Affiliate of such Guarantor, (ii) shall not be deemed to be a Capital Contribution and (iii) shall be paid solely by the Guarantor and/or the Member who is an Affiliate of such Guarantor.

SECTION 3.8    Indemnification; Liability.

(a)    The Members shall be indemnified, defended and held harmless by the Company from and against any and all expenses (including reasonable attorneys' fees), losses, damages, liabilities, charges and claims of any kind or nature whatsoever (collectively, "Indemnified Losses"), actually incurred by them in their capacities as Members, arising out of or incidental to any act performed or omitted to be performed by any one or more of the Members in their capacities as Members in connection with the business of the Company, provided that such act or omission was taken in good faith and within the scope of authority granted to such Member(s) by the terms of this Agreement and did not constitute gross negligence, willful misconduct, criminal or unlawful conduct, fraud or bad faith. In seeking to recover from the Company, the Members may look solely to the assets of the Company and none of the Members shall be personally liable nor shall any of their assets be available to satisfy any claim against the Company.

(b)    The Company and the Members shall be indemnified and held harmless by each Member from and against any and all Indemnified Losses arising out of or incidental to any gross negligence, criminal or unlawful conduct, willful misconduct, fraud or bad faith performed by such Member. Notwithstanding the foregoing, any such indemnity shall be subordinate to the claims of any Lender under any Permitted Loan Documents for so long as the applicable Permitted Indebtedness remains outstanding.

## ARTICLE 4
## ALLOCATION OF PROFITS AND LOSSES

SECTION 4.1    Allocation of Profits and Losses.

(a)    Allocations. Profits and Losses for a taxable year shall be allocated among the persons who were Members during such taxable year in a manner that will reduce,

17

proportionately, the differences between their respective Partially Adjusted Capital Accounts and Target Capital Accounts for such taxable year. No portion of the Losses for any taxable year shall be allocated to a Member whose Target Capital Account is greater than or equal to its Partially Adjusted Capital Account for such taxable year. No portion of the Profits for any taxable year shall be allocated to any Member whose Partially Adjusted Capital Account is greater than or equal to its Target Capital Account for such taxable year. For this purpose "Partially Adjusted Capital Account" means, with respect to any Member for any taxable year, the Capital Account of such Member at the beginning of such taxable year, adjusted for all contributions and distributions during such year and all special allocations pursuant to Section 4.2 respect to such taxable year, but before giving effect to any allocations of Profits or Losses for such taxable year pursuant to this Section 4.1(a). For this purpose "Target Capital Account" means the amount (which may be either a positive or a deficit balance) equal to:

(i)    the amount of the hypothetical distribution (if any) that such Member would receive if, on the last day of the taxable year, (x) all Company assets, including cash, were sold for cash equal to their Gross Asset Values, taking into account any adjustments thereto for such taxable year, (y) all Company liabilities were satisfied in cash according to their terms (limited, with respect to each nonrecourse liability, to the Gross Asset Values of the assets securing such liability), and (z) the net proceeds thereof (after satisfaction of such liabilities) were distributed in full pursuant to Section 8.3(c)(iv) hereof, over

(ii)    the sum of (x) the amount, if any, without duplication, that such Member would be obligated to contribute to the capital of the Company pursuant to any provision of this Agreement, (y) such Member's share of Company Minimum Gain, and (z) such Member's share of Member Nonrecourse Debt Minimum Gain, all computed immediately prior to the hypothetical sale described in Section 4.1(a)(i) hereof.

(iii)    Except as otherwise provided in this Agreement or otherwise as required under Section 704(b) of the Code and the related Treasury Regulations, each item of income, gain, loss or deduction of the Company for federal income tax purposes shall be allocated to the Members in the same manner that the corresponding item of Profit or Loss or other item of income, gain, loss or deduction that affect Capital Accounts of the Members was allocated pursuant to Sections 4.1(a) and 4.2.

SECTION 4.2    Special Allocations.

(a)    Minimum Gain Chargeback and Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gains or Member Nonrecourse Debt Minimum Gain during any taxable year or other period, prior to any other allocation pursuant hereto, such Member shall be specially allocated items of income and gain for such year (and, in necessary, subsequent years) in an amount and manner required by Treasury Regulation Section 1.704-2(f) or 1.704-2(i)(4). The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2.

(b)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in paragraphs (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d), items of Company income and gain shall be specially

18

allocated to such Members in an amount and manner sufficient to eliminate, to the extent required by such Regulations, the Adjusted Capital Account deficit of such Members as quickly as possible, provided that an allocation pursuant to this <u>Section 4.2(b)</u> shall be made only if and to the extent that a Member would have an Adjusted Capital Account deficit after all other allocations provided for in this <u>Article 4</u> have been tentatively made as if this <u>Section 4.2(b)</u> were not in the Agreement.

(c)     <u>Gross Income Allocation</u>.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this <u>Section 4.2(c)</u> shall be made only if and to the extent that a Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this <u>Article 4</u> have been tentatively made as if <u>Section 4.2(b)</u> and <u>4.2(c)</u> were not in this Agreement.

(d)     <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions shall be allocated to the Members in proportion to their respective Percentage Interests.

(e)     <u>Member Nonrecourse Deductions</u>.  Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(2).

(f)     <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(g)     <u>Curative Allocation</u>.  If the Capital Account balances of the Members, determined on a tentative basis (after giving effect to all contributions, distributions and allocations for all periods), differ from the amounts that will be distributed to them upon the liquidation of the Company, then notwithstanding anything to the contrary herein, items of income, gain, loss and deduction shall be specially allocated among the Members for the Fiscal Year in which the dissolution of the Company occurs (and, if necessary, the prior Fiscal Year), in order to conform the Capital Account balances of the Members to the amounts that will be distributed to them upon the liquidation of the Company.

(h)     <u>Loss Allocation Limitation</u>.  Notwithstanding the provisions of <u>Section 4.2</u> hereof, Losses (or items of loss) allocated pursuant to <u>Section 4.2</u> hereof shall not exceed the

19

maximum amount of Losses (or items of loss) that can be so allocated without causing any Members to have a deficit balance in its Adjusted Capital Account at the end of any Fiscal Year. In the event some but not all of the Members would have deficit balances in their Adjusted Capital Accounts as a result of an allocation of Losses (or items of loss) pursuant to <u>Section 4.2</u> hereof, the limitation set forth in this <u>Section 4.2(h)</u> shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). All Losses (or items of loss) in excess of the limitation set forth in this <u>Section 4.3(h)</u> shall be allocated to other Members in accordance with the provisions of <u>Section 4.2</u>, provided that no Losses (or items of loss) shall be allocated to any Members who are not permitted to be allocated any Losses (or items of loss) under this <u>Section 4.2(h)</u>.

SECTION 4.3    <u>Other Allocation Rules.</u>

(a)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as reasonably determined by the Member using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b)    Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members for tax purposes in the same proportions as they share Profits or Losses, as the case may be, for the year.

(c)    The Members are aware of the income tax consequences of the allocations made by this <u>Article 4</u> and hereby agree to be bound by the provisions of this <u>Article 4</u> in reporting their shares of Company income and loss for income tax purposes. It is the intent of the Members that each Member's share of Profits, Losses income, gain, expense, deduction and tax credits shall be determined and allocated for income tax purposes in accordance with this <u>Article 4</u> to the fullest extent permitted by Code Section 704(b).

(d)    Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the interest of the Members in Profits equals one hundred percent (100%), in proportion to their respective Percentage Interests.

SECTION 4.4    <u>Tax Allocations: Code Section 704(c).</u>

(a)    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with clause (a) of the definition of Gross Asset Value set forth in <u>Article 2</u> hereof).

(b)    In the event the Gross Asset Value of any Company property is adjusted pursuant to <u>Section 4.4(a)</u> hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such

20

asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocations shall be made by the Members, in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 4.4 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

## ARTICLE 5
## CASH DISTRIBUTIONS

SECTION 5.1    Distribution of Available Net Cash Flow and Capital Event Proceeds.

(a)    As used in this Agreement, the term "Available Net Cash Flow" shall mean the sum of all money available to the Company at the end of that period for distribution to its Members, less any portion thereof used to pay for, or establish, Reserves and other expenses and liabilities of the Applicable Companies (without duplication), including, without limitation, debt payments (including interest and principal) on loans, taxes, capital improvements and replacements and rent loss insurance proceeds, all as determined in accordance with this Agreement.  Available Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances and Available Net Cash Flow shall not be deemed to include any Capital Event Proceeds or any expenses related thereto.

(b)    As used in this Agreement, the term "Capital Event Proceeds" shall mean the net cash proceeds (net of Company expenses and liabilities) from all sales and other dispositions and all financings of all or any portion of the Property and/or any other property of the Applicable Companies, including the proceeds of condemnation proceedings (including payments in lieu thereof) or settlement of any insurance claims resulting in insurance proceeds not used in repair or restoration of the Property (other than rent loss insurance) that, in each instance, shall not be required to be paid to a Lender, less any portion thereof used to establish Reserves, all as determined in accordance with this Agreement.  Capital Event Proceeds shall include all principal and interest payments with respect to any note or other obligation received by Property Owner in connection with sales and other dispositions of the Property.

(c)    Capital Event Proceeds, and Available Net Cash Flow, if any, shall be distributed to the Members promptly after receipt thereof, as follows:

(i)    First, to the Members, pro-rata based upon the relative amount of each Member's Capital Contribution until such time as each Member shall have received aggregate distributions pursuant to this Section 5.1(c)(i) equal to the amount of Capital Contributions contributed by such Member; and

(ii)    Second, to the Members, pro-rata in accordance with their respective Percentage Interests.

21

(d)    If Manager shall determine that any Reserves established for the benefit of Property Owner from the proceeds of what otherwise would have been Available Net Cash Flow or Capital Event Proceeds shall no longer be required, such excess Reserves shall be distributed by the Company pursuant to the provisions of Section 5.1(c) hereof.

SECTION 5.2    Distributions.

(a)    A Member shall have no right to demand and receive any Distribution from the Company in any form other than cash.    The Company shall not make any in-kind Distributions to any Member without the Member's prior written consent.    Any in-kind distributions of Company property shall be valued by an established, reputable, independent and qualified appraiser.

(b)    A Member may not receive a Distribution to the extent that, after giving effect to the Distribution, all liabilities of the Company, other than liability to Members on account of their Capital Contributions, would exceed the fair value of the Company's assets.

SECTION 5.3    Withholding.  All Amounts required to be withheld pursuant to Section 1446 of the Code or any other provision of federal, state, or local law shall be treated as amounts actually distributed to the Members under this Agreement.  If the Members determine that the Company has insufficient liquid assets to satisfy such withholding obligation, the Members as to which withholding applies shall contribute cash to the Company in an amount sufficient to satisfy such withholding obligation (which amount shall not be treated as a Capital Contribution and the related payment of cash shall not be treated as a distribution).

## ARTICLE 6
## MANAGEMENT AND RIGHTS, OBLIGATIONS
## AND POWERS OF THE MEMBERS

SECTION 6.1    Management.

(a)    Subject to the terms of Section 6.2 hereof, the day to day business and affairs of the Company shall be managed by JS Member.  JS Member, in such capacity, is referred to herein as "Manager".   Manager shall: (i) manage the affairs and business of the Company; (ii) exercise, or refrain from exercising, the authority and powers granted to the Company; and (iii) otherwise act in all other matters on behalf of the Company, including, without limitation, the implementation of the decisions of the Members made in accordance with this Agreement and causing the Applicable Companies to implement the Business Plan in effect from time to time.

(b)    In performing its obligations under this Section 6.1, except as expressly provided in this Agreement, Manager shall not be required at any time to expend funds other than those of the Company.

(c)    Each Member shall, promptly after receipt thereof, furnish the other with copies of all material notices, reports and communications (i) between any of the Applicable Companies and the holder of a mortgage or deed of trust or any party to any material contract affecting any of the Applicable Companies, which in either case relates to an existing or pending

22

default thereunder or to any financial or operational information requested by such party, or is expressly required to be delivered to the other party by this Agreement and (ii) regarding material violations or material matters affecting any of the Applicable Companies.

(d)    Manager shall have the obligation and authority to (i) implement all Major Acts approved by the Members, (ii) conduct the day-to-day business and affairs of the Company and (iii) perform or observe all of the specific obligations to be performed by Manager.  Subject to Section 6.2, no Person dealing with the Company will be required to inquire into the authority of the Members to take any action or make any decision on behalf of the Company.  Manager shall be required to devote to the conduct of the operations of the Company only such time and attention as shall be necessary to accomplish the purposes, and to conduct properly the operations of the Company.

SECTION 6.2    Major Acts.

(a)    Notwithstanding any contrary term set forth in this Agreement, but subject to Section 6.2(b) below, neither Manager nor any of the Applicable Companies shall undertake any of the following acts (each, a "Major Act") without first obtaining the consent of Jangana Members, with such approval not to be unreasonably withheld, conditioned or delayed:

(i)    adopting (or thereafter materially modifying) a Business Plan, plan (a "Business Plan"), provided, however, that the Members hereby approve the initial Business Plan of the Company annexed hereto as Exhibit B;

(ii)    adopting an Operating Budget, other than in accordance with Section 6.4 hereof provided that Members hereby adopt the initial Operating Budget annexed hereto as Exhibit C;

(iii)    adopting a Development Budget, other than in accordance with Section 6.5 hereof, provided that the Members hereby adopt the initial Development Budget annexed hereto as Exhibit D;

(iv)    causing the conveyance, ground lease or master lease of the Property, other than in accordance with Section 7.6 hereof;

(v)    using funds of the Applicable Companies for any purpose, other than as set forth in the approved Operating Budget or Development Budget, except to the extent permitted by the ensuing provisions of this Section 6.2;

(vi)    causing any of the Applicable Companies to extend credit (except immaterial amounts in the ordinary course of business), make loans or become or act as a surety, guarantor, endorser or accommodation endorser (or modifying any obligations relating to the foregoing);

(vii)    causing any of the Applicable Companies to enter into any agreement or other arrangement with a Person which is an Affiliate of any of the Members, or thereafter modifying, amending or changing in any material respect any such agreement or other arrangement;

(viii)    causing any of the Applicable Companies to take any action which contravenes the then-effective Business Plan;

(ix)    except as permitted by <u>Section 3.2</u> hereof, making a Capital Call;

(x)    commencing or settling any litigation by or against any of the Applicable Companies involving claims in excess of $100,000 in the aggregate, other than (i) claims covered by insurance and (ii) actions to enforce the terms of any Leases, including, without limitation, eviction or holdover proceedings;

(xi)    causing any of the Applicable Companies to initiate any Bankruptcy proceedings;

(xii)    appointing or replacing the attorneys or accountants for the Company;

(xiii)    causing any of the Applicable Companies to contract with any Lender for any Indebtedness, provided, however, that the Members hereby approve the Canyon Loan and the Canyon Loan Documents;

(xiv)    causing Property Owner to exercise any option to extend the maturity date of the Canyon Loan;

(xv)    causing any of the Applicable Companies to acquire any property, other than the Property and any personal property contemplated by an approved Operating Budget or an approved Development Budget;

(xvi)    (A) selecting a property manager or entering into a property management agreement, provided that the Members hereby approve the appointment of Jones Lang LaSalle Americas, Inc. as property manager pursuant to that certain property management agreement, dated as of the date hereof, between Property Owner and Jones Lang LaSalle Americas, Inc., a copy of which is annexed hereto as <u>Exhibit E</u>; (B) selecting a general contractor or construction manager for the redevelopment of the Property or entering into a general contract or construction management agreement; (C) selecting a leasing agent or entering into a leasing agency agreement; (D) selecting an architect for the redevelopment of the Property or entering into an architect's agreement; or (E) entering into any contract for the performance of the Redevelopment having a value in excess of $50,000 in the aggregate;

(xvii)    causing Property Owner to file the Plans for approval with the City of Los Angeles Department of Building and Safety;

(xviii)    causing the Property Owner to sell, convey, encumber or exchange the Property or any part thereof;

(xix)    causing Property Owner to enter into any Leases, other than Leases consistent with leasing criteria set forth in the then-effective Business Plan;

(xx)   extending credit (except immaterial amounts in the ordinary course of business), making loans or becoming or acting as a surety, guarantor, endorser or accommodation endorser (or modifying any obligations relating to the foregoing);

(xxi)   causing any of the Applicable Companies to enter into any agreement or other arrangement with a Person which is a Member or an Affiliate thereof, or thereafter modifying, amending or changing in any material respect any such agreement or other arrangement;

(xxii)   amending, modifying or terminating this Agreement, the Broadbridge Member Operating Agreement or the Property Owner Operating Agreement, or any of the organizational documents of any of the Applicable Companies;

(xxiii)   making any capital improvements, repairs, alterations or changes in, to or on the Property, or any part thereof, except to the extent contemplated by the

(xxiv)   incurring any Development Costs not contemplated by the Development Budget which would have the effect (either individually or in the aggregate) of (A) increasing or decreasing any line item set forth in the Development Budget by more than the lesser of (x) 1% and (y) $50,000, (B) increasing or decreasing the total amount of such Development Budget by more than the lesser of (x) 2% and (y) $100,000; (C) changing in a material and adverse way the overall aesthetic appearance of the Property or any significant services or amenities to be provided in connection with the Property, (D) diminishing in any material respect the overall quality, functionality or marketability of the Property; or (E) causing an event of default under any applicable Permitted Loan Documents.   Notwithstanding any contrary term set forth in this Agreement, Manager may freely reallocate amounts in any contingency line item in the Development Budget, and may, upon the completion of any particular line item, reallocate any cost savings to other line items of the Development Budget;

(xxv)   incurring any Operating Expenses not contemplated by the then-effective Operating Budget which would have the effect (either individually or in the aggregate) of (x) increasing any line item set forth in such Operating Budget by more than 2% or (y) increasing the total amount of such Annual Budget by more than 1% in the aggregate;

(xxvi)   filing or otherwise initiating any Bankruptcy proceedings with respect to any of the Applicable Companies;

(xxvii)   settling insurance claims in excess of $50,000;

(xxviii) creating additional classes of interest in any of the Applicable Companies;

(xxix)   adopting any position in respect of the tax liability of the Company; and

(xxx)   taking any other action with respect to any matter which, pursuant to the express provisions of this Agreement, requires the approval, consent or agreement of the Jangana Members.

SECTION 6.3    Request for Consent to Major Act. As to each proposal for a Major Act, Manager shall notify Jangana Members and request their consent, which request for consent shall be accompanied by such back-up and explanatory materials as Manager shall reasonably determine is necessary to evaluate the proposed Major Act. If Jangana Members shall require additional information to evaluate the request of Manager, such Member may request such additional information from Manager within five (5) Business Days after its receipt of the request for consent. If Jangana Members fail to either consent or withhold consent to a Major Act within five (5) Business Days of their receipt of the request for consent (or its receipt of any additional information requested pursuant to the immediately preceding sentence), Manager may furnish Jangana Members with a second notice requesting consent, which second notice shall provide that the Member's failure affirmatively to consent or withhold consent thereto within five (5) Business Days shall be deemed to constitute the Jangana Members' withholding of consent to the Major Act. Jangana Members shall be deemed to have withheld consent to the proposed Major Act, unless Jangana Members affirmatively consent thereto within five (5) Business Days after receipt of such second notice.

SECTION 6.4    Operating Budget. No later than thirty (30) days prior to (i) the expiration of the fiscal year covered by the initial Operating Budget and (ii) each successive fiscal year, Manager shall submit to Jangana Members a proposed draft of the Operating Budget for ensuing fiscal year (each, a "Proposed Operating Budget"), which Proposed Operating Budget shall include, without limitation, a reasonable description of each item of income and expense that is anticipated to be generated or incurred with respect to the Property. Such Proposed Operating Budget shall be subject to approval by Jangana Members in accordance with the further provisions of this Section 6.4, which approval shall not be unreasonably withheld. Any notice of disapproval shall set forth with reasonable specificity the reasons for such disapproval. If Jangana Members fail to approve or disapprove a Proposed Operating Budget within thirty (30) days after receipt thereof, Manager may furnish Jangana Members with a second notice enclosing the Proposed Operating Budget, which notice shall state that Jangana Members Member's failure to approve or disapprove the Proposed Operating Budget within five (5) Business Days of its receipt thereof shall be deemed to constitute Jangana Members' consent thereto. If Jangana Members thereafter fail to approve or disapprove the Proposed Operating Budget within five (5) Business Days after receipt of such second notice, Jangana Members shall be deemed to have approved such Proposed Operating Budget. If Jangana Members fail to approve a Proposed Operating Budget prior to the commencement of a fiscal year, the Operating Budget for the prior fiscal year shall continue in effect, subject to increases of 3% in respect of each line item (other than increases in uncontrollable expenses, such as real estate taxes and utilities, the line items for which shall increase by the actual increase in expense). Upon Jangana Members' approval (or deemed approval) of a Proposed Operating Budget, the same shall constitute the Operating Budget for all purposes under this Agreement.

SECTION 6.5    Development Budget. No later than four (4) months after the date hereof, Manager shall submit to Jangana Members proposed drafts of the Development Budgets for the Initial Post-Closing Capital Improvements and the Redevelopment Work (collectively, the "Proposed Supplementary Development Budgets"), which Proposed Supplementary Development Budgets shall include, without limitation, a reasonable description of each item of Development Costs anticipated to be incurred in connection with the applicable phase of the Redevelopment. Such Proposed Supplementary Development Budgets shall be subject to

1346741 v4
17994.00022

approval by Jangana Members in accordance with the further provisions of this Section 6.5, which approval shall not be unreasonably withheld. Any notice of disapproval shall set forth with reasonable specificity the reasons for such disapproval. If Jangana Members fails to approve or disapprove a Proposed Operating Budget within thirty (30) days after receipt thereof, Manager may furnish Jangana Members with a second notice enclosing the Proposed Operating Budget, which notice shall state that Jangana Members Member's failure to approve or disapprove the Proposed Operating Budget within five (5) Business Days of its receipt thereof shall be deemed to constitute Jangana Members' consent thereto. If Jangana Members thereafter fail to approve or disapprove the Proposed Operating Budget within five (5) Business Days after receipt of such second notice, Jangana Members shall be deemed to have approved such Proposed Supplementary Development Budgets. Upon Jangana Members' approval (or deemed approval) of the Proposed Supplementary Development Budgets, the same shall, together with the initial Development Budget, constitute the Operating Budget for all purposes under this Agreement.

SECTION 6.6    Exculpation.

(a)    Subject to Section 6.6(b) below, neither Member nor any of its respective Affiliates, officers, partners, employees or agents, shall be liable, in damages or otherwise, to the Company or to any of the other Members, for any act or omission performed or omitted by such Member, pursuant to the authority granted by this Agreement, except if such act or omission results from gross negligence, willful misconduct, fraud or bad faith.

(b)    Notwithstanding anything to the contrary contained in Section 6.6(a), neither Member nor any officer or director of such Member shall be liable, responsible or accountable in damages or otherwise to the other Member for any action or failure to act taken or omitted on behalf of the Company in good faith within the scope of the authority conferred upon such Member or by law unless such action or failure to act (i) is or results in a breach of any representation, warranty or covenant of the Member contained in this Agreement and, if capable of cure, is not cured within thirty (30) days after notice thereof is delivered to the other Member, (ii) was performed or omitted fraudulently or in bad faith or (iii) constituted gross negligence, unlawful activity or willful misconduct.

(c)    Notwithstanding the provisions of Section 6.6(a), if a Member or its Affiliate shall make a payment under a Guaranty, the Members' respective reimbursement and indemnification obligations, if any, as well as whether such payment increases a Member's Capital Account or is deemed to be a Capital Contribution, shall be governed by Section 3.7 hereof.

SECTION 6.7    Time Devoted by Members; Competing Ventures.

(a)    Each Member shall devote such time to the Company as is reasonably necessary to perform its obligations hereunder. Except as otherwise expressly provided herein, the Members shall not be entitled to any salary or other compensation from the Company except for their respective cash distributions as set forth in Article 5.

27

(b)    Notwithstanding anything to the contrary contained in <u>Section 6.6(a)</u> above, the Members and their respective Affiliates shall devote such time and attention to the Company's business as shall be necessary to supervise the Company's business and affairs in accordance with the provisions of the Agreement.

(c)    Notwithstanding any contrary term set forth in this Agreement, each Member and its respective Affiliates may engage in business ventures of any type or description, at any location, independently or with others, with no obligation to offer the Company or the other Member any interest in such venture, and whether or not the venture in question may compete with the business of the Company.

SECTION 6.8    <u>Other Duties and Obligations of the Members</u>.

(a)    The Members shall take all reasonable action that may be necessary or appropriate for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged.

(b)    The Members shall use diligent efforts to conduct their respective affairs and the affairs of the Company at all times in such a manner that the Members shall not have any personal liability (other than personal liability to the Company as described and provided for in this Agreement) with respect to any Company liability or obligation in excess of their Capital Contributions.

(c)    The Members shall take all actions reasonably necessary to assure that the Company will be treated as a partnership or an entity that is disregarded for U.S. federal income tax purposes.

## ARTICLE 7
## TRANSFERABILITY OF MEMBERS' INTERESTS

SECTION 7.1    <u>Prohibited Transfers</u>.

(a)    Except in accordance with, and as permitted by <u>Sections 7.2</u> or <u>7.6</u>, no Member may, directly or indirectly, sell, assign, transfer or otherwise dispose of (collectively, "<u>Transfer</u>") all or any part of its Company Interests, whether voluntarily or by foreclosure, assignment in lieu thereof or other enforcement of a pledge, hypothecation or collateral assignment, without the prior written consent of the other Member(s).

(b)    For purposes of this Agreement, any sale, assignment, transfer or other disposition of the capital stock or other equity interest in any Member or the issuance of capital stock or additional partnership or membership interests shall constitute a Transfer unless such Transfer shall be permitted pursuant to this <u>Article 7</u>.

SECTION 7.2    <u>Permitted Transfers</u>.    Notwithstanding any contrary term set forth in this Agreement, (i) JS Member may effectuate any indirect Transfer, provided that, after giving effect thereto, Joel Schreiber continues to control the day to day management and affairs of JS

28

Member and shall own, in the aggregate, directly or indirectly, not less than 80% of JS Member, (ii) Jangana Members may Transfer interests among each other, provided that, after giving effect to any such Transfer, Jack retains a direct membership interest in the Company and (iii) Jangana Members may effectuate any Transfer (other than Transfers described in <u>clause (ii)</u> of this <u>Section 7.2</u>), provided that, after giving effect thereto, the Jangana Members (including Jack) own not less than 80% of the membership interests in the Company and Jack continues to exercise all consent and other rights in respect of the membership interests of the Jangana Members (including the membership interests transferred to the transferee), it being understood that no voting or other rights in respect of such consent and other rights shall be accorded to the transferee.

SECTION 7.3    <u>Admission of a Substituted Member</u>.  In the event that a Member shall Transfer all or a portion of its direct Company Interest pursuant to, and in accordance with, the terms of this Agreement, the transferee thereof shall become a Substituted Member only upon the Company's receipt of (i) an instrument, in form satisfactory to the Company, whereby the transferee agrees to assume all of the obligations of the transferor under this Agreement, (ii) evidence reasonably satisfactory to the Members of the authority of such Substituted Member to become a Member and to be bound by all of the terms and conditions of this Agreement, (iii) such other documents or instruments as may reasonably be required under the LLCA or otherwise in order to effect the admission of the Substituted Member as a Member under this Agreement; and (iv) evidence reasonably satisfactory to Manager that such Transfer (A) would not violate (I) any Federal and state securities laws and rules and regulations of the Securities and Exchange Commission, state securities commissions, and any other Government Entity with jurisdiction over such disposition or (II) any of the operating agreements or certificates of formation of the Applicable Companies or (B) would not jeopardize the Company's classification for Federal income tax purposes as a partnership and (C) would not affect the Company's existence as a limited liability company under the LLCA.

SECTION 7.4    <u>Withdrawal of a Member</u>.  A Member may not voluntarily withdraw or resign from the Company, retire or dissolve, except pursuant to a Transfer of all of such Member's Company Interest as a Member in accordance with this <u>Article 7</u>, or as otherwise may be agreed among the Members.  Resignation from the Company shall not entitle a Member to receive the fair value of its Company Interest as provided in the LLCA or any other distributions from the Company.

SECTION 7.5    <u>Dissolution of Member; Other Termination of Membership</u>.

(a)    In the event of dissolution of a Member, any successor to the Company Interest of the affected Member as a result thereof shall be deemed to be the transferee of the entire Company Interest of the affected Member and may be admitted as a Substitute Member upon the consent of the Members and upon satisfaction of the requirements of <u>Section 7.3</u>.

(b)    The provisions of <u>Article 1</u> and this <u>Section 7.5</u> shall not cause or require the dissolution of the Company should any of the events described in such Article or Section occur to a Person that is not a Member but only possesses economic benefits associated with any Company Interest.

1346741 v4
17994.00022

SECTION 7.6    <u>Forced Sale.</u>

(a)    Notwithstanding any contrary term set forth in this Agreement, if the Members are unable to agree on any Major Act, the Jangana Members acting jointly or JS Member (each, a "<u>Forced Sale Initiating Member</u>") may, from and after the expiration of the Lock-Out Period, cause a sale of the Property, subject to a right of first offer in favor of JS Member or the Jangana Members (as applicable) (the "<u>Responding Member</u>") and the other terms and conditions set forth in this <u>Section 7.6</u>.

(b)    The initiating Member (the "<u>Forced Sale Initiating Member</u>") shall provide the other Member (the "<u>Forced Sale Responding Member</u>") with a written notice (each, a "<u>ROFO Notice</u>") indicating the purchase price (the "<u>ROFO Purchase Price</u>") and all other material terms upon which it is prepared to cause the Property Owner to sell the Property. The Forced Sale Responding Member, upon written notice to the Forced Sale Initiating Member (a "<u>ROFO Election Notice</u>") no later than thirty (30) days after its receipt of the ROFO Notice (time being of the essence), may elect to exercise the ROFO and acquire all of the membership interests of the Forced Sale Initiating Member for a purchase price equal to the distributions that the Forced Sale Initiating Member upon a sale of the Property for a purchase price equal to the ROFO Purchase Price (the "<u>Allocated ROFO Purchase Price</u>"). The effectiveness of exercise of the ROFO is conditioned upon the Forced Sale Responding Member's delivery to Escrow Agent of the ROFO Deposit (to be held in escrow pursuant to customary escrow agreement in form mutually satisfactory to the Members and Escrow Agent). If the Forced Sale Responding Member exercises the ROFO in the time and in the manner hereinbefore prescribed, the Company shall cause the Property Owner to proceed to the closing of the sale of the Property to the Forced Sale Responding Member (hereinafter, the "<u>ROFO Closing</u>") in accordance with the terms of <u>Section 7.6(c)</u> hereof. If the Forced Sale Responding Member fails to exercise the ROFO in the time and in the manner hereinbefore prescribed, the Forced Sale Responding Member shall be deemed irrevocably to have waived its right to exercise the ROFO in respect of the Property, whereupon the Forced Sale Initiating Member may proceed to cause the sale of the Property to a Person which is not an Affiliate of the Forced Sale Initiating Member. The Forced Sale Responding Member shall execute and deliver to the Forced Sale Initiating Member such reasonable instrument as the Forced Sale Initiating Member may request to confirm the waiver of the ROFO, provided, however, that the Forced Sale Initiating Member's failure to so execute such instrument shall not derogate from the waiver.

(c)    If the Forced Sale Responding Member exercises the ROFO in respect of the Property in the time and the manner prescribed by <u>Section 7.6(b)</u> hereof, the ROFO Closing shall occur on the date which is sixty (60) days after the date upon which the Forced Sale Initiating Member receives the ROFO Election Notice. At the ROFO Closing, (i) the Forced Sale Responding Member shall pay to the Forced Sale Initiating Member, by wire transfer of immediately available funds, the balance of the Allocated ROFO Purchase Price (after application of the ROFO Deposit), (ii) the Forced Sale Initiating Member shall convey to the Forced Sale Initiating Member, by instrument of assignment and assumption, all of its right, title and interest, as a member, in the Company, free of any lien or encumbrance, other than any lien or encumbrance in favor of the holder of any Permitted Indebtedness, (iii) the Forced Sale Responding Member shall assume all of the obligations of the Initiating Member under this Agreement pursuant to the aforesaid instrument of assignment and assumption, (iv) the Forced

Sale Initiating Member shall execute and deliver to the Forced Sale Responding Member an affidavit under the Foreign Investors in Real Property Act and (v) the Forced Sale Initiating Member shall pay any transfer tax payable in respect of the transfer of its membership interest. At the ROFO Closing, the Forced Sale Responding Member shall cause the unconditional release from each Guaranty of any Guarantor which is an Affiliate of the Forced Sale Initiating Member (provided, however, that the Forced Sale Responding Member shall be deemed to have satisfied such condition, notwithstanding the Lender's refusal to release any such Affiliate of the Forced Sale Initiating Member from liability under any Guaranty of Non-Recourse Carve-Outs arising by reason of the acts or omissions of the Forced Sale Initiating Member or its Affiliates prior to the ROFO Closing).  If the ROFO Closing fails to occur by reason of the default of the Forced Sale Responding Member, the ROFO Deposit shall be paid to the Forced Sale Initiating Member, as liquidated damages for such default.  Thereafter, the Forced Sale Initiating Member may cause a sale of the Property, free of any ROFO in favor of the Forced Sale Responding Member, upon such terms as the Forced Sale Initiating Member deems appropriate.  If the ROFO Closing fails to occur by reason of the default of the Forced Sale Initiating Member, the Forced Sale Responding Member shall have all of the remedies available to it, at law or in equity, on account thereof, including, without limitation, the remedy of specific performance.

(d)    If the Forced Sale Responding Member waives (or is deemed to have waived), the Forced Sale Initiating Member shall have the right, during the ensuing six-month period, to cause the Property Owner to sell the Property to a Person which is not an Affiliate of the Forced Sale Initiating Member for an all-cash purchase price equal to not less than ninety-five percent (95%) of the ROFO Purchase Price (the "Minimum Purchase Price").  The Forced Sale Initiating Member, on behalf of the Property Owner, shall be authorized to accept an offer meeting the criteria set forth in this Section 7.6(d) and to execute all such documents as shall be required in order to close and consummate the sale of the Property pursuant to the terms and conditions of such offer.  If a Forced Sale Initiating Member receives an offer from a third party that it wishes to accept for a purchase price that is less than the Minimum Purchase Price set forth in the applicable ROFO Notice, or wishes to close on such sale on a date which is later than six (6) months after the date upon which the Forced Sale Responding Member waived (or is deemed to have waived) the ROFO, the Forced Sale Initiating Member shall not have the right to close on such sale, but shall again comply with the provisions of Section 7.6(b) hereof prior to closing on the same (except that the period in which to respond to the ROFO Notice shall be reduced from thirty (30) days to ten (10) days, and the time in which to close shall be reduced from sixty (60) days to thirty (30) days).

SECTION 7.7    Certain Prohibited Transfers.  Notwithstanding any contrary term set forth in this Agreement, a Member may not Transfer its Company Interest, or cause the sale of the Property, unless such Member shall have obtained the consent of any Lender under any Permitted Loan Documents, if required pursuant to such Permitted Loan Documents or otherwise satisfy any Permitted Indebtedness.  Any Transfer shall be conducted in accordance with, and shall not violate, the terms and conditions of any applicable Permitted Loan Documents.  For the avoidance of doubt, the reallocation of limited liability interests in the Company among the existing Members of the Company or otherwise shall constitute a "Transfer" for all purposes hereunder.

1346741 v4
17994.00022

## ARTICLE 8
## DISSOLUTION AND LIQUIDATION OF THE COMPANY

SECTION 8.1    Events Causing Dissolution.    The Company shall dissolve and its affairs wound up upon the happening of any Dissolution Event.

SECTION 8.2    Liquidating Trustee.    Upon dissolution of the Company, unless as a result of an event specified in Section 1.3(d) that shall affect Manager, Manager will act as the "Liquidating Trustee".    Upon dissolution of the Company as a result of an event under Section 1.3(d) that shall affect Manager, JS Member shall be the Liquidating Trustee.

SECTION 8.3    Liquidation.    As soon as possible after dissolution of the Company, the Liquidating Trustee will wind up the Company's business and affairs as follows:

(a)    The Liquidating Trustee will prepare or cause to be prepared and delivered to each Member an accounting with respect to all Company accounts and the Capital Account of each Member and with respect to the Company's assets and liabilities and its operations from the date of the last previous audit of the Company delivered to the Members to the date of dissolution.

(b)    The Liquidating Trustee will liquidate all Company assets which, in its sole discretion, it determines may be sold for such assets' fair market value or where it determines such liquidation is otherwise in the best interests of the Members.

(c)    In settling accounts after dissolution, the assets of the Company shall be distributed as follows:

(i)    to creditors, including, to the extent not prohibited by law, Members who are creditors, in satisfaction of liabilities of the Company;

(ii)    pay all expenses incurred in connection with the termination, liquidation and dissolution of the Company and distribution of its assets as herein provided;

(iii)    to the establishment of Reserves for contingencies or unforeseen liabilities and obligations of the Company, which Reserves may be paid over to a bank or other party chosen by the Members, to be held in escrow for payment of such contingent or unforeseen liabilities;

(iv)    to the Members in accordance with the provisions of Section 5.1(c).

(d)    At the expiration of such time period as the Members shall deem advisable, the remaining balance of any Reserve established in accordance with clause (iii) shall be distributed in the manner set forth in clause (iv).

(e)    If the Liquidating Trustee and all of the Members shall determine that it is in the best interest of the Members to distribute certain Company assets in kind, such assets will be distributed subject to such liens, encumbrances, restrictions, contracts, obligations,

commitments or undertakings as existed with respect to such asset prior to the dissolution of the Company and have not been discharged by payments made pursuant to <u>Section 8.3(c)(i)</u>.

SECTION 8.4    <u>Termination</u>.    Upon completion of the distribution of the Company property as provided in this <u>Article 8</u>, the Company shall be terminated, and the Liquidating Trustee appointed in accordance with <u>Section 8.2</u> in charge of winding up the Company's business shall cause the filing of articles of dissolution with the Secretary of State of Delaware and shall take all such other actions as may be necessary to terminate the Company.

SECTION 8.5    <u>Claims of the Members</u>.    The Members shall look solely to the Company property for the return of their Capital Contributions, and if the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members shall have no recourse against the Company or any other Member or any former Member or any other employee or agent of the Company.

# ARTICLE 9
# REPRESENTATIONS AND WARRANTIES

SECTION 9.1    <u>Representations and Warranties of JS Member</u>.    JS Member represents and warrants to the Company and the Jangana Members as follows:

(a)    JS Member is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)    JS Member has all necessary power and authority to own and operate its assets and properties and to carry on the business contemplated by this Agreement.

(c)    The execution and delivery of this Agreement and all other documents, instruments and agreements to be executed in connection with the transactions contemplated by this Agreement have been duly and validly authorized by all necessary actions of JS Member, and shall constitute the legal, valid and binding obligations of JS Member, enforceable against JS Member in accordance with the terms hereof and thereof except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, liquidation, receivership, moratorium or other similar laws related to or affecting the enforcement of creditors' rights generally or by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(d)    No consent, waiver, approval or authorization of or notice to any other Person (including any Government Entity) is required to be made, obtained or given by JS Member in connection with the execution and delivery of this Agreement or any other Transaction Document except for those which have been heretofore obtained.

(e)    Neither the execution nor delivery of this Agreement nor any of the other documents or instruments to be executed and delivered in connection with this Agreement does or will (i) violate, conflict with or constitute a default under any term or provision of (A) any agreement to which JS Member is a party or by which it is bound, or (B) any judgment, decree, order, statute, injunction, rule or regulation of a Government Entity applicable to JS Member, or

1346741 v4
17994.00022

by which it or its assets or properties are bound, or (ii) result in the creation of any lien or encumbrance upon any of its assets.

SECTION 9.2    Representations and Warranties of Jangana Members.    Jangana Members hereby represents and warrants to the Company and JS Member as follows:

(a)    This Agreement and all other documents, instruments and agreements to be executed in connection with this Agreement constitute the legal, valid and binding obligations of Jangana Members, enforceable against Jangana Members in accordance with the terms hereof and thereof except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, liquidation, receivership, moratorium or other similar laws related to or affecting the enforcement of creditors' rights generally or by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(b)    No consent, waiver, approval or authorization of or notice to any other Person (including any Government Entity) is required to be made, obtained or given by Jangana Members in connection with the execution and delivery of this Agreement or any other Transaction Document except for those which have been heretofore obtained.

(c)    Neither the execution nor delivery of this Agreement nor any other document or instrument to be executed and delivered in connection with this Agreement does or will (i) violate, conflict with or constitute a default under any term or provision of (A) any agreement to which Jangana Members are a party or by which it is bound, or (B) any judgment, decree, order, statute, injunction, rule or regulation of a Government Entity applicable to Jangana Members, or by which it or its assets or properties are bound, or (ii) result in the creation of any lien or encumbrance upon any of its assets.

# ARTICLE 10
# BOOKS AND RECORDS, ACCOUNTING, REPORTS, TAX ELECTIONS

SECTION 10.1    Books of Account; Records.    At all times during the continuance of the Company, Manager shall keep, or cause to be kept, full and true books of account in which shall be entered, fully and accurately, all transactions of the Company.  All of said books of account, together with a certified copy of the Articles, any amendments thereto, and an executed copy of such other instruments as the Members may execute to carry out and give effect to the provisions of this Agreement or to maintain the status of the Company as a limited liability company as constituted from time to time, shall at all times be maintained at the Principal Office of the Company, or at such other office of the Company as may be designated for such purpose by the Members, and each Member may, at any time during reasonable business hours, at its own expense, inspect, examine and make photocopies of the books and records of the Company or cause them to be examined by its representative, or by an attorney and/or a certified public accountant designated by such Member.

SECTION 10.2    Financial Reports.

(a)    Annual.    Manager shall cause to be delivered to the Members, within sixty (60) days after the expiration of each Fiscal Year, annual reports of the Company, including (i) an annual balance sheet and profit and loss statement and statement regarding sources and uses

34

of funds prepared in accordance with generally accepted accounting principles, consistently applied, and audited by the Company Accountants, (ii) a statement showing the distributions to the Members and the allocation among the Capital Accounts of the Members of taxable income, gains, losses, deductions, credits and other relevant items of the Company for such Fiscal Year, (iii) an audited statement setting forth the amount of Available Net Cash Flow and Capital Event Proceeds for the just completed Fiscal Year, and (iv) any other items reasonably requested by the Members. All such reports and statements shall be prepared in accordance with generally accepted accounting principles, consistently applied. The foregoing reports shall also contain a summary of all transactions and payments for such Fiscal Year between the Company and any Member and/or Affiliates of any Member. In addition, Manager shall deliver to the Members, on a monthly basis, an income and expense statement, and a reconciliation statement for the Property.

(b)    Quarterly. Manager shall cause to be delivered to the Members, within thirty (30) days after the end of each quarter during a Fiscal Year, a report of the Company's accountants, setting forth as at the end of such quarter, for the Company, a statement of changes in financial position or a cash flow statement, as well as a report Unit sales activity (if applicable), budget variance, construction progress and such other information as the Members shall reasonably request.

SECTION 10.3  Tax Returns and Advances. Manager shall cause all income tax and information returns for the Company to be prepared by the company accountants and shall, within sixty (60) days after the end of each Fiscal Year, submit to each other Member for its approval a draft of all such tax returns and shall cause such tax and information returns to be filed with the appropriate authorities. Manager shall use commercially reasonable efforts to cause the K-1 Information Return for each Member to be delivered to such Member within forty-five (45) days after the end of each Fiscal Year. Copies of such tax and information returns (including K-1 Information Returns for the respective Members) shall also be kept at the Principal Office of the Company where they shall be available for inspection by the Members and their representatives during normal business hours.

SECTION 10.4  Tax Elections. Manager is designated as the "Tax Matters Partner" (as defined in Section 63231 of the Code) of the Company and is authorized and required to represent the Company (at the expense of the Company) in connection with all examinations of the affairs of the Company by any Federal, state, or local tax authorities, including any resulting administrative and judicial proceedings, and to expend funds of the Company for professional services and costs associated therewith; provided, however, that the Tax Matters Partner shall take no action that would have an adverse effect on the JS Member without the prior consent of the JS Member, which consent shall not be unreasonably withheld, delayed or conditioned.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

SECTION 11.1  Notices. All notices, demands, requests or other communications (collectively, "Notices") which may be or are required to be given, served, or sent by any party to any other party pursuant to this Agreement shall be in writing and shall be hand delivered or mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or

35

transmitted by facsimile (with the original to be sent the same day by Federal Express or other recognized overnight delivery service) or by Federal Express or other recognized overnight delivery service addressed to the recipient at its address set forth below (or at such other address as the recipient may theretofore have designated in writing). Each Notice which shall be hand delivered or mailed in the manner described shall be deemed sufficiently given, served, sent, received, or delivered for all purposes on the first Business Day following the day the Notice is delivered to the addressee (with the return receipt, the delivery receipt, or the affidavit of messenger being deemed conclusive (but not exclusive) evidence of such delivery), or if delivery is refused, then on the first Business Day following the day that delivery of the Notice is refused by the addressee upon presentation. Each Notice which shall be faxed in the manner described above shall be deemed sufficiently given, served, sent, received, or delivered for all purposes on the first Business Day following the date of such facsimile. Notice may be given by counsel to the Members. Subject to the above, all Notices shall be addressed as follows:

If to JS Member:

    JS Western Holdco Member LLC
    c/o Waterbridge Capital LLC
    590 Madison Avenue
    34th Floor
    New York, New York  10022
    Attention: Joel Schreiber
    Telecopier: (212) 696-2401

with a copy to:

    Pryor Cashman LLP
    7 Times Square
    New York, New York  10036
    Attention:  Dennis M. Sughrue, Esq.
    Telecopier: (212) 710-6090

If to Jangana Members:

    Jack Jangana, Jenny Haim and Joyce Reiss
    c/o Continental Worsteds Inc.
    45 North Station Plaza, Ste 402
    Great Neck, New York 11021

with a copy to:

    Katten Muchin Rosenman LLP
    2029 Century Park East, Ste 2600
    Los Angeles, California  90067-3012
    Attention: Benzion Westreich, Esq.

SECTION 11.2 <u>Confidentiality</u>.    Neither the Members nor the Members' Representatives shall, at any time or in any manner, either directly or indirectly, without the consent of each other Members, divulge, disclose or communicate to any Person (i) the terms of this Agreement, (iii) the transactions contemplated hereby, and (iii) the identities of the Members and/or their constituent members or Affiliates (collectively, the "<u>Confidential Information</u>"). Notwithstanding the foregoing, (a) a Member may disclose to such Member's Representatives (including, without limitation, such Member's prospective investors) as much of the Confidential Information as such Member deems necessary or desirable, provided that those to whom such Confidential Information is disclosed are informed of the confidential nature thereof and agree to keep the same confidential in accordance with this Agreement, and (b) if a Member shall be advised by its counsel that such Member is legally required to disclose any Confidential Information, such Member may disclose such Confidential Information after notice to, and consultation with, the other Members.

SECTION 11.3   Signatures; Amendments.  No amendment, change or alteration of this Agreement shall bind any Member, unless it is in writing and signed by all the Members. Notwithstanding any contrary term set forth in this Agreement, so long as the obligations evidenced by the Canyon Loan Documents remain outstanding, this Agreement may not be amended without the consent of the lender under the Canyon Loan Documents, except as follows: (i) to eliminate ambiguity in any of the existing terms of this Agreement; and (ii) to amend, supplement or otherwise revise any existing term of this Agreement in a manner which conforms with the requirements of the Canyon Loan Documents.

SECTION 11.4   Binding Provisions.  The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, executors, administrators, personal representatives, and permitted successors and assigns of the respective parties hereto.

SECTION 11.5   Applicable Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to principles of conflicts of law.

SECTION 11.6   Counterparts.  This Agreement may be executed in several counterparts, all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the same counterpart.

SECTION 11.7   Severability of Provisions.  Each provision of this Agreement shall be considered separable and if, for any reason, any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

SECTION 11.8   Interpretation.  Captions and headings, contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope of this Agreement or any provision hereof.  Whenever the singular or plural number or the masculine, feminine or neuter gender is used herein, it shall equally include the other(s).  The words "hereof," "herein" and "hereunder" and words of similar import when used without reference to an article, Section or Section of this Agreement, shall refer to this Agreement as a whole and not to any particular provision in this Agreement.  All exhibits are hereby incorporated into, and made a part of, this Agreement.  Whenever in this Agreement there is a reference to a day that is not a Business Day, such reference shall mean the first succeeding Business Day following such day.

SECTION 11.9   No Benefit to Third Parties.  No Person other than the Members and the Company is or shall be entitled to bring any action to enforce any provision of this Agreement against any Member or the Company and that the covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Members (or their respectively successors and assigns as permitted hereunder) and the Company.

SECTION 11.10   Remedies Not Exclusive.  Any remedies herein contained for breaches of obligations hereunder shall not be deemed to be exclusive and shall not impair the right of any party to exercise any other right or remedy, whether for damages, injunction or otherwise.

1346741 v4
17994.00022

SECTION 11.11 <u>Brokerage Representation and Indemnity</u>.    Each Member hereby represents and warrants to the other that it has had no dealings with any broker or finder in connection with the transactions contemplated by this Agreement, and hereby agrees to indemnify, defend and hold the other Member and the Company harmless from and against any loss, cost, claim, damage or expense (including, without limitation, reasonable attorneys' fees) arising by reason of any breach of the foregoing representation.

SECTION 11.12 <u>Jangana Members</u>.  Any actions or consents required or to be given by or on behalf of the Jangana Members shall be given Jack, who shall have the sole and exclusive authority to bind all of the Jangana Members.  The Jangana Members hereby authorize and instruct JS Member to ignore any action or consent given by any Jangana Member (other than Jack) which conflicts with any action or consent given by Jack.

SECTION 11.13 <u>Joint and Several Obligations</u>.  Notwithstanding anything herein to the contrary, the obligations of the Jangana Members (including, if applicable, the obligation to contribute Additional Capital Contributions and any indemnification obligations of the Jangana Members set forth in this Agreement) shall be their joint and several obligations.

[Signature Page Follows.]

IN WITNESS WHEREOF, the undersigned Members have executed this Agreement as of the date first above written.

**MEMBERS**:

_____
JENNY HAIM

_____
JOYCE REISS

_____
JACK JANGANA


JS WESTERN HOLDCO MEMBER LLC,
a Delaware limited liability company


By:_____
Name: Joel Schreiber
Title: Sole Member

IN WITNESS WHEREOF, the undersigned Members have executed this Agreement as of the date first above written.

**MEMBERS:**

_____
JENNY HAIM


_____
JOYCE REISS


_____
JACK JANOANA


JS WESTERN HOLDCO MEMBER LLC,
a Delaware limited liability company


By:_____
Name: Joel Schreiber
Title: Sole Member

IN WITNESS WHEREOF, the undersigned Members have executed this Agreement as of the date first above written.

**MEMBERS**:

_____

JENNY HAIM

_____

JOYCE REISS

_____

JACK JANGANA

JS WESTERN HOLDCO MEMBER LLC,
a Delaware limited liability company

By:_____
Name: Joel Schreiber
Title: Sole Member

Signature Page to the LLC Agreement of Western LA Holdco LLC

## Schedule A

Member Names, Addresses, Initial Capital Contribution and Percentage Interest

| NAME AND ADDRESS OF MEMBER | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| JS MEMBER | | 50.00000 |
| JENNY HAIM | | 16.667 |
| JACK JANGANA | | 16.667 |
| JOYCE REISS | | 16.666 |
| TOTALS | | 100.00 |

# **<u>EXHIBIT A</u>**

LEGAL DESCRIPTION OF THE PROPERTY

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOT "C" AS SHOWN ON MAP OF A RE-SUBDIVISION OF A PORTION OF BLOCK 52, OF HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 12 PAGE 1 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LOT "C" INCLUDED WITHIN THE BOUNDARIES DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 52, OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF HILL STREET, 92 FEET WIDE, DISTANT THEREON SOUTH 37° 42' WEST 177.25 FEET FROM THE SOUTHWESTERLY LINE OF EIGHTH STREET, 70 FEET WIDE, AS LOCATED BY THE CITY ENGINEER OF SAID CITY; THENCE ALONG HILL STREET SOUTH 37° 42' WEST 59.33 FEET TO THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO KATE VAN NUYS PAGE, RECORDED ON SEPTEMBER 17, 1923 AS INSTRUMENT NO. 943 IN, IN BOOK 2396 PAGE 242 OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG SAID NORTHEASTERLY LINE SOUTH 52° 11' 20' EAST 160.70 FEET; THENCE NORTH 37° 56' EAST 59.38 FEET TO A LINE HAVING A BEARING OF NORTH 52° 12' 30" WEST WHICH PASSES THROUGH THE POINT OF BEGINNING; THENCE ALONG SAID LINE NORTH 52° 12' 30' WEST 160.94 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LOT "C" INCLUDED WITHIN THE PORTION OF THE SOUTHEASTERLY 6.00 FEET OF HILL STREET 92.00 FEET WIDE WHICH LIES NORTHWESTERLY OF AND ADJOINING THE LAND ABOVE EXCEPTED.

PARCEL 1A:

LOT 20 IN BLOCK 52, OF HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:

LOT "B" OF TRACT 2698, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 29 PAGE 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2A:

THAT PORTION OF LOUISA KALISHER'S HILL STREET LOT, AS PER MAP RECORDED IN BOOK 8 PAGE 34, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

A STRIP OF LAND LYING ADJACENT TO THE NORTHERLY LINE OF LOT "B" OF TRACT 2698 ABOVE DESCRIBED, AND HAVING A FRONTAGE OF 15 9/16 INCHES ALONG THE EASTERLY LINE OF HILL STREET AND A WIDTH OF 24 5/16 INCHES ON THE EASTERLY LINE OF SAID LOUISA KALISHER'S HILL STREET LOT AS SHOWN ON THE AFORESAID MAP.

PARCEL 3:

LOT "F" OF TRACT 2022, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 21 PAGE 92 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 4:

THE NORTH 1/2 OF LOT "E" OF TRACT 655, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 98 AND 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WHICH SAME LOT IS ALSO KNOWN AS THE NORTH 1/2 OF LOT "E" OF TRACT 419, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 14 PAGE 136 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 5:

THE SOUTH 1/2 OF LOT "E" OF TRACT 655, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 98 AND 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WHICH SAME LOT IS ALSO KNOWN AS THE SOUTH 1/2 OF LOT "E" OF TRACT 419, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 14 PAGE 136 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 6:

PARCEL A:

THAT PORTION OF BLOCK 52, OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF HILL STREET, 92 FEET WIDE, DISTANT THEREON SOUTH 37° 42' WEST 177.25 FEET FROM THE SOUTHWESTERLY LINE OF EIGHTH STREET, 70 FEET WIDE, AS LOCATED BY THE CITY ENGINEER OF SAID CITY; THENCE ALONG HILL STREET SOUTH 37° 42' WEST 59.33 FEET TO THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO KATE VAN NUYS PAGE, RECORDED IN BOOK 2396 PAGE 242 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG SAID NORTHEASTERLY LINE SOUTH 52° 11' 20" EAST 160.70 FEET; THENCE NORTH 37° 56' EAST 59.38 FEET TO A LINE HAVING A BEARING OF NORTH 52° 12' 30" WEST WHICH PASSES THROUGH THE POINT OF BEGINNING; THENCE ALONG SAID LINE NORTH 52° 12' 30" WEST 160.94 FEET TO THE POINT OF BEGINNING.

PARCEL B:

LOUISA KALISHER'S HILL STREET LOT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 8 PAGE 34 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LOT PARTICULARLY DESCRIBED AS FOLLOWS:

A STRIP OF LAND LYING ADJACENT TO THE NORTHERLY LINE OF LOT "B" OF TRACT 2698, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 29 PAGE 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF COUNTY, AND HAVING A FRONTAGE OF 15 9/16THS INCHES ALONG THE EASTERLY LINE OF HILL STREET AND A WIDTH OF 24 5/16THS INCHES ON THE EASTERLY LINE OF SAID LOUISA KALISHER'S HILL STREET LOT.

APN: 5144-17-30

# **EXHIBIT B**

INITIAL BUSINESS PLAN OF THE COMPANY

# EXHIBIT C

## INITIAL OPERATING BUDGET

**OPERATING BUDGET FOR 2014**

| | August (15 days) | September | October | November | December | Year End |
|---|---|---|---|---|---|---|
| YEAR | 2014 | 2014 | 2014 | 2014 | 2014 | Total |
| PERIOD | 1 | 2 | 3 | 4 | 5 | 8.15 - 12.31 |
| **INCOME** | | | | | | |
| Potential Gross Income | 239,378 | 494,715 | 494,715 | 494,715 | 494,715 | 2,218,238 |
| Occupancy | 50% | 40% | 0% | 0% | 0% | |
| RET Reimb. | - | - | - | - | - | |
| Effective Gross Income | 119,689 | 197,886 | - | - | - | 317,575 |
| **EXPENSES** | | | | | | |
| Expense - Escalations | 3% | 3% | 3% | 3% | 3% | |
| Real Estate Taxes | 121,333 | 121,333 | 121,333 | 121,333 | 121,333 | 606,667 |
| Tax Credit | (72,800) | (72,800) | (72,800) | (72,800) | (72,800) | (364,000) |
| Insurance | 178,253 | 178,253 | 178,253 | 178,253 | 178,253 | 891,263 |
| Gas | 833 | 833 | 833 | 833 | 833 | 4,167 |
| Electricity | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 41,667 |
| Water | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 8,333 |
| Sewer | 833 | 833 | 833 | 833 | 833 | 4,167 |
| Management Fee (3%) | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 | 104,167 |
| Security and Doorman | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 83,333 |
| Repairs and Maintenance | | | | | | |
| *Elevators* | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 8,333 |
| *Lighting* | 833 | 1,000,012 | 1,000,012 | 1,000,012 | 1,000,012 | 4,000,881 |
| *Exterminating* | 417 | 417 | 417 | 417 | 417 | 2,083 |
| *Fire Protection* | 833 | 833 | 833 | 833 | 833 | 4,167 |
| *Maintenance Payroll* | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 14,583 |
| *Cleaning & Janitorial* | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 20,833 |
| Total Expenses | 286,786 | 1,285,965 | 1,285,965 | 1,285,965 | 1,285,965 | 5,430,645 |
| **NET OPERATING INCOME** | | | | | | |
| Net Operating Income | (167,097) | (1,088,079) | (1,285,965) | (1,285,965) | (1,285,965) | (5,113,070) |
| % of Income | -140% | -550% | 0% | 0% | 0% | |

## **EXHIBIT D**

### INITIAL DEVELOPMENT BUDGET



WATERBRIDGE
CAPITAL

## 801 S. Broadway – Predevelopment Budget (Draft)

| Predevelopment Budget (Draft) | | |
|---|---|---|
| **Category** | **Includes** | **Amount** |
| Professional Fees | Legal, Zoning, Expeditor, Architecture, Project Manager | $350,000 |
| Asbestos & Mold | Initial Phase of Asbestos and Mold Abatement | $220,000 |
| Façade & Windows | Initial Phase of Façade and Window Cleaning | $250,000 |
| Contingency | Predevelopment Contingency (22%) | $180,000 |
| **Total Predevelopment** | | **$1,000,000** |