# Exhibit 2

**AMENDED AND RESTATED BINDING MEMORANDUM OF UNDERSTANDING**
**WESTERN LA HOLDCO LLC**

***THIS AMENDED AND RESTATED BINDING MEMORANDUM OF UNDERSTANDING*** (this "**Restated MOU**"), dated as of June 8, 2018 (the "**Effective Date**"), is entered into between:

**JOEL SCHREIBER** ("**JS**"), and **JS WESTERN HOLDCO MEMBER LLC**, a Delaware limited liability company ("**JS Western**", and, together with JS, collectively, the "**JS Parties**"); and

**JENNY HAIM, JOYCE REISS** and **JACK JANGANA**, individuals (collectively, the "**Jangana Parties**").

**RECITALS:**

WHEREAS, JS Western and the Jangana Parties (collectively, the "**Parties**") are the sole members of Western LA Holdco LLC, a Delaware limited liability company (the "**Company**");

WHEREAS, the Company is the indirect owner of all of the beneficial interest in Broadbridge LA LLC, a Delaware limited liability company ("**Property Owner**");

WHEREAS, Property Owner is the owner of fee title to certain real property known as 801 South Broadway, Los Angeles, California (the "**Property**");

WHEREAS, the Members of the Company entered into that certain Amended and Restated Limited Liability Company Operating Agreement of the Company, dated as of August 20, 2014 (the "**Original Operating Agreement**");

WHEREAS, the Original Operating Agreement has from time to time been amended, modified and or supplemented by (i) that certain Binding Memorandum of Understanding of Western LA Holdco LLC, by and among Parties, dated as of February 2, 2016 (the "**Original MOU**"), (ii) that certain Unanimous Written Consent of the Members of Western LA Holdco LLC, dated as of June 10, 2016, duly resolved, executed and delivered by written consent of all the Members (the "**2016 Unanimous Consent**"), and (iii) that certain letter agreement, dated as of February 14, 2017, entered into by and among JS Parties and the Jangana Parties (the "**Letter Agreement**");

WHEREAS, as of the Effective Date, Property Owner, as borrower, has obtained on or about the date hereof, a certain mortgage loan in the principal amount of up to $[213,701,154.00] ("**Starwood Loan**") from SPT CA Fundings 2, LLC, a Delaware limited liability company (as initial lender and as administrative agent for the lenders from time to time party thereto (whether individually or collectively, "**Starwood Lender**") pursuant to that certain loan agreement, dated as of the date hereof by and among Property Owner, SPT CA Fundings 2, LLC, as administrative agent on behalf of the Senior Mortgage Lender ("**Starwood Loan Agreement**"));

WHEREAS, to facilitate Property Owner's obtaining the Starwood Loan and all future Financings (as defined in this Restated MOU) or the refinancing of the Starwood Loan or any future Financings, the JS Parties and the Jangana Parties desire, and have agreed, as of the Effective Date, to (i) terminate the Letter Agreement; (ii) amend, restate and replace the terms, covenants and conditions of the Original MOU in its entirety with the terms, covenants and conditions of this Restated MOU and (iii) ratify and confirm the provisions of the 2016 Unanimous Consent; and

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Original Operating Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the Parties, desiring to be bound by the terms hereof, hereby agree as follows:

1. Operating Agreement; Percentage Interests; Capital Contributions.

(a) **Operating Agreement; Prior Understandings Terminated**. The terms, covenants and conditions of the Original MOU are hereby amended, restated and replaced in their entirety by this Restated MOU. The Letter Agreement is hereby terminated and the 2016 Unanimous Consent is hereby revoked effective as of the Effective Date. The Original Operating Agreement, together with this Restated MOU (hereinafter, the "**Operating Agreement**"), shall constitute the entire Operating Agreement of the Company as of the Effective Date, and all references to the "Operating Agreement" in the Original Operating Agreement shall be construed to mean the Original Operating Agreement, as amended by this Restated MOU.

(b) **Percentage Interests; Capital Contributions.** **Schedule A** annexed hereto (which the Parties agree amends and restates "Schedule A" to the Original Operating Agreement in its entirety and shall be deemed to be, as of the Effective Date, "Schedule A" to the Operating Agreement) reflects the respective, agreed-upon Percentage Interests of the Parties as of the Effective Date based on the Capital Contributions of the Parties as of the Effective Date. The Capital Contributions of the Members are and shall continue to be reflected on the books and records of the Company. Notwithstanding any contrary term set forth in this Restated MOU, the Parties acknowledge that the precise, actual Capital Contributions of the Members remain subject to further and final review and confirmation by the Parties. The Parties hereby agree to consult with one another in good faith to the extent required, on or before June 15, 2018, to review and confirm the actual Capital Contributions of the Parties. Further notwithstanding any contrary term in this Restated MOU or the Operating Agreement, the Parties hereby agree that the Capital Contributions of the Parties shall be deemed to include: (A) with respect to the Jangana Parties, the sum of (x) the actual Capital Contributions made by the Jangana Parties to the Company on or before the Effective Date and (y) $7,500,000 (the foregoing items (x) and (y), the "**JJJ Deemed Capital Contributions**"); and (B) with respect to JS Western, the sum of (I) the actual Capital Contributions made by JS Western to the Company on or before the Effective Date, (II) $1,000,000 and (III) the Loan Cost Reimbursement (as hereinafter defined, provided that the JS Parties pay the Loan Cost Reimbursement on the Effective Date in accordance with the terms of this Restated MOU (the foregoing items (I), (II) and (III), collectively, the "**JS**

**Deemed Capital Contributions**", and, collectively with the JJJ Deemed Capital Contributions, the "**Deemed Capital Contributions**"). The Parties expressly acknowledge and agree that the updated books and records agreed upon on or about June 15, 2018 shall in all cases account for the JJJ Deemed Capital Contributions and the JS Deemed Capital Contributions. The Parties shall from time to time thereafter update **Schedule A** to reflect additional Capital Contributions by the Members and any adjustment of the Percentage Interests of the Members made in accordance with the Operating Agreement (but the for avoidance of doubt the review and update of the books and records contemplated by this Section 1(b) to occur on or about June 15, 2018 shall not affect the Percentage Interests attached on **Schedule A** to this Restated MOU as of the Effective Date). Confirming the provisions of Section 5.1(c) of the Operating Agreement, the Parties agree that the Company shall distribute Capital Event Proceeds and Available Net Cash Flow (if any) to the Members as follows: *first*, to the Members, pro-rata based upon the relative amount of each Member's Capital Contribution (including without limitation, their respective Deemed Capital Contributions and Additional Capital Contributions made after the Effective Date) until such time as each Member shall have received aggregate distributions pursuant to Section 5.1(c)(i) of the Operating Agreement equal to the amount of Capital Contributions (including without limitation, their respective Deemed Capital Contributions and Additional Capital Contributions made after the Effective Date) contributed by such Member; and *second*, to the Members, *pro rata* in accordance with their respective Percentage Interests.

2. Financings; Administrative Matters; Corrections to Original Operating Agreement

(a) Article 2 of the Original Operating Agreement is hereby modified and amended to add the following additional defined terms:

"**Financing**" shall mean any construction or permanent loan, secured or unsecured line of credit, mortgage financing, mezzanine financing and/or the refinancing of any of the foregoing, in each case obtained by the Company or any Subsidiary in accordance with the provisions hereof and secured, directly or indirectly, by the Property which is or has been entered into for the purpose of financing or refinancing the costs of constructing, operating, managing developing and redeveloping the Property and which has been approved by the individuals entitled to act as Manager as of the time such Financing is obtained. The Starwood Loan is a Financing which has been approved by the Managers.

"**Financing Documents**" means any documents or instruments which evidence, secure and/or guaranty any Financing, including, without limitation, (i) the "Loan Documents" (as such term is defined in the Starwood Loan Agreement) and (ii) the "Loan Documents" pursuant to any other Financing Loan Agreement.

"**Financing Loan Agreement**" means (i) the Starwood Loan Agreement and (ii) any loan agreement entered into in connection with any other Financing.

(b) Article 2 of the Original Operating Agreement is hereby modified and amended to delete each of the following defined terms in its entirety: "Canyon Loan", "Canyon Loan Agreement and "Canyon Loan Documents". Further to the foregoing, each use of the term "Canyon Loan" in the Original Operating Agreement, wherever such term appears, is in each instance hereby replaced with the term "Financing". Each use of the term "Canyon Loan

Documents" in the Original Operating Agreement, wherever such term appears, is in each instance hereby replaced with the term "Financing Documents". Each use of the term "Canyon Loan Agreement" in the Original Operating Agreement, wherever such term appears, is in each instance hereby replaced with the term "Financing Loan Agreement".

(c) The definitions of "Redevelopment" and "Redevelopment Work" set forth in Article 2 of the Original Operating Agreement are hereby modified and amended to provide as follows:

> "**Redevelopment**" shall mean the refurbishment and redevelopment of the Property as a mixed-use retail, hotel and office property in accordance with any Business Plan and budgets (whether Operating Budget, Redevelopment Budget or otherwise) approved by the Managers and/or any lender pursuant to a Financing, including, without limitation, the Initial Post-Closing Capital Improvements, the Prior Redevelopment Work and the Redevelopment Work.
>
> "**Redevelopment Work**" means the "Pre-Development Work", as such term is defined in the Starwood Loan Agreement and any future pre-development or redevelopment work contemplated for the Property in connection with any Financing.

(d) Section 6.1 of the Original Operating Agreement is hereby modified and amended to delete in their entirety the first two sentences of said Section 6.1 and replace them with the following text:

> "Subject to the terms of Section 6.2 hereof, the day to day business and affairs of the Company shall, effective on and after June 10, 2016, be managed by Jack Jangana and, so long as JS satisfies the JS Minimum Hold, JS Western or any entity wholly owned and controlled by JS and approved any lender pursuant to a Financing (collectively, a "JS Manager"). Each of Jack Jangana and, so long as JS satisfies the JS Minimum Hold, any JS Manager, in such capacity, is referred to herein as "Manager". The Members hereby agree that, as of the Effective Date, Jack Jangana and JS Manager constitute the sole Managers of the Company."

(e) Notwithstanding anything in Section 6.1 or Section 6.2 of the Operating Agreement to the contrary, the Parties agree that the Jangana Parties (specifically Jack Jangana, acting on behalf of the Company, or any other Jangana Party acting upon the express authorization of Jack Jangana), shall at all times have the sole right to (A) cause the Property Owner, the Company or any subsidiary of the Company to select, control, approve or designate any account bank or open or close any account by or on behalf of or for the benefit of Property Owner, the Company or any other subsidiary of the Company, whether for the purposes of any general operating account or reserve account in the name of or for the benefit of the Company, Property Owner or any other subsidiary of the Company, or in connection with any accounts or reserve accounts required to be established by any lender in connection with any Financing (any such account or reserve account, an "**Account**", and any such bank, an "**Account Bank**") and (B) cause the Property Owner or any other subsidiary of the Company to execute and deliver any documentation required by the Account Bank or any lender under a Financing in order to open or close any Accounts and/or select any Account Bank, and the JS Parties agree to execute

and deliver any additional documentation reasonably required by any lender pursuant to Financing and any Account Bank in order to evidence the consent of the JS Parties granted hereunder and to exercise commercially reasonable efforts to deliver the same. So long as JS satisfies the JS Minimum Hold and is a JS Manager, JS Manager shall be an authorized account signatory for the purposes of draws under Financings for Redevelopment Work provided there is a co-signature at such time by Jack Jangana as Co-Manager.

3. JJJ Member Loan. JS Western hereby agrees to make or cause to be made a Member Loan to the Jangana Parties in the amount of $1,500,000.00 ("**JJJ Member Loan**"), which shall bear interest per annum equal to the lesser of (i) the applicable Federal short term rate in effect on Effective Date as determined under Section 1274(d) of the Code and (ii) the lowest possible interest rate that would not give rise to imputed interest under the Code, and which shall be disbursed by JS Western in equal monthly installments of $250,000.00, the first such installment being made on the Effective Date and thereafter each further installment shall be made on the first day of each month subsequent to the Effective Date until the entire JJJ Member Loan has been disbursed to the Jangana Parties. The JJJ Member Loan shall mature and become due and payable on March 31, 2019 ("**JJJ Member Loan Maturity Date**"). If the Jangana Parties shall fail to repay the outstanding principal balance and accrued, unpaid interest of the JJJ Member Loan on the JJJ Member Loan Maturity Date, the sole right and remedy of JS Western shall be, after five days' prior written notice to the Jangana Parties, (x) to declare the JJJ Member Loan immediately due and payable and (x) cause the Percentage Interests of the Parties to be adjusted to convert the amount of the outstanding principal balance into a deemed equity contribution by JS Western based on a deemed total equity capitalization by all of the Parties equal to the sum of $72,000,000. If JS Western defaults in the timely disbursement of any installment of the proceeds of the Member Loan in accordance with this Section 3 and such default continues for five (5) days following the date JS Western is required to make such disbursement, then, as the sole remedy of the Jangana Parties therefor, the Percentage Interests of the Members shall be automatically adjusted to conform with the following ratio: (A) 22% (JS Western); and (B) 78% (the Jangana Parties), whereupon such adjusted Percentage Interests of the Members shall be deemed to constitute the Percentage Interests of the Members for all purposes of the Operating Agreement and this Restated MOU. Upon any such adjustment, the Jangana Parties shall have the right to update the books and records of the Company (including, without limitation, **Schedule A** to the Operating Agreement) to reflect such adjustment. Any adjustment of the Percentage Interests of the Members as aforesaid shall not derogate from the obligation of the Jangana Parties to repay any portion of the JJJ Member Loan and accrued, unpaid interest thereon theretofore advanced by JS Western on the JJJ Member Loan Maturity Date, or the remedy hereinbefore accorded to JS Western in the event of non-payment thereof.

4. Purchase Option. Notwithstanding any contrary term set forth in the Operating Agreement, the Jangana Parties shall have the option ("**JS Option**"), upon Notice (as hereinafter defined) to JS Western (a "**JS Option Notice**"), to acquire 100% of JS Western's Company Interest for a purchase price (the "**JS Option Consideration**") equal to $33,000,000. Any JS Option Notice shall stipulate the date of the of the acquisition of JS Western's Company Interest pursuant to the exercise of JS Option, which date shall be no sooner than five days after the JS Parties' receipt of the JS Option Notice and no later than August 10, 2018, *provided*, that if the Jangana Parties pay to JS Western a non-refundable deposit in an amount equal to ten percent (10%) of the JS Option Consideration (the "**Option Deposit Amount**") no later than August 10,

2018 (TIME BEING OF THE ESSENCE), the Jangana Parties shall have the right to extend the JS Option Closing Date (as hereinafter defined) to no later than September 12, 2018 (TIME BEING OF THE ESSENCE), and the Jangana Parties shall be entitled to a credit against the JS Option Consideration in an amount equal to the Option Deposit Amount. The closing of the acquisition of JS Western's Company Interest pursuant to the exercise of JS Option is referred to herein as the "**JS Option Closing**", while the date upon which the JS Option Closing occurs (as the same may be extended upon the making of the deposit of the Option Deposit Amount) is referred to herein as the "**JS Option Closing Date**". The JS Option Closing shall occur through an escrow established with Fidelity National Title Insurance Company or any other reputable national title insurer (but not any agent therefor) designated by the Jangana Parties and reasonably acceptable to the JS Parties ("**Escrow Agent**") pursuant to an escrow agreement mutually acceptable to the parties and Escrow Agent and otherwise consistent with the terms of this Restated MOU. If the JS Parties default in respect of their obligations to be performed at the JS Option Closing for any reason other than a default by the Jangana Parties, the Jangana Parties shall have the right to seek specific performance of such obligations. If the Jangana Parties fail to consummate the JS Option Closing (for any reason other than a default by the JS Parties) by August 10, 2018 (TIME BEING OF THE ESSENCE) (or, if the JS Option Closing Date has been extended pursuant to this paragraph, September 12, 2018 (TIME BEING OF THE ESSENCE), the Jangana Parties shall be deemed irrevocably to have waived the JS Option and, if the Jangana Parties have theretofore paid the Option Deposit Amount to JS Western, JS Western shall retain the Option Deposit Amount as liquidated damages for such default.

5. JS Option Closing Deliveries. No later than one (1) Business Day prior to the date scheduled for the JS Option Closing, (i) JS Western shall execute and deliver into escrow with Escrow Agent: (x) two counterparts of an Assignment and Assumption of Membership Interests in the form of **Exhibit A** annexed hereto (the "**Assignment**"); and (y) a Foreign Investment in Real Property Tax Act affidavit (the "**FIRPTA Certificate**") and (ii) the Jangana Parties shall execute and deliver into escrow with Escrow Agent two counterparts of the Assignment, and deliver to Escrow Agent the JS Option Consideration (or the balance thereof, if the Jangana Parties have theretofore paid to JS Western the Option Deposit Amount), by wire transfer of immediately available funds to the escrow account of Escrow Agent at Citibank, N.A. or any other banking institution at which Escrow Agent holds escrow funds as designated by Escrow Agent. The Jangana Parties will use reasonable efforts to cause the lender under any Financing then outstanding for the Property to deliver such lender's release of JS from any guaranties delivered by JS in connection with such Financing. If the Jangana Parties are unable to obtain any such release, notwithstanding the exercise of reasonable efforts as aforesaid, they shall execute and deliver, at the JS Option Closing, such instrument upon which the Parties reasonably agree pursuant to which the Jangana Parties jointly and severally agree to indemnify, defend and hold JS harmless form and against any loss, cost, claim or damages (including, without limitation, reasonable attorneys' fees) arising by reason of liability arising under such guaranties, except to the extent such liability arose by reason of the acts or omissions of the JS Parties prior to the JS Option Closing Date. Notwithstanding any contrary term set forth in this Restated MOU, the Jangana Parties shall have the right, upon Notice to the JS Parties and Escrow Agent at any time prior to the JS Option Closing, to designate parties or entities other than the Jangana Parties (which designated parties or entities shall satisfy any permitted transferee requirements under any then outstanding Financing) to receive the assignment of all or any portion of the Company Interests to be assigned by the Assignment. Promptly following

receipt thereof, the JS Parties and the Jangana Parties shall furnish Escrow Agent with written confirmation of the substitution of transferees, whereupon Escrow Agent shall revise the Assignment accordingly. Upon receipt of joint written instructions from the JS Parties and the Jangana Parties to consummate the JS Option Closing, Escrow Agent shall (I) deliver fully executed counterparts of the Assignment to the JS Parties and the Jangana Parties, (II) deliver an executed FIRPTA Certificate to the Jangana Parties and (III) deliver the JS Option Consideration to an account designated by the JS Parties. At the JS Option Closing, the principal amount and accrued, unpaid interest on any portion of the JJJ Member Loan theretofore advanced to the Jangana Parties shall become immediately due and payable, and shall be paid through the escrow established with Escrow Agent.

6. Loan Cost Reimbursement. On the Effective Date, JS or the JS Parties have caused funds in the amount of $167,500.00 to be paid directly to the Jangana Parties in reimbursement of certain loan amounts incurred by the Jangana Parties (the "**Loan Cost Reimbursement**").

7. Voting Rights. If, following any adjustment of the Percentage Interests of the Parties that occurs for any reason, whether by transfer, dilution or otherwise, the Percentage Interest in the Company held, directly or indirectly, by JS shall at any time become less than 20% of all direct and indirect beneficial equity interests in the Property (the "**JS Minimum Hold**"), (i) JS Manager shall be replaced as Manager of the Company by Jack Jangana, which Person shall be the sole Manager and (ii) the Jangana Parties shall have the sole and exclusive authority to manage the Company, without the approval or vote of any JS Manager, including the sole and absolute discretion to (x) cause a sale of all or substantially all of the Property or the direct or indirect beneficial interests in the Company and (y) effectuate any other Major Act (including an amendment to the Operating Agreement which would have the effect of vesting control or management rights in such third-party or parties unaffiliated with the Parties as the Jangana Parties shall designate), provided, however, that the Jangana Parties shall not, without the JS Parties' consent, amend this Restated MOU or the Operating Agreement in a manner which would disproportionately impair the rights or disproportionately increase the obligations (relative to the rights and obligations of the Jangana Parties) under the Operating Agreement or this Restated MOU or would have the effect of subordinating the interest of the JS Parties to the interest of the Jangana Parties.

8. Notices. All notices, demands, requests or other communications (collectively, "**Notices**") which may be or are required to be given, served, or sent by any party to any other party pursuant to this Restated MOU shall be in writing and shall be hand delivered or mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or transmitted by electronic mail (with the original to be sent the same day by Federal Express or other recognized overnight delivery service) or by Federal Express or other recognized overnight delivery service addressed to the recipient at its address set forth below (or at such other address as the recipient may theretofore have designated in writing). Each Notice which shall be hand delivered or mailed in the manner described shall be deemed sufficiently given, served, sent, received, or delivered for all purposes on the first Business Day following the day the Notice is delivered to the addressee (with the return receipt, the delivery receipt, or the affidavit of messenger being deemed conclusive (but not exclusive) evidence of such delivery), or if delivery is refused, then on the first Business Day following the day that delivery of the Notice is refused

by the addressee upon presentation. Each Notice which shall be electronically mailed in the manner described above shall be deemed sufficiently given, served, sent, received, or delivered for all purposes on the first Business Day following the date of such delivery. Notice may be given by counsel to the Parties. Each of the Jangana Parties and the JS Parties may change any address for notice to such Parties upon notice to the other Parties in accordance with this Section 8. Subject to the above, all Notices shall be addressed as follows:

If to the JS Parties:

c/o Waterbridge Capital LLC
115 West 18th Street
2nd Floor
New York, New York 10011
Attention: Joel Schreiber
Email: js@waterbridge.com

with a copy to:

Pryor Cashman LLP
7 Times Square
New York, New York 10036
Attention: Dennis M. Sughrue, Esq.
Email: dsughrue@pryorcashman.com

If to the Jangana Parties:

Jack Jangana, Jenny Haim and Joyce Reiss
c/o Continental Worsteds Inc.
45 North Station Plaza, Ste 402
Great Neck, New York 11021
Attention: Jack Jangana
Email: mgmt@continental-equities.com

with a copy to:

Greenberg Traurig
200 Park Avenue
New York, New York 10166
Attention: Daniel J. Ansell, Esq.
Email: anselld@gtlaw.com

9. Cooperation. The JS Parties and/or the Jangana Parties (as applicable) shall fully cooperate in the transfer of any of their membership, ownership, and/or capital accounts and other rights in the Company to the other Parties, as contemplated by this Restated MOU. The JS Parties shall be responsible for any transfer tax determined to be due in respect of any transfer of the Company Interest of JS Western effectuated by this Restated MOU (other than the JS Option Closing), while the Jangana Parties shall be responsible for any transfer tax determined to be due

in respect of the JS Option Closing and any other transfer of the Company Interest of the Jangana Parties effectuated by this Restated MOU.

10. Governing Law; Submission to Jurisdiction. This Restated MOU is to be governed by and construed in accordance with the laws of the State of Delaware. Each of the Jangana Parties and the JS Parties hereby submit to the exclusive jurisdiction of any federal or state court sitting in New York, New York in respect of any action or proceeding arising under this Restated MOU or the Operating Agreement.

11. Counterparts/Facsimile Signatures. This Restated MOU may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one MOU. To facilitate execution of this Restated MOU and any amendment hereto, the Parties may execute and exchange by electronic mail counterparts of the signature pages which shall serve as originals.

12. Successors and Assigns. This Restated MOU shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of each of the Parties hereto.

13. Conflicts. This Restated MOU is intended to be, and shall constitute, an amendment to the Operating Agreement. To the extent any of the terms and conditions of the MOU and the Operating Agreement shall conflict, the terms and conditions of this Restated MOU shall govern.

14. Attorneys' Fees. If the Jangana Parties or the JS Parties obtain a judgment against the other by reason of the breach of this Restated MOU or the failure to comply with the terms of this Restated MOU, reasonable attorneys' fees and costs as fixed by the court shall be added to such judgment.

15. 1031 Exchange. The Parties understand that the Jangana Parties acquired a portion of their Company Interests in a transaction qualifying as an exchange of like-kind property pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended. The JS Parties hereby agree, at no material cost to the JS Parties, to cooperate with the Jangana Parties to the extent reasonably required to accommodate the requests of the Jangana Parties in connection with the aforesaid 1031 exchange.

16. Representation of the Parties. In connection with this Restated MOU and the transactions contemplated hereby, the Jangana Parties have been represented by Daniel J. Ansell, Esq. (of the law firm of Greenberg Traurig, LLP) and the JS Parties have been represented by Dennis M. Sughrue, Esq. (of the law firm of Pryor Cashman LLP).

[signatures on following page]

**IN WITNESS WHEREOF**, the Parties hereto have executed and delivered this MOU as of the Effective Date.

______________________________
**JOEL SCHREIBER**

**JS WESTERN HOLDCO MEMBER LLC,**
a Delaware limited liability company

By: ______________________________
Name: Joel Schreiber
Title: Manager

______________________________
**JENNY HAIM**

______________________________
**JOYCE REISS**

______________________________
**JACK JANGANA**

**IN WITNESS WHEREOF**, the Parties hereto have executed and delivered this MOU as of the Effective Date.

______________________________
**JOEL SCHREIBER**

**JS WESTERN HOLDCO MEMBER LLC,**
a Delaware limited liability company

By: JS Western Member II LLC,
a Delaware limited liability company

By: ______________________________
Name: Joel Schreiber
Title: Authorized Signatory

______________________________
**JENNY HAIM**

______________________________
**JOYCE REISS**

______________________________
**JACK JANGANA**

Schedule A

| Member | Percentage Interest |
|---|---|
| JS Western Holdco Member LLC | 27% |
| Jackie Jangana | 24.333% |
| Joyce Reiss | 24.333% |
| Jenny Haim | 24.333% |