**DUANE MORRIS LLP**
Lawrence J. Kotler, Esq. (LK-8177)
1540 Broadway, 14th Floor
New York, NY 10036
Telephone: (212) 692-1000
Facsimile: (215) 692-1020

Meagen E. Leary, Esq. (admitted *pro hac vice*)
One Market Plaza
Spear Street Tower, Suite 200
San Francisco, CA 94105
Telephone: (415) 957-3000
Facsimile: (415) 957-3001

Paul E. Chronis, Esq. (admitted *pro hac vice*)
190 South LaSalle Street, Suite 3700
Chicago, IL 60603
Telephone: (312) 499-6700
Facsimile: (312) 499-6701

*Counsel for Museum Building Holdings, LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT NEW YORK**

| | |
|---|---|
| In re:<br><br>BROADBRIDGE LA LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 8-22-72048-las |

**SECURED CREDITOR'S REPLY IN SUPPORT OF**
**MOTION TO DISMISS CHAPTER 11 CASE**

Secured creditor, Museum Building Holdings, LLC ("Secured Creditor"), respectfully submits this reply (the "Reply") to the *Debtor's Opposition to Motion of Museum Building Holdings LLC to Dismiss the Chapter 11 Case* [Dkt. No. 44] (the "Opposition").[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Motion to Dismiss Chapter 11 Case* [Dkt. No. 28] (the "Motion").

**Preliminary Statement**

This case concerns Joel Schreiber's improper attempt to force the Secured Creditor to fund his last ditch effort to preserve his alleged equity interest in the Debtor. The Bankruptcy Court should not be used to effectuate that improper objective. That is especially true given the utterly unsupported nature of Debtor's argument that it should be given 90 days to file a realistic bankruptcy plan even though there is no factual or legal basis to support that request. Said differently, there are important standards that must be met to file a bankruptcy case and to stay in bankruptcy as a single asset real estate case. A petitioner either meets them, or it does not. The fact that those petitioners who file properly and have an operating debtor get 90 days does not mean that those who do not, like Debtor, are somehow entitled to the same relief just because they want it. Here, Debtor has not and could never put a good faith petition before this Court for at least the following separate and independent reasons.

- Debtor does not dispute that all of the eight factors enumerated in *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304 (2d Cir. 1997) have been met;

- Having met all of the *C-TC* factors, Debtor cannot timely present a confirmable plan to this Court;

- Debtor admits that this is a non-operating single asset real estate case was filed on the eve of foreclosure to stop the foreclosure and avoid the immediate loss of Mr. Schreiber's alleged $121 million investment[2] in the Property (Opposition ¶¶ 1, 40);

- Debtor has had years to find a buyer for the Property and has failed to do so despite its alleged significant efforts (and despite the Secured Creditor having entered into multiple standstill agreements with Debtor during that period) (Opposition ¶ 4);

---

[2] In addition to Mr. Schreiber's alleged $121 million investment, Debtor argues that it has "made a substantial investment in the Property" through the "more than $115 million" that Debtor allegedly made "in interest payments" and/or "for debt service." (Objection ¶¶ 7, 16). Debtor does not identify to which loan(s) these payments were made, *i.e.*, whether they were made in whole or in part to Secured Creditor and/or to other lenders. Indeed, Debtor's sole support for this assertion appears to be a line item in Exhibit "B" to the Opposition identified only as "interest cost." In any event, Secured Creditor's schedule of Debtor's payments made towards the Loan (the "Payment Schedule") shows that Debtor has paid only approximately $5.2 million to Secured Creditor for debt service. A true and correct copy of the Payment Schedule is attached hereto as **Exhibit A**.

- Notwithstanding that this case has been pending for over two months, Debtor has offered no evidence of: i) a bona fide buyer for the Property; ii) any source of funds to support the Property and/or this bankruptcy case other than Secured Creditor; or iii) any concrete restructuring plan that would pay, in full, Secured Creditor's more than $270 million claim which continues to increase;

- Debtor's four-year-old Property appraisal and its alleged intent to "continue to seek out a buyer right up to the start of the hearing on the Motion" do not establish that Debtor's petition was filed in good faith or that Debtor is likely to propose a confirmable plan (Opposition ¶ 29);

- In direct contravention of its own organizational documents, Debtor failed to obtain the necessary consents required to file this case;

- None of Debtor's cases support its erroneous contention that section 9(c)(iii) of the Debtor OA is unenforceable; and

- Debtor concedes the facts which demonstrate that the Jangana Members reasonably withheld their consent to the filing of this case.

The Court should therefore grant the Motion for these and the other reasons set forth herein.

## Argument

### A. Debtor's Opposition Confirms That This Case Was Filed In Bad Faith

*1. Debtor Does Not Actually Dispute That The C-TC Factors Have Been Met*

1. Debtor made many unfounded arguments in its Opposition. However, and importantly, Debtor does not actually contest that all of the *C-TC* factors have been met and support dismissal. (See Motion and Opposition generally). Thus, Debtor concedes this to be true. *See Frey v. Bekins Van Lines, Inc.*, 748 F.Supp.2d 176, 182 (E.D.N.Y. 2010) (deeming argument conceded because opposing party failed to respond); *see also Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived."). The Motion should be granted for this reason alone.

2. Moreover, even if the Court were to further consider the Opposition, which it should not, Debtor's remaining arguments are baseless. For example, because Debtor could not

contest that the *C-TC* factors were met, Debtor instead argues that secured creditor "mechanically applies" them. (Opposition ¶ 24). Debtor is wrong.

3.  While it is true that this Court has previously held that it will not "engage in a mechanical counting[3] exercise" to determine a debtor's bad faith, *see Consolidated Distributors*, 2013 WL 3929851, at *7, this does not mean that this Court can ignore these factors.

4.  Here, Secured Creditor did not engage in any mechanical counting.

5.  Nor did Secured Creditor need to because, as set forth above, *all* of the *C-TC* factors weigh in favor of dismissing Debtor's bankruptcy case for cause.

6.  Where, as here, *all* of the C-TC factors are met, the totality of the circumstances necessarily demonstrate that Debtor's filing was in bad faith and should be dismissed.

> 2. *Debtor Does Not Refute Secured Creditor's Cases Which Establish That the Motion Should Be Granted*

7.  In an attempt to overcome this fatal defect, Debtor unsuccessfully attempts to distinguish Secured Creditor's cases on various grounds. (Opposition ¶¶ 26, 29). For example, Debtor argues that "the facts presented here are entirely differently [sic]" from the facts in *In re GEL LLC,* 495 B.R. 240 (Bankr. E.D.N.Y. 2012) because the *GEL* debtor "filed multiple petitions in more than one district, and failed to make any effort to move [to] fulfill its duties under the Bankruptcy Code in any of the cases it filed." (Opposition ¶ 26).

---

[3] This "mechanical counting" refers to simply adding up and comparing how many factors do or do not support a finding of bad faith, as opposed to evaluating the totality of the circumstances. *See In re Consol. Distributors, Inc.*, No. 13-40350 (NHL), 2013 WL 3929851, at *7 (Bankr. E.D.N.Y. July 23, 2013) ("[T]he totality of the circumstances, rather than any single factor…will determine whether good faith exists."); *see also In re 68 W. 127 St., LLC*, 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002) (explaining that courts caution against applying the *C-TC* factors mechanically because the existence of bad faith "depends not on any one specific factor but on a combination of factors determined after careful examination of the facts of the particular debtor's case"); *In re 300 Washington St. LLC*, 528 B.R. 534, 551 (Bankr. E.D.N.Y. 2015) (stating that the *C-TC* factors should "guide courts" in "assessing the totality of the circumstances" and that, depending on the case, "one or another factor may have greater weight, and the number of factors on one side or the other of the balance is not, standing alone, determinative of the outcome").

8.  However, this Court did not dismiss *GEL* simply because the debtor was a serial bankruptcy filer who failed to fulfill its duties under the Bankruptcy Code. Instead, and as Secured Creditor detailed in its Motion, the *GEL* court based its decision on many facts, including several which are present in this case. *See GEL*, 495 B.R. at 246 (dismissing bankruptcy case where debtors filed their petition on the same day as the scheduled foreclosure sales, debtors had no employees or cash flow, and cases were essentially two-party disputes).

9.  Debtor also makes the nonsensical argument that *GEL* is distinguishable because it "does not discuss the implications of Section 362(d)(3)." (Opposition ¶ 26). But there were no section 362(d)(3) "implications" to discuss in *GEL*. That is because the secured creditor in *GEL* did not seek stay relief under 362(d)(3). Instead, the secured creditor sought dismissal under section 1112(b). Thus, the *GEL* court did not discuss section 362(d)(3) in granting the secured creditor's motion to dismiss because it had nothing to do with the Court's analysis. Similarly, this Court need not consider 362(d)(3) in connection with Secured Creditor's Motion which seeks dismissal under section 1112(b).[4]

10. Debtor also unsuccessfully argues that *In re 652 W. 160th LLC*, 330 B.R. 455 (Bankr. S.D.N.Y. 2005) and *In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751 (Bankr. S.D.N.Y. 1997) do not support the Motion. (Opposition ¶ 29).

11. As to *652 W. 160th LLC,* Debtor notes that the debtor in that case "failed to meet the 90 day deadline fixed by 11 U.S.C. §362(d)(3) to file a plan or make a proper tender to the secured lender." *Id.* Based solely on that fact, Debtor appears to argue that *652 W. 160th LLC* is

---

[4] Although Secured Creditor does not presently seek relief from stay under section 362(d)(3), Secured Creditor reserves the right to do so if and when Debtor fails to either file a confirmable plan or begin making the statutory payments to Secured Creditor by November 7, 2022 (*i.e.*, 90 days after the petition date). Secured Creditor also reserves the right to seek stay relief under any other subsection of section 362(d), including under section 362(d)(1) for "cause" based on Debtor's bad faith.

somehow inapplicable to the Motion simply because Debtor has not missed the 90-day deadline (yet). However, this purported 90-day issue is a red herring because, once again, the Secured Creditor is not seeking relief from stay pursuant to section 362(d)(3).[5]

12.     Finally, and contrary to Debtor's contentions, the *652 W. 160th LLC* case does, in fact, support the Motion because the court found that the debtor acted in bad faith based on many of the same facts present in this case.[6] *652 W. 160th LLC*, 330 B.R. at 466 (finding bad faith in "single asset real estate case in which the debtor has [no] unsecured creditors, … petition was filed to delay foreclosure, and … debtor's operating reports reveal it cannot meet current expenses on its own").

13.     With respect to *234-6 W. 22nd St. Corp.*, Debtor argues that it is inapplicable for the same reasons as *GEL*. (Opposition ¶ 29). However, just as in *GEL*, in *234-6 W. 22nd St. Corp.* the debtor's serial bankruptcy filing was just one factor in the court's bad faith finding amongst many others that are similar to those in this case. *See 234-6 W. 22nd St.*, 214 B.R. at 760 (finding bad faith where bankruptcy was filed with a "foreclosure sale looming," debtor "has no employees and has conducted no business," and debtor was "simply gambling with the creditor's money").

### 3.     Debtor's Cases Do Not Support That the Motion Should be Denied

14.     Debtor cites *Consolidated Distributors* and *In re R & G Properties, Inc.*, No. 08-10876, 2009 WL 1076703 (Bankr. D. Vt. Apr. 16, 2009) as purported support for its argument that

---

[5] Debtor also ignores that there is a significant difference between a single asset real estate case where the debtor is an operating entity company versus a case where the debtor is not operating, there is a receiver in place, and the secured creditor is funding all of the expenses associated with the upkeep and maintenance of the property.

[6] The *652 W. 160th LLC* court granted the secured creditor relief from stay under section 362(d)(3) because the debtor failed to meet the 90-day deadline and, separately, under section 362(d)(1) for "cause" due to the debtor's bad faith. *652 W. 160th LLC*, 330 B.R. at 465-66. As noted by the *652 W. 160th LLC* court, the bad faith analysis is the same in the stay relief context as it is in the dismissal context. *Id.* 466-67 (applying the *C-TC* factors in granting stay relief); *see also 234-6 W. 22nd St.*, 214 B.R. at 757 ("[I]n the context of a motion either to dismiss a chapter 11 case under § 1112(b) or to lift the stay under § 362(d)(1) the standards for bad faith … are not substantively different from each other.").

dismissal based on bad faith is not warranted in this case. However, neither case supports that proposition because neither of them concerned the situation where, as here, all of the *C-TC* factors have been met. *See Consolidated Distributors*, 2013 WL 3929851, at *8 (finding that some of the "*C-TC* factors are not entirely born out on the record"); *R & G Properties*, 2009 WL 1076703, at *5 (finding that creditor failed to prove *C-TC* factors 4 and 5 and that factors 6 and 7 "weigh against finding a bad faith filing").

> 4. *Section 362(d)(3) Does Not Insulate Debtor's Petition From Dismissal for 90 Days After the Petition Date*

15. Debtor repeatedly refers to section 362(d)(3) in its Opposition. Section 362(d)(3) applies in single asset real estate cases. It provides a secured creditor with relief from the automatic stay where the debtor fails to either file a confirmable plan, or begin making monthly payments to the secured creditor within 90 days after the petition date.

16. Notwithstanding the language and actual purpose of section 362(d)(3), Debtor seems to be taking the incredible position that its petition, however defective, cannot be dismissed within 90 days after the petition date because it is a single asset real estate debtor. (*See* Opposition ¶¶ 8, 26).

17. Debtor is wrong. In truth, section 362(d)(3) is irrelevant to the analysis of whether Debtor's case can be dismissed now. That is because section 362(d)(3) provides a basis for stay relief, and nothing more. Said differently, section 362(d)(3) is a tool to be used by secured creditors and not, as Debtor appears to argue, by debtors. *In re RYYZ, LLC*, 490 B.R. 29, 34 (Bankr. E.D.N.Y. 2013) ("Section 362(d)(3) is designed to protect secured creditors by requiring debtors to act quickly.").

18. Notwithstanding the above, Debtor argues that certain language in the *RYYZ* case supports the proposition that secured creditors must wait until 90 days after the petition date to

seek dismissal. That language includes that secured creditors should be counseled against filing "knee-jerk" dismissal motions that "merely parrot the elements of 'bad faith.'" *See RYYZ*, 490 B.R. at 35.

19. However, this language is not applicable to this case because it does not involve a "knee-jerk" motion, nor does the Motion merely "parrot" the *C-TC* factors. Rather, as previously set forth herein, the Motion is based on undisputed evidence (most of it from the Debtor itself) which demonstrates that Debtor filed this case in bad faith.

### 5. *An Outdated Appraisal and Empty Promises to Find a Buyer Do Not Mitigate Against a Bad Faith Finding*

20. Debtor contends that the overwhelming and undisputed facts proving its bad faith should be ignored in favor of its two alleged acts of good faith. Specifically, Debtor argues that the Motion should be denied merely because Debtor: i) provided a four-year-old appraisal of the Property; and ii) promised to "continue to seek out a buyer right up to the start of the hearing on the Motion." (Opposition ¶ 29). As is typical, Debtor offers no case law to support this argument which should be rejected for this reason alone. It should also be rejected for the separate and independent reason that Debtor cannot remain in bankruptcy by paying "mere lip service to the good faith requirement." *See In re HBA E., Inc.*, 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988).

21. Debtor's argument should also be rejected based on its own admissions. For example, Debtor conceded that, with respect to whether there is a viable sale of the property, "the proof is in the pudding." (Opposition ¶ 4). According to Debtor, *if* it obtains a signed sale contract for the Property, *then* "this Chapter 11 case must be seen in an entirely different light." *Id*. But Debtor has obtained no such sale contract…and the proof is in the pudding.

### 6. *Debtor Has Shown No Ability To Procure a Buyer*

22. Debtor argues that it filed this bankruptcy so that it could take one last opportunity to "find a buyer or investor for the Property *even if this goal had proven elusive in the past.*" (Opposition ¶ 4 (emphasis added)). Debtor also represents that Mr. Schreiber is "reasonably confident" that a "firm sale contract" can be prepared by October 13, 2022.[7] (Opposition ¶ 4). Indeed, Debtor claimed to be "pressing hard to file an actual signed contract of sale (with a $10 million deposit) next week," meaning the week of October 3, 2022. (*Id.*)

23. However, that week came and went without Debtor filing *any* sale contract, let alone a sale contract with a $10 million deposit. Thus, over two months into this case, this "situation" is, according to Debtor, still "fluid to say the least." (Opposition ¶ 12). But, the proof is indeed in the pudding, and it shows that there is not now, nor has there been, any material movement toward a sale. Enough is enough.

### B. Debtor's Opposition Confirms It's Lack Of Authority to File This Case

24. Debtor's Opposition and other bankruptcy filings prove that it lacked the corporate authority to file this bankruptcy case. To be sure, Debtor admits that: i) it failed to obtain the prior unanimous consent of its two independent managers;[8] and ii) it failed to obtain the consent of all of the Jangana Members. (*See* Opposition ¶¶ 2, 5, 22 37).

25. Having conceded these facts, Debtor offers two baseless arguments to support its untenable position that it actually had filing authority. First, Debtor argues that Section 9(c)(iii) of

---

[7] Notably, Debtor claims that this supposed "firm sale contract" would be for the sale of the Property "at a price that will pay off the Secured Creditor *on a negotiated amount*." (Opposition ¶ 4 (emphasis added)). This is a baseless assertion because Debtor did not quantify the alleged "negotiated amount," and Secured Creditor is under no obligation to reduce its claim, especially if, as noted in the Debtor's schedules, Secured Creditor is oversecured. In other words, Debtor is just making up alleged facts.

[8] In fact, Debtor never even *notified* its independent managers of any potential bankruptcy filing because Mr. Schreiber claims he did not know who they were. (Opposition ¶ 5). But it is undisputed that both of the independent managers are clearly identified by name in the Debtor OA. (Opposition ¶ 32). Accordingly, Mr. Schreiber's failure to comply with the Debtor OA cannot be justified by his claimed lack of knowledge and certainly does not excuse his failure to comply with the Debtor's own organizational documents.

9

the Debtor OA (requiring the consent of its independent managers to a bankruptcy filing) is unenforceable. Second, Debtor argues that the Jangana Members unreasonably withheld their consent to this filing.

### 1. Section 9(c)(iii) of the Debtor OA Is Valid and Enforceable

26. Section 9(c)(iii) of the Debtor OA requires the prior unanimous written consent of all of Debtor's independent managers for Debtor to file for bankruptcy where, as here, Debtor's debt to Secured Creditor remains outstanding.

27. Debtor admits that it failed to comply with section 9(c)(iii). Nonetheless, Debtor contends that section 9(c)(iii) is an unenforceable waiver of Debtor's right to file for bankruptcy. (Opposition ¶ 34). Debtor's sole argument to support its position is an unintelligible statement that section 9(c)(iii) is the "type of so-called 'Blocking Provision' [that] has been repeatedly struck down by the Courts as an unenforceable waiver of the right to file a bankruptcy petition." (*Id.*) Debtor's purported argument should be rejected for a number of reasons.

28. First, Debtor does not define "blocking provision," nor do the cases upon which he relies. Debtor's argument should be rejected for this reason alone.

29. Second, in all but one of the cases Debtor relied on to support its position, the courts held that the provisions at issue were unenforceable because the secured creditors had a veto right over the debtor's ability to file for bankruptcy. Here, the Secured Creditor has no such right so there is no basis for the court to determine that section 9(c)(iii) is unenforceable. *See In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 265 (Bankr. D. Del. 2016) (operating agreement provision deemed unenforceable where secured creditor had authority over secured creditor's bankruptcy filing). *In re Lexington Hosp. Grp., LLC*, 577 B.R. 676 (Bankr. E.D. Ky. 2017) (restrictions in debtor's governance documents deemed unenforceable where the secured creditor had the deciding vote over the debtor's right to file bankruptcy); *In re Insight Terminal*

10

*Sols., LLC*, No. 19-32231(1)(11), 2019 WL 4640773, at *2 (Bankr. W.D. Ky. Sept. 23, 2019) (deeming loan and operating agreement provisions vesting sole bankruptcy authority in secured creditor unenforceable).

30. Third, Debtor's last case, *In re Bay Club Partners-472, LLC*, No. BR 14-30394-RLD11, 2014 WL 1796688, (Bankr. D. Or. May 6, 2014), similarly does not support the conclusion that section 9(c)(iii) of the Debtor OA is a bankruptcy waiver, much less an unenforceable bankruptcy waiver.

31. Indeed, the *Bay* court voided a provision in the debtor's operating agreement because it expressly and unconditionally prohibited the debtor from filing bankruptcy. *Bay Club*, 2014 WL 1796688, at *3. Here, there was no such unconditional prohibition on Debtor filing bankruptcy. Instead, Debtor had the right to file for bankruptcy. That filing, however, merely required the independent managers' consent (which the Debtor did not even attempt to obtain). Of course, Debtor did not cite a single case where a bankruptcy filing provision was held unenforceable simply because the debtor's own operating agreement required the consent of the debtor's independent managers.[9]

> 2. *The Undisputed Record Before This Court Demonstrates That The Jangana Members Reasonably Withheld Their Consent to the Filing of This Bankruptcy Case*

---

[9] Debtor also claims that its independent managers could not have contested this bankruptcy filing "as a true fiduciary of the [Debtor]." (Opposition ¶ 5). Debtor provides exactly no support for this position and it should be rejected for that reason alone. Debtor's argument also fails because, even if the independent managers somehow owed fiduciary duties, they are owed to Debtor's *creditors*, not to the Debtor itself because Debtor is insolvent. *See In re Troll Communications LLC*, 385 B.R. 110, 120 (Bankr. D. Del. 2008) ("[U]nder Delaware law, officers and directors owe a fiduciary duty to creditors once a corporation becomes insolvent."). Therefore, if anything, the independent managers had a duty to *oppose* this bankruptcy which was filed at Secured Creditor's expense. Given the above, it is not surprising that Debtor stooped to arguing that the independent managers' consent was not needed because they are merely "ghosts" and "phantoms." (Opposition ¶ 22, 37).

32.     Debtor argues, again with no support, that it was authorized to file this case because the Jangana Members' unreasonably withheld their consent to that filing.[10] (Opposition ¶¶ 22, 36, 37). That argument is demonstrably incorrect because the Opposition confirms that the Jangana Members had many reasonable justifications for withholding their consent.[11]

33.     First, Debtor admits that the Jangana Members did not consent to the bankruptcy filing because they were concerned about triggering a "bad act guaranty" under the Loan Documents. (Opposition ¶ 2). Notwithstanding that Debtor has the burden of proof, Debtor provides no such proof (or any legal support) demonstrating that the Jangana Members' concern was unreasonable. *See Cypress Assocs., LLC v. Sunnyside Cogeneration Assocs. Project*, No. 1607-N, 2007 WL 148754, at *18 (Del. Ch. Jan. 17, 2007) ("The burden of proving unreasonableness in failing to give consent on a matter rests on the party who challenges the reasonableness of the other's actions."). Nor could Debtor provide such proof because triggering a bad act guaranty is obviously a legitimate concern.

---

[10] Debtor also claims that "at one point various member [sic] of the Jangana Family indicated that Joel Schreiber had the requisite authority alone to commence the Chapter 11 case on behalf of the [Debtor] without their consent." (Opposition ¶ 2). Debtor provides no support for this claim. Further, in an inexplicable *non sequitur*, Debtor asserts that Mr. Schreiber will only address that claim in a declaration "once he obtains more definitive information regarding the prospects for a sale contract for the Property." (*Id.* ¶ 2 n. 1). In any event, Mr. Schreiber's alleged statements are unsworn, unsupported and blatant hearsay which should be not be considered. But even if they were considered, they are inconsistent with the Schreiber Resolution attached to the Petition which represented that, "during the [August 8, 2022] meeting and follow-up conferences, one or more of the Jangana Members indicated that it was their belief that … either Joel Schreiber or Jack Jangana acting alone or together had the authority to file a Chapter 11 petition on behalf of the [Debtor]." Schreiber Resolution at 1. It seems that Debtor and Mr. Schreiber can't keep their stories straight.

[11] Debtor also appears to argue that the Jangana Members could not withhold their consent to a bankruptcy filing unless they presented some "alternative" or "deal" for the Property. (*See* Opposition ¶¶ 40-41). However, the Jangana Members were not required to do so. (*See* Western LA OA § 6.2(a)). Rather, the Jangana Members merely had to withhold their consent to this filing, which they in fact did. Similarly, Debtor argues that the Jangana Members withheld their consent "in violation of the fiduciary duties of the Debtor." (Opposition ¶ 30). The Jangana Members had no such duty. Indeed, Debtor provides no support for the position that the Jangana Members, who are only Debtor's indirect members, owe fiduciary duties to Debtor. Regardless, because Debtor is insolvent, any fiduciary duties are now owed to Debtor's creditors, not Debtor. *Troll*, 385 B.R. at 120.

12

34. Second, Debtor also admits that the Jangana Members withheld their consent because they did not believe that a bankruptcy would likely be successful where "all prior efforts to salvage the situation have failed." (Opposition ¶ 40). Once again, Debtor did not meet its burden of proving that this additional concern, whether alone or when combined with all of the Jangana Members' other concerns, was an unreasonable basis for withholding consent. In any event, the Opposition confirms that the Jangana Members' belief that the bankruptcy would fail was justified because, among other reasons: i) Mr. Schreiber confirmed that he could not sell the Property for years despite his "vigorous" efforts; and ii) Mr. Schreiber provided no proof that he will be able to achieve a sale or a successful reorganization now. (Opposition ¶ 7).

35. Third, Debtor further admits that the Jangana Members withheld their consent because they concluded that the small possibility of a successful bankruptcy did not justify the estimated thousands (potentially millions) of dollars that any bankruptcy would cost. (Opposition ¶ 40). Debtor again provides no support for its argument that this conclusion was unreasonable. It is, in fact, more than reasonable for a debtor's members to avoid the high costs and expenses of a bankruptcy case, especially one that is unlikely to yield any positive results.[12]

[*Remainder of page intentionally left blank*]

---

[12] Indeed, Debtor concedes in the Opposition that the Jangana Members may have acted reasonably in withholding their consent "from an individual perspective." (*See* Opposition ¶ 43). However, Debtor nevertheless contends that the Jangana Members acted unreasonably "from a Company perspective." *Id*. Of course, Debtor provides no explanation as to what this "Company perspective" is or why it should matter. Regardless, section 6.2(a) of the Western LA OA, which requires the Jangana Members' consent, does not prohibit the Jangana Members from withholding their consent unreasonably "from a Company perspective." Instead, section 6.2(a) merely provides that the Jangana Members' consent shall not be unreasonably withheld. As discussed above, the Jangana Members did not unreasonably withhold their consent, and, as such, they have acted well within their rights under section 6.2(a).

WHEREFORE, for these reasons and those set forth in the Motion, Secured Creditor respectfully requests entry of the Proposed Order attached as Exhibit A to the Motion i) dismissing the Chapter 11 Case, ii) barring Debtor against the filing of any further voluntary petition for relief under any chapter of the Bankruptcy Code for 180 days and iii) granting such other and further relief as this Court may deem appropriate and/or necessary.

Dated: October 10, 2022          DUANE MORRIS LLP

/s/ Lawrence J. Kotler
Lawrence J. Kotler, Esq. (LK-8177)
1540 Broadway, 14th Floor
New York, NY 10036
Telephone: (212) 692-1000
Facsimile: (215) 692-1020
Email: ljkotler@duanemorris.com

Meagen E. Leary, Esq. (admitted *pro hac vice*)
One Market Plaza
Spear Street Tower, Suite 200
San Francisco, CA 94105
Telephone: (415) 957-3000
Facsimile: (415) 957-3001
Email: meleary@duanemorris.com

Paul E. Chronis, Esq. (admitted *pro hac vice*)
190 South LaSalle Street, Suite 3700
Chicago, IL 60603
Telephone: (312) 499-6700
Facsimile: (312) 499-6701
Email: pechronis@duanemorris.com

*Counsel for Museum Building Holdings, LLC*