UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

In re:                                                                      Chapter 11

Broadbridge LA LLC                                            Case No.

                                        Debtor.

--------------------------------------------------------------x

## COMPANY RESOLUTION OF BROADBRIDGE LA LLC

WHEREAS, a special meeting of the direct and indirect Member and Managers of Broadbridge LA, LLC (the "Company") was held on August 8, 2022 pursuant to notice issued on August 5, 2022, a copy of which is attached hereto (the "Notice") and provided to the named Independent Directors to consider the filing of a Chapter 11 petition on behalf of the Company in light of the imminent foreclosure sale of the Company's development property; and

WHEREAS, the sole member of the Company, Broadbridge LA Member LLC ("BB Member") appeared by and through its sole member, Western LA Holdco LLC ("Western LA"), and Western LA appeared by its members, JS Western Holdco Member LLC by Joel Schreiber (collectively, "JS"), and Jack Jangana, Jenny Haim and Joyce Reiss (collectively, the Jangana Members") and their counsel; and the independent directors did not attend the meeting on August 8, 2022; and

WHEREAS, more particularly, Independent Director John Morrissey left the employ of Cogency Global Inc. sometime in 2021 and has not been replaced, and Independent Director Colleen DeVries remains employed by Cogency Global Inc. and was served with the Notice by email and was advised of the meeting by voicemail message on August 5, 2022 and did not attend the August 8, 2022 meeting; and

WHEREAS, at the August 8, 2022 meeting Joel Schreiber sought consent from the Jangana Members to file a voluntary Chapter 11 petition on behalf of the Company in light of a foreclosure sale of the Company's real property located at 801 South Broadway, Los Angeles, CA scheduled for August 9, 2022 at 11:00 a.m. (PST); and

WHEREAS, during the meeting and follow-up conferences, one or more of the Jangana Members indicated it was their belief that pursuant to the Unanimous Written Consent of the Members Western LA Holdco LLC dated June 10, 2016 (the "2016 Consent") either Joel Schreiber or Jack Jangana acting alone or together had the authority to file a Chapter 11 petition on behalf of the Company; and

WHEREAS, the Company is governed by the August 20, 2014 Limited Liability Company Agreement which, pursuant to Sections 8 and 9 thereof authorizes BB Member to manage the business affairs of the Company and take all necessary actions to further the purposes of the Company; and

WHEREAS, BB Member is governed by the August 20, 2014 Limited Liability Company Agreement which, pursuant to Sections 8 and 9 thereof authorizes Western LA to manage the business affairs of the Company and take all necessary actions to further the purposes of the Company; and

WHEREAS, Western LA is governed by the August 20, 2014 Amended and Restated Operating Agreement (the "WLA OA"); and

WHEREAS, by the terms of the June 8, 2018 Amended and Restated Binding Memorandum of Understanding Western LA Holdco LLC (the "2018 Memorandum"), the 2016 Consent was terminated, and Section 6.1 of the WLA OA was amended to provide that Jack Jangana and JS were each designated as Co-Managers each with authority to act on behalf of Western LA; and

WHEREAS, the WLA OA provides in Paragraph 6.1, as amended by the 2018 Memorandum, and Paragraph 6.2 that JS as one of the Managers of Western LA has the obligation and authority to implement Major Acts, including under Paragraph 6.2(a)(xxvi) initiating a bankruptcy filing by the Company, which authority may be taken after first obtaining the consent of the Jangana Members, which consent may not "be unreasonably withheld, conditioned or delayed"; and

WHEREAS, after several discussions throughout the day on August 8, 2022 JS remained in favor of filing a Chapter 11 petition and the Jangana Members remained opposed to the filing of a Chapter 11 petition; and

WHEREAS, in light of the inability of the Company to obtain a postponement of the foreclosure sale, and upon the authority granted to him under the WLA OA as amended by the 2018 Memorandum, and it also appearing that the Jangana Members have acted unreasonably in withholding consent to facilitate their personal interest as opposed to the Company's overriding interests, JS as co-Manager and co-Member through JS Western Holdco Member LLC, has authorized the following resolutions:

**RESOLVED**, that the Company is authorized to file for relief under the provisions of Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of New York; and it is further

**RESOLVED**, that the Company is authorized to retain Kevin J. Nash and the firm of Goldberg Weprin Finkel Goldstein LLC as the Company's bankruptcy counsel.

Dated: New York, NY
  August 9, 2022

       BROADBRIDGE LA LLC
       By : Broadbridge LA Member LLC
       By: Western LA Holdco LLC
       By: JS Western Holdco Member LLC

       By: _____
         Name: Joel Schreiber
         Title: Co-Manager

**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**BROADBRIDGE LA LLC**

This Second Amended and Restated Limited Liability Company Agreement (together with the schedules attached hereto, this "Agreement") of BROADBRIDGE LA LLC (the "Company"), is entered into by BROADBRIDGE LA MEMBER LLC, a Delaware limited liability company, as the sole equity member (the "Member"), and C. Anthony Shippam and Gregory S. Harrison, as the Independent Managers (as defined on Schedule A hereto).  Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A hereto.

WHEREAS, the Company was formed as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. §§ 18-101 et seq.), as amended from time to time (the "Act"), by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on June 26, 2014, and the entering into of the Operating Agreement of the Company, dated as of August 20, 2014 (the "Original LLC Agreement"), by the Member, as the sole equity member;

WHEREAS, the Member amended and restated the Original LLC Agreement in its entirety and entered into the Amended and Restated Limited Liability Company Agreement of the Company, dated as of June 10, 2016, by the Member, as the sole equity member, and C. Anthony Shippam, as Independent Manager (the "Prior LLC Agreement"); and

WHEREAS, the Member desires to continue the Company as a limited liability company under the Act and to amend and restate the Prior LLC Agreement in its entirety.

NOW, THEREFORE, BE IT RESOLVED, that in consideration of the agreements and obligations hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Member, by execution of this Agreement, hereby continues the Company as a limited liability company, without dissolution, in accordance with the Act and the Prior LLC Agreement, and the Member and the Independent Managers hereby agree to, and hereby do, amend and restate the Prior LLC Agreement as follows:

Section 1.        Name.

The name of the limited liability company continued hereby is BROADBRIDGE LA LLC.

Section 2.        Principal Business Office.

The principal business office of the Company shall be located at c/o Continental Equities Group Inc., 45 North Station Plaza, Great Neck, New York 11021, or such other location as may hereafter be determined by the Member.

Section 3.    <u>Registered Office</u>.

The address of the registered office of the Company in the State of Delaware is c/o Registered Agents Legal Services, LLC, 1013 Centre Road, Suite 403S, Wilmington, Delaware 19805.

Section 4.    <u>Registered Agent</u>.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are Registered Agents Legal Services, LLC, 1013 Centre Road, Suite 403S, Wilmington, Delaware 19805.

Section 5.    <u>Members</u>.

(a)    The mailing address of the Member is set forth on <u>Schedule B</u> attached hereto. The Member was admitted to the Company as a member of the Company upon its execution of the Original LLC Agreement.  The Member hereby continues the Company as a limited liability company without dissolution.

(b)    Subject to <u>Section 9(c)</u>, the Member may act by written consent.

(c)    Upon the occurrence of any event that causes the Member to cease to be a member of the Company (other than (i) upon continuation of the Company without dissolution upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to <u>Sections 21 and 23</u>, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to <u>Sections 22 and 23</u>), each person acting as an Independent Manager pursuant to <u>Section 10</u> shall, without any action of any Person and simultaneously with the Member ceasing to be a member of the Company, automatically be admitted to the Company as a Special Member and shall continue the existence of the Company without dissolution.  No Special Member may voluntarily resign from the Company or transfer its rights as Special Member unless (i) a successor Special Member has been admitted to the Company as Special Member by executing a counterpart to this Agreement, and (ii) such successor has also accepted his or her appointment as Independent Manager pursuant to <u>Section 10</u>; <u>provided</u>, <u>however</u>, that the Special Members shall automatically cease to be members of the Company upon the admission to the Company of a substitute Member.  Each Special Member shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets.  Pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company.  A Special Member, in its capacity as Special Member, may not bind the Company.  Except as required by any mandatory provision of the Act, each Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company.  In order to implement the admission to the Company of each Special Member, each person acting as an Independent Manager pursuant to <u>Section 10</u> shall execute a counterpart to this Agreement.  Prior to its

admission to the Company as Special Member, each person acting as an Independent Manager pursuant to <u>Section 10</u> shall not be a member of the Company.

Section 6.    <u>Certificates</u>.

Dennis M. Sughrue was designated as an "authorized person" within the meaning of the Act, and executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware.  Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, his powers as an "authorized person" ceased, and the Member thereupon became the designated "authorized person" and shall continue as the designated "authorized person" within the meaning of the Act.  The Member or an Officer shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in the State of California and in any other jurisdiction in which the Company may wish to conduct business.

The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

Section 7.    <u>Purposes</u>.

The purpose to be conducted or promoted by the Company is to engage in the following activities:

(a)

(i)    to acquire, develop, construct, own, hold, sell, lease, ground lease, transfer, exchange, dispose of, manage, operate or otherwise deal with the real property located at 801 S. Broadway, 826 South Hill Street and 832 South Hill Street, Los Angeles, California (collectively, the "<u>Property</u>");

(ii)    to enter into, execute, deliver and perform its obligations under the Basic Documents to which it is a party and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto;

(iii)    refinancing the Property in connection with a permitted repayment of the Loan; and

(iv)    to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes.

(b)    The Company, and the Member, or any Manager or Officer on behalf of the Company, may enter into, execute, deliver and perform under the Basic Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any Member, manager, Officer or other Person notwithstanding any other provision of this Agreement, or, to the fullest extent permitted by applicable law, the Act or applicable law, rule or regulation.  The foregoing authorization

shall not be deemed a restriction on the powers of the Member or any Manager or Officer to enter into other agreements on behalf of the Company.

Section 8.    Powers.

Subject to Section 9(c), the Company, and the Manager and the Officers of the Company on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 7 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act. Subject to Section 7, the Manager has the authority to bind the Company.

Section 9.    Management.

(a)    Manager.  Subject to Section 9(c), the business and affairs of the Company shall be managed by or under the direction of the Manager.  The initial Manager shall be the Member. The Manager does not need to be a Member.  The Manager shall be, and is hereby designated as a "manager" within the meaning of Section 18-101(10) of the Act.  The Manager may resign at any time by giving written notice to the Member.  The Manager may be removed or expelled, with or without cause, at any time by the Member.  Any vacancy caused by the removal, expulsion or resignation of the Manager may be filled by action of the Member.

(b)    Manager as Agent.  To the extent of its powers set forth in this Agreement and subject to Section 9(c), the Manager is an agent of the Company for the purposes of the Company's business, and the actions of the Manager taken in accordance with such powers set forth in this Agreement shall bind the Company.  Notwithstanding the last sentence of Section 18-402 of the Act, except as provided in this Agreement or in a resolution of the Manager, the Manager may not bind the Company.

(c)    Limitations on the Company's Activities.

(i)    This Section 9(c) is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

(ii)    The Member shall not, so long as any Obligation is outstanding, amend, alter, change or repeal the definition of "Independent Manager" or Sections 5(c), 7, 8, 9, 10, 16, 20, 21, 22, 23, 24, 25, 26, 29 or 31 or Schedule A of this Agreement (collectively, the "Special Purpose Provisions") without the written consent of the Administrative Agent. Subject to this Section 9(c), the Member reserves the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 31.  To the fullest extent permitted by applicable law, in the event of any conflict between any of the Special Purpose Provisions and any other provisions of this or any document governing the formation, management or operation of the Company, the Special Purpose Provisions shall control.

(iii)    So long as any Obligation is outstanding, notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member, the Manager, any Officer or any other Person, neither the Member nor the Manager nor any Officer nor any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior unanimous written consent of the Member, the Manager and all of the Independent Managers, to take any Material Action, provided, however, that the Manager, Member, any Officer or any other Person may not vote on, or authorize the taking of, any Material Action, unless there are at least two (2) Independent Managers then serving in such capacity.

(iv)    The Manager and the Member shall cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises; provided, however, that the Company shall not be required to preserve any such right or franchise if:  (1) the Manager shall determine that the preservation thereof is no longer desirable for the conduct of its business and that the loss thereof is not disadvantageous in any material respect to the Company and (2) the Rating Agency Condition is satisfied.  So long as any Obligation is outstanding, the Manager also shall cause the Company to:

(A)    not engage in any business unrelated to the purposes set forth in Section 7(a);

(B)    not have any assets other than the Property and such incidental personal property necessary for the ownership, operation and development of the Property;

(C)    to the fullest extent permitted by law, not engage in, seek or consent to, (i) any dissolution, winding up, liquidation, consolidation, merger, or sale of all or substantially all of its assets, (ii) except as permitted under the terms of the Loan Agreement, any transfer of membership interests, or (iii) any amendment of the Certificate of Formation or this Agreement with respect to the matters set forth in this definition without the written consent of Administrative Agent;

(D)    intend to remain solvent and intend to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, and endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, however, that in no event shall the foregoing create liability of the Company on account of the Company's insolvency due to insufficiency of capital or require any Member or any other Person to make any

additional capital contribution, advance, loan or any other type of financing to the Company;

(E)     not fail to correct any known misunderstanding regarding its separate identity;

(F)     maintain its accounts (except as otherwise provided to the contrary in the Loan Documents), books and records separate from any other Person and file its own tax returns, except to the extent that it (i) has been or is required to file consolidated tax returns by law or (ii) is treated as a disregarded entity for federal or state tax purposes;

(G)     maintain its own resolutions and agreements, books and records;

(H)     other than as provided in the Loan Agreement and the other Loan Documents, (i) not commingle, its funds or assets with those of any other Person and (ii) not participate in any cash management system with any other Person;

(I)     hold its assets in its own name;

(J)     conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of the Company, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subparagraph (X) below, as long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Company;

(K)     maintain its financial statements, accounting records and other entity documents separate from any other Person and not permit its assets to be listed as assets on the financial statement of any other entity except as permitted by GAAP, provided that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(L)     pay its own liabilities and expenses, including the salaries of its own employees (if any), out of its own funds and assets, and maintain a sufficient number of employees (if any) in light of its contemplated business operations; provided, however, that in no event shall the foregoing create liability of the Company on account of the Company's insolvency due to insufficiency of capital or require any member of the Company or any other Person to make any additional capital contribution, advance, loan or any other type of financing to the Company;

(M)     observe in all material respects all limited liability company formalities;

(N)     have no Indebtedness other than (i) the Debt, (ii) the Permitted Debt, and (iii) such other liabilities that are permitted pursuant to the Loan Agreement;

(O)     except in connection with the Loan Documents, not assume or guarantee or become obligated for the debts of any other Person and not hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to the Loan Agreement;

(P)     not acquire obligations or securities of its Member or any other Affiliate;

(Q)     allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including paying for shared office space and services performed by any employee of an Affiliate; provided, however, that in no event shall the foregoing create liability of the Company on account of the Company's insolvency due to insufficiency of capital or require any member of the Company or any other Person to make any additional capital contribution, advance, loan or any other type of financing to the Company;

(R)     maintain and use separate stationery, invoices and checks bearing its name, and all stationery, invoices, and checks utilized by the Company or utilized to collect its funds or pay its expenses shall bear its own name and shall not bear the name of any other entity unless such entity is clearly designated as being the Company's agent;

(S)     unless otherwise specifically permitted under the Loan Documents, not pledge its assets for the benefit of any other Person;

(T)     hold itself out and identify itself as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of the Company and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subparagraph (X) below, as long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Company;

(U)     maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(V)     make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity) except that the Company, from time to time in the ordinary course of business, may agree with Tenants under Leases of all or any portion of the Property to make certain tenant improvement allowances available to such Tenants;

(W)     not identify its Member or any Affiliate as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

(X)     not enter into or be a party to, any transaction with its Member or Affiliates except (i) in the ordinary course of its business and on terms which are arms-length, commercially reasonable and are substantially similar to those that would be obtained in a comparable arm's-length transaction with an unrelated third party, (ii) in connection with the Loan Agreement, the other Loan Documents and (iii) the Existing Affiliate Agreements;

(Y)     consider the interests of its creditors in connection with all company actions;

(Z)     except as provided in the Loan Documents, not have any of its obligations guaranteed by any Affiliate;

(AA)    comply in all material respects with all of the terms and provisions contained in its organizational documents and this Agreement; and

(BB)    not knowingly consent to any other Person (i) operating its business in the name of such Person, (ii) acting in the name of such Person, (iii) using such Person's stationery or business forms, (iv) holding out its credit as being available to satisfy the obligations of such Person, or (v) having contractual liability for the payment of any of the liabilities of such Person (except pursuant to the limited extent provided under the Loan Documents).

Failure of the Company, or the Member or Manager on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Company as a separate legal entity or the limited liability of the Member or the managers.

Section 10.    <u>Independent Manager</u>.

As long as any Obligation is outstanding, the Member shall cause the Company at all times to have at least two (2) Independent Managers who will be appointed by the Member. Each Independent Manager shall be, and is hereby designated as a "manager" within the meaning of Section 18-101(10) of the Act, and shall have only those powers in management of the business and affairs of the Company as shall be specifically provided in this Agreement.  No Independent Manager may be removed or replaced except for Cause. To the fullest extent permitted by law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Managers shall consider only the interests of the Company, including its creditors, in acting or otherwise voting on the matters referred to in <u>Section 9(c)(iii)</u>.  Except for duties to the Company as set forth in the immediately preceding sentence (including duties to the Company's creditors and the Member solely to the extent of its economic interest in the Company but excluding (i) all other interests of the Member, (ii) the interests of other Affiliates of the Company, and (iii) the interests of any group of Affiliates of which the Company is a part), to the fullest extent permitted by law the Independent Managers shall not have any fiduciary duties to the Member, Manager, any Officer or any other Person bound by this Agreement; <u>provided</u>, <u>however</u>, that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law. To the fullest extent permitted by law, any resignation, removal or replacement of any Independent Manager shall not be effective without five (5) Business Days prior written notice to Administrative Agent (in each case, unless such resignation, removal or replacement occurs as a result of the death or incapacity of such Independent Manager, or the termination of such individual's employment as an Independent Manager, in which case the Company shall provide written notice of the removal and replacement of such Independent Manager promptly following such resignation, removal or replacement) accompanied by a statement as to the reasons for such removal, the identity of the proposed replacement Independent Manager, and a certificate that the replacement Independent Manager satisfies the applicable terms and conditions of the definition of "Independent Manager" contained in this Agreement.  In addition, no resignation or removal of an Independent Manager, and no appointment of a successor Independent Manager, shall be effective until such successor (i) shall have accepted his or her appointment as an Independent Manager by a written instrument, which may be a counterpart signature page to the Management Agreement, and (ii) shall have executed a counterpart to this Agreement as required by <u>Section 5(c)</u>.  In the event of a vacancy in the position of an Independent Manager, the Member shall, as soon as practicable, appoint a successor Independent Manager.  All right, power and authority of the Independent Managers shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement.  No Independent Manager shall at any time serve as trustee in bankruptcy for any Affiliate of the Company.

Section 11.    <u>Officers</u>.

(a)    The Member may, from time to time as it deems advisable, appoint officers of the Company (the "<u>Officers</u>") and assign in writing titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person.  Unless the Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the

delegation to such person of the authorities and duties that are normally associated with that office.

(b)     The Member confirms that all determinations, decisions and actions made or taken by any of the Officers in accordance with this Agreement shall be conclusive and absolutely binding upon the Company, the Member and their respective successors, assigns and personal representatives.

(c)     Persons dealing with the Company are entitled to rely conclusively upon the power and authority of the Officers as set forth in this Agreement.  A certificate of any Officer certifying that such individual is an Officer shall be conclusive evidence that such individual is an Officer, and such individual's actions as an Officer shall be authorized and binding on the Company.

(d)     Officers as Agents.  The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Manager not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and, subject to Section 9(c), the actions of the Officers taken in accordance with such powers shall bind the Company.

(e)     Duties of Manager and Officers.  Except to the extent otherwise provided herein, any manager and each Officer shall have a fiduciary duty of loyalty and care similar to that of directors and officers of business corporations organized under the General Corporation Law of the State of Delaware.

Section 12.     Limited Liability.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and neither the Member nor the Special Members nor any manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, Special Member or manager of the Company.

Section 13.     Capital Contributions.

The Member has contributed to the Company property of an agreed value as listed on Schedule B attached hereto.  In accordance with Section 5(c), the Special Members shall not be required to make any capital contributions to the Company.

Section 14.     Additional Contributions.

The Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time upon the written consent of such Member.  To the extent that the Member makes an additional capital contribution to the Company, the Member shall revise Schedule B of this Agreement. The provisions of this Section 14 are intended to benefit the Member and the Special Members and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Section 14) and the Member and the Special Members shall not have any duty

or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 15.    Allocation of Profits and Losses.

The Company's profits and losses shall be allocated to the Member.

Section 16.    Distributions.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Manager.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or any Basic Document.

Section 17.    Books and Records.

The Member shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.  The Member shall have the right to examine the Company's books, records and documents during normal business hours.  The Company's books of account shall be kept using the method of accounting determined by the Member.  The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Member.

Section 18.    Reserved.

Section 19.    Other Business.

The Member, the Manager, the Special Members and any Affiliate of the Member or the Special Members may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others.  The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 20.    Exculpation and Indemnification.

(a)    Neither the Member nor the Special Members nor any Officer, manager, employee or agent of the Company nor any employee, representative, agent or Affiliate of the Member or the Special Members (collectively, the "Covered Persons") shall, to the fullest extent permitted by law, be liable to the Company or any other Person that is a party to or is otherwise bound by this Agreement, for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct. To the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, an Independent Manager shall not be liable to the Company, any Member, Manager or Officer or any other Person bound by this Agreement for breach of contract or breach of duties

(including fiduciary duties), unless the Independent Manager acted in bad faith or engaged in willful misconduct.

(b)     To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 20 by the Company shall be provided out of and to the extent of Company assets only, and the Member and the Special Members shall not have personal liability on account thereof; and provided, further, that so long as any Obligation is outstanding, no indemnity payment from funds of the Company (as distinct from funds from other sources, such as insurance) of any indemnity under this Section 20 shall be payable from amounts allocable to any other Person pursuant to the Basic Documents.

(c)     To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 20.

(d)     To the fullest extent permitted by applicable law, a Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(e)     To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, to the fullest extent permitted by applicable law, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Covered Person. The provisions of this Agreement, to the extent that they eliminate or restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Member and the Special Members to replace such other duties and liabilities of such Covered Person to the fullest extent permitted by applicable law.

(f)     Notwithstanding the foregoing provisions, any indemnification set forth herein shall be fully subordinate to the Obligations and, to the fullest extent permitted by law, shall not

constitute a claim against the Obligations in the event that cash flow in excess of the amount required to pay the Obligations is insufficient to pay such obligation.

(g)    The provisions of this Section 20 shall survive any termination of this Agreement.

Section 21.    Assignments.

The Member may assign in whole or in part its limited liability company interest in the Company. Subject to Section 23, the transferee shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 21, such admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Notwithstanding anything in this Agreement to the contrary, any successor to the Member by merger or consolidation in compliance with the Basic Documents shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

Section 22.    Resignation.

So long as any Obligation is outstanding, the Member may not resign, except as permitted under the Basic Documents and if the Rating Agency Condition is satisfied. If the Member is permitted to resign pursuant to this Section 22, an additional member of the Company shall be admitted to the Company, subject to Section 23, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

Section 23.    Admission of Additional Members.

One or more additional Members of the Company may be admitted to the Company with the written consent of the Member; provided, however, that, notwithstanding the foregoing, so long as any Obligation remains outstanding, no additional Member may be admitted to the Company pursuant to Sections 21, 22 or 23 unless the Rating Agency Condition is satisfied.

Section 24.    Dissolution.

(a)    Subject to Section 9(c), the Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company or that causes the Member to cease to be a member of the Company

(other than (i) upon continuation of the Company without dissolution upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to <u>Sections 21 and 23</u>, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to <u>Sections 22 and 23</u>), to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company or the Member in the Company.

(b)    Notwithstanding any other provision of this Agreement, the Bankruptcy or dissolution of the Member or a Special Member shall not cause the Member or Special Member, respectively, to cease to be a member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

(c)    Notwithstanding any other provision of this Agreement, each of the Member and the Special Members waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member or a Special Member, or the occurrence of an event that causes the Member or a Special Member to cease to be a member of the Company.

(d)    In the event of dissolution of the Company, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(e)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

Section 25.    <u>Waiver of Partition; Nature of Interest</u>.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Member and the Special Members hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.  The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to <u>Section 16</u> hereof.  The interest of the Member in the Company is personal property.

Section 26.    <u>Benefits of Agreement; No Third-Party Rights</u>.

Notwithstanding any other provision of this Agreement, during the Term of the Loan, Administrative Agent and Lender are intended third-party beneficiaries of the Special Purpose Provisions of this Agreement. Except for Administrative Agent and Lender with respect to the Special Purpose Provisions, none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member or a Special Member. Nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (except as provided in <u>Section 29</u>).

Section 27.    <u>Severability of Provisions</u>.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 28.    <u>Entire Agreement</u>.

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 29.    <u>Binding Agreement</u>.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement, including, without limitation, the Special Purpose Provisions, constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member by the Independent Managers, in accordance with its terms. In addition, the Independent Managers shall be intended beneficiaries of this Agreement.

Section 30.    <u>Governing Law</u>.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

Section 31.    <u>Amendments</u>.

Subject to <u>Section 9(c)</u>, this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Member. Notwithstanding anything to the contrary in this Agreement, so long as any Obligation is outstanding, this Agreement may not be modified, altered, supplemented or amended unless the Rating Agency Condition is satisfied except: (i) to cure any ambiguity or (ii) to convert or supplement any provision in a manner consistent with the intent of this Agreement and the other Basic Documents.

Section 32.     <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 33.     <u>Notices</u>.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in <u>Section 2</u>, (b) in the case of the Member, to the Member at its address as listed on <u>Schedule B</u> attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the _8th_ day of June, 2018.

**MEMBER:**

**BROADBRIDGE LA MEMBER LLC,**
a Delaware limited liability company

By:    Western LA Holdco LLC,
       a Delaware limited liability company,
       its sole member

By:    _____
       Name: Jack Pangana
       Title:  Co-Manager

**INDEPENDENT MANAGER:**

_____
C. Anthony Shippam

_____
Gregory S. Harrison

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of Broadbridge LA LLC]

**INDEPENDENT MANAGERS**:

_____
**C. ANTHONY SHIPPAM**

_____
**GREGORY S. HARRISON**

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of Broadbridge LA LLC]

<u>SCHEDULE A</u>

<u>Definitions</u>

A.      Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"<u>Act</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Administrative Agent</u>" means SPT CA FUNDINGS 2, LLC, a Delaware limited liability company.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.

"<u>Agreement</u>" means this Second Amended and Restated Limited Liability Company Agreement of the Company, together with the schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"<u>Bankruptcy</u>" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.  The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(l) and 18-304 of the Act.

"<u>Basic Documents</u>" means the Loan Documents and all documents and certificates contemplated thereby or delivered in connection therewith.

"<u>Business Day</u>" has the meaning assigned to that term in the Loan Agreement.

"<u>Cause</u>" has the meaning assigned to that term in the Loan Agreement.

A-1

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on June 26, 2014, as amended or amended and restated from time to time.

"Company" means BROADBRIDGE LA LLC, a Delaware limited liability company.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"Covered Persons" has the meaning set forth in Section 20(a).

"Debt" has the meaning assigned to that term in the Loan Agreement.

"Existing Affiliate Agreements" has the meaning assigned to that term in the Loan Agreement.

"GAAP" has the meaning assigned to that term in the Loan Agreement.

"Indebtedness" means with respect to the Company, (i) indebtedness or liability of the Company for borrowed money whether or not evidenced by bonds, debentures, notes or other instruments, or for the deferred purchase price of property or services (excluding trade obligations); (ii) obligations of the Company as lessee under leases which should have been or should be, in accordance with GAAP, recorded as capital leases; (iii) current liabilities of such Person in respect of unfunded vested benefits under plans covered by Title IV of ERISA; (iv) obligations issued for, or liabilities incurred on the account of, the Company; (v) obligations or liabilities of the Company arising under letters of credit, credit facilities or other acceptance facilities; (vi) obligations of the Company under any guarantees or other agreement to become secondarily liable for any obligation of any other Person, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person or otherwise to assure a creditor against loss; (vii) obligations of the Company secured by any Lien on any property of the Company, whether or not the obligations have been assumed by the Company; or (viii) obligations of the Company under any interest rate or currency exchange agreement.

"Independent Manager" means a natural person who (A) has prior experience as an independent director, independent manager or independent member with at least three (3) years of employment experience and who is provided by CT Corporation, Corporation Service Company, National Registered Agents, Inc. (or its affiliate NRAI Entity Services, LLC), Wilmington Trust Company, Stewart Management Company, Lord Securities Corporation or, if none of those companies is then providing professional independent directors, independent managers or independent members, another nationally-recognized company reasonably approved by Administrative Agent, in each case, that is not an Affiliate of the Company and that provides professional independent directors, independent managers, independent members and other corporate services in the ordinary course of its business, and (B) is duly appointed as an

A-2

independent manager of the Company and for the five (5)-year period prior to his or her appointment as independent manager has not been and during the continuation of his or her serving as independent manager will not be, any of the following:  (i) a member (other than a Special Member of the Company), manager (other than an Independent Manager of the Company), director, trustee, officer, employee, attorney, or counsel of any of the Company or its Affiliates; (ii) a creditor, customer, supplier, service provider (including provider of professional services) or other Person who derives any of its purchases or revenues from its activities with the Company or its Affiliates (other than a member, manager, director, trustee, officer, employee, attorney or counsel of a nationally-recognized company that routinely provides professional independent directors, independent managers and independent members and other corporate services to the Company or its Affiliates in the ordinary course of business); (iii) a direct or indirect legal or beneficial owner in the Company or any of its Affiliates; (iv) a member of the immediate family of any member, manager, employee, attorney, customer, supplier or other Person referred to above; and (v) a Person Controlling or under the common Control of anyone listed in clauses (i) through (iv) above.  A natural person who otherwise satisfies the foregoing definition but does not satisfy the requirements of clause (i) by reason of being the independent director, independent manager or independent member of a "single purpose entity" affiliated with the Company shall be qualified to serve as an Independent Manager hereunder, provided that the fees that such individual earns from serving as an independent director, independent manager or independent member of affiliates of the Company in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.  For purposes of this paragraph, a "single purpose entity" is an entity, whose organizational documents contain restrictions on its activities and impose requirements intended to preserve such entity's separateness that are substantially similar to the Single Purpose Entity definition in the Loan Agreement.

"Lender" means SPT CA FUNDINGS 2, LLC, a Delaware limited liability company, as administrative agent for itself and the other lenders party to the Loan Agreement, together with their respective successors and assigns.

"Loan" means the loan by Lender to the Company.

"Loan Agreement" means the Loan Agreement entered into by the Company, as the borrower, Lender, and Administrative Agent on or about the date hereof.

"Loan Documents" has the meaning assigned to that term in the Loan Agreement.

"Leases" has the meaning assigned to that term in the Loan Agreement.

"Lien" has the meaning assigned to that term in the Loan Agreement.

"Management Agreement" means the agreement of the Independent Managers in the form attached hereto as Schedule C.  The Management Agreement shall be deemed incorporated into, and a part of this Agreement.

"Manager" means BROADBRIDGE LA MEMBER LLC, a Delaware limited liability company, as the initial manager of the Company, and includes any Person designated as a

Manager of the Company pursuant to the provisions of this Agreement; provided, however, the term "Manager" shall not include the Independent Managers.

"Material Action" means to not institute proceedings to have the Company be adjudicated bankrupt or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a voluntary bankruptcy petition with respect to the Company, to file or consent to the filing of any petition to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute or other laws relating to the relief from debts or the protection of debtors generally, with respect to the Company, or to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or all or a portion of its property, or to make any assignment for the benefit of creditors of the Company, or to admit in writing the Company's inability to pay its debts generally as they become due, or to take action in furtherance of any such actions.

"Member" means BROADBRIDGE LA MEMBER LLC, a Delaware limited liability company, as the initial member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company; provided, however, the term "Member" shall not include the Special Members.

"Obligations" shall mean the indebtedness, liabilities and obligations of the Company under or in connection with the Basic Documents or any related document in effect as of any date of determination.

"Officer" means an officer of the Company described in Section 11.

"Permitted Debt" has the meaning assigned to that term in the Loan Agreement.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited partnership, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Property" has the meaning assigned to that term in Section 7(a).

"Rating Agency" has the meaning assigned to that term in the Basic Documents.

"Rating Agency Condition" means (i) with respect to any action taken at any time before the loan evidenced and secured by the Basic Documents has been sold or assigned to a securitization trust, that the lender thereunder has consented in writing to such action, and (ii) with respect to any action taken at any time after such loan has been sold or assigned to a securitization trust, that each Rating Agency shall have been given ten (10) days prior notice thereof and that each of the Rating Agencies shall have notified the Company in writing that such action will not result in a reduction or withdrawal of the then current rating by such Rating Agency of any of securities issued by such securitization trust.

"Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to Section 5(c), a person acting as Independent Manager, in such person's

A-4

capacity as a member of the Company.  A Special Member shall only have the rights and duties expressly set forth in this Agreement.

"<u>Tenant</u>" has the meaning assigned to that term in the Loan Agreement.

"<u>Term</u>" has the meaning assigned to that term in the Loan Agreement.

B.      Rules of Construction

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."  The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision.  The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement.  All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

## SCHEDULE B

### Member

| Name | Mailing Address | Agreed Value of Capital Contribution | Membership Interest |
|---|---|---|---|
| BROADBRIDGE LA MEMBER LLC, a Delaware limited liability company | c/o Continental Equities Group Inc., 45 North Station Plaza, Suite 402, Great Neck, New York 11021 | $100.00 | 100% |

B-1

SCHEDULE C

Management Agreement

June 8, 2018

BROADBRIDGE LA LLC
c/o Continental Equities Group Inc.
45 North Station Plaza, Suite 402
Great Neck, New York 11021

      Re:    Management Agreement --  BROADBRIDGE LA LLC

Ladies and Gentlemen:

For good and valuable consideration, each of the undersigned Persons, who have been designated as Independent Managers of BROADBRIDGE LA LLC, a Delaware limited liability company (the "Company"), in accordance with the Second Amended and Restated Limited Liability Company Agreement of the Company, dated as of the date hereof, as it may be amended or restated from time to time (the "LLC Agreement"), hereby agree as follows:

1.    Each of the undersigned accepts such Person's rights and authority as an Independent Manager under the LLC Agreement and agrees to perform and discharge such Person's duties and obligations as an Independent Manager under the LLC Agreement, and further agrees that such rights, authorities, duties and obligations under the LLC Agreement shall continue until such Person's successor as an Independent Manager is designated or until such Person's resignation or removal as an Independent Manager in accordance with the LLC Agreement.  Each of the undersigned agrees and acknowledges that it has been designated as a "manager" of the Company within the meaning of the Delaware Limited Liability Company Act.

2.    So long as any Obligation is outstanding, each of the undersigned agrees, solely in its capacity as a creditor of the Company on account of any indemnification or other payment owing to the undersigned by the Company, not to acquiesce, petition or otherwise invoke or cause the Company to invoke the process of any court or governmental authority for the purpose of commencing or sustaining a case against the Company under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or any substantial part of the property of the Company, or ordering the winding up or liquidation of the affairs of the Company.

3.    THIS MANAGEMENT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

Initially capitalized terms used and not otherwise defined herein have the meanings set forth in the LLC Agreement.

This Management Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Management Agreement and all of which together shall constitute one and the same instrument.

C-2

IN WITNESS WHEREOF, the undersigned have executed this Management Agreement as of the day and year first above written.

_____
C. Anthony Shippam

_____
Gregory S. Harrison

C-3

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

WESTERN LA HOLDCO LLC

DATED: AUGUST 20, 2014

**TABLE OF CONTENTS**

ARTICLE 1 ORGANIZATION, TERM, PURPOSE, POWERS, ETC. .......................................... 2

    SECTION 1.1    Formation. ........................................................................ 2
    SECTION 1.2    Name ................................................................................ 2
    SECTION 1.3    Term ................................................................................. 2
    SECTION 1.4    Registered Agent and Office ........................................... 2
    SECTION 1.5    Principal Office ............................................................... 3
    SECTION 1.6    Other Instruments ........................................................... 3
    SECTION 1.7    Purpose ........................................................................... 3
    SECTION 1.8    Members; Membership Lists; Obligation to Update ....... 3

ARTICLE 2 DEFINITIONS .............................................................................................. 3

ARTICLE 3 CAPITAL CONTRIBUTIONS ............................................................................ 13

    SECTION 3.1    Initial Capital Contributions. ......................................... 13
    SECTION 3.2    Additional Capital Contributions. .................................. 13
    SECTION 3.3    Limitation on Liability of Members ............................... 15
    SECTION 3.4    No Withdrawal of Capital Contributions ....................... 16
    SECTION 3.5    Return of Capital Contributions. ................................... 16
    SECTION 3.6    No Priority ..................................................................... 16
    SECTION 3.7    Payments Under Guaranties. .......................................... 16
    SECTION 3.8    Indemnification; Liability................................................ 17

ARTICLE 4 ALLOCATION OF PROFITS AND LOSSES .......................................................... 17

    SECTION 4.1    Allocation of Profits and Losses. ................................... 17
    SECTION 4.2    Special Allocations......................................................... 18
    SECTION 4.3    Other Allocation Rules. .................................................. 20
    SECTION 4.4    Tax Allocations:  Code Section 704(c). ......................... 20

ARTICLE 5 CASH DISTRIBUTIONS ................................................................................... 21

    SECTION 5.1    Distribution of Available Net Cash Flow and Capital Event Proceeds........ 21
    SECTION 5.2    Distributions. ................................................................. 22
    SECTION 5.3    Withholding.................................................................... 22

ARTICLE 6 MANAGEMENT AND RIGHTS, OBLIGATIONS AND POWERS OF THE
MEMBERS ................................................................................................................. 22

    SECTION 6.1    Management. .................................................................. 22
    SECTION 6.2    Major Acts...................................................................... 23

SECTION 6.3    Request for Consent to Major Act.................................................................... 26
SECTION 6.4    Operating Budget............................................................................................. 26
SECTION 6.5    Development Budget......................................................................................... 26
SECTION 6.6    Exculpation...................................................................................................... 27
SECTION 6.7    Time Devoted by Members; Competing Ventures............................................ 27
SECTION 6.8    Other Duties and Obligations of the Members................................................. 28

ARTICLE 7 TRANSFERABILITY OF MEMBERS' INTERESTS........................................ 28

SECTION 7.1    Prohibited Transfers. ...................................................................................... 28
SECTION 7.2    Permitted Transfers ........................................................................................ 28
SECTION 7.3    Admission of a Substituted Member ............................................................... 29
SECTION 7.4    Withdrawal of a Member ................................................................................ 29
SECTION 7.5    Dissolution of Member; Other Termination of Membership............................ 29
SECTION 7.6    Forced Sale. .................................................................................................... 30
SECTION 7.7    Certain Prohibited Transfers .......................................................................... 31

ARTICLE 8 DISSOLUTION AND LIQUIDATION OF THE COMPANY ............................. 32

SECTION 8.1    Events Causing Dissolution............................................................................. 32
SECTION 8.2    Liquidating Trustee ......................................................................................... 32
SECTION 8.3    Liquidation ..................................................................................................... 32
SECTION 8.4    Termination ..................................................................................................... 33
SECTION 8.5    Claims of the Members ................................................................................... 33

ARTICLE 9 REPRESENTATIONS AND WARRANTIES.................................................... 33

SECTION 9.1    Representations and Warranties of JS Member ............................................... 33
SECTION 9.2    Representations and Warranties of Jangana Members..................................... 34

ARTICLE 10 BOOKS AND RECORDS, ACCOUNTING, REPORTS, TAX ELECTIONS .... 34

SECTION 10.1   Books of Account; Records.............................................................................. 34
SECTION 10.2   Financial Reports............................................................................................. 34
SECTION 10.3   Tax Returns and Advances .............................................................................. 35
SECTION 10.4   Tax Elections ................................................................................................... 35

ARTICLE 11 MISCELLANEOUS PROVISIONS................................................................. 35

SECTION 11.1   Notices............................................................................................................. 35
SECTION 11.2   Confidentiality................................................................................................. 37
SECTION 11.3   Signatures; Amendments................................................................................. 38
SECTION 11.4   Binding Provisions .......................................................................................... 38
SECTION 11.5   Applicable Law ............................................................................................... 38
SECTION 11.6   Counterparts .................................................................................................... 38
SECTION 11.7   Severability of Provisions ............................................................................... 38
SECTION 11.8   Interpretation ................................................................................................... 38
SECTION 11.9   No Benefit to Third Parties ............................................................................. 38

SECTION 11.10  Remedies Not Exclusive ................................................................. 38
SECTION 11.11  Brokerage Representation and Indemnity ................................. 39
SECTION 11.12  Jangana Members ........................................................................ 39
SECTION 11.13  Joint and Several Obligations .................................................... 39

Schedule A – Name and Address of the Members
Exhibit A – Legal Description of the Property
Exhibit B – Initial Business Plan of the Company
Exhibit C – Initial Operating Budget
Exhibit D – Initial Development Budget
Exhibit E – Property Management Agreement

1346741 v4
17994.00022

# AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY

# OPERATING AGREEMENT

# OF

# WESTERN LA HOLDCO LLLC

This Amended and Restated Limited Liability Company Operating Agreement of **WESTERN LA HOLDCO LLC**, a Delaware limited liability company (the "Company") (this "Agreement"), is made as of August 20, 2014 (the "Effective Date") among JS WESTERN HOLDCO MEMBER LLC, a Delaware limited liability company ("JS Member"), and JACK JANGANA, an individual ("Jack"), JENNY HAIM, an individual ("Jenny") and JOYCE REISS, an individual ("Joyce") (Jack, Jenny and Joyce, collectively, the "Jangana Members") (JS Member and the Jangana Members, each, a "Member", and collectively, the "Members").

## WITNESSETH:

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in Article 2;

WHEREAS, Western Development Group, a New York limited liability company ("WDG"), formed the Company, as its sole member, on August 12, 2014;

WHEREAS, WDG transferred all of its right, title and interest, as a member in the Company to 53 Murray LLC, a New York limited liability company ("53 Murray");

WHEREAS, 53 Murray thereafter transferred all of its right, title and interest in the Company to the Jangana Members;

WHEREAS, the Company is the sole member and manager of Broadbridge LA Member LLC, a Delaware limited liability company ("Broadbridge Member"), pursuant to the Limited Liability Company Operating Agreement of Broadbridge Member, dated as of the date hereof (the "Broadbridge Member Operating Agreement");

WHEREAS, Broadbridge Member is the sole member and manager of Broadbridge LA LLC, a Delaware limited liability company ("Property Owner"), pursuant to the Limited Liability Company Operating Agreement of Property Owner, dated as of the date hereof (the "Property Owner Operating Agreement")';

WHEREAS, JS Member caused its affiliate, Waterbridge Capital LL, to contribute to Property Owner all of its right, title and interest, as purchaser, in and to a sale-purchase agreement (the "SPA") for the acquisition of premises known as 801 South Broadway, Los Angeles, California (the "Property"), which Property are more particularly described in Exhibit A annexed hereto; and

WHEREAS, as consideration for the assignment of the SPA to Property Owner and other good and valuable consideration, Jangana Members wish to admit JS Member as a Member of the Company;

WHEREAS, Property Owner has on this date closed the acquisition of the Property pursuant to the SPA; and

WHEREAS, the Members wish to memorialize (i) the admission of JS Member as a member of the Company and (ii) their respective rights and obligations, as Members of the Company.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the Members hereby agree as follows:

## ARTICLE 1
## ORGANIZATION, TERM, PURPOSE, POWERS, ETC.

SECTION 1.1    Formation.

(a)    The Company was formed as a limited liability company pursuant to the LLCA by the filing of the Certificate.

(b)    To maintain the Company as a limited liability company under the laws of the State of Delaware, the Company shall from time to time take appropriate action, including the preparation and filing of such amendments to the Certificate and such other assumed name certificates, documents, instruments and publications as may be required by or desirable under law.

SECTION 1.2    Name. The name of the Company is WESTERN LA HOLDCO LLC.

SECTION 1.3    Term. The term of the Company shall continue in full force and effect until the earliest of the following (each of the following being herein referred to as a "Dissolution Event"):

(a)    the later of (x) the sale or disposition of all or substantially all of the Property in accordance with the terms of this Agreement and (y) the satisfaction in full of the obligations of Property Owner and Broadbridge Member under the Canyon Loan Documents;

(b)    the dissolution of the Company by the unanimous written agreement of the Members in accordance with the terms of this Agreement;

(c)    the entry of a decree of judicial dissolution under the LLCA; and

(d)    the happening of any event which makes it unlawful for the Company business to be continued.

SECTION 1.4    Registered Agent and Office. The address of the registered office of the Company in the State of Delaware is c/o Vcorp Services, LLC, 1811 Silverside Road,

2

Wilmington, Delaware 19810, County of New Castle. The name and address of the registered agent of the Company for the service of process is Vcorp Services, LLC, 1811 Silverside Road, Wilmington, Delaware 19810, County of New Castle.

SECTION 1.5    Principal Office. The principal office of the Company is c/o 45 North Station Plaza, Ste 402, Great Neck, NY 11021, Attention: Jack Jangana ("Principal Office"). Such office may be changed upon the mutual agreement of the Members.

SECTION 1.6    Other Instruments. Each Member shall execute and deliver to the Company, within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and take such other action as the Company shall reasonably deem necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company or any Member to fulfill its responsibilities under this Agreement.

SECTION 1.7    Purpose. The principal purpose and character of the business of the Company is to engage in any lawful activities for which a limited liability company may be formed under the LLCA, including, without limitation, (i) maintaining the Company's interest in Broadbridge Member and exercising its rights, and performing its obligations, as a member of Broadbridge Member pursuant to the Broadbridge Member Operating Agreement; (ii) causing Broadbridge Member to maintain its interest in Property Owner and causing Broadbridge Member to exercise its rights, and perform its obligations, as member of the Property Owner Operating Agreement; and (iii) causing Property Owner to own, redevelop, hold, lease, manage, operate, finance, refinance, sell or otherwise dispose of the Property and (iv) doing all things necessary, suitable or proper for the accomplishment of, or in furtherance of, any of the purposes set forth herein and to do every other act or acts incidental to or arising from, or connected with, any of such purposes. The Company shall not engage in any other businesses or activities, except with the consent of the Members.

SECTION 1.8    Members; Membership Lists; Obligation to Update. The names and addresses of the Members (together with their respective interests in the Company) are set forth on Schedule A hereto. The Company shall maintain a list of all Members, and their last known business, residence or mailing address.

## ARTICLE 2
## DEFINITIONS

Defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article 2. Certain additional defined terms are set forth elsewhere in this Agreement. Unless the context requires otherwise, the singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires, and Article and Section references are references to the Articles and Sections of this Agreement.

"Additional Capital Contributions" shall have the meaning given in Section 3.2(a) hereof.

1346741 v4
17994.00022

"Adjusted Capital Account" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to the terms of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)     Debit to such Capital Account the items described in paragraphs (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations to the extent relevant thereto and shall be interpreted consistently therewith.

"Affiliate" means, when used with reference to a particular Person, (a) any Person or group of Persons acting in concert that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person, (b) any Person that is an officer, partner or trustee of, or serves in a similar capacity with respect to, such Person or of which such Person is an officer, partner or trustee or with respect to which such Person serves in a similar capacity, (c) any Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of voting securities of, or otherwise has an equivalent beneficial interest in, such Person or of which such Person is directly or indirectly the owner of 10% or more of any class of voting securities or in which such Person has an equivalent beneficial interest or (d) any relative or spouse of such Person.

"Agreement" has the meaning defined in the Preamble to this Agreement.

"Allocated ROFO Purchase Price" shall have the meaning given in Section 7.6(b) hereof.

"Applicable Companies" means, collectively, the Company, Broadbridge Member and Property Owner.

"Available Net Cash Flow" shall have the meaning given in Section 5.1(a) hereof.

"Bankruptcy" or "Bankrupt", as to any Person, means the filing of a petition for relief as to any such Person as debtor or bankrupt under the Bankruptcy Code of 1978 or like provision of law (except if such petition is filed by a Person other than the Person that is the debtor or bankrupt, such filing is contested by the Person that is the debtor or bankrupt, and such petition has been dismissed within one hundred twenty (120) days); insolvency of such Person as finally determined by a court proceeding; filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of such Person's assets; or commencement of any proceedings relating to such Person under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereafter in effect, either by such Person or by another, provided that if such proceeding is commenced by another, such Person indicates such Person's approval of such proceeding, consents thereto or acquiesces therein, or

such proceeding is contested by such Person and has not been finally dismissed within one hundred twenty (120) days.

"Broadbridge Member" has the meaning given in the Recitals to this Agreement.

"Broadbridge Member Operating Agreement" has the meaning given in the Recitals to this Agreement.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banks in New York are required or permitted to be closed.

"Business Plan" shall mean a plan for the redevelopment, management, leasing and operation the Property.

"Canyon Loan" shall mean that certain loan in the maximum principal amount of $140,000,000 by Canpartners Realty Holding Company IV LLC, as lender, and Property Owner, as borrower, which Canyon Loan is evidenced, secured and/or guarantied by the Canyon Loan Documents.

"Canyon Loan Agreement" shall mean that certain Loan Agreement, dated as of the date hereof, between Canpartners Realty Holding Company IV LLC, as lender, and Property Owner, as borrower.

"Canyon Loan Documents" shall mean the documents and instruments which evidence, secure and/or guaranty the Canyon Loan.

"Capital Account" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv) and the following provisions:

(a)    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's share of Profits, and any items in the nature of income or gain that are specially allocated to such Member pursuant to Section 4.2 hereof, and the amount of any Company liabilities that are assumed by such Member (other than liabilities that are secured by any Company property distributed to such Member).

(b)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to), such Member's share of Losses, and any items in the nature of expenses or losses that are specially allocated to such Member pursuant to Section 4.2 hereof, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities that are secured by any property contributed by such Member to the Company).

(c)    In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest; provided, however, that if such transfer causes a

termination of the Company within the meaning of Code Section 708(b)(1)(B), the Capital Accounts of the Members shall govern the constructive liquidation under Treasury Regulations Section 1.708-1(b)(1)(iv), and, upon constructive reformation, the Capital Account of each Member shall be redetermined in accordance with the provisions of this definition. In the case of a sale or exchange of an interest in the Company at a time when an election under Code Section 754 is in effect, the Capital Account of the transferee Member shall not be adjusted to reflect the adjustments to the adjusted tax bases of Company property required under Code Sections 754 and 743, except as otherwise permitted by Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)    In determining the amount of any liability for purposes of clauses (a) and (b) of this definition, there shall be taken into account Code Section 752(c) and the Treasury Regulations promulgated thereunder, and any other applicable provisions of the Code and Regulations.

(e)    In the event the Gross Asset Values of Company assets are adjusted pursuant to the definition of Gross Asset Value, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the manner in which unrealized income, gain, loss and deduction inherent in all Company assets (that has not been previously reflected in the Capital Accounts) would be allocated pursuant to Article 4 if there were a taxable disposition of Company property at fair market value. Similarly, in the event of a distribution of Company assets to a Member (whether in connection with a liquidation or otherwise), the Capital Accounts shall be adjusted to reflect the manner in which unrealized income, gain, loss and deduction inherent in such distributed assets (not previously reflected in Capital Accounts) would be allocated pursuant to Article 4 if there were a taxable disposition of such distributed assets at fair market value.

(f)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company.

"Capital Call" shall have the meaning given in Section 3.2(a) hereof.

"Capital Contributions" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property contributed (or deemed contributed) by such Member to the Company (net of any liabilities secured by such property or to which such property is otherwise subject) including, without limitation, the Initial Capital Contributions and any Additional Capital Contributions. The Initial Capital Contributions of the Members are set forth in Schedule A annexed hereto.

"Capital Event Proceeds" shall have the meaning given in Section 5.1(b) hereof.

"Capital Proceeds" shall mean all cash received by the Company (including principal but not interest, except in the case of a sale of all or substantially all of the Property, received with respect to any deferred payment obligation received by the Company in connection with a sale or other disposition) (i) from the sale or other disposition (including any condemnation or a disposition in lieu thereof) of all or any portion of the Property, (ii) the financing or refinancing of all or any portion of any Indebtedness of any of the Applicable Companies, (iii) from the settlement of any insurance claim respecting a casualty to the Property (excluding any business interruption claims) which is not used to repair, restore or replace the Property, or (iv) which would be considered "capital proceeds" in accordance with GAAP, consistently applied, decreased by (in the case of each of clauses (i)-(iv)) the sum of (a) the amount thereof applied to the payment of any closing, transaction and other costs incurred by the Company in connection therewith; (b) the amount thereof applied to the retirement of any outstanding Indebtedness; and (c) the amount thereof applied to fund any Reserves. In addition, any reduction in Reserves shall, up to the amount of Reserves funded with Capital Proceeds pursuant to clause (c) of the preceding sentence, be deemed to be Capital Proceeds.

"Jangana Guarantor" means any Affiliate of Jangana Members that shall from time to time deliver a Guaranty, including, without limitation, Jack Jangana.

"Certificate" shall have the meaning given in the Recitals.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision or provisions of succeeding law.

"Company" shall have the meaning given in the Recitals to this Agreement.

"Company Interest" means the entire membership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which such Member may be entitled as provided in this Agreement or under the LLCA, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

"Company Minimum Gain" shall have the same meaning as "Partnership Minimum Gain" set forth in Treasury Regulations Section 1.704-2(d).

"Contributing Member" shall have the meaning given in Section 3.2(b)(i) hereof.

"Conversion Date" shall have the meaning given in Section 3.2(b)(v) hereof.

"Conversion Notice" shall have the meaning given in Section 3.2(b)(iv) hereof.

"Depreciation" shall mean, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis. If the federal income tax depreciation, amortization, or other cost recovery deduction for the year is

7

zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Members.

"Development Budget" shall mean a budget setting forth all Development Costs required for the Redevelopment (or the applicable phase thereof).

"Development Costs" shall mean all hard and soft costs incurred in connection with the Redevelopment.

"Dissolution Event" shall have the meaning given in Section 1.3 hereof.

"Distribution" means a transfer of cash or property of the Company to a Member on account of the Company Interest held by such Member, as described in Sections 5.1 and 8.3(c) hereof.

"Emergency Expenses" means any expenditures or costs for repairs to the Property which (i) are not included in any Operating Budget and (ii) in any Member's business judgment, are immediately required to be made (x) to preserve and avoid material damage to the Property, (y) to avoid suspension of any essential services to the Property or (z) to avoid personal injury or death at the Property.

"Entity" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association.

"Escrow Agent" shall mean such reputable escrow agent as Forced Sale Initiating Member shall select to act as escrow agent (pursuant to an escrow agreement in form reasonably acceptable to Forced Sale Initiating Member, Forced Sale Responding Member and Escrow Agent) in respect of the ROFO Deposit.

"Failed Capital Contribution" shall have the meaning given in Section 3.2(b)(i) hereof.

"GAAP" means United States generally accepted accounting principles, in effect from time to time.

"Government Entity" means the United States, the State of Delaware, the State of New York and any other state that may have jurisdiction over any of the Applicable Companies or the Property, any municipality, and political subdivision of any of the foregoing, and any agency, authority, department, court, commission or other legal entity of any of the foregoing.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

        (a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as set forth herein;

        (b)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Members, as of the following times:  (i) the acquisition of an interest or an additional interest in the Company by any

8

new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of property or money as consideration for an interest in the Company; (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (iv) in any other circumstances as permitted by the Code or the Treasury Regulations as determined by the Members; provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Members shall reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members;

(c)     The Gross Asset Value of any Company asset distributed to a Member shall be the gross fair market value of such asset on the date of distribution; and

(d)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (d) to the extent the Members determine that an adjustment pursuant to clause (b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d).

(e)     If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (a), (b), or (d), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Guaranty" means any guaranty and/or indemnity, including, without limitation, a completion guaranty, a payment guaranty, a guaranty of Nonrecourse Carve-outs and/or an environmental indemnity, given by any Guarantor to any Lender.

"Guarantor" means, individually and collectively, Joel Schreiber and Jack Jangana.

"Indebtedness" means any and all secured and unsecured borrowings or other indebtedness by any of the Applicable Companies (excluding trade payables and other monthly payables), including, without limitation, any secured or unsecured revolving lines of credit, any construction loans, permanent loans or other forms of indebtedness encumbering the Property or any portion thereof.

"Indemnified Losses" shall have the meaning given in Section 3.11(a) hereof.

"Indirect Interest" shall mean an ownership interest (whether direct or indirect) in a Member (as opposed to a Member's ownership interest in the Company).

"Indirect Owner" means a Person holding an Indirect Interest.

"Initial Capital Contributions" shall mean the Capital Contributions made, or deemed made, pursuant to Section 3.1.

"Initial Post-Closing Capital Improvements" shall have the meaning given in the Canyon Loan Agreement.

"Jangana Guarantor" shall mean a Guarantor which is an Affiliate of a Jangana Member, including, without limitation, Jack Jangana.

"JS Guarantor" shall mean a Guarantor which is an Affiliate of JS Member, including, without limitation, Joel Schreiber.

"JS Member" shall have the meaning given in the Recitals to this Agreement.

"Leases" means any lease, license or occupancy agreement affecting the Property.

"Lender" means the holder of any Permitted Indebtedness.

"Liquidating Trustee" shall have the meaning given in Section 8.2 hereof.

"LLCA" shall have the meaning given in the Recitals to this Agreement.

"Lock-Out Period" shall mean the five (5) year period commencing on the Effective Date.

"Major Act" shall have the meaning given in Section 6.2(a) hereof.

"Manager" shall have the meaning given in Section 6.1 hereof.

"Member" and "Members" shall have the meaning given in the Preamble to this Agreement.

"Member Loan" shall have the meaning given in Section 3.2(b)(ii) hereof.

"Member Nonrecourse Debt Minimum Gain" shall have the same meaning as "partner nonrecourse debt minimum gain" as defined in Treasury Regulations Section 1.704-2(i)(2) and (3).

"Minimum Purchase Price" shall have the meaning given in Section 7.6(d) hereof.

"Necessary Expenditures" shall mean all expenses of any of the Applicable Companies, whether or not of a recurring nature, that are necessary to operate the Property or otherwise to prevent a default by any of the Applicable Companies under, or an assessment of a fine or late payment charge against any of the Applicable Companies in connection with, any contractual obligations of any of the Applicable Companies, including, without limitation, payments in respect of liens (such as real estate taxes), debt service and other required payments under any Permitted Loan Documents, payments of mechanics' liens, insurance premiums, utility costs and costs of compliance with federal, state and local laws, codes, rules or regulations.

"Non-Contributing Member" shall have the meaning given in Section 3.2(b)(i) hereof.

"Nonrecourse Carve-outs" shall mean those acts or omissions which limit or qualify the non-recourse nature of Permitted Indebtedness, as set forth in any Permitted Loan Documents.

Examples of Nonrecourse Carve-outs include, without limitation, fraud, intentional misrepresentation, misappropriation of funds, misappropriation of insurance proceeds and matters relating to contamination or violation of environmental laws.

"Nonrecourse Deductions" shall have the meaning given in Treasury Regulations Section 1.704-2(b)(1).

"Operating Budget" means a Budget setting forth all Operating Expenses relating to the Property.

"Operating Expenses" means, for any period, all costs and expenses (including capital expenses) anticipated to be incurred in connection with the ownership, operation, maintenance, repair and leasing of the Property (other than Development Costs), including, without limitation, real estate taxes, insurance premiums, utility charges, maintenance expenses, sales and marketing expenses, leasing costs, management fees and other ordinary and customary expenses relating to the Property.

"Operating Year" means the Initial Operating Year and each ensuing calendar year (or portion thereof) during the term of the Property Owner's ownership of the Property.

"Partially Adjusted Capital Account" shall have the meaning given in Section 4.1(a) hereof.

"Percentage Interest" means, with respect to each Member, the ratio of such Member's Capital Contributions to the aggregate Capital Contributions made by all of the Members from time to time, as the same may be adjusted in accordance with the terms of this Agreement. The initial Percentage Interests of the Members are set forth in Schedule A annexed hereto. The Members shall amend Schedule A attached hereto from time to time to account for admissions, transfers and conveyances made in accordance with Article 7 hereof, and any adjustment to the Percentage Interests of the Members made in accordance with the terms of this Agreement.

"Permitted Indebtedness" means, for so long as the indebtedness evidenced by the Canyon Loan Documents remains outstanding, the Canyon Loan, and thereafter, such other Indebtedness for which any of the Applicable Companies contracts in accordance with the terms of this Agreement.

"Permitted Loan Documents" means, for long as the indebtedness evidenced by the Canyon Loan Documents remains outstanding, the Canyon Loan Documents, and thereafter, such documents and instruments, in form and substance acceptable to the Members, evidencing any other Permitted Indebtedness.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and permitted assigns of such Person where the context so permits.

"Plans" shall mean the plans and specifications for the Redevelopment.

"Principal Office" shall have the meaning given in Section 1.5 hereof.

1346741 v4
17994.00022

"Profits" and "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income and gain for such Fiscal Year or period determined in accordance with Section 703(a) of the Code (including all items of income and gain required to be stated separately under Section 703(a)(1) of the Code with the following adjustment:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definitional Section shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(d)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the provisions of the definition of Depreciation; and

(e)    Notwithstanding any other provision of this definitional section, any items which are specially allocated pursuant to Section 4.2 hereof shall not be taken into account in computing Profits or Losses.

"Property" shall have the meaning given in the Recitals to this Agreement.

"Property Owner" shall have the meaning given in the Recitals to this Agreement.

"Property Owner Operating Agreement" shall have the meaning given in the Recitals to this Agreement.

"Redevelopment" shall mean the refurbishment and redevelopment of the Property as a mixed-use retail and office property in accordance with the Business Plan, including without limitation, the Initial Post-Closing Capital Improvements and the Redevelopment Work..

"Redevelopment Work" shall have the meaning set forth in the Canyon Loan Agreement.

"Representatives" means, with respect to any Member, such Member's, officers, employees, affiliates, partners, members, shareholders, brokers, agents or other representatives, including, without limitation, attorneys, accountants, contractors, consultants, engineers and financial advisors.

"Reserves" means, with respect to the Property, reasonable cash reserves established and maintained from time to time by Manager for the benefit of the Applicable Companies, as set

forth in an approved Operating Budget, as applicable, or which are otherwise approved by the Members as a Major Act, which amounts (i) are required to pay anticipated capital improvements in respect of the Property, (ii) are required to be maintained under any Permitted Loan Documents, (iii) are required to pay any other current or anticipated expenses under any Condominium Documents or (iv) are required to pay any other current or anticipated expenses permitted under this Agreement.

"ROFO" shall have the meaning given in Section 7.6(a) hereof.

"ROFO Closing" shall have the meaning given in Section 7.6(b) hereof.

"ROFO Deposit" shall mean an amount equal to ten percent (10%) of the Allocated ROFO Purchase Price.

"ROFO Election Notice" shall have the meaning given in Section 7.6(b) hereof.

"ROFO Notice" shall have the meaning given in Section 7.6(b) hereof.

"ROFO Purchase Price" shall have the meaning given in Section 7.6(b) hereof.

"Substitute Capital Contribution" shall have the meaning given in Section 3.2(b)(v) hereof.

"Substituted Member" means a person who is admitted to the Company as a Substituted Member in accordance with Article 7 hereof.

"Target Capital Account" shall have the meaning given in Section 4.1(a) hereof.

"Tax Matters Partner" shall have the meaning given in Section 10.4 hereof.

"Transfer" shall have the meaning given in Section 7.1(a) hereof.


**ARTICLE 3**
**CAPITAL CONTRIBUTIONS**

SECTION 3.1    Initial Capital Contributions.

(a)    Prior to, or as of, the Effective Date, each of the Members have made Initial Capital Contributions in the amounts set forth on Schedule A; and

(b)    The names, addresses, Initial Capital Contributions and Percentage Interest of the Members are as set forth on Schedule A, as from time to time amended.

SECTION 3.2    Additional Capital Contributions.

(a)    Subsequent to the funding of the Initial Capital Contributions, Manager may, upon notice to the Members (a "Capital Call"), call for additional Capital Contributions, to the

extent required to fund (after the application of the proceeds of any Indebtedness), (i) Emergency Expenses, (ii) Necessary Expenditures or (iii) expenses contemplated by an approved Operating Budget or an approved Development Budget. Capital Contributions required pursuant to this Section 3.2(a) are herein referred to as "Additional Capital Contributions". Members shall fund Additional Capital Contributions *pro rata*, in accordance with their respective Percentage Interests. Each Member shall pay its Additional Capital Contribution by wire transfer of immediately available funds to an account designated by the Manager within ten (10) Business Days of such Member's receipt of the applicable Capital Call.

      (b)   Failure to Fund Additional Capital Contributions.

      (i)   If a Member fails to timely make an Additional Capital Contribution required pursuant to Section 3.2(a) in the amount specified therein (such Member is hereinafter referred to as a "Non-Contributing Member"), the non-defaulting Member shall give notice of such failure to the Non-Contributing Member, which notice shall state the amount of the Capital Contribution not funded by the Non-Contributing Member (such amount is hereinafter referred to as the "Failed Capital Contribution". Thereafter, the non-defaulting Members may, as the sole and exclusive remedy of the Company and the non-defaulting Members on account of the failure of the Non-Contributing Member to make the applicable Capital Contribution (other than as set forth in Section 3.2(b)(ii) hereof), either (A) fund all or part of the Failed Capital Contribution (the funding Member is hereinafter referred to as a "Contributing Member") or (B) demand from the Company reimbursement of the amount contributed, whereupon the Company shall promptly repay the amount of such withdrawn contribution to the non-defaulting Member. If more than one non-defaulting Member elects to fund the Failed Capital Contribution, the electing Members shall fund the same in proportion to their relative Percentage Interests, or in such other proportion as they mutually agree.

      (ii)   If a Contributing Member funds a Failed Capital Contribution as provided in clause (A) of Section 3.2(b)(i) hereof, the portion of the Failed Capital Contribution funded by the Contributing Member shall be treated as a loan (a "Member Loan") by the Contributing Member to the Non-Contributing Member, bearing interest at the rate of twenty (20%) per annum compounded annually, followed by a Capital Contribution in the amount of the Member Loan by the Non-Contributing Member. Any Member Loan (to the extent of unpaid principal and interest) shall be (A) prepayable at any time prior to the Conversion Date, without penalty or premium and (B) recourse only to the Non-Contributing Member's Company Interest. Until a Member Loan and accrued, unpaid interest thereon is paid in full, the Company shall pay to the Contributing Member, on behalf of the Non-Contributing Member, all funds otherwise distributable to the Non-Contributing Member pursuant to Section 5.1 and Section 8.3 hereof, in reduction of the Member Loan and accrued, unpaid interest thereon. Any payment of a Member Loan and accrued, unpaid interest thereon made by or on behalf of a Non-Contributing Member to a Contributing Member shall be applied first to accrued, unpaid interest on the Member Loan and then to the principal amount of the Member Loan.

      (iii)   Repayment of any Member Loan shall be secured by the Non-Contributing Member's Company Interest, and the Non-Contributing Member hereby grants a security interest in such Company Interest to the Contributing Member advancing such Member Loan and hereby irrevocably appoints such Contributing Member and any of its Representatives

14

as its attorneys-in-fact, coupled with an interest, with full power and authority to prepare and execute any documents, instruments and agreements, including, without limitation, any note evidencing the Member Loan, and such Uniform Commercial Code financing statements, continuation statements and other security instruments as may be appropriate to perfect and continue such security interest in favor of such Member.

(iv)    If a Contributing Member shall make a Member Loan to a Non-Contributing Member and such Member Loan and accrued, unpaid interest thereon shall not have been repaid within ninety (90) days after the making of such Member Loan, the Contributing Member may, upon notice to the Non-Contributing Member at any time after the expiration of such ninety (90) period, elect to convert the Member Loan into an Additional Capital Contribution by the Contributing Member (a "Conversion Notice").  The Non-Contributing Member shall have the right, during the ten (10) day period following its receipt of a Conversion Notice, to repay in full the Member Loan and accrued, unpaid interest thereon.  If the Non-Contributing Member repays the Member Loan and accrued, unpaid interest thereon in the time and in the manner hereinbefore prescribed, the Contributing Member shall have no further rights under this Section 3.2(b)(iv) or Section 3.2(b)(v) below with respect to the Member Loan.

(v)    If a Non-Contributing Member fails to repay a Member Loan and accrued, unpaid interest thereon within ten (10) days after its receipt of a Conversion Notice, then, effective as of the day immediately succeeding the expiration of such ten (10) day period (the "Conversion Date"), (A) the Contributing Member shall be credited with an Additional Capital Contribution in an amount equal to the Member Loan plus accrued, unpaid interest thereon (a "Substitute Capital Contribution"), (B) the Capital Contribution credited to the Non-Contributing Member by Section 3.2(b)(ii) hereof shall be deducted from the aggregate Capital Contributions made by the Non-Contributing Member by an amount equal to the Substitute Capital Contribution, (C) the Percentage Interest of the Contributing Member shall be increased by an amount equal to a fraction, (I) the numerator of which is equal to 150% of the Substitute Capital Contribution and (II) the denominator of which is equal to the aggregate amount of all Capital Contributions theretofore made by the Members (including the Substitute Capital Contribution) and (D) the Percentage Interest of the Non-Contributing Member shall be reduced by the percentage by which the Contributing Member's Percentage Interest was increased pursuant to the preceding clause (C).  Any conversion of a Member Loan as provided in this Section 3.2 shall constitute the payment in full of such Member Loan and accrued, unpaid interest thereon.  Notwithstanding any contrary term set forth in this Agreement, so long as the indebtedness evidenced by the Canyon Loan Documents remains outstanding, any conversion of a Member Loan as hereinbefore provided shall constitute a Transfer subject to the terms of the Canyon Loan Agreement, including, without limitation, the provisions of Section 5.16 thereof.

SECTION 3.3    Limitation on Liability of Members.  The liability of each Member shall be limited to the aggregate Capital Contribution made by it, and no Member shall, except as expressly provided in this Agreement, have any personal liability in respect of any liabilities or obligations of the Company or the Members, beyond the amount that it shall contribute, or be required to contribute, to the capital of the Company in accordance with this Agreement. Notwithstanding the foregoing, each Member shall be personally liable to any other Member, but not to third parties, for all loss, cost, damage or expense resulting from such Member's gross negligence, willful misconduct, fraud or bad faith.

15

SECTION 3.4    No Withdrawal of Capital Contributions.  Except upon dissolution and liquidation of the Company or as otherwise provided herein, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contribution, or any part thereof, or any distribution thereon.  No Member shall have the right to receive property, other than cash in connection with a distribution or return of capital.  No Member shall be entitled to receive interest on such Member's Capital Contributions to the Company.

SECTION 3.5    Return of Capital Contributions.

Except upon dissolution and liquidation of the Company or as provided in Article 5 hereof, there is no agreement, nor time set, for the return of any Capital Contribution of any Member.

SECTION 3.6    No Priority.  Except as otherwise provided herein, no Member shall have priority over another with respect to the return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

SECTION 3.7    Payments Under Guaranties.

(a)    Subject to the terms of Section 3.11(b) hereof, if a Guarantor shall make a payment under a Guaranty, such Guarantor (or if such Guarantor is not a Member, the Member that is an Affiliate of the Guarantor) shall promptly notify the other Member of such fact, which notice shall (i) state the amount of the payment made under the Guaranty and (ii) evidence payment of same by the Guarantor.  Within thirty (30) days after its receipt of such notice, the other Member (i.e., the Member which is not the Guarantor or an Affiliate of the Guarantor) shall reimburse the Guarantor in an amount equal to the product obtained by multiplying such other Member's Percentage Interest by the amount of the payment.  If such other Member fails timely to reimburse the Guarantor as aforesaid, the Guarantor (or the Member which is an Affiliate of the Guarantor) shall be deemed, as of the expiration of the aforesaid thirty (30) day period, to have made a Member Loan to the other Member in the delinquent amount, whereupon the provisions of Section 3.2(b) hereof in respect of Member Loans shall apply.

(b)    Notwithstanding any contrary term set forth in this Agreement, if (i) a JS Guarantor shall make a payment under a Guaranty of Nonrecourse Carve-outs, and such payment shall be caused by a breach of the Nonrecourse Carve-outs by Jangana Members (or an Affiliate of Jangana Members), then Jangana Members shall, within five (5) Business Days after demand, repay such amount to JS Guarantor and indemnify, defend and hold JS Guarantor harmless from and against any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against such JS Guarantor resulting from such breach and (ii) a Jangana Guarantor shall make a payment under a Guaranty of Nonrecourse Carve-outs and such payment shall be caused by a breach of the Nonrecourse Carve-outs by JS Member (or an Affiliate of JS Member), then JS Member shall, within five (5) Business Days after demand, repay such amount to Jangana Guarantor and indemnify, defend and hold Jangana Guarantor harmless from and against any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against such Jangana Guarantor resulting from such breach.  It is hereby agreed that any payments made to a Guarantor by a Member and/or any of its Affiliates pursuant to this Section 3.7(b) (i) shall not increase the Capital Account of any Member and (ii) shall not be deemed to be a Capital

16

Contribution. If a Member shall fail to make such repayment to a Guarantor pursuant to this Section 3.7(b) and/or shall fail to so indemnify such Guarantor, then such Guarantor (or if such Guarantor is not a Member, the Member that is an Affiliate of such Guarantor) shall be deemed to have made a Member Loan to the defaulting Member in the amount of (i) the payment by such Guarantor under the Guaranty of Nonrecourse Carve-outs (to the extent such other Member shall fail to make such repayment) and (ii) any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against such Guarantor caused by such breach (to the extent such other Member shall fail to indemnify the Guarantor), whereupon the provisions of Section 3.2(b) hereof in respect of Member Loans shall apply.

(c)    Any payments that a Guarantor shall make pursuant to a Guaranty of Nonrecourse Carve-outs on account of a breach of a Nonrecourse Carve-out by such Guarantor or, if the Guarantor is not a Member, on account of a breach of a Nonrecourse Carve-out by the Member that is an Affiliate of such Guarantor, (i) shall not increase the Capital Account of the Member or, if the Guarantor is not a Member, of the Member that is an Affiliate of such Guarantor, (ii) shall not be deemed to be a Capital Contribution and (iii) shall be paid solely by the Guarantor and/or the Member who is an Affiliate of such Guarantor.

SECTION 3.8    Indemnification; Liability.

(a)    The Members shall be indemnified, defended and held harmless by the Company from and against any and all expenses (including reasonable attorneys' fees), losses, damages, liabilities, charges and claims of any kind or nature whatsoever (collectively, "Indemnified Losses"), actually incurred by them in their capacities as Members, arising out of or incidental to any act performed or omitted to be performed by any one or more of the Members in their capacities as Members in connection with the business of the Company, provided that such act or omission was taken in good faith and within the scope of authority granted to such Member(s) by the terms of this Agreement and did not constitute gross negligence, willful misconduct, criminal or unlawful conduct, fraud or bad faith. In seeking to recover from the Company, the Members may look solely to the assets of the Company and none of the Members shall be personally liable nor shall any of their assets be available to satisfy any claim against the Company.

(b)    The Company and the Members shall be indemnified and held harmless by each Member from and against any and all Indemnified Losses arising out of or incidental to any gross negligence, criminal or unlawful conduct, willful misconduct, fraud or bad faith performed by such Member. Notwithstanding the foregoing, any such indemnity shall be subordinate to the claims of any Lender under any Permitted Loan Documents for so long as the applicable Permitted Indebtedness remains outstanding.

## ARTICLE 4
## ALLOCATION OF PROFITS AND LOSSES

SECTION 4.1    Allocation of Profits and Losses.

(a)    Allocations. Profits and Losses for a taxable year shall be allocated among the persons who were Members during such taxable year in a manner that will reduce,

proportionately, the differences between their respective Partially Adjusted Capital Accounts and Target Capital Accounts for such taxable year. No portion of the Losses for any taxable year shall be allocated to a Member whose Target Capital Account is greater than or equal to its Partially Adjusted Capital Account for such taxable year. No portion of the Profits for any taxable year shall be allocated to any Member whose Partially Adjusted Capital Account is greater than or equal to its Target Capital Account for such taxable year. For this purpose "Partially Adjusted Capital Account" means, with respect to any Member for any taxable year, the Capital Account of such Member at the beginning of such taxable year, adjusted for all contributions and distributions during such year and all special allocations pursuant to Section 4.2 respect to such taxable year, but before giving effect to any allocations of Profits or Losses for such taxable year pursuant to this Section 4.1(a). For this purpose "Target Capital Account" means the amount (which may be either a positive or a deficit balance) equal to:

(i)     the amount of the hypothetical distribution (if any) that such Member would receive if, on the last day of the taxable year, (x) all Company assets, including cash, were sold for cash equal to their Gross Asset Values, taking into account any adjustments thereto for such taxable year, (y) all Company liabilities were satisfied in cash according to their terms (limited, with respect to each nonrecourse liability, to the Gross Asset Values of the assets securing such liability), and (z) the net proceeds thereof (after satisfaction of such liabilities) were distributed in full pursuant to Section 8.3(c)(iv) hereof, over

(ii)    the sum of (x) the amount, if any, without duplication, that such Member would be obligated to contribute to the capital of the Company pursuant to any provision of this Agreement, (y) such Member's share of Company Minimum Gain, and (z) such Member's share of Member Nonrecourse Debt Minimum Gain, all computed immediately prior to the hypothetical sale described in Section 4.1(a)(i) hereof.

(iii)   Except as otherwise provided in this Agreement or otherwise as required under Section 704(b) of the Code and the related Treasury Regulations, each item of income, gain, loss or deduction of the Company for federal income tax purposes shall be allocated to the Members in the same manner that the corresponding item of Profit or Loss or other item of income, gain, loss or deduction that affect Capital Accounts of the Members was allocated pursuant to Sections 4.1(a) and 4.2.

SECTION 4.2     Special Allocations.

(a)     Minimum Gain Chargeback and Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gains or Member Nonrecourse Debt Minimum Gain during any taxable year or other period, prior to any other allocation pursuant hereto, such Member shall be specially allocated items of income and gain for such year (and, in necessary, subsequent years) in an amount and manner required by Treasury Regulation Section 1.704-2(f) or 1.704-2(i)(4). The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2.

(b)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in paragraphs (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d), items of Company income and gain shall be specially

allocated to such Members in an amount and manner sufficient to eliminate, to the extent required by such Regulations, the Adjusted Capital Account deficit of such Members as quickly as possible, provided that an allocation pursuant to this Section 4.2(b) shall be made only if and to the extent that a Member would have an Adjusted Capital Account deficit after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.2(b) were not in the Agreement.

(c)    Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that a Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 4 have been tentatively made as if Section 4.2(b) and 4.2(c) were not in this Agreement.

(d)    Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated to the Members in proportion to their respective Percentage Interests.

(e)    Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(2).

(f)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(g)    Curative Allocation.  If the Capital Account balances of the Members, determined on a tentative basis (after giving effect to all contributions, distributions and allocations for all periods), differ from the amounts that will be distributed to them upon the liquidation of the Company, then notwithstanding anything to the contrary herein, items of income, gain, loss and deduction shall be specially allocated among the Members for the Fiscal Year in which the dissolution of the Company occurs (and, if necessary, the prior Fiscal Year), in order to conform the Capital Account balances of the Members to the amounts that will be distributed to them upon the liquidation of the Company.

(h)    Loss Allocation Limitation.  Notwithstanding the provisions of Section 4.2 hereof, Losses (or items of loss) allocated pursuant to Section 4.2 hereof shall not exceed the

maximum amount of Losses (or items of loss) that can be so allocated without causing any Members to have a deficit balance in its Adjusted Capital Account at the end of any Fiscal Year. In the event some but not all of the Members would have deficit balances in their Adjusted Capital Accounts as a result of an allocation of Losses (or items of loss) pursuant to Section 4.2 hereof, the limitation set forth in this Section 4.2(h) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). All Losses (or items of loss) in excess of the limitation set forth in this Section 4.3(h) shall be allocated to other Members in accordance with the provisions of Section 4.2, provided that no Losses (or items of loss) shall be allocated to any Members who are not permitted to be allocated any Losses (or items of loss) under this Section 4.2(h).

SECTION 4.3     Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as reasonably determined by the Member using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members for tax purposes in the same proportions as they share Profits or Losses, as the case may be, for the year.

(c)     The Members are aware of the income tax consequences of the allocations made by this Article 4 and hereby agree to be bound by the provisions of this Article 4 in reporting their shares of Company income and loss for income tax purposes. It is the intent of the Members that each Member's share of Profits, Losses income, gain, expense, deduction and tax credits shall be determined and allocated for income tax purposes in accordance with this Article 4 to the fullest extent permitted by Code Section 704(b).

(d)     Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the interest of the Members in Profits equals one hundred percent (100%), in proportion to their respective Percentage Interests.

SECTION 4.4     Tax Allocations: Code Section 704(c).

(a)     In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with clause (a) of the definition of Gross Asset Value set forth in Article 2 hereof).

(b)     In the event the Gross Asset Value of any Company property is adjusted pursuant to Section 4.4(a) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such

asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocations shall be made by the Members, in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 4.4 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

## ARTICLE 5
## CASH DISTRIBUTIONS

SECTION 5.1    Distribution of Available Net Cash Flow and Capital Event Proceeds.

(a)    As used in this Agreement, the term "Available Net Cash Flow" shall mean the sum of all money available to the Company at the end of that period for distribution to its Members, less any portion thereof used to pay for, or establish, Reserves and other expenses and liabilities of the Applicable Companies (without duplication), including, without limitation, debt payments (including interest and principal) on loans, taxes, capital improvements and replacements and rent loss insurance proceeds, all as determined in accordance with this Agreement. Available Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances and Available Net Cash Flow shall not be deemed to include any Capital Event Proceeds or any expenses related thereto.

(b)    As used in this Agreement, the term "Capital Event Proceeds" shall mean the net cash proceeds (net of Company expenses and liabilities) from all sales and other dispositions and all financings of all or any portion of the Property and/or any other property of the Applicable Companies, including the proceeds of condemnation proceedings (including payments in lieu thereof) or settlement of any insurance claims resulting in insurance proceeds not used in repair or restoration of the Property (other than rent loss insurance) that, in each instance, shall not be required to be paid to a Lender, less any portion thereof used to establish Reserves, all as determined in accordance with this Agreement. Capital Event Proceeds shall include all principal and interest payments with respect to any note or other obligation received by Property Owner in connection with sales and other dispositions of the Property.

(c)    Capital Event Proceeds, and Available Net Cash Flow, if any, shall be distributed to the Members promptly after receipt thereof, as follows:

(i)    First, to the Members, pro-rata based upon the relative amount of each Member's Capital Contribution until such time as each Member shall have received aggregate distributions pursuant to this Section 5.1(c)(i) equal to the amount of Capital Contributions contributed by such Member; and

(ii)    Second, to the Members, pro-rata in accordance with their respective Percentage Interests.

(d)    If Manager shall determine that any Reserves established for the benefit of Property Owner from the proceeds of what otherwise would have been Available Net Cash Flow or Capital Event Proceeds shall no longer be required, such excess Reserves shall be distributed by the Company pursuant to the provisions of Section 5.1(c) hereof.

SECTION 5.2    Distributions.

(a)    A Member shall have no right to demand and receive any Distribution from the Company in any form other than cash.  The Company shall not make any in-kind Distributions to any Member without the Member's prior written consent.  Any in-kind distributions of Company property shall be valued by an established, reputable, independent and qualified appraiser.

(b)    A Member may not receive a Distribution to the extent that, after giving effect to the Distribution, all liabilities of the Company, other than liability to Members on account of their Capital Contributions, would exceed the fair value of the Company's assets.

SECTION 5.3    Withholding.  All Amounts required to be withheld pursuant to Section 1446 of the Code or any other provision of federal, state, or local law shall be treated as amounts actually distributed to the Members under this Agreement.  If the Members determine that the Company has insufficient liquid assets to satisfy such withholding obligation, the Members as to which withholding applies shall contribute cash to the Company in an amount sufficient to satisfy such withholding obligation (which amount shall not be treated as a Capital Contribution and the related payment of cash shall not be treated as a distribution).

## ARTICLE 6
## MANAGEMENT AND RIGHTS, OBLIGATIONS
## AND POWERS OF THE MEMBERS

SECTION 6.1    Management.

(a)    Subject to the terms of Section 6.2 hereof, the day to day business and affairs of the Company shall be managed by JS Member.  JS Member, in such capacity, is referred to herein as "Manager".  Manager shall: (i) manage the affairs and business of the Company; (ii) exercise, or refrain from exercising, the authority and powers granted to the Company; and (iii) otherwise act in all other matters on behalf of the Company, including, without limitation, the implementation of the decisions of the Members made in accordance with this Agreement and causing the Applicable Companies to implement the Business Plan in effect from time to time.

(b)    In performing its obligations under this Section 6.1, except as expressly provided in this Agreement, Manager shall not be required at any time to expend funds other than those of the Company.

(c)    Each Member shall, promptly after receipt thereof, furnish the other with copies of all material notices, reports and communications (i) between any of the Applicable Companies and the holder of a mortgage or deed of trust or any party to any material contract affecting any of the Applicable Companies, which in either case relates to an existing or pending

default thereunder or to any financial or operational information requested by such party, or is expressly required to be delivered to the other party by this Agreement and (ii) regarding material violations or material matters affecting any of the Applicable Companies.

(d)    Manager shall have the obligation and authority to (i) implement all Major Acts approved by the Members, (ii) conduct the day-to-day business and affairs of the Company and (iii) perform or observe all of the specific obligations to be performed by Manager. Subject to Section 6.2, no Person dealing with the Company will be required to inquire into the authority of the Members to take any action or make any decision on behalf of the Company. Manager shall be required to devote to the conduct of the operations of the Company only such time and attention as shall be necessary to accomplish the purposes, and to conduct properly the operations of the Company.

SECTION 6.2    Major Acts.

(a)    Notwithstanding any contrary term set forth in this Agreement, but subject to Section 6.2(b) below, neither Manager nor any of the Applicable Companies shall undertake any of the following acts (each, a "Major Act") without first obtaining the consent of Jangana Members, with such approval not to be unreasonably withheld, conditioned or delayed:

(i)    adopting (or thereafter materially modifying) a Business Plan, plan (a "Business Plan"), provided, however, that the Members hereby approve the initial Business Plan of the Company annexed hereto as Exhibit B;

(ii)    adopting an Operating Budget, other than in accordance with Section 6.4 hereof provided that Members hereby adopt the initial Operating Budget annexed hereto as Exhibit C;

(iii)    adopting a Development Budget, other than in accordance with Section 6.5 hereof, provided that the Members hereby adopt the initial Development Budget annexed hereto as Exhibit D;

(iv)    causing the conveyance, ground lease or master lease of the Property, other than in accordance with Section 7.6 hereof;

(v)    using funds of the Applicable Companies for any purpose, other than as set forth in the approved Operating Budget or Development Budget, except to the extent permitted by the ensuing provisions of this Section 6.2;

(vi)    causing any of the Applicable Companies to extend credit (except immaterial amounts in the ordinary course of business), make loans or become or act as a surety, guarantor, endorser or accommodation endorser (or modifying any obligations relating to the foregoing);

(vii)    causing any of the Applicable Companies to enter into any agreement or other arrangement with a Person which is an Affiliate of any of the Members, or thereafter modifying, amending or changing in any material respect any such agreement or other arrangement;

23

(viii)    causing any of the Applicable Companies to take any action which contravenes the then-effective Business Plan;

(ix)    except as permitted by <u>Section 3.2</u> hereof, making a Capital Call;

(x)    commencing or settling any litigation by or against any of the Applicable Companies involving claims in excess of $100,000 in the aggregate, other than (i) claims covered by insurance and (ii) actions to enforce the terms of any Leases, including, without limitation, eviction or holdover proceedings;

(xi)    causing any of the Applicable Companies to initiate any Bankruptcy proceedings;

(xii)    appointing or replacing the attorneys or accountants for the Company;

(xiii)    causing any of the Applicable Companies to contract with any Lender for any Indebtedness, provided, however, that the Members hereby approve the Canyon Loan and the Canyon Loan Documents;

(xiv)    causing Property Owner to exercise any option to extend the maturity date of the Canyon Loan;

(xv)    causing any of the Applicable Companies to acquire any property, other than the Property and any personal property contemplated by an approved Operating Budget or an approved Development Budget;

(xvi)    (A) selecting a property manager or entering into a property management agreement, provided that the Members hereby approve the appointment of Jones Lang LaSalle Americas, Inc. as property manager pursuant to that certain property management agreement, dated as of the date hereof, between Property Owner and Jones Lang LaSalle Americas, Inc., a copy of which is annexed hereto as <u>Exhibit E</u>; (B) selecting a general contractor or construction manager for the redevelopment of the Property or entering into a general contract or construction management agreement; (C) selecting a leasing agent or entering into a leasing agency agreement; (D) selecting an architect for the redevelopment of the Property or entering into an architect's agreement; or (E) entering into any contract for the performance of the Redevelopment having a value in excess of $50,000 in the aggregate;

(xvii)    causing Property Owner to file the Plans for approval with the City of Los Angeles Department of Building and Safety;

(xviii)    causing the Property Owner to sell, convey, encumber or exchange the Property or any part thereof;

(xix)    causing Property Owner to enter into any Leases, other than Leases consistent with leasing criteria set forth in the then-effective Business Plan;

1346741 v4
17994.00022

(xx)    extending credit (except immaterial amounts in the ordinary course of business), making loans or becoming or acting as a surety, guarantor, endorser or accommodation endorser (or modifying any obligations relating to the foregoing);

(xxi)    causing any of the Applicable Companies to enter into any agreement or other arrangement with a Person which is a Member or an Affiliate thereof, or thereafter modifying, amending or changing in any material respect any such agreement or other arrangement;

(xxii)    amending, modifying or terminating this Agreement, the Broadbridge Member Operating Agreement or the Property Owner Operating Agreement, or any of the organizational documents of any of the Applicable Companies;

(xxiii)    making any capital improvements, repairs, alterations or changes in, to or on the Property, or any part thereof, except to the extent contemplated by the

(xxiv)    incurring any Development Costs not contemplated by the Development Budget which would have the effect (either individually or in the aggregate) of (A) increasing or decreasing any line item set forth in the Development Budget by more than the lesser of (x) 1% and (y) $50,000, (B) increasing or decreasing the total amount of such Development Budget by more than the lesser of (x) 2% and (y) $100,000; (C) changing in a material and adverse way the overall aesthetic appearance of the Property or any significant services or amenities to be provided in connection with the Property, (D) diminishing in any material respect the overall quality, functionality or marketability of the Property; or (E) causing an event of default under any applicable Permitted Loan Documents. Notwithstanding any contrary term set forth in this Agreement, Manager may freely reallocate amounts in any contingency line item in the Development Budget, and may, upon the completion of any particular line item, reallocate any cost savings to other line items of the Development Budget;

(xxv)    incurring any Operating Expenses not contemplated by the then-effective Operating Budget which would have the effect (either individually or in the aggregate) of (x) increasing any line item set forth in such Operating Budget by more than 2% or (y) increasing the total amount of such Annual Budget by more than 1% in the aggregate;

(xxvi)    filing or otherwise initiating any Bankruptcy proceedings with respect to any of the Applicable Companies;

(xxvii)    settling insurance claims in excess of $50,000;

(xxviii)    creating additional classes of interest in any of the Applicable Companies;

(xxix)    adopting any position in respect of the tax liability of the Company; and

(xxx)    taking any other action with respect to any matter which, pursuant to the express provisions of this Agreement, requires the approval, consent or agreement of the Jangana Members.

1346741 v4
17994.00022

SECTION 6.3    <u>Request for Consent to Major Act</u>. As to each proposal for a Major Act, Manager shall notify Jangana Members and request their consent, which request for consent shall be accompanied by such back-up and explanatory materials as Manager shall reasonably determine is necessary to evaluate the proposed Major Act. If Jangana Members shall require additional information to evaluate the request of Manager, such Member may request such additional information from Manager within five (5) Business Days after its receipt of the request for consent. If Jangana Members fail to either consent or withhold consent to a Major Act within five (5) Business Days of their receipt of the request for consent (or its receipt of any additional information requested pursuant to the immediately preceding sentence), Manager may furnish Jangana Members with a second notice requesting consent, which second notice shall provide that the Member's failure affirmatively to consent or withhold consent thereto within five (5) Business Days be deemed to constitute the Jangana Members' withholding of consent to the Major Act. Jangana Members shall be deemed to have withheld consent to the proposed Major Act, unless Jangana Members affirmatively consent thereto within five (5) Business Days after receipt of such second notice.

SECTION 6.4    <u>Operating Budget</u>. No later than thirty (30) days prior to (i) the expiration of the fiscal year covered by the initial Operating Budget and (ii) each successive fiscal year, Manager shall submit to Jangana Members a proposed draft of the Operating Budget for ensuing fiscal year (each, a "Proposed Operating Budget"), which Proposed Operating Budget shall include, without limitation, a reasonable description of each item of income and expense that is anticipated to be generated or incurred with respect to the Property. Such Proposed Operating Budget shall be subject to approval by Jangana Members in accordance with the further provisions of this <u>Section 6.4</u>, which approval shall not be unreasonably withheld. Any notice of disapproval shall set forth with reasonable specificity the reasons for such disapproval. If Jangana Members fail to approve or disapprove a Proposed Operating Budget within thirty (30) days after receipt thereof, Manager may furnish Jangana Members with a second notice enclosing the Proposed Operating Budget, which notice shall state that Jangana Members Member's failure to approve or disapprove the Proposed Operating Budget within five (5) Business Days of its receipt thereof shall be deemed to constitute Jangana Members' consent thereto. If Jangana Members thereafter fail to approve or disapprove the Proposed Operating Budget within five (5) Business Days after receipt of such second notice, Jangana Members shall be deemed to have approved such Proposed Operating Budget. If Jangana Members fail to approve a Proposed Operating Budget prior to the commencement of a fiscal year, the Operating Budget for the prior fiscal year shall continue in effect, subject to increases of 3% in respect of each line item (other than increases in uncontrollable expenses, such as real estate taxes and utilities, the line items for which shall increase by the actual increase in expense). Upon Jangana Members' approval (or deemed approval) of a Proposed Operating Budget, the same shall constitute the Operating Budget for all purposes under this Agreement.

SECTION 6.5    <u>Development Budget</u>. No later than four (4) months after the date hereof, Manager shall submit to Jangana Members proposed drafts of the Development Budgets for the Initial Post-Closing Capital Improvements and the Redevelopment Work (collectively, the "<u>Proposed Supplementary Development Budgets</u>"), which Proposed Supplementary Development Budgets shall include, without limitation, a reasonable description of each item of Development Costs anticipated to be incurred in connection with the applicable phase of the Redevelopment. Such Proposed Supplementary Development Budgets shall be subject to

26

approval by Jangana Members in accordance with the further provisions of this Section 6.5, which approval shall not be unreasonably withheld. Any notice of disapproval shall set forth with reasonable specificity the reasons for such disapproval. If Jangana Members fails to approve or disapprove a Proposed Operating Budget within thirty (30) days after receipt thereof, Manager may furnish Jangana Members with a second notice enclosing the Proposed Operating Budget, which notice shall state that Jangana Members Member's failure to approve or disapprove the Proposed Operating Budget within five (5) Business Days of its receipt thereof shall be deemed to constitute Jangana Members' consent thereto. If Jangana Members thereafter fail to approve or disapprove the Proposed Operating Budget within five (5) Business Days after receipt of such second notice, Jangana Members shall be deemed to have approved such Proposed Supplementary Development Budgets. Upon Jangana Members' approval (or deemed approval) of the Proposed Supplementary Development Budgets, the same shall, together with the initial Development Budget, constitute the Operating Budget for all purposes under this Agreement.

SECTION 6.6    Exculpation.

(a)    Subject to Section 6.6(b) below, neither Member nor any of its respective Affiliates, officers, partners, employees or agents, shall be liable, in damages or otherwise, to the Company or to any of the other Members, for any act or omission performed or omitted by such Member, pursuant to the authority granted by this Agreement, except if such act or omission results from gross negligence, willful misconduct, fraud or bad faith.

(b)    Notwithstanding anything to the contrary contained in Section 6.6(a), neither Member nor any officer or director of such Member shall be liable, responsible or accountable in damages or otherwise to the other Member for any action or failure to act taken or omitted on behalf of the Company in good faith within the scope of the authority conferred upon such Member or by law unless such action or failure to act (i) is or results in a breach of any representation, warranty or covenant of the Member contained in this Agreement and, if capable of cure, is not cured within thirty (30) days after notice thereof is delivered to the other Member, (ii) was performed or omitted fraudulently or in bad faith or (iii) constituted gross negligence, unlawful activity or willful misconduct.

(c)    Notwithstanding the provisions of Section 6.6(a), if a Member or its Affiliate shall make a payment under a Guaranty, the Members' respective reimbursement and indemnification obligations, if any, as well as whether such payment increases a Member's Capital Account or is deemed to be a Capital Contribution, shall be governed by Section 3.7 hereof.

SECTION 6.7    Time Devoted by Members; Competing Ventures.

(a)    Each Member shall devote such time to the Company as is reasonably necessary to perform its obligations hereunder. Except as otherwise expressly provided herein, the Members shall not be entitled to any salary or other compensation from the Company except for their respective cash distributions as set forth in Article 5.

(b)    Notwithstanding anything to the contrary contained in <u>Section 6.6(a)</u> above, the Members and their respective Affiliates shall devote such time and attention to the Company's business as shall be necessary to supervise the Company's business and affairs in accordance with the provisions of the Agreement.

(c)    Notwithstanding any contrary term set forth in this Agreement, each Member and its respective Affiliates may engage in business ventures of any type or description, at any location, independently or with others, with no obligation to offer the Company or the other Member any interest in such venture, and whether or not the venture in question may compete with the business of the Company.

SECTION 6.8    <u>Other Duties and Obligations of the Members</u>.

(a)    The Members shall take all reasonable action that may be necessary or appropriate for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged.

(b)    The Members shall use diligent efforts to conduct their respective affairs and the affairs of the Company at all times in such a manner that the Members shall not have any personal liability (other than personal liability to the Company as described and provided for in this Agreement) with respect to any Company liability or obligation in excess of their Capital Contributions.

(c)    The Members shall take all actions reasonably necessary to assure that the Company will be treated as a partnership or an entity that is disregarded for U.S. federal income tax purposes.

## ARTICLE 7
## TRANSFERABILITY OF MEMBERS' INTERESTS

SECTION 7.1    <u>Prohibited Transfers</u>.

(a)    Except in accordance with, and as permitted by <u>Sections 7.2</u> or <u>7.6</u>, no Member may, directly or indirectly, sell, assign, transfer or otherwise dispose of (collectively, "<u>Transfer</u>") all or any part of its Company Interests, whether voluntarily or by foreclosure, assignment in lieu thereof or other enforcement of a pledge, hypothecation or collateral assignment, without the prior written consent of the other Member(s).

(b)    For purposes of this Agreement, any sale, assignment, transfer or other disposition of the capital stock or other equity interest in any Member or the issuance of capital stock or additional partnership or membership interests shall constitute a Transfer unless such Transfer shall be permitted pursuant to this <u>Article 7</u>.

SECTION 7.2    <u>Permitted Transfers</u>.    Notwithstanding any contrary term set forth in this Agreement, (i) JS Member may effectuate any indirect Transfer, provided that, after giving effect thereto, Joel Schreiber continues to control the day to day management and affairs of JS

Member and shall own, in the aggregate, directly or indirectly, not less than 80% of JS Member, (ii) Jangana Members may Transfer interests among each other, provided that, after giving effect to any such Transfer, Jack retains a direct membership interest in the Company and (iii) Jangana Members may effectuate any Transfer (other than Transfers described in <u>clause (ii)</u> of this <u>Section 7.2</u>), provided that, after giving effect thereto, the Jangana Members (including Jack) own not less than 80% of the membership interests in the Company and Jack continues to exercise all consent and other rights in respect of the membership interests of the Jangana Members (including the membership interests transferred to the transferee), it being understood that no voting or other rights in respect of such consent and other rights shall be accorded to the transferee.

SECTION 7.3    <u>Admission of a Substituted Member</u>.  In the event that a Member shall Transfer all or a portion of its direct Company Interest pursuant to, and in accordance with, the terms of this Agreement, the transferee thereof shall become a Substituted Member only upon the Company's receipt of (i) an instrument, in form satisfactory to the Company, whereby the transferee agrees to assume all of the obligations of the transferor under this Agreement, (ii) evidence reasonably satisfactory to the Members of the authority of such Substituted Member to become a Member and to be bound by all of the terms and conditions of this Agreement, (iii) such other documents or instruments as may reasonably be required under the LLCA or otherwise in order to effect the admission of the Substituted Member as a Member under this Agreement; and (iv) evidence reasonably satisfactory to Manager that such Transfer (A) would not violate (I) any Federal and state securities laws and rules and regulations of the Securities and Exchange Commission, state securities commissions, and any other Government Entity with jurisdiction over such disposition or (II) any of the operating agreements or certificates of formation of the Applicable Companies or (B) would not jeopardize the Company's classification for Federal income tax purposes as a partnership and (C) would not affect the Company's existence as a limited liability company under the LLCA.

SECTION 7.4    <u>Withdrawal of a Member</u>.  A Member may not voluntarily withdraw or resign from the Company, retire or dissolve, except pursuant to a Transfer of all of such Member's Company Interest as a Member in accordance with this <u>Article 7</u>, or as otherwise may be agreed among the Members. Resignation from the Company shall not entitle a Member to receive the fair value of its Company Interest as provided in the LLCA or any other distributions from the Company.

SECTION 7.5    <u>Dissolution of Member; Other Termination of Membership</u>.

(a)    In the event of dissolution of a Member, any successor to the Company Interest of the affected Member as a result thereof shall be deemed to be the transferee of the entire Company Interest of the affected Member and may be admitted as a Substitute Member upon the consent of the Members and upon satisfaction of the requirements of <u>Section 7.3</u>.

(b)    The provisions of <u>Article 1</u> and this <u>Section 7.5</u> shall not cause or require the dissolution of the Company should any of the events described in such Article or Section occur to a Person that is not a Member but only possesses economic benefits associated with any Company Interest.

SECTION 7.6    Forced Sale.

(a)    Notwithstanding any contrary term set forth in this Agreement, if the Members are unable to agree on any Major Act, the Jangana Members acting jointly or JS Member (each, a "Forced Sale Initiating Member") may, from and after the expiration of the Lock-Out Period, cause a sale of the Property, subject to a right of first offer in favor of JS Member or the Jangana Members (as applicable) (the "Responding Member") and the other terms and conditions set forth in this Section 7.6.

(b)    The initiating Member (the "Forced Sale Initiating Member") shall provide the other Member (the "Forced Sale Responding Member") with a written notice (each, a "ROFO Notice") indicating the purchase price (the "ROFO Purchase Price") and all other material terms upon which it is prepared to cause the Property Owner to sell the Property. The Forced Sale Responding Member, upon written notice to the Forced Sale Initiating Member (a "ROFO Election Notice") no later than thirty (30) days after its receipt of the ROFO Notice (time being of the essence), may elect to exercise the ROFO and acquire all of the membership interests of the Forced Sale Initiating Member for a purchase price equal to the distributions that the Forced Sale Initiating Member upon a sale of the Property for a purchase price equal to the ROFO Purchase Price (the "Allocated ROFO Purchase Price"). The effectiveness of exercise of the ROFO is conditioned upon the Forced Sale Responding Member's delivery to Escrow Agent of the ROFO Deposit (to be held in escrow pursuant to customary escrow agreement in form mutually satisfactory to the Members and Escrow Agent). If the Forced Sale Responding Member exercises the ROFO in the time and in the manner hereinbefore prescribed, the Company shall cause the Property Owner to proceed to the closing of the sale of the Property to the Forced Sale Responding Member (hereinafter, the "ROFO Closing") in accordance with the terms of Section 7.6(c) hereof. If the Forced Sale Responding Member fails to exercise the ROFO in the time and in the manner hereinbefore prescribed, the Forced Sale Responding Member shall be deemed irrevocably to have waived its right to exercise the ROFO in respect of the Property, whereupon the Forced Sale Initiating Member may proceed to cause the sale of the Property to a Person which is not an Affiliate of the Forced Sale Initiating Member. The Forced Sale Responding Member shall execute and deliver to the Forced Sale Initiating Member such reasonable instrument as the Forced Sale Initiating Member may request to confirm the waiver of the ROFO, provided, however, that the Forced Sale Initiating Member's failure to so execute such instrument shall not derogate from the waiver.

(c)    If the Forced Sale Responding Member exercises the ROFO in respect of the Property in the time and the manner prescribed by Section 7.6(b) hereof, the ROFO Closing shall occur on the date which is sixty (60) days after the date upon which the Forced Sale Initiating Member receives the ROFO Election Notice. At the ROFO Closing, (i) the Forced Sale Responding Member shall pay to the Forced Sale Initiating Member, by wire transfer of immediately available funds, the balance of the Allocated ROFO Purchase Price (after application of the ROFO Deposit), (ii) the Forced Sale Initiating Member shall convey to the Forced Sale Initiating Member, by instrument of assignment and assumption, all of its right, title and interest, as a member, in the Company, free of any lien or encumbrance, other than any lien or encumbrance in favor of the holder of any Permitted Indebtedness, (iii) the Forced Sale Responding Member shall assume all of the obligations of the Initiating Member under this Agreement pursuant to the aforesaid instrument of assignment and assumption, (iv) the Forced

Sale Initiating Member shall execute and deliver to the Forced Sale Responding Member an affidavit under the Foreign Investors in Real Property Act and (v) the Forced Sale Initiating Member shall pay any transfer tax payable in respect of the transfer of its membership interest. At the ROFO Closing, the Forced Sale Responding Member shall cause the unconditional release from each Guaranty of any Guarantor which is an Affiliate of the Forced Sale Initiating Member (provided, however, that the Forced Sale Responding Member shall be deemed to have satisfied such condition, notwithstanding the Lender's refusal to release any such Affiliate of the Forced Sale Initiating Member from liability under any Guaranty of Non-Recourse Carve-Outs arising by reason of the acts or omissions of the Forced Sale Initiating Member or its Affiliates prior to the ROFO Closing).   If the ROFO Closing fails to occur by reason of the default of the Forced Sale Responding Member, the ROFO Deposit shall be paid to the Forced Sale Initiating Member, as liquidated damages for such default. Thereafter, the Forced Sale Initiating Member may cause a sale of the Property, free of any ROFO in favor of the Forced Sale Responding Member, upon such terms as the Forced Sale Initiating Member deems appropriate. If the ROFO Closing fails to occur by reason of the default of the Forced Sale Initiating Member, the Forced Sale Responding Member shall have all of the remedies available to it, at law or in equity, on account thereof, including, without limitation, the remedy of specific performance.

(d)   If the Forced Sale Responding Member waives (or is deemed to have waived), the Forced Sale Initiating Member shall have the right, during the ensuing six-month period, to cause the Property Owner to sell the Property to a Person which is not an Affiliate of the Forced Sale Initiating Member for an all-cash purchase price equal to not less than ninety-five percent (95%) of the ROFO Purchase Price (the "Minimum Purchase Price"). The Forced Sale Initiating Member, on behalf of the Property Owner, shall be authorized to accept an offer meeting the criteria set forth in this Section 7.6(d) and to execute all such documents as shall be required in order to close and consummate the sale of the Property pursuant to the terms and conditions of such offer. If a Forced Sale Initiating Member receives an offer from a third party that it wishes to accept for a purchase price that is less than the Minimum Purchase Price set forth in the applicable ROFO Notice, or wishes to close on such sale on a date which is later than six (6) months after the date upon which the Forced Sale Responding Member waived (or is deemed to have waived) the ROFO, the Forced Sale Initiating Member shall not have the right to close on such sale, but shall again comply with the provisions of Section 7.6(b) hereof prior to closing on the same (except that the period in which to respond to the ROFO Notice shall be reduced from thirty (30) days to ten (10) days, and the time in which to close shall be reduced from sixty (60) days to thirty (30) days).

SECTION 7.7    Certain Prohibited Transfers.   Notwithstanding any contrary term set forth in this Agreement, a Member may not Transfer its Company Interest, or cause the sale of the Property, unless such Member shall have obtained the consent of any Lender under any Permitted Loan Documents, if required pursuant to such Permitted Loan Documents or otherwise satisfy any Permitted Indebtedness. Any Transfer shall be conducted in accordance with, and shall not violate, the terms and conditions of any applicable Permitted Loan Documents. For the avoidance of doubt, the reallocation of limited liability interests in the Company among the existing Members of the Company or otherwise shall constitute a "Transfer" for all purposes hereunder.

## ARTICLE 8
## DISSOLUTION AND LIQUIDATION OF THE COMPANY

SECTION 8.1    Events Causing Dissolution.    The Company shall dissolve and its affairs wound up upon the happening of any Dissolution Event.

SECTION 8.2    Liquidating Trustee.    Upon dissolution of the Company, unless as a result of an event specified in Section 1.3(d) that shall affect Manager, Manager will act as the "Liquidating Trustee". Upon dissolution of the Company as a result of an event under Section 1.3(d) that shall affect Manager, JS Member shall be the Liquidating Trustee.

SECTION 8.3    Liquidation.    As soon as possible after dissolution of the Company, the Liquidating Trustee will wind up the Company's business and affairs as follows:

(a)    The Liquidating Trustee will prepare or cause to be prepared and delivered to each Member an accounting with respect to all Company accounts and the Capital Account of each Member and with respect to the Company's assets and liabilities and its operations from the date of the last previous audit of the Company delivered to the Members to the date of dissolution.

(b)    The Liquidating Trustee will liquidate all Company assets which, in its sole discretion, it determines may be sold for such assets' fair market value or where it determines such liquidation is otherwise in the best interests of the Members.

(c)    In settling accounts after dissolution, the assets of the Company shall be distributed as follows:

(i)    to creditors, including, to the extent not prohibited by law, Members who are creditors, in satisfaction of liabilities of the Company;

(ii)    pay all expenses incurred in connection with the termination, liquidation and dissolution of the Company and distribution of its assets as herein provided;

(iii)    to the establishment of Reserves for contingencies or unforeseen liabilities and obligations of the Company, which Reserves may be paid over to a bank or other party chosen by the Members, to be held in escrow for payment of such contingent or unforeseen liabilities;

(iv)    to the Members in accordance with the provisions of Section 5.1(c).

(d)    At the expiration of such time period as the Members shall deem advisable, the remaining balance of any Reserve established in accordance with clause (iii) shall be distributed in the manner set forth in clause (iv).

(e)    If the Liquidating Trustee and all of the Members shall determine that it is in the best interest of the Members to distribute certain Company assets in kind, such assets will be distributed subject to such liens, encumbrances, restrictions, contracts, obligations,

commitments or undertakings as existed with respect to such asset prior to the dissolution of the Company and have not been discharged by payments made pursuant to Section 8.3(c)(i).

SECTION 8.4    Termination.  Upon completion of the distribution of the Company property as provided in this Article 8, the Company shall be terminated, and the Liquidating Trustee appointed in accordance with Section 8.2 in charge of winding up the Company's business shall cause the filing of articles of dissolution with the Secretary of State of Delaware and shall take all such other actions as may be necessary to terminate the Company.

SECTION 8.5    Claims of the Members.  The Members shall look solely to the Company property for the return of their Capital Contributions, and if the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members shall have no recourse against the Company or any other Member or any former Member or any other employee or agent of the Company.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES

SECTION 9.1    Representations and Warranties of JS Member.  JS Member represents and warrants to the Company and the Jangana Members as follows:

(a)    JS Member is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)    JS Member has all necessary power and authority to own and operate its assets and properties and to carry on the business contemplated by this Agreement.

(c)    The execution and delivery of this Agreement and all other documents, instruments and agreements to be executed in connection with the transactions contemplated by this Agreement have been duly and validly authorized by all necessary actions of JS Member, and shall constitute the legal, valid and binding obligations of JS Member, enforceable against JS Member in accordance with the terms hereof and thereof except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, liquidation, receivership, moratorium or other similar laws related to or affecting the enforcement of creditors' rights generally or by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(d)    No consent, waiver, approval or authorization of or notice to any other Person (including any Government Entity) is required to be made, obtained or given by JS Member in connection with the execution and delivery of this Agreement or any other Transaction Document except for those which have been heretofore obtained.

(e)    Neither the execution nor delivery of this Agreement nor any of the other documents or instruments to be executed and delivered in connection with this Agreement does or will (i) violate, conflict with or constitute a default under any term or provision of (A) any agreement to which JS Member is a party or by which it is bound, or (B) any judgment, decree, order, statute, injunction, rule or regulation of a Government Entity applicable to JS Member, or

33

by which it or its assets or properties are bound, or (ii) result in the creation of any lien or encumbrance upon any of its assets.

SECTION 9.2    Representations and Warranties of Jangana Members.    Jangana Members hereby represents and warrants to the Company and JS Member as follows:

(a)    This Agreement and all other documents, instruments and agreements to be executed in connection with this Agreement constitute the legal, valid and binding obligations of Jangana Members, enforceable against Jangana Members in accordance with the terms hereof and thereof except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, liquidation, receivership, moratorium or other similar laws related to or affecting the enforcement of creditors' rights generally or by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(b)    No consent, waiver, approval or authorization of or notice to any other Person (including any Government Entity) is required to be made, obtained or given by Jangana Members in connection with the execution and delivery of this Agreement or any other Transaction Document except for those which have been heretofore obtained.

(c)    Neither the execution nor delivery of this Agreement nor any other document or instrument to be executed and delivered in connection with this Agreement does or will (i) violate, conflict with or constitute a default under any term or provision of (A) any agreement to which Jangana Members are a party or by which it is bound, or (B) any judgment, decree, order, statute, injunction, rule or regulation of a Government Entity applicable to Jangana Members, or by which it or its assets or properties are bound, or (ii) result in the creation of any lien or encumbrance upon any of its assets.

## ARTICLE 10
## BOOKS AND RECORDS, ACCOUNTING, REPORTS, TAX ELECTIONS

SECTION 10.1    Books of Account; Records.    At all times during the continuance of the Company, Manager shall keep, or cause to be kept, full and true books of account in which shall be entered, fully and accurately, all transactions of the Company. All of said books of account, together with a certified copy of the Articles, any amendments thereto, and an executed copy of such other instruments as the Members may execute to carry out and give effect to the provisions of this Agreement or to maintain the status of the Company as a limited liability company as constituted from time to time, shall at all times be maintained at the Principal Office of the Company, or at such other office of the Company as may be designated for such purpose by the Members, and each Member may, at any time during reasonable business hours, at its own expense, inspect, examine and make photocopies of the books and records of the Company or cause them to be examined by its representative, or by an attorney and/or a certified public accountant designated by such Member.

SECTION 10.2    Financial Reports.

(a)    Annual.    Manager shall cause to be delivered to the Members, within sixty (60) days after the expiration of each Fiscal Year, annual reports of the Company, including (i) an annual balance sheet and profit and loss statement and statement regarding sources and uses

of funds prepared in accordance with generally accepted accounting principles, consistently applied, and audited by the Company Accountants, (ii) a statement showing the distributions to the Members and the allocation among the Capital Accounts of the Members of taxable income, gains, losses, deductions, credits and other relevant items of the Company for such Fiscal Year, (iii) an audited statement setting forth the amount of Available Net Cash Flow and Capital Event Proceeds for the just completed Fiscal Year, and (iv) any other items reasonably requested by the Members.  All such reports and statements shall be prepared in accordance with generally accepted accounting principles, consistently applied.  The foregoing reports shall also contain a summary of all transactions and payments for such Fiscal Year between the Company and any Member and/or Affiliates of any Member.  In addition, Manager shall deliver to the Members, on a monthly basis, an income and expense statement, and a reconciliation statement for the Property.

(b)    Quarterly.  Manager shall cause to be delivered to the Members, within thirty (30) days after the end of each quarter during a Fiscal Year, a report of the Company's accountants, setting forth as at the end of such quarter, for the Company, a statement of changes in financial position or a cash flow statement, as well as a report Unit sales activity (if applicable), budget variance, construction progress and such other information as the Members shall reasonably request.

SECTION 10.3    Tax Returns and Advances.  Manager shall cause all income tax and information returns for the Company to be prepared by the company accountants and shall, within sixty (60) days after the end of each Fiscal Year, submit to each other Member for its approval a draft of all such tax returns and shall cause such tax and information returns to be filed with the appropriate authorities.  Manager shall use commercially reasonable efforts to cause the K-1 Information Return for each Member to be delivered to such Member within forty-five (45) days after the end of each Fiscal Year.  Copies of such tax and information returns (including K-1 Information Returns for the respective Members) shall also be kept at the Principal Office of the Company where they shall be available for inspection by the Members and their representatives during normal business hours.

SECTION 10.4    Tax Elections.  Manager is designated as the "Tax Matters Partner" (as defined in Section 63231 of the Code) of the Company and is authorized and required to represent the Company (at the expense of the Company) in connection with all examinations of the affairs of the Company by any Federal, state, or local tax authorities, including any resulting administrative and judicial proceedings, and to expend funds of the Company for professional services and costs associated therewith; provided, however, that the Tax Matters Partner shall take no action that would have an adverse effect on the JS Member without the prior consent of the JS Member, which consent shall not be unreasonably withheld, delayed or conditioned.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

SECTION 11.1    Notices.  All notices, demands, requests or other communications (collectively, "Notices") which may be or are required to be given, served, or sent by any party to any other party pursuant to this Agreement shall be in writing and shall be hand delivered or mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or

transmitted by facsimile (with the original to be sent the same day by Federal Express or other recognized overnight delivery service) or by Federal Express or other recognized overnight delivery service addressed to the recipient at its address set forth below (or at such other address as the recipient may theretofore have designated in writing).  Each Notice which shall be hand delivered or mailed in the manner described shall be deemed sufficiently given, served, sent, received, or delivered for all purposes on the first Business Day following the day the Notice is delivered to the addressee (with the return receipt, the delivery receipt, or the affidavit of messenger being deemed conclusive (but not exclusive) evidence of such delivery), or if delivery is refused, then on the first Business Day following the day that delivery of the Notice is refused by the addressee upon presentation.  Each Notice which shall be faxed in the manner described above shall be deemed sufficiently given, served, sent, received, or delivered for all purposes on the first Business Day following the date of such facsimile.  Notice may be given by counsel to the Members.  Subject to the above, all Notices shall be addressed as follows:

If to JS Member:

        JS Western Holdco Member LLC
        c/o Waterbridge Capital LLC
        590 Madison Avenue
        34th Floor
        New York, New York  10022
        Attention: Joel Schreiber
        Telecopier: (212) 696-2401

with a copy to:

        Pryor Cashman LLP
        7 Times Square
        New York, New York  10036
        Attention:  Dennis M. Sughrue, Esq.
        Telecopier: (212) 710-6090

If to Jangana Members:

        Jack Jangana, Jenny Haim and Joyce Reiss
        c/o Continental Worsteds Inc.
        45 North Station Plaza, Ste 402
        Great Neck, New York 11021

with a copy to:

        Katten Muchin Rosenman LLP
        2029 Century Park East, Ste 2600
        Los Angeles, California  90067-3012
        Attention: Benzion Westreich, Esq.

      SECTION 11.2  Confidentiality.    Neither   the   Members   nor   the   Members' Representatives shall, at any time or in any manner, either directly or indirectly, without the consent of each other Members, divulge, disclose or communicate to any Person (i) the terms of this Agreement, (iii) the transactions contemplated hereby, and (iii) the identities of the Members and/or their constituent members or Affiliates (collectively, the "Confidential Information"). Notwithstanding the foregoing, (a) a Member may disclose to such Member's Representatives (including, without limitation, such Member's prospective investors) as much of the Confidential Information as such Member deems necessary or desirable, provided that those to whom such Confidential Information is disclosed are informed of the confidential nature thereof and agree to keep the same confidential in accordance with this Agreement, and (b) if a Member shall be advised by its counsel that such Member is legally required to disclose any Confidential Information, such Member may disclose such Confidential Information after notice to, and consultation with, the other Members.

1346741 v4
17994.00022

SECTION 11.3    Signatures; Amendments.  No amendment, change or alteration of this Agreement shall bind any Member, unless it is in writing and signed by all the Members. Notwithstanding any contrary term set forth in this Agreement, so long as the obligations evidenced by the Canyon Loan Documents remain outstanding, this Agreement may not be amended without the consent of the lender under the Canyon Loan Documents, except as follows: (i) to eliminate ambiguity in any of the existing terms of this Agreement; and (ii) to amend, supplement or otherwise revise any existing term of this Agreement in a manner which conforms with the requirements of the Canyon Loan Documents.

SECTION 11.4    Binding Provisions.  The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, executors, administrators, personal representatives, and permitted successors and assigns of the respective parties hereto.

SECTION 11.5    Applicable Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to principles of conflicts of law.

SECTION 11.6    Counterparts.  This Agreement may be executed in several counterparts, all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the same counterpart.

SECTION 11.7    Severability of Provisions.  Each provision of this Agreement shall be considered separable and if, for any reason, any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

SECTION 11.8    Interpretation.  Captions and headings, contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope of this Agreement or any provision hereof.  Whenever the singular or plural number or the masculine, feminine or neuter gender is used herein, it shall equally include the other(s).  The words "hereof," "herein" and "hereunder" and words of similar import when used without reference to an article, Section or Section of this Agreement, shall refer to this Agreement as a whole and not to any particular provision in this Agreement.  All exhibits are hereby incorporated into, and made a part of, this Agreement.  Whenever in this Agreement there is a reference to a day that is not a Business Day, such reference shall mean the first succeeding Business Day following such day.

SECTION 11.9    No Benefit to Third Parties.  No Person other than the Members and the Company is or shall be entitled to bring any action to enforce any provision of this Agreement against any Member or the Company and that the covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Members (or their respectively successors and assigns as permitted hereunder) and the Company.

SECTION 11.10   Remedies Not Exclusive.  Any remedies herein contained for breaches of obligations hereunder shall not be deemed to be exclusive and shall not impair the right of any party to exercise any other right or remedy, whether for damages, injunction or otherwise.

1346741 v4
17994.00022

SECTION 11.11 <u>Brokerage Representation and Indemnity</u>.    Each Member hereby represents and warrants to the other that it has had no dealings with any broker or finder in connection with the transactions contemplated by this Agreement, and hereby agrees to indemnify, defend and hold the other Member and the Company harmless from and against any loss, cost, claim, damage or expense (including, without limitation, reasonable attorneys' fees) arising by reason of any breach of the foregoing representation.

SECTION 11.12 <u>Jangana Members</u>.    Any actions or consents required or to be given by or on behalf of the Jangana Members shall be given Jack, who shall have the sole and exclusive authority to bind all of the Jangana Members.    The Jangana Members hereby authorize and instruct JS Member to ignore any action or consent given by any Jangana Member (other than Jack) which conflicts with any action or consent given by Jack.

SECTION 11.13 <u>Joint and Several Obligations</u>.    Notwithstanding anything herein to the contrary, the obligations of the Jangana Members (including, if applicable, the obligation to contribute Additional Capital Contributions and any indemnification obligations of the Jangana Members set forth in this Agreement) shall be their joint and several obligations.

[Signature Page Follows.]

1346741 v4
17994.00022

IN WITNESS WHEREOF, the undersigned Members have executed this Agreement as of the date first above written.

**MEMBERS**:

_____
JENNY HAIM

_____
JOYCE REISS

_____
JACK JANGANA

JS WESTERN HOLDCO MEMBER LLC,
a Delaware limited liability company

By:_____
Name: Joel Schreiber
Title: Sole Member

Signature Page to the LLC Agreement of Western LA Holdco LLC

IN WITNESS WHEREOF, the undersigned Members have executed this Agreement as of the date first above written.

**MEMBERS**:

_____

JENNY HAIM

_____

JOYCE REISS

_____

JACK JANOANA

JS WESTERN HOLDCO MEMBER LLC,
a Delaware limited liability company

By:_____
Name: Joel Schreiber
Title: Sole Member

IN WITNESS WHEREOF, the undersigned Members have executed this Agreement as of the date first above written.

**MEMBERS**:

_____

JENNY HAIM

_____

JOYCE REISS

_____

JACK JANGANA

JS WESTERN HOLDCO MEMBER LLC,
a Delaware limited liability company

By:_____
Name: Joel Schreiber
Title: Sole Member

## Schedule A

Member Names, Addresses, Initial Capital Contribution and Percentage Interest

| NAME AND ADDRESS OF MEMBER | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| JS MEMBER | | 50.00000 |
| JENNY HAIM | | 16.667 |
| JACK JANGANA | | 16.667 |
| JOYCE REISS | | 16.666 |
| TOTALS | | 100.00 |

## EXHIBIT A

LEGAL DESCRIPTION OF THE PROPERTY

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOT "C" AS SHOWN ON MAP OF A RE-SUBDIVISION OF A PORTION OF BLOCK 52, OF HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 12 PAGE 1 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LOT "C" INCLUDED WITHIN THE BOUNDARIES DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 52, OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF HILL STREET, 92 FEET WIDE, DISTANT THEREON SOUTH 37° 42' WEST 177.25 FEET FROM THE SOUTHWESTERLY LINE OF EIGHTH STREET, 70 FEET WIDE, AS LOCATED BY THE CITY ENGINEER OF SAID CITY; THENCE ALONG HILL STREET SOUTH 37° 42' WEST 59.33 FEET TO THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO KATE VAN NUYS PAGE, RECORDED ON SEPTEMBER 17, 1923 AS INSTRUMENT NO. 943 IN, IN BOOK 2396 PAGE 242 OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG SAID NORTHEASTERLY LINE SOUTH 52° 11' 20' EAST 160.70 FEET; THENCE NORTH 37° 56' EAST 59.38 FEET TO A LINE HAVING A BEARING OF NORTH 52° 12' 30" WEST WHICH PASSES THROUGH THE POINT OF BEGINNING; THENCE ALONG SAID LINE NORTH 52° 12' 30' WEST 160.94 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LOT "C" INCLUDED WITHIN THE PORTION OF THE SOUTHEASTERLY 6.00 FEET OF HILL STREET 92.00 FEET WIDE WHICH LIES NORTHWESTERLY OF AND ADJOINING THE LAND ABOVE EXCEPTED.

PARCEL 1A:

LOT 20 IN BLOCK 52, OF HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:

LOT "B" OF TRACT 2698, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 29 PAGE 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2A:

THAT PORTION OF LOUISA KALISHER'S HILL STREET LOT, AS PER MAP RECORDED IN BOOK 8 PAGE 34, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

A STRIP OF LAND LYING ADJACENT TO THE NORTHERLY LINE OF LOT "B" OF TRACT 2698 ABOVE DESCRIBED, AND HAVING A FRONTAGE OF 15 9/16 INCHES ALONG THE EASTERLY LINE OF HILL STREET AND A WIDTH OF 24 5/16 INCHES ON THE EASTERLY LINE OF SAID LOUISA KALISHER'S HILL STREET LOT AS SHOWN ON THE AFORESAID MAP.

PARCEL 3:

LOT "F" OF TRACT 2022, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 21 PAGE 92 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 4:

THE NORTH 1/2 OF LOT "E" OF TRACT 655, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 98 AND 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WHICH SAME LOT IS ALSO KNOWN AS THE NORTH 1/2 OF LOT "E" OF TRACT 419, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 14 PAGE 136 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 5:

THE SOUTH 1/2 OF LOT "E" OF TRACT 655, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16 PAGES 98 AND 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WHICH SAME LOT IS ALSO KNOWN AS THE SOUTH 1/2 OF LOT "E" OF TRACT 419, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 14 PAGE 136 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 6:

PARCEL A:

THAT PORTION OF BLOCK 52, OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF HILL STREET, 92 FEET WIDE, DISTANT THEREON SOUTH 37° 42' WEST 177.25 FEET FROM THE SOUTHWESTERLY LINE OF EIGHTH STREET, 70 FEET WIDE, AS LOCATED BY THE CITY ENGINEER OF SAID CITY; THENCE ALONG HILL STREET SOUTH 37° 42' WEST 59.33 FEET TO THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN THE DEED TO KATE VAN NUYS PAGE, RECORDED IN BOOK 2396 PAGE 242 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE ALONG SAID NORTHEASTERLY LINE SOUTH 52° 11' 20" EAST 160.70 FEET; THENCE NORTH 37° 56' EAST 59.38 FEET TO A LINE HAVING A BEARING OF NORTH 52° 12' 30" WEST WHICH PASSES THROUGH THE POINT OF BEGINNING; THENCE ALONG SAID LINE NORTH 52° 12' 30" WEST 160.94 FEET TO THE POINT OF BEGINNING.

PARCEL B:

LOUISA KALISHER'S HILL STREET LOT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 8 PAGE 34 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LOT PARTICULARLY DESCRIBED AS FOLLOWS:

A STRIP OF LAND LYING ADJACENT TO THE NORTHERLY LINE OF LOT "B" OF TRACT 2698, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 29 PAGE 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF COUNTY, AND HAVING A FRONTAGE OF 15 9/16THS INCHES ALONG THE EASTERLY LINE OF HILL STREET AND A WIDTH OF 24 5/16THS INCHES ON THE EASTERLY LINE OF SAID LOUISA KALISHER'S HILL STREET LOT.

APN: 5144-17-30

## **EXHIBIT B**

INITIAL BUSINESS PLAN OF THE COMPANY

## EXHIBIT C

INITIAL OPERATING BUDGET

## OPERATING BUDGET FOR 2014

| YEAR<br>PERIOD | August (15 days)<br>2014<br>1 | September<br>2014<br>2 | October<br>2014<br>3 | November<br>2014<br>4 | December<br>2014<br>5 | Year End<br>Total<br>8.15 - 12.31 |
|---|---|---|---|---|---|---|
| **INCOME** | | | | | | |
| Potential Gross Income | 239,378 | 494,715 | 494,715 | 494,715 | 494,715 | 2,218,238 |
| Occupancy | 50% | 40% | 0% | 0% | 0% | |
| RET Reimb. | - | - | - | - | - | |
| Effective Gross Income | 119,689 | 197,886 | - | - | - | 317,575 |
| | | | | | | |
| **EXPENSES** | | | | | | |
| Expense - Escalations | 3% | 3% | 3% | 3% | 3% | |
| Real Estate Taxes | 121,333 | 121,333 | 121,333 | 121,333 | 121,333 | 606,667 |
| Tax Credit | (72,800) | (72,800) | (72,800) | (72,800) | (72,800) | (364,000) |
| Insurance | 178,253 | 178,253 | 178,253 | 178,253 | 178,253 | 891,263 |
| Gas | 833 | 833 | 833 | 833 | 833 | 4,167 |
| Electricity | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 41,667 |
| Water | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 8,333 |
| Sewer | 833 | 833 | 833 | 833 | 833 | 4,167 |
| Management Fee (3%) | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 | 104,167 |
| Security and Doorman | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 83,333 |
| Repairs and Maintenance | | | | | | |
| *Elevators* | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 8,333 |
| *Lighting* | 833 | 1,000,012 | 1,000,012 | 1,000,012 | 1,000,012 | 4,000,881 |
| *Exterminating* | 417 | 417 | 417 | 417 | 417 | 2,083 |
| *Fire Protection* | 833 | 833 | 833 | 833 | 833 | 4,167 |
| *Maintenance Payroll* | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 14,583 |
| *Cleaning & Janitorial* | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 20,833 |
| Total Expenses | 286,786 | 1,285,965 | 1,285,965 | 1,285,965 | 1,285,965 | 5,430,645 |
| | | | | | | |
| **NET OPERATING INCOME** | | | | | | |
| Net Operating Income | (167,097) | (1,088,079) | (1,285,965) | (1,285,965) | (1,285,965) | (5,113,070) |
| % of Income | -140% | -550% | 0% | 0% | 0% | |

# **EXHIBIT D**

INITIAL DEVELOPMENT BUDGET



WATERBRIDGE
CAPITAL

## 801 S. Broadway – Predevelopment Budget (Draft)

| Predevelopment Budget (Draft) | | |
|---|---|---|
| **Category** | **Includes** | **Amount** |
| Professional Fees | Legal, Zoning, Expeditor, Architecture, Project Manager | $350,000 |
| Asbestos & Mold | Initial Phase of Asbestos and Mold Abatement | $220,000 |
| Façade & Windows | Initial Phase of Façade and Window Cleaning | $250,000 |
| Contingency | Predevelopment Contingency (22%) | $180,000 |
| **Total Predevelopment** | | **$1,000,000** |

## AMENDED AND RESTATED BINDING
## MEMORANDUM OF UNDERSTANDING
## WESTERN LA HOLDCO LLC

***THIS AMENDED AND RESTATED BINDING MEMORANDUM OF UNDERSTANDING*** (this "**Restated MOU**"), dated as of June 8, 2018 (the "**Effective Date**"), is entered into between:

**JOEL SCHREIBER** ("**JS**"), and **JS WESTERN HOLDCO MEMBER LLC**, a Delaware limited liability company ("**JS Western**", and, together with JS, collectively, the "**JS Parties**"); and

**JENNY HAIM, JOYCE REISS** and **JACK JANGANA**, individuals (collectively, the "**Jangana Parties**").

## RECITALS:

WHEREAS, JS Western and the Jangana Parties (collectively, the "**Parties**") are the sole members of Western LA Holdco LLC, a Delaware limited liability company (the "**Company**");

WHEREAS, the Company is the indirect owner of all of the beneficial interest in Broadbridge LA LLC, a Delaware limited liability company ("**Property Owner**");

WHEREAS, Property Owner is the owner of fee title to certain real property known as 801 South Broadway, Los Angeles, California (the "**Property**");

WHEREAS, the Members of the Company entered into that certain Amended and Restated Limited Liability Company Operating Agreement of the Company, dated as of August 20, 2014 (the "**Original Operating Agreement**");

WHEREAS, the Original Operating Agreement has from time to time been amended, modified and or supplemented by (i) that certain Binding Memorandum of Understanding of Western LA Holdco LLC, by and among Parties, dated as of February 2, 2016 (the "**Original MOU**"), (ii) that certain Unanimous Written Consent of the Members of Western LA Holdco LLC, dated as of June 10, 2016, duly resolved, executed and delivered by written consent of all the Members  (the "**2016 Unanimous Consent**"), and (iii) that certain letter agreement, dated as of February 14, 2017, entered into by and among JS Parties and the Jangana Parties (the "**Letter Agreement**");

WHEREAS, as of the Effective Date, Property Owner, as borrower, has obtained on or about the date hereof, a certain mortgage loan in the principal amount of up to $[213,701,154.00] ("**Starwood Loan**") from SPT CA Fundings 2, LLC, a Delaware limited liability company (as initial lender and as administrative agent for the lenders from time to time party thereto (whether individually or collectively, "**Starwood Lender**") pursuant to that certain loan agreement, dated as of the date hereof by and among Property Owner, SPT CA Fundings 2, LLC, as administrative agent on behalf of the Senior Mortgage Lender ("**Starwood Loan Agreement**"));

WHEREAS, to facilitate Property Owner's obtaining the Starwood Loan and all future Financings (as defined in this Restated MOU) or the refinancing of the Starwood Loan or any future Financings, the JS Parties and the Jangana Parties desire, and have agreed, as of the Effective Date, to (i) terminate the Letter Agreement; (ii) amend, restate and replace the terms, covenants and conditions of the Original MOU in its entirety with the terms, covenants and conditions of this Restated MOU and (iii) ratify and confirm the provisions of the 2016 Unanimous Consent; and

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Original Operating Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the Parties, desiring to be bound by the terms hereof, hereby agree as follows:

1.    <u>Operating Agreement; Percentage Interests; Capital Contributions</u>.

(a)    **<u>Operating Agreement; Prior Understandings Terminated</u>**.    The terms, covenants and conditions of the Original MOU are hereby amended, restated and replaced in their entirety by this Restated MOU.  The Letter Agreement is hereby terminated and the 2016 Unanimous Consent is hereby revoked effective as of the Effective Date.  The Original Operating Agreement, together with this Restated MOU (hereinafter, the "**<u>Operating Agreement</u>**"), shall constitute the entire Operating Agreement of the Company as of the Effective Date, and all references to the "Operating Agreement" in the Original Operating Agreement shall be construed to mean the Original Operating Agreement, as amended by this Restated MOU.

(b)    **<u>Percentage Interests; Capital Contributions</u>**.    **<u>Schedule A</u>** annexed hereto (which the Parties agree amends and restates "Schedule A" to the Original Operating Agreement in its entirety and shall be deemed to be, as of the Effective Date, "Schedule A" to the Operating Agreement) reflects the respective, agreed-upon Percentage Interests of the Parties as of the Effective Date based on the Capital Contributions of the Parties as of the Effective Date.  The Capital Contributions of the Members are and shall continue to be reflected on the books and records of the Company.  Notwithstanding any contrary term set forth in this Restated MOU, the Parties acknowledge that the precise, actual Capital Contributions of the Members remain subject to further and final review and confirmation by the Parties.  The Parties hereby agree to consult with one another in good faith to the extent required, on or before June 15, 2018, to review and confirm the actual Capital Contributions of the Parties.  Further notwithstanding any contrary term in this Restated MOU or the Operating Agreement, the Parties hereby agree that the Capital Contributions of the Parties shall be deemed to include: (A) with respect to the Jangana Parties, the sum of (x) the actual Capital Contributions made by the Jangana Parties to the Company on or before the Effective Date and (y) $7,500,000 (the foregoing items (x) and (y), the "**<u>JJJ Deemed Capital Contributions</u>**"); and (B) with respect to JS Western, the sum of (I) the actual Capital Contributions made by JS Western to the Company on or before the Effective Date, (II) $1,000,000 and (III) the Loan Cost Reimbursement (as hereinafter defined, provided that the JS Parties pay the Loan Cost Reimbursement on the Effective Date in accordance with the terms of this Restated MOU (the foregoing items (I), (II) and (III), collectively, the "**<u>JS</u>**

**Deemed Capital Contributions**", and, collectively with the JJJ Deemed Capital Contributions, the "**Deemed Capital Contributions**"). The Parties expressly acknowledge and agree that the updated books and records agreed upon on or about June 15, 2018 shall in all cases account for the JJJ Deemed Capital Contributions and the JS Deemed Capital Contributions.  The Parties shall from time to time thereafter update **Schedule A** to reflect additional Capital Contributions by the Members and any adjustment of the Percentage Interests of the Members made in accordance with the Operating Agreement (but the for avoidance of doubt the review and update of the books and records contemplated by this Section 1(b) to occur on or about June 15, 2018 shall not affect the Percentage Interests attached on **Schedule A** to this Restated MOU as of the Effective Date).  Confirming the provisions of Section 5.1(c) of the Operating Agreement, the Parties agree that the Company shall distribute Capital Event Proceeds and Available Net Cash Flow (if any) to the Members as follows: *first*, to the Members, pro-rata based upon the relative amount of each Member's Capital Contribution (including without limitation, their respective Deemed Capital Contributions and Additional Capital Contributions made after the Effective Date) until such time as each Member shall have received aggregate distributions pursuant to Section 5.1(c)(i) of the Operating Agreement equal to the amount of Capital Contributions (including without limitation, their respective Deemed Capital Contributions and Additional Capital Contributions made after the Effective Date) contributed by such Member; and *second*, to the Members, *pro rata* in accordance with their respective Percentage Interests.

2.     Financings; Administrative Matters; Corrections to Original Operating Agreement

(a)     Article 2 of the Original Operating Agreement is hereby modified and amended to add the following additional defined terms:

"**Financing**" shall mean any construction or permanent loan, secured or unsecured line of credit, mortgage financing, mezzanine financing and/or the refinancing of any of the foregoing, in each case obtained by the Company or any Subsidiary in accordance with the provisions hereof and secured, directly or indirectly, by the Property which is or has been entered into for the purpose of financing or refinancing the costs of constructing, operating, managing developing and redeveloping the Property and which has been approved by the individuals entitled to act as Manager as of the time such Financing is obtained.  The Starwood Loan is a Financing which has been approved by the Managers.

"**Financing Documents**" means any documents or instruments which evidence, secure and/or guaranty any Financing, including, without limitation, (i) the "Loan Documents" (as such term is defined in the Starwood Loan Agreement) and (ii) the "Loan Documents" pursuant to any other Financing Loan Agreement.

"**Financing Loan Agreement**" means (i) the Starwood Loan Agreement and (ii) any loan agreement entered into in connection with any other Financing.

(b)     Article 2 of the Original Operating Agreement is hereby modified and amended to delete each of the following defined terms in its entirety: "Canyon Loan", "Canyon Loan Agreement and "Canyon Loan Documents". Further to the foregoing, each use of the term "Canyon Loan" in the Original Operating Agreement, wherever such term appears, is in each instance hereby replaced with the term "Financing".  Each use of the term "Canyon Loan

3

Documents" in the Original Operating Agreement, wherever such term appears, is in each instance hereby replaced with the term "Financing Documents". Each use of the term "Canyon Loan Agreement" in the Original Operating Agreement, wherever such term appears, is in each instance hereby replaced with the term "Financing Loan Agreement".

(c)     The definitions of "Redevelopment" and "Redevelopment Work" set forth in Article 2 of the Original Operating Agreement are hereby modified and amended to provide as follows:

> "**Redevelopment**" shall mean the refurbishment and redevelopment of the Property as a mixed-use retail, hotel and office property in accordance with any Business Plan and budgets (whether Operating Budget, Redevelopment Budget or otherwise) approved by the Managers and/or any lender pursuant to a Financing, including, without limitation, the Initial Post-Closing Capital Improvements, the Prior Redevelopment Work and the Redevelopment Work.

> "**Redevelopment Work**" means the "Pre-Development Work", as such term is defined in the Starwood Loan Agreement and any future pre-development or redevelopment work contemplated for the Property in connection with any Financing.

(d)     Section 6.1 of the Original Operating Agreement is hereby modified and amended to delete in their entirety the first two sentences of said Section 6.1 and replace them with the following text:

> "Subject to the terms of Section 6.2 hereof, the day to day business and affairs of the Company shall, effective on and after June 10, 2016, be managed by Jack Jangana and, so long as JS satisfies the JS Minimum Hold, JS Western or any entity wholly owned and controlled by JS and approved any lender pursuant to a Financing (collectively, a "JS Manager"). Each of Jack Jangana and, so long as JS satisfies the JS Minimum Hold, any JS Manager, in such capacity, is referred to herein as "Manager". The Members hereby agree that, as of the Effective Date, Jack Jangana and JS Manager constitute the sole Managers of the Company."

(e)     Notwithstanding anything in Section 6.1 or Section 6.2 of the Operating Agreement to the contrary, the Parties agree that the Jangana Parties (specifically Jack Jangana, acting on behalf of the Company, or any other Jangana Party acting upon the express authorization of Jack Jangana), shall at all times have the sole right to (A) cause the Property Owner, the Company or any subsidiary of the Company to select, control, approve or designate any account bank or open or close any account by or on behalf of or for the benefit of Property Owner, the Company or any other subsidiary of the Company, whether for the purposes of any general operating account or reserve account in the name of or for the benefit of the Company, Property Owner or any other subsidiary of the Company, or in connection with any accounts or reserve accounts required to be established by any lender in connection with any Financing (any such account or reserve account, an "**Account**", and any such bank, an "**Account Bank**") and (B) cause the Property Owner or any other subsidiary of the Company to execute and deliver any documentation required by the Account Bank or any lender under a Financing in order to open or close any Accounts and/or select any Account Bank, and the JS Parties agree to execute

and deliver any additional documentation reasonably required by any lender pursuant to Financing and any Account Bank in order to evidence the consent of the JS Parties granted hereunder and to exercise commercially reasonable efforts to deliver the same. So long as JS satisfies the JS Minimum Hold and is a JS Manager, JS Manager shall be an authorized account signatory for the purposes of draws under Financings for Redevelopment Work provided there is a co-signature at such time by Jack Jangana as Co-Manager.

3.      **JJJ Member Loan**.  JS Western hereby agrees to make or cause to be made a Member Loan to the Jangana Parties in the amount of $1,500,000.00 ("**JJJ Member Loan**"), which shall bear interest per annum equal to the lesser of (i) the applicable Federal short term rate in effect on Effective Date as determined under Section 1274(d) of the Code and (ii) the lowest possible interest rate that would not give rise to imputed interest under the Code, and which shall be disbursed by JS Western in equal monthly installments of $250,000.00, the first such installment being made on the Effective Date and thereafter each further installment shall be made on the first day of each month subsequent to the Effective Date until the entire JJJ Member Loan has been disbursed to the Jangana Parties. The JJJ Member Loan shall mature and become due and payable on March 31, 2019 ("**JJJ Member Loan Maturity Date**"). If the Jangana Parties shall fail to repay the outstanding principal balance and accrued, unpaid interest of the JJJ Member Loan on the JJJ Member Loan Maturity Date, the sole right and remedy of JS Western shall be, after five days' prior written notice to the Jangana Parties, (x) to declare the JJJ Member Loan immediately due and payable and (x) cause the Percentage Interests of the Parties to be adjusted to convert the amount of the outstanding principal balance into a deemed equity contribution by JS Western based on a deemed total equity capitalization by all of the Parties equal to the sum of $72,000,000. If JS Western defaults in the timely disbursement of any installment of the proceeds of the Member Loan in accordance with this Section 3 and such default continues for five (5) days following the date JS Western is required to make such disbursement, then, as the sole remedy of the Jangana Parties therefor, the Percentage Interests of the Members shall be automatically adjusted to conform with the following ratio: (A) 22% (JS Western); and (B) 78% (the Jangana Parties), whereupon such adjusted Percentage Interests of the Members shall be deemed to constitute the Percentage Interests of the Members for all purposes of the Operating Agreement and this Restated MOU. Upon any such adjustment, the Jangana Parties shall have the right to update the books and records of the Company (including, without limitation, **Schedule A** to the Operating Agreement) to reflect such adjustment. Any adjustment of the Percentage Interests of the Members as aforesaid shall not derogate from the obligation of the Jangana Parties to repay any portion of the JJJ Member Loan and accrued, unpaid interest thereon theretofore advanced by JS Western on the JJJ Member Loan Maturity Date, or the remedy hereinbefore accorded to JS Western in the event of non-payment thereof.

4.      Purchase Option.  Notwithstanding any contrary term set forth in the Operating Agreement, the Jangana Parties shall have the option ("**JS Option**"), upon Notice (as hereinafter defined) to JS Western (a "**JS Option Notice**"), to acquire 100% of JS Western's Company Interest for a purchase price (the "**JS Option Consideration**") equal to $33,000,000. Any JS Option Notice shall stipulate the date of the the acquisition of JS Western's Company Interest pursuant to the exercise of JS Option, which date shall be no sooner than five days after the JS Parties' receipt of the JS Option Notice and no later than August 10, 2018, *provided*, that if the Jangana Parties pay to JS Western a non-refundable deposit in an amount equal to ten percent (10%) of the JS Option Consideration (the "**Option Deposit Amount**") no later than August 10,

2018 (TIME BEING OF THE ESSENCE), the Jangana Parties shall have the right to extend the JS Option Closing Date (as hereinafter defined) to no later than September 12, 2018 (TIME BEING OF THE ESSENCE), and the Jangana Parties shall be entitled to a credit against the JS Option Consideration in an amount equal to the Option Deposit Amount. The closing of the acquisition of JS Western's Company Interest pursuant to the exercise of JS Option is referred to herein as the "**JS Option Closing**", while the date upon which the JS Option Closing occurs (as the same may be extended upon the making of the deposit of the Option Deposit Amount) is referred to herein as the "**JS Option Closing Date**". The JS Option Closing shall occur through an escrow established with Fidelity National Title Insurance Company or any other reputable national title insurer (but not any agent therefor) designated by the Jangana Parties and reasonably acceptable to the JS Parties ("**Escrow Agent**") pursuant to an escrow agreement mutually acceptable to the parties and Escrow Agent and otherwise consistent with the terms of this Restated MOU. If the JS Parties default in respect of their obligations to be performed at the JS Option Closing for any reason other than a default by the Jangana Parties, the Jangana Parties shall have the right to seek specific performance of such obligations. If the Jangana Parties fail to consummate the JS Option Closing (for any reason other than a default by the JS Parties) by August 10, 2018 (TIME BEING OF THE ESSENCE) (or, if the JS Option Closing Date has been extended pursuant to this paragraph, September 12, 2018 (TIME BEING OF THE ESSENCE), the Jangana Parties shall be deemed irrevocably to have waived the JS Option and, if the Jangana Parties have theretofore paid the Option Deposit Amount to JS Western, JS Western shall retain the Option Deposit Amount as liquidated damages for such default.

5.     JS Option Closing Deliveries. No later than one (1) Business Day prior to the date scheduled for the JS Option Closing, (i) JS Western shall execute and deliver into escrow with Escrow Agent: (x) two counterparts of an Assignment and Assumption of Membership Interests in the form of **Exhibit A** annexed hereto (the "**Assignment**"); and (y) a Foreign Investment in Real Property Tax Act affidavit (the "**FIRPTA Certificate**") and (ii) the Jangana Parties shall execute and deliver into escrow with Escrow Agent two counterparts of the Assignment, and deliver to Escrow Agent the JS Option Consideration (or the balance thereof, if the Jangana Parties have theretofore paid to JS Western the Option Deposit Amount), by wire transfer of immediately available funds to the escrow account of Escrow Agent at Citibank, N.A. or any other banking institution at which Escrow Agent holds escrow funds as designated by Escrow Agent. The Jangana Parties will use reasonable efforts to cause the lender under any Financing then outstanding for the Property to deliver such lender's release of JS from any guaranties delivered by JS in connection with such Financing. If the Jangana Parties are unable to obtain any such release, notwithstanding the exercise of reasonable efforts as aforesaid, they shall execute and deliver, at the JS Option Closing, such instrument upon which the Parties reasonably agree pursuant to which the Jangana Parties jointly and severally agree to indemnify, defend and hold JS harmless form and against any loss, cost, claim or damages (including, without limitation, reasonable attorneys' fees) arising by reason of liability arising under such guaranties, except to the extent such liability arose by reason of the acts or omissions of the JS Parties prior to the JS Option Closing Date. Notwithstanding any contrary term set forth in this Restated MOU, the Jangana Parties shall have the right, upon Notice to the JS Parties and Escrow Agent at any time prior to the JS Option Closing, to designate parties or entities other than the Jangana Parties (which designated parties or entities shall satisfy any permitted transferee requirements under any then outstanding Financing) to receive the assignment of all or any portion of the Company Interests to be assigned by the Assignment. Promptly following

6

receipt thereof, the JS Parties and the Jangana Parties shall furnish Escrow Agent with written confirmation of the substitution of transferees, whereupon Escrow Agent shall revise the Assignment accordingly. Upon receipt of joint written instructions from the JS Parties and the Jangana Parties to consummate the JS Option Closing, Escrow Agent shall (I) deliver fully executed counterparts of the Assignment to the JS Parties and the Jangana Parties, (II) deliver an executed FIRPTA Certificate to the Jangana Parties and (III) deliver the JS Option Consideration to an account designated by the JS Parties. At the JS Option Closing, the principal amount and accrued, unpaid interest on any portion of the JJJ Member Loan theretofore advanced to the Jangana Parties shall become immediately due and payable, and shall be paid through the escrow established with Escrow Agent.

6.    Loan Cost Reimbursement. On the Effective Date, JS or the JS Parties have caused funds in the amount of $167,500.00 to be paid directly to the Jangana Parties in reimbursement of certain loan amounts incurred by the Jangana Parties (the "**Loan Cost Reimbursement**").

7.    <u>Voting Rights</u>. If, following any adjustment of the Percentage Interests of the Parties that occurs for any reason, whether by transfer, dilution or otherwise, the Percentage Interest in the Company held, directly or indirectly, by JS shall at any time become less than 20% of all direct and indirect beneficial equity interests in the Property (the "**JS Minimum Hold**"), (i) JS Manager shall be replaced as Manager of the Company by Jack Jangana, which Person shall be the sole Manager and (ii) the Jangana Parties shall have the sole and exclusive authority to manage the Company, without the approval or vote of any JS Manager, including the sole and absolute discretion to (x) cause a sale of all or substantially all of the Property or the direct or indirect beneficial interests in the Company and (y) effectuate any other Major Act (including an amendment to the Operating Agreement which would have the effect of vesting control or management rights in such third-party or parties unaffiliated with the Parties as the Jangana Parties shall designate), provided, however, that the Jangana Parties shall not, without the JS Parties' consent, amend this Restated MOU or the Operating Agreement in a manner which would disproportionately impair the rights or disproportionately increase the obligations (relative to the rights and obligations of the Jangana Parties) under the Operating Agreement or this Restated MOU or would have the effect of subordinating the interest of the JS Parties to the interest of the Jangana Parties.

8.    <u>Notices</u>. All notices, demands, requests or other communications (collectively, "**Notices**") which may be or are required to be given, served, or sent by any party to any other party pursuant to this Restated MOU shall be in writing and shall be hand delivered or mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or transmitted by electronic mail (with the original to be sent the same day by Federal Express or other recognized overnight delivery service) or by Federal Express or other recognized overnight delivery service addressed to the recipient at its address set forth below (or at such other address as the recipient may theretofore have designated in writing). Each Notice which shall be hand delivered or mailed in the manner described shall be deemed sufficiently given, served, sent, received, or delivered for all purposes on the first Business Day following the day the Notice is delivered to the addressee (with the return receipt, the delivery receipt, or the affidavit of messenger being deemed conclusive (but not exclusive) evidence of such delivery), or if delivery is refused, then on the first Business Day following the day that delivery of the Notice is refused

7

by the addressee upon presentation. Each Notice which shall be electronically mailed in the manner described above shall be deemed sufficiently given, served, sent, received, or delivered for all purposes on the first Business Day following the date of such delivery. Notice may be given by counsel to the Parties. Each of the Jangana Parties and the JS Parties may change any address for notice to such Parties upon notice to the other Parties in accordance with this Section 8. Subject to the above, all Notices shall be addressed as follows:

> If to the JS Parties:
>
> > c/o Waterbridge Capital LLC
> > 115 West 18th Street
> > 2nd Floor
> > New York, New York 10011
> > Attention: Joel Schreiber
> > Email: js@waterbridge.com
>
> with a copy to:
>
> > Pryor Cashman LLP
> > 7 Times Square
> > New York, New York 10036
> > Attention: Dennis M. Sughrue, Esq.
> > Email: dsughrue@pryorcashman.com
>
> If to the Jangana Parties:
>
> > Jack Jangana, Jenny Haim and Joyce Reiss
> > c/o Continental Worsteds Inc.
> > 45 North Station Plaza, Ste 402
> > Great Neck, New York 11021
> > Attention: Jack Jangana
> > Email: mgmt@continental-equities.com
>
> with a copy to:
>
> > Greenberg Traurig
> > 200 Park Avenue
> > New York, New York 10166
> > Attention: Daniel J. Ansell, Esq.
> > Email: anselld@gtlaw.com

9.    <u>Cooperation</u>. The JS Parties and/or the Jangana Parties (as applicable) shall fully cooperate in the transfer of any of their membership, ownership, and/or capital accounts and other rights in the Company to the other Parties, as contemplated by this Restated MOU. The JS Parties shall be responsible for any transfer tax determined to be due in respect of any transfer of the Company Interest of JS Western effectuated by this Restated MOU (other than the JS Option Closing), while the Jangana Parties shall be responsible for any transfer tax determined to be due

in respect of the JS Option Closing and any other transfer of the Company Interest of the Jangana Parties effectuated by this Restated MOU.

10.     <u>Governing Law; Submission to Jurisdiction</u>.    This Restated MOU is to be governed by and construed in accordance with the laws of the State of Delaware.  Each of the Jangana Parties and the JS Parties hereby submit to the exclusive jurisdiction of any federal or state court sitting in New York, New York in respect of any action or proceeding arising under this Restated MOU or the Operating Agreement.

11.     <u>Counterparts/Facsimile Signatures</u>. This Restated MOU may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one MOU.  To facilitate execution of this Restated MOU and any amendment hereto, the Parties may execute and exchange by electronic mail counterparts of the signature pages which shall serve as originals.

12.     <u>Successors and Assigns</u>.  This Restated MOU shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of each of the Parties hereto.

13.     <u>Conflicts</u>.    This Restated MOU is intended to be, and shall constitute, an amendment to the Operating Agreement.  To the extent any of the terms and conditions of the MOU and the Operating Agreement shall conflict, the terms and conditions of this Restated MOU shall govern.

14.     <u>Attorneys' Fees</u>.  If the Jangana Parties or the JS Parties obtain a judgment against the other by reason of the breach of this Restated MOU or the failure to comply with the terms of this Restated MOU, reasonable attorneys' fees and costs as fixed by the court shall be added to such judgment.

15.     <u>1031 Exchange</u>.    The Parties understand that the Jangana Parties acquired a portion of their Company Interests in a transaction qualifying as an exchange of like-kind property pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended.  The JS Parties hereby agree, at no material cost to the JS Parties, to cooperate with the Jangana Parties to the extent reasonably required to accommodate the requests of the Jangana Parties in connection with the aforesaid 1031 exchange.

16.     <u>Representation of the Parties</u>.  In connection with this Restated MOU and the transactions contemplated hereby, the Jangana Parties have been represented by Daniel J. Ansell, Esq. (of the law firm of Greenberg Traurig, LLP) and the JS Parties have been represented by Dennis M. Sughrue, Esq. (of the law firm of Pryor Cashman LLP).

[signatures on following page]

**IN WITNESS WHEREOF**, the Parties hereto have executed and delivered this MOU as of the Effective Date.

_____
**JOEL SCHREIBER**

**JS WESTERN HOLDCO MEMBER LLC,**
a Delaware limited liability company

By: _____
      Name: Joel Schreiber
      Title:  Manager

_____
**JENNY HAIM**

_____
**JOYCE REISS**

_____
**JACK JANGANA**

[Signature Page to Amended and Restated Binding Memorandum of Understanding of Western LA Holdco LLC]

**IN WITNESS WHEREOF**, the Parties hereto have executed and delivered this MOU as of the Effective Date.

_____
**JOEL SCHREIBER**

**JS WESTERN HOLDCO MEMBER LLC,**
a Delaware limited liability company

By:    JS Western Member II LLC,
       a Delaware limited liability company

By:    _____
       Name: Joel Schreiber
       Title:   Authorized Signatory

_____
**JENNY HAIM**

_____
**JOYCE REISS**

_____
**JACK JANGANA**

Schedule A

| Member | Percentage Interest |
|---|---|
| JS Western Holdco Member LLC | 27% |
| Jackie Jangana | 24.333% |
| Joyce Reiss | 24.333% |
| Jenny Haim | 24.333% |