## tdonovan@gwulaw.com

| | |
|---|---|
| **From:** | Hoffmann, Trevor <THoffmann@GOULSTONSTORRS.com> |
| **Sent:** | Wednesday, October 12, 2022 6:07 PM |
| **To:** | Kevin Nash; mgmt continental-equities.com |
| **Cc:** | mfox@olshanlaw.com; Safer, Adam |
| **Subject:** | Re: 801 S Broadway - membership interest purchase agreement |

Closing of the transaction remains subject to Starwood's consent.


Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** Kevin Nash <knash@gwulaw.com>
**Sent:** Wednesday, October 12, 2022 5:31:46 PM
**To:** mgmt continental-equities.com <mgmt@continental-equities.com>
**Cc:** mfox@olshanlaw.com <mfox@olshanlaw.com>; Hoffmann, Trevor <THoffmann@GOULSTONSTORRS.com>; Safer, Adam <ASafer@GOULSTONSTORRS.com>
**Subject:** Re: 801 S Broadway - membership interest purchase agreement

Once Joel signs can I release signatures

Sent from my iPhone


> On Oct 12, 2022, at 5:25 PM, mgmt continental-equities.com <mgmt@continental-equities.com> wrote:
>
> Apologies, attached is the final agreement which includes Annex A. Thanks.
>
> **From:** mgmt continental-equities.com <mgmt@continental-equities.com>
> **Sent:** Wednesday, October 12, 2022 5:08 PM
> **To:** mfox@olshanlaw.com <mfox@olshanlaw.com>; Kevin Nash <knash@gwulaw.com>
> **Cc:** Hoffmann, Trevor <THoffmann@goulstonstorrs.com>; Safer, Adam <ASafer@goulstonstorrs.com>
> **Subject:** Re: 801 S Broadway - membership interest purchase agreement
>
>
> Hi Michael,
>
> We received the 10K wire from Joel.
>
> Please confirm that the final agreement that you have reflects "32%" in section 1.1 (b) (iii).
>
> Per my conversation with Joel a few minutes ago, Kevin Nash copied here, should send you Joel's signature to the agreement, <u>as well as a signature to Annex A</u>. Once received and after making sure you have the **correct version of the agreement attached here**, please send fully executed agreement to all parties.
>
> Thank you,

1

tdonovan@gwulaw.com

| | |
|---|---|
| **From:** | Fox, Michael S. <MFox@olshanlaw.com> |
| **Sent:** | Wednesday, October 12, 2022 6:26 PM |
| **To:** | Nash Kevin |
| **Subject:** | Fwd: 801 S Broadway - membership interest purchase agreement |
| **Attachments:** | IMG_0003.pdf; Membership Interest Purchase Agreement for Western LA - 10-12-22 - revised3.docx; Redline - Membership Interest Purchase Agreement for Western LA - 10-12-22 - revised and Membership Interest Purchase Agreement for Western LA - 10-12-22 - revised3.pdf |

Begin forwarded message:

Michael S. Fox

**OLSHAN**

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 53rd Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2277
Facsimile: 212.451.2222
Email: MFox@olshanlaw.com
Web: **www.olshanlaw.com**

**From:** "mgmt continental-equities.com" <mgmt@continental-equities.com>
**Date:** October 12, 2022 at 4:07:11 PM EDT
**To:** "Fox, Michael S." <MFox@olshanlaw.com>
**Cc:** "Hoffmann, Trevor" <THoffmann@goulstonstorrs.com>, "Safer, Adam" <ASafer@goulstonstorrs.com>
**Subject: Re: 801 S Broadway - membership interest purchase agreement**

Hi Michael, as per my conversation with Joel just now and his agreement to the last version of the buyout agreement sent by Trevor, please find attached our signature page for the buyout agreement and do not release it until you receive Joel's signature and we until we confirm receipt of 10k wire. Please confirm. Thanks, Jenny

> On Oct 12, 2022, at 3:39 PM, Hoffmann, Trevor <THoffmann@goulstonstorrs.com> wrote:
>
> All,

1

Attached is the revised execution version of the membership interest purchase agreement, reflecting our earlier call and subsequent discussions between Jenny and Joel. I'm also attaching a redline versus the version I circulated earlier today.

In the interests of time, I am going to send the clean version of this document, plus our comments to the consent agreement, to Duane Morris so that they can begin to review everything.

Trevor

**Trevor Hoffmann**
(212) 878-5048

*goulston*&storrs


**From:** Hoffmann, Trevor
**Sent:** Wednesday, October 12, 2022 11:51 AM
**To:** mfox@olshanlaw.com
**Cc:** js@waterbridge.com; Safer, Adam <ASafer@GOULSTONSTORRS.com>; Continental <MGMT@Continental-Equities.com>
**Subject:** Membership Interest Purchase Agreement for Western LA - 10-12-22 - revised

Michael,

I am attaching a revised draft of the membership interest purchase agreement which contains a few changes, including changing the percentage in section 1.2(b)(iii) from 33% to 30% (requested by Joel).

The agreement also reflects that legal fee reimbursement from Joel to the Janganas will be $20,000, since this has become much more complicated and time intensive than first anticipated (requested by my client).

I'm also attaching the comments that we sent Starwood regarding the consent. We are still waiting to hear back from them as a follow-up to our call yesterday afternoon. If you have comments to the consent agreement, please send them to Starwood asap.

Thanks,
Trevor


**Trevor Hoffmann**
(212) 878-5048
Bio

*goulston*&storrs
885 Third Avenue  New York, New York 10022
goulstonstorrs.com
thoffmann@goulstonstorrs.com
************************************************************************

This communication may contain information which is privileged and/or confidential under applicable law. Any dissemination, copy or disclosure, other

2

than by the intended recipient, is strictly prohibited. If you have received this communication in error, please immediately notify us via return e-mail to thoffmann@goulstonstorrs.com and delete this communication without making any copies. Thank you for your cooperation.

---

Electronic transmissions by the law firm of Olshan Frome Wolosky LLP may contain information that is confidential or proprietary, or protected by the attorney-client privilege or work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents hereof is strictly prohibited. If you have received this transmission in error, please notify Olshan Frome Wolosky LLP at once at 212.451.2300.

**EXECUTION VERSION**

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of October __, 2022, is entered into by and among Jack Jangana, an individual ("<u>Jangana</u>"), the Jack Jangana Irrevocable Grantor Trust, an irrevocable grantor trust (the "<u>Jangana Trust</u>"), Jenny Haim, an individual ("<u>Haim</u>"), the Haim Irrevocable Grantor Trust, an irrevocable grantor trust (the "<u>Haim Trust</u>"), Joyce Reiss ("<u>Reiss</u>"), an individual, the Reiss Irrevocable Grantor Trust, an irrevocable grantor trust (the "<u>Reiss Trust</u>", and together with Jangana, the Jangana Trust, Haim, the Haim Trust, and Reiss, each a, "<u>Seller</u>," and collectively, the "<u>Sellers</u>"), and JS Western Holdco Member LLC, a Delaware limited liability company (the "<u>Purchaser</u>"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Amended and Restated Limited Liability Company Operating Agreement of Western LA Holdco LLC, a Delaware limited liability company (the "<u>Company</u>"), dated as of August 20, 2014 (as amended, the "<u>Company Agreement</u>").

## RECITALS

**WHEREAS**, the Sellers collectively own 45% of the outstanding Company Interests, comprised of their respective percentage ownership of the Company Interests as follows: Jangana (7.3822%), the Jangana Trust (7.6177%), Haim (7.3822%), the Haim Trust (7.6177%), Reiss (7.3822%) and the Reiss Trust (7.6177%) (together with any additional equity interest any of the Sellers may own in the Company, collectively, the "<u>Interest</u>");[*]

**WHEREAS**, the Purchaser owns 55% of the outstanding Company Interests, comprised of their respective ownership of the Company Interests in the following amounts; and Joel Schreiber ("<u>Schreiber</u>"), directly or indirectly owns 100% of the membership interests in the Purchaser:

**WHEREAS**, the Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, the Interest, subject to the terms and conditions set forth herein;

**WHEREAS**, the Company is the indirect owner of all of the beneficial interest in Broadbridge LA LLC, a Delaware limited liability company ("<u>Property Owner</u>");

**WHEREAS**, the Property Owner is currently the subject of a bankruptcy case pending in the United States Bankruptcy Court for the Eastern District of New York, styled as *In re Broadbridge LA LLC*, Case No. 22-72048-LAS (the "<u>Bankruptcy Case</u>");

**WHEREAS**; the Property Owner owns 100% of the real property and improvements, including a commercial building located at 826 and 832 South Hill Street and 801 South Broadway, City and County of Los Angeles, State of California (the "<u>Property</u>");

**WHEREAS**, Property Owner, as borrower, entered into a loan agreement, dated June 8, 2018 (as amended, the "<u>Starwood Loan Agreement</u>"), with SPT CA Fundings 2, LLC, a Delaware limited liability company (as initial lender and as administrative agent for the lenders from time to

---

[*] [Percentages to be filled in]

time party thereto (whether individually or collectively, the "Starwood Lender");

**WHEREAS**, in connection with the proposed sale of the Interest to Purchaser by the Sellers, the consent of the Starwood Lender is required pursuant to the Starwood Loan Agreement (the "Starwood Consent").

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF INTEREST

Section 1.1   Purchase and Sale.

(a)   Upon the terms and subject to the conditions of this Agreement, at Closing (as hereinafter defined), each Seller shall sell, transfer, deliver and assign to Purchaser (the "Sale"), and Purchaser shall purchase, acquire and accept from each Seller, such Seller's portion of the Interest free and clear of all Encumbrances (as hereinafter defined).

(b)   In consideration for the Interest, Purchaser shall pay to the Sellers, in the aggregate, in proportion to their respective ownership of the Interest, the following amounts (the "Purchase Price"):

(i)   One Million Dollars ($1,000,000) (the "Guaranteed Cash Payment"), to be paid to the Sellers on or December 31, 2022, Time Being of the Essence, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on Schedule A hereto; *and*

(ii)   Prior to the receipt by Schreiber or any direct or indirect subsidiary or affiliate of Schreiber of debt or equity for construction financing or development of the Property, in the event of any sale, reorganization, recapitalization, gift, conveyance, divestiture, sale-leaseback or other transfer of all or any portion of the Property or any direct or indirect ownership interests in the Property, by Schreiber or any direct or indirect subsidiary or affiliate of Schreiber (collectively, a "Transaction"), upon the closing of each such Transaction, the Sellers shall be paid fifty percent (50%) of all Net Proceeds received by Schreiber and any direct or indirect subsidiary or affiliate of Schreiber in connection with such Transaction, up to a total of Five Million Dollars ($5,000,000) in the aggregate for all such Transactions. For the avoidance of doubt, if Schreiber receives Ten Million Dollars ($10,000,000) of Net Proceeds in such a Transaction, the Sellers shall be paid Five Million Dollars ($5,000,000) upon closing of the Transaction; *and*

(iii)   On and after the date of receipt by Schreiber or any direct or indirect

subsidiary or affiliate of Schreiber of debt or equity for construction financing or development of the Property, in addition to the amounts set forth above in Section 1(b)(ii), Seller shall be paid thirty-two percent (32.00%) of (x) all Net Proceeds received by Schreiber and any direct or indirect subsidiary or affiliate of Schreiber in connection with each and every Transaction, plus (y) any and all income, dividends and other distributions received by Schreiber and any direct or indirect subsidiary or affiliate of Schreiber in connection with the Property; *provided that* prior to the Sellers being entitled to payments pursuant this section 1.1(b)(iii), Schreiber shall receive a credit for thirty-six percent (36.00%) of all amounts previously paid to the Sellers pursuant to section 1.1(b)(ii).

"Appraised Value" shall mean the average of two appraisals conducted by licensed professional commercial real estate appraisers (one of which shall be chosen by the Purchaser and the other chosen by the Sellers).

"Net Proceeds" shall mean all amounts received by Schreiber and any direct or indirect subsidiary or affiliate of Schreiber, after accounting for his share of all loans and expenses directly related to the Property. In the event of any Transaction for no value, for less than the Appraised Value of the Property (*i.e.*, as determined by an independent appraiser), or that otherwise does not result in a monetization of the Property or the applicable direct or indirect ownership interests in the Property, the Sellers shall be entitled to fifty percent (50%) of the Net Proceeds of such Transaction as if it had been conducted at the Appraised Value.

Section 1.2    Any portion of the Purchase Price which shall become due to the Sellers pursuant to Section 1.1(b) herein shall (x) upon repayment of the Starwood Loan Agreement, accrue interest at an annual rate of 10% from the date such amount become due and (y) be secured by a springing lien on Schreiber's direct or indirect interest in the Property, until all such amounts are paid, together with all interest to the Sellers. The Purchaser and Schreiber hereby authorize the Sellers to file appropriate financing statements on Form UCC-1 in such office or offices as may be necessary or, in the opinion of the Sellers, desirable to perfect the liens to be created by hereby. For the avoidance of doubt, no amounts described under Sections 1.1(b)(ii) or (iii) shall be paid to the Sellers until the earlier of: (i) repayment of the Starwood Loan Agreement in full; and (ii) no Event of Default (as defined in the Starwood Loan Agreement) persists; provided that interest shall accrue on such amounts at the rate set forth in this Section 1.2 until such time as the amounts contemplated in Sections 1.1(b)(ii) and (iii) are actually paid.

Section 1.3    Taxes and Related Matters.

(a)    The Purchaser shall pay for any transfer taxes, documentary charges, recording fees or similar taxes, charges, fees or expenses, if any, that become due and payable as a result of the transactions contemplated by this Agreement.

(b)    Purchaser and the Sellers shall request that the Company allocate all items of Company income, gain, loss, deduction or credit attributable to the Interest for the taxable year of the Closing based on a closing of the Company's books as of the Effective Date.

Section 1.4    Withdrawal. Effective as of the Closing Date, the Sellers shall be deemed to have withdrawn from the Company and shall no longer be Members. Each of the Sellers hereby waive its claim to such Seller's capital account in the Company and, except as set forth in Section 1.1 above, any profits made by the Company or distributions which may be made by the Company in the future.

Section 1.5    Agreement to be Bound. Purchaser acknowledges that it has received and reviewed a complete copy of the Company Agreement and that, effective as of the Closing Date, Purchaser shall be the sole party to the Company Agreement and shall remain fully bound by, and subject to, all of the covenants, terms and conditions of the Company Agreement.

Section 1.6    Purchaser Price Obligations.  Joel Schreiber acknowledges that he is a beneficiary of this Agreement and agrees to personally guaranty full repayment of the Purchase Price and all obligations of Purchaser under this Agreement.

Section 1.7    Ongoing Obligations.  Notwithstanding the terms of this Agreement, JS Western Holdco Member LLC and Joel Schreiber remain liable to Jangana, Haim and Reiss (collectively, the "Jangana Parties") pursuant to that certain letter agreement among the Jangana Parties, Western Holdco Member LLC and Joel Schreiber dated July 16, 2021 (the "July 21, 2021 Letter Agreement"). If and only if the Guaranteed Cash Payment is received by the Sellers on or before December 31, 2022, as required pursuant to Section 1.1 hereof, the July 21, 2021 Letter Agreement shall be null and void, and the $1 million obligation of Joel Schreiber thereunder shall be fully released.

Section 1.8    Reporting Requirements. For all time periods relating to Schreiber's direct or indirect ownership of all or a portion of the Property, (i) each year upon completion of Schreiber's and the Company's financials, Schreiber shall provide, and in accordance with the direction letter attached hereto as Annex A, hereby authorizes and directs his accountants and those of the Company (or any successor or new company that possesses a direct or indirect interest in the Property) to provide, the Sellers with an audited annual report prepared in accordance with generally accepted accounting principles in relation to the status of the Property and his direct and indirect interest in the Property; and (ii) at reasonable intervals during each year, Schreiber shall provide the Sellerswith electronic copies of any and all financial statements, reports, notices, organizational documents, shareholder or similar agreements in respect of the Property and/or his direct and indirect interests in the Property and such additional information relating to the Property and his direct and indirect interests in the Property, as the Sellers reasonably may request and that is then in the possession of, or may reasonably be obtained by Schreiber or his direct or indirect subsidiaries or affiliates.  In the event that Schreiber determines that confidentiality obligations would restrict his ability to provide any of the foregoing information or rights to the Sellers, Schreiber will inform the Sellers of that determination and, if requested by the Sellers, will use commercially reasonable efforts to obtain any necessary consent or otherwise to comply with the terms and conditions of its confidentiality obligations so as to enable the provision of such information and rights to the Sellers.

Section 1.9    Specific Disclaimers. Each Seller specifically disclaims any claim for fraud, breach of loyalty or fiduciary duty arising out of each Seller's relationship as a Member of the Company. Purchaser specifically disclaims any claim for fraud, breach of loyalty or fiduciary

duty arising out of Purchaser's relationship as a Member of the Company. Except as set forth in Section 1.1 above, each Seller specifically disclaims any claim for any interest in the profits, losses, cash, distributions or other assets of the Company, or from the future value of the Company. Each Seller acknowledges that Purchaser may re-sell the Interest for a profit, and, except as set forth in Section 1.1 above, no Seller shall have any interest whatsoever therein nor any claim relating thereto. Each Seller has performed its own valuation, without reliance on Purchaser and assumes all risk of any error judgment with computation relating to that valuation. Each Seller has requested all information deemed material with respect to its valuation and its decision to enter into this Agreement and all information requested by each Seller with respect to such valuation and decision has been provided by the Company.

## ARTICLE II
## THE CLOSING AND TERMINATION

Section 2.1    The Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place via exchange of signed documents contemplated herein via PDF (email) transmission and satisfaction of the closing conditions (the date such conditions are satisfied, the "Closing Date"). In connection with the Closing: (i) the Purchaser and the Sellers shall execute and deliver this Agreement; and (ii) the Starwood Consent shall be obtained and evidence of the Starwood Consent shall be provided to the Purchaser and the Sellers. The effective date of the transactions contemplated by this Agreement shall be the Closing Date (the "Effective Date").

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers, severally and jointly, hereby represent and warrant to Purchaser that the statements contained in this Article III are true, correct and complete as of the Closing Date.

Section 3.1    Title to Membership Interests. Each Seller is the sole legal, beneficial, record and equitable owner of such Seller's portion of the Interest, free and clear of any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership (collectively, "Encumbrances"). Upon the transfer of the Interest contemplated herein as of the Closing Date, Purchaser shall acquire good and marketable title to the Interest, free and clear of any and all Encumbrances.

Section 3.2    Authority. Each Seller has all requisite power, legal capacity and authority to enter into this Agreement and to assume and perform its obligations hereunder. This Agreement when duly executed and delivered by each Seller will constitute a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally or by the principles governing the availability of equitable remedies.

Section 3.3    Approvals and Consents.  No action, approval, consent or authorization, including, but not limited to, any action, approval, consent or authorization by any governmental or quasi-governmental agency, commission, board, bureau, or instrumentality is necessary or required as to the Sellers in order to constitute this Agreement as a valid, binding and enforceable obligation of the Sellers in accordance with its terms.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Sellers that the statements contained in this Article IV are true, correct and complete as of the Closing Date.

Section 4.1    Organization and Authority of Purchaser; Enforceability.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware. Purchaser has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Purchaser of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Purchaser. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Purchaser, and (assuming due authorization, execution and delivery by the Sellers) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms.

Section 4.2    Approvals and Consents.  No action, approval, consent or authorization, including, but not limited to, any action, approval, consent or authorization by any governmental or quasi-governmental agency, commission, board, bureau, or instrumentality is necessary or required as to the Purchaser in order to constitute this Agreement as a valid, binding and enforceable obligation of the Purchaser in accordance with its terms.

## ARTICLE V
## INDEMNIFICATION

Section 5.1    Survival.  All of the representations, warranties and covenants contained in this Agreement shall survive the Closing Date.

Section 5.2    Indemnification by the Sellers.  The Sellers, jointly and severally, agree to save, defend, indemnify and hold harmless Purchaser and its respective successors and assigns from and against any and all claims, counterclaims, charges, complaints, demands, actions, causes of action, suits, remedies, rights, sums of money, costs, losses, covenants, contracts, controversies, agreements, promises, damages, obligations, liabilities and expenses (including reasonable attorneys' fees and costs) (collectively, "Damages"), suffered or incurred by it, directly or indirectly, arising from, related to or as a result of (i) any untrue representation or breach of warranty by the Sellers under this Agreement, (ii) the non-fulfillment of any covenant or other agreement of the Sellers contained herein, or (iii) any and all Damages incident to any of the foregoing or in enforcing this indemnity.

Section 5.3    Indemnification by the Purchaser. The Purchaser agrees to save, defend, indemnify and hold harmless Sellers and their respective successors and assigns from and against any and all Damages, suffered or incurred by them, directly or indirectly, arising from, related to or as a result of (i) any untrue representation or breach of warranty by the Purchaser under this Agreement, (ii) the non-fulfillment of any covenant or other agreement of the Purchaser contained herein, (iii) any action for breach of fiduciary duty commenced by the Company or its subsidiaries, including the Property Owner, in connection with the refusal of the Sellers (or any of them) to consent to the filing of the Bankruptcy Case; or (iv) any and all Damages incident to any of the foregoing or in enforcing this indemnity.

## ARTICLE VI
## MISCELLANEOUS

Section 6.1    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.1):

If to the Sellers:

>Jack Jangana, Jenny Haim and Joyce Reiss
>c/o Continental Worsteds Inc.
>45 North Station Plaza, Ste 402
>Great Neck, New York 11021
>Attention: Jack Jangana
>Email: mgmt@continental-equities.com

with a copy to (which shall not constitute notice):

>Goulston & Storrs PC
>825 Third Avenue
>New York, New York 10022
>Attention: Trevor Hoffmann, Esq. and Adam Safer, Esq.
>E-mail: thoffmann@goulstonstorrs.com and asafer@goulstonstorrs.com

If to Purchaser:

>c/o Waterbridge Capital LLC
>115 West 18th Street

Case 8-22-72048-las    Doc 47-2    Filed 10/12/22    Entered 10/12/22 19:19:11

> 2nd Floor
> New York, New York 10011
> Attention: Joel Schreiber
> Email: js@waterbridge.com

with a copy to (which shall not constitute notice):

> Olshan Frome Wolosky LLP
> 1325 Avenue of the Americas
> New York, New York 10019
> Facsimile: 212.451.2222
> E-mail: mfox@olshanlaw.com
> Attn: Michael S. Fox, Esq.

Section 6.2    Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective heirs, legal representatives, successors and assigns of the parties hereto.

Section 6.3    Severability.  Should any phrase, clause, sentence or section of this Agreement be judicially declared to be invalid, unenforceable or void, such decision will not have the effect of invalidating or voiding the remainder of this Agreement, and such part of this Agreement will be deemed to have been stricken herefrom and the remainder will have the same force and effect as if such part or parts had never been included herein.

Section 6.4    Singular, Plural; Gender.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.

Section 6.5    Governing Law; Jurisdiction and Venue.  This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without giving effect to such State's principles governing conflicts of law.  The state or federal courts located within the State of New York in the County of New York shall have exclusive jurisdiction over any dispute or controversy arising under or in connection with this Agreement and, by execution and delivery of this Agreement, each of the parties hereby submits to the jurisdiction of those courts, including, but not limited to, the in personam and subject matter jurisdiction of those courts, waives any objection to such jurisdiction on the grounds of venue or forum non conveniens, the absence of in personam or subject matter jurisdiction and any similar grounds, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.  EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 6.6    Specific Performance.  Each Seller acknowledges that the rights of Purchaser to consummate the transactions contemplated hereby are unique and recognizes and

affirms that in the event of a breach of this Agreement by a Seller, money damages may be inadequate and the Purchaser may not have adequate remedies at law, and agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by such Seller in accordance with their specific terms or were otherwise breached. Accordingly, Purchaser shall be entitled to seek an injunction or restraining order to prevent breaches of this Agreement and to seek to enforce specifically the terms and provisions hereof, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which Purchaser may be entitled under this Agreement, at law or in equity.

Section 6.7    Counterparts. This Agreement and any amendments hereto may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which together shall constitute but one and the same instrument. This Agreement may be executed by facsimile or .pdf signature and a facsimile or .pdf signature shall constitute an original for all purposes.

Section 6.8    Entire Agreement. This Agreement, together with the documents expressly referenced herein, constitutes the entire understanding among the parties with respect to the subject matter hereof. Any agreement, discussions, or negotiations among the parties prior to the date hereof with respect to the purchase of the Interest is superseded by this Agreement. Except as expressly provided herein, nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 6.9    Amendment; Waiver. No provision of this Agreement may be amended except in a written instrument signed by Purchaser and the Sellers. No provision of this Agreement may be waived except in a written instrument signed by the party waiving the benefit to which it is otherwise entitled. No waiver of any provision, condition or requirement of this Agreement shall be deemed to be a waiver continuing into the future or a waiver on a subsequent occasion or a waiver of any other provision, condition or requirement of this Agreement, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair such party's ability to exercise such right.

Section 6.10    Expenses. Each party hereto shall pay its own costs and expenses involved in carrying out the transactions contemplated by this Agreement, except that the Purchaser shall reimburse the Sellers promptly upon Closing, Time Being of the Essence, for Ten Thousand Dollars ($10,000) on account of the Sellers' costs and expenses.

Section 6.11    Remedies Not Exclusive. The remedies provided in this Agreement shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any other remedies against any other party hereto, whether at law or equity.

Section 6.12    Further Assurances. Subject to the terms and conditions of this Agreement, each of the parties hereto shall use all reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable, under applicable laws and regulations or otherwise, to fulfill its obligations under this Agreement and to consummate the transactions contemplated by this Agreement.

Section 6.13    <u>No Construction Against Drafter</u>.    Each of the parties hereto has been represented by counsel who has each been involved in the drafting of this Agreement or has had an opportunity to have input into the drafting of this Agreement. Accordingly, this Agreement shall not be construed either against or in favor of any party based upon that party's role in drafting this Agreement, and any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation or construction of this Agreement.

*[Remainder of page intentionally left blank; signature page follows.]*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first above written.

**SELLERS:**

_____
JENNY HAIM

_____
JACK JANGANA

_____
JOYCE REISS

**HAIM IRREVOCABLE GRANTOR TRUST**

By: _____
Name: Jenny Haim
Title: Trustee

**REISS IRREVOCABLE GRANTOR TRUST**

By: _____
Name: Joyce Reiss
Title: Trustee

**JACK JANGANA IRREVOCABLE GRANTOR TRUST**

By: _____
Name: Jenny Haim
Title: Trustee

**PURCHASER:**

JS WESTERN HOLDCO MEMBER LLC

By: _____
Name: Joel Schreiber
Title: Manager

**GUARANTOR:**

_____
Joel Schreiber

[SIGNATURE PAGE TO MEMBERSHIP INTEREST PURCHASE AGREEMENT]
1" = "1" "10420182-4" "" 10420182-4