**BANKRUPTCY ESTATE OF
BROADBRIDGE LA LLC**

**AS SELLER**

**AND**

**CAPRI INVESTOR, LLC or its designee**

**AS BUYER.**

_____

**CONTRACT OF SALE**

_____

**PREMISES:  801 SOUTH BROADWAY
LOS ANGELES, CALIFORNIA**

**AS OF OCTOBER 27, 2022**

## CONTRACT OF SALE

This Contract of Sale, (the "**Contract**" or "**Contract of Sale**") made as of **October 27, 2022** (the "**Effective Date**") between **THE BANKRUPTCY ESTATE OF BROADBRIDGE LA LLC**, a Delaware limited liability company, having its principal business address at 45 North Station Plaza, Ste 402, Great Neck, NY 11021-5011 (hereinafter referred to as "**Seller**"), and **CAPRI INVESTOR, LLC or its designee** having its principal business address at 208 N. Green Street, Suite 404, Chicago, IL 60607, or its designee (hereinafter referred to as "**Buyer**").

1.    **Defined Terms**.  The terms set forth on Schedule 1 constitute defined terms in this Contract of Sale, and, when used in this Contract of Sale, they shall have the respective meanings set forth on Schedule 1.

2.    **Purchase and Sale of Assets**.

2.1    On the Closing Date and upon the terms and conditions of this Contract of Sale and following the Bankruptcy Court Approval hereof via entry of an order confirming a plan of reorganization pursuant to 11 U.S.C. §§ 1123(a)(5)(D) and 1129 or entry of an order pursuant to 11 U.S.C. §363(b) and (f) approving a sale of the Property (in either event, an "**Approval Order**"), Seller shall sell, transfer and convey to Buyer, and Buyer shall purchase, acquire and receive from Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), all of Seller's right, title and interest in and to the following:

(a)    the land, buildings and improvements situated therein comprising the fee simple interest (the "**Building**"), commonly known as 801 South Broadway, Los Angeles, California in the real property more particularly described on **Exhibit A** attached hereto (the "**Land**"), together with any furniture, fixtures, equipment, appliances, apparatus and personal property attached to, located on or used in the operation of the Building (the **"Personalty"**) (the Land, Building and Personalty are collectively referred to as the "**Premises**" or the "**Property**"); and

(b)    all rights, privileges, easements, and rights of way appurtenant to the Premises, including without limitation, all subsurface rights, development rights, air rights, and water rights; and

(c)    all records relating to the Premises; and

(d)    all rights, warranties, guarantees, utility contracts, approvals (governmental or otherwise), permits, certificates of occupancy, surveys, plans and specifications, any agreements, covenants, or indemnifications that Seller received from a third-party, including any prior owner, owned, held, utilized or controlled by Seller with respect to the ownership, development or operation of the Premises to the extent transferable to Buyer.

2.2.    Notwithstanding anything to the contrary set forth in Section 2.1 or elsewhere in this Contract of Sale, Seller is not selling or otherwise transferring to Buyer any of, and Buyer shall acquire no interest in or to, the following:

        (a)     all books, records, files and papers (whether in hard copy or computer format) that are not used in, or that do not relate to or affect, the Premises;

        (b)     any permits that relate to or affect the Premises which are not assignable or transferable to Buyer;

        (c)     any insurance policies to which Seller is a party, except as expressly provided by this Contract of Sale; and

        (d)     any other Personalty of Seller, wherever located.

3.      **Purchase Price**.

    3.1.    The purchase price for the Premises (the "**Purchase Price**") is Three Hundred Twenty Five Million Dollars ($325,000,000), payable as follows:

        (a)     A payment of Nine Million Five Hundred Thousand Dollars ($9,500,000) to be paid no later than November 4, (the "**Deposit**"). The Deposit becomes nonrefundable on November 15, 2022 unless (i) the Contract is terminated by Buyer during the Due Diligence Period provided below in Section 3.2, (ii) pursuant to Sections 5, 6, 12, 13 or 24, or (iii) Seller breaches this Contract of Sale, it being agreed that in any of such cases the Deposit shall be refunded to Buyer;

        (b)     The Deposit shall be paid in immediately available federal funds wired to a trust account designated by Seller's bankruptcy counsel as the Escrow Agent. The Deposit shall be held in escrow by the Seller's bankruptcy counsel, Goldberg Weprin Finkel Goldstein LLP, subject to the terms and conditions hereof; and

        (c)     The balance of the Purchase Price of Three Hundred Fifteen Million ($315,500,000) shall be paid at the Closing by immediately available federal funds wired as instructed to Seller's attorneys on the Closing Date pursuant to the Approval Order, as defined below.

    3.2    **Limited Due Diligence**. This Contract of Sale is subject to a limited due diligence period (the "**Due Diligence Period**") ending on November 15, 2022 to allow Buyer to complete its review and investigation of the Property. If Buyer is not satisfied with any aspects of the Property following due diligence, Buyer shall have the right to terminate this Contract by delivering written notice thereof (the "**Termination Notice**") to Seller and Escrow Agent prior to the expiration of the Due Diligence Period. In the event Buyer gives a timely Termination Notice, (i) this Contract shall terminate and shall be of no further force or effect and (ii) Escrow Agent shall return the Deposit to the Buyer.

    3.3    **Contingencies**. Other than the limited due diligence provided above ending on November 1 5 , 2022, and the rights of Buyer pursuant to Section 5, there are no contingencies of any kind or nature, including any financing, environmental or regulatory conditions relating to this Contract.

4.    **State of Title**. Buyer shall accept fee simple title to the Premises, free and clear of all claims, liens, taxes, adverse interests and other encumbrances (except for Permitted Encumbrances) pursuant to the Approval Order, but subject to the following (collectively, the "**Permitted Encumbrances**"):

4.1.    All building, zoning and other restrictions, regulations, requirements, laws, ordinances, resolutions and orders of any state, municipal, federal or other governmental authority, including all boards, bureaus, commissions, departments and bodies thereof, now or hereafter having or acquiring jurisdiction over the Premises or the use or improvement thereof.

4.2.    Covenants, easements and restrictions of record as of the date hereof provided same do not: (A) render title unmarketable; or (B) prohibit or interfere with the maintenance of any building or structure or structures now on the Premises.

4.3.    Any state of facts shown on the existing survey and any state of facts shown on any updated survey provided same do not: (A) render title unmarketable; or (B) prohibit or interfere with the Building now on the Premises;

4.4.    Rights, if any, relating to construction, maintenance and operation of public utility lines, wires, poles, cables, pipes, distribution boxes and other equipment and installations on, over and under the Premises.

4.5.    Minor encroachments and projections of areas, cornices, trim, fences, hedges, retaining walls, awnings, canopies, ledges, or other improvements or installations from the Premises onto any street or highway or onto adjoining property, and encroachments of similar elements projecting from adjoining property over the Premises.

4.6.    Real estate taxes, together with all governmental assessments and related obligations, if any, subject to adjustment as hereinafter provided.

4.7.    Minor imperfections of title, if any, none of which is substantial in amount, materially detracts from the value or impairs the use of the Premises and is of a nature that a recognized title company would not either insure over or provide affirmative coverage against (at no additional cost to Buyer) such imperfection without additional premium.

4.8.    Any other matter which the Title Company may raise as an exception to title, provided the Title Company will insure or provide affirmative coverage against (at no additional cost to Buyer).

Notwithstanding any provision contained in this Contract to the contrary, under all circumstances and under all events, Seller shall be obligated to cure the Mandatory Cure Items, it being understood by the parties hereto that, notwithstanding anything to the contrary contained herein, the Mandatory Cure Items shall not for any purpose whatsoever be included in the Permitted Exceptions and Seller shall be affirmatively obligated to cure the Mandatory Cure Items whether or not Buyer objects to same. For purposes of this Contract, the term "**Mandatory Cure Items**" means all mortgages, liens caused by the acts of Seller, and other encumbrances of ascertainable amounts; leases other than renters in possession; options to purchase and rights of first refusal encumbering the Property; any

3

unpaid utilities, and unpaid taxes and special assessments currently due; the satisfaction of all Schedule B-I requirements set forth in the Title Updates applicable to Seller; and such documents necessary to delete from the Title Policy the standard pre-printed exceptions.

5.    **Objections to Title and Survey**.

5.1    Within two (2) business days after the date hereof, Seller shall deliver to Buyer a title insurance commitment (the title insurance commitment and all updates, supplements and continuations of the title commitment and subsequent searches, collectively, the "**Title Updates**") from a nationally recognized title company (the "**Title Company**"), and order an ALTA/NSPS survey of the Land (the "**Survey**") from a surveyor acceptable to Buyer and the Title Company, in each case on an expedited basis. shall be promptly furnished to the Seller's attorneys.  Buyer shall deliver to Seller's attorneys, Goldberg Weprin Finkel Goldstein LLP, Attention: Kevin J. Nash, Esq., 1501 Broadway, 22nd Floor, New York, NY 10036, not later than five (5) days after receipt of the later to be received of the Title Updates and the Survey (the "**Title Objection Notification Date**"), a letter from Buyer or Buyer's attorneys setting forth any objections to title or the Survey as stated in the applicable Title Update or Survey (the "**Title Objection Notice**"). Seller shall provide written notice to Buyer within five (5) days after receipt of the Title Objection Notice specifying which, if any, of the objections to title or the Survey contained in the Title Objection Notice (collectively, the "**Title Defects**") Seller elects to cure prior to the Closing (the "**Seller's Response**").

5.2    If Buyer does not notify Seller of any Title Defects by the Title Objection Notification Date, Buyer shall be deemed to have waived such objection and shall be obligated to purchase the Premises and fulfill its obligations under this Contract of Sale subject to such objections and without abatement of the Purchase Price, credit or allowance of any kind or any claim or right of action against Seller for damages or otherwise.

5.3    If Seller fails to timely provide the Seller's Response, Seller shall be deemed to have elected not to cure all of the Title Defects.

5.4    If Buyer is dissatisfied with the Seller's Response then, at the option of Buyer, Buyer may (a) terminate this Contract by providing written notice to Seller within five (5) days from Buyer's receipt of Seller's Response, whereupon the Deposit shall be promptly returned to Buyer and neither party shall have any further rights or obligations hereunder, except for those matters that expressly survive termination of this Contract, or (b) proceed to the Closing without satisfaction of the Title Defects Seller has elected not to cure, which such Title Defects shall be deemed Permitted Exceptions.

5.5    Buyer shall also have the right to object at any time to (i) any matter that arises on any update of the Title Updates that was not contemplated to be an exception pursuant to the express terms and provisions of this Contract and/or (ii) any matter that arises on any update of the Survey (collectively, and in each case, the "**New Title Defects**"). Seller shall have the obligation to cure all of the New Title Defects. If, prior to the Closing, Seller shall fail to cure any of the New Title Defects, the Title Defects elected to be cured by Seller in the Seller's Response and/or the Mandatory Cure Items, then, Buyer shall, in Buyer's sole

discretion, shall either (A) terminate this Contract by providing written notice to Seller, whereupon the Deposit shall be promptly returned to Buyer and neither party shall have any further rights or obligations hereunder, except for those matters that expressly survive termination of this Contract or (B) proceed to the Closing without satisfaction of such New Title Defects, Title Defects, and/or Mandatory Cure Items, at which time such New Title Defects, Title Defects, and/or Mandatory Cure Items shall be deemed Permitted Exceptions.

5.6     Buyer shall accept fee title to the Premises as the Title Company will insure in accordance with the Approval Order subject only to the Permitted Encumbrances and such other exceptions as the Title Company, without special premium, will omit as exceptions to coverage or will except with insurance against collection out of or enforcement against the Premises.

5.7     If Seller is unable to convey title in accordance with this Contract of Sale by the Closing Date, following Bankruptcy Court approval hereof, then Seller shall be entitled, at its election delivered in writing to Buyer no later than five (5) business days before the scheduled Closing Date, to one (1) or more adjournments of the Closing Date for a period not to extend beyond thirty (30) days, and the Closing Date shall be adjourned to a date specified by Seller not beyond such period. If, at the expiration of said period or, if Seller shall be unable to convey title to the Premises in accordance with this Contract of Sale, then, provided that Buyer did not create or cause the condition preventing Seller to convey title in accordance with this Contract of Sale, Seller's sole obligation shall be to (i) cause the Escrow Agent to refund the Deposit to Buyer, and (ii) refund Buyer's cost of examination of title without insurance (the "**Buyer's Expense for Title Examination**"), whereupon this Contract of Sale shall terminate and neither party shall have any further rights or claims against the other, except for those obligations which expressly survive termination of this Contract of Sale.  If Buyer creates or causes the condition that prevents Seller from conveying title in accordance with this Contract of Sale, same shall constitute a default by Buyer under this Contract of Sale entitling Seller to the remedy set forth in Section 15 of this Contract of Sale.

5.8     Notwithstanding the provisions in Section 5.7 to the contrary, Buyer may, by notifying Seller at any time prior to the expiration of the period referred to in Section 5.7, if Seller elects to adjourn the Closing Date in accordance with Section 5.7, elect to accept such title as Seller can convey. In such event, such Encumbrances that Seller was unable to discharge or otherwise remove shall be deemed to be a Permitted Encumbrance and this Contract of Sale shall remain in effect and the parties shall proceed to Closing and Buyer shall remain obligated to purchase the Premises for the full Purchase Price without any abatement, credit or allowance of any kind or any claim or right of action against Seller for Damages or otherwise for such Encumbrances.

5.9     Buyer and Seller shall cooperate with the Title Company in connection with obtaining title insurance insuring title to the Premises consistent with proceedings before the Bankruptcy Court and subject only to the Permitted Encumbrances.  At or prior to the Closing, Buyer and Seller shall deliver to the Title Company such affidavits, certificates and other instruments as are reasonably requested by such Title Company and customarily furnished in connection with the issuance of Owner's policies of title insurance.

6.    **Violations**.  Buyer agrees to take title subject to all notes or notices of violations of law or governmental ordinances, orders or requirements issued by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises issued prior to the Closing Date (collectively, "**Violations**"), provided that Seller agrees to pay all monetary fines or penalties in association with the Violations as claims in the bankruptcy case without being obligated to remedy any underlying conditions. Within two (2) business days after the date hereof, Seller shall deliver to Buyer copies of all notes and notices of violations of law or governmental ordinances, orders or requirements issued by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises received by Seller and issued prior to the date of this Contract of Sale (the "**Pre-Contract Violations**"). Within two (2) business days after its receipt thereof, Seller shall deliver to Buyer copies of all notes and notices of violations of law or governmental ordinances, orders or requirements issued by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises received by Seller and issued on or after the date of this Contract of Sale (collectively, "**Post-Contract Violations**"). If required, Seller, upon written request by Buyer, shall furnish to Buyer written authorization to make necessary searches to determine whether Violations have been noted or issued with respect to the Premises. Buyer shall have the right to terminate this Contract by written notice to Seller no later than five (5) days after its receipt of any Post-Contract Violations that cannot be remediated by the payment of fines and penalties and otherwise materially impacts development of the Property, whereupon Buyer may object to such Post-Contract Violation, in which case Seller shall (i) cause the Escrow Agent to refund the Deposit to Buyer, and (ii) refund Buyer's Expense for Title Examination, and neither party shall have any further rights or claims against the other, except for those obligations which expressly survive termination of this Contract of Sale.

7.    **Litigation.**  Buyer acknowledges that Seller is subject to a pending Chapter 11 case (together with an underlying foreclosure action commenced by the Lender) and this Contract of Sale remains subject to Bankruptcy Court approval.  Accordingly, Buyer's obligations under this Contract of Sale shall not be affected by (i) the pendency of any of the litigation involving Seller; or (ii) any other litigation affecting the Premises whether commenced prior to or subsequent to the date hereof, provided that such litigation can be adequately addressed by the Bankruptcy Court having jurisdiction over Seller's Chapter 11 case, meaning that Buyer shall have no liability related to any such litigation.

8.    **Free and Clear Sale of Premises.**  At Closing Seller will deliver title to the Premises free and clear of all Encumbrances (except for Permitted Encumbrances), including all existing mortgages, assignments and financing statements, pursuant to the applicable provisions of the Bankruptcy Code, with the mortgage of the Seller's lender and secured creditor, Museum Building Holdings LLC (the "**Lender**"), to be paid at Closing as to all agreed and allowed amounts, with a reserve to be established from the sale proceeds as to any amounts in dispute.

9.    **Closing Date**.

9.1    Subject to Section 5.7, the closing (the "**Closing**") of the transaction contemplated hereunder shall occur no later than December 15, 2022, time being of the essence, so long as the Approval Order is entered by that time which is either final or immediately enforceable without any stay of enforcement. The Closing shall occur remotely through the Title Company.

10.    **Closing Documents**.

10.1.    Seller shall deliver to Buyer (duly executed where appropriate) at the Closing the following items:

(a)    Vacant possession of the Premises with removal of the Receiver;

(b)    a certificate evidencing that Seller is not a "foreign person" within the meaning of the Internal Revenue Code of 1986, as amended. Based thereon, no portion of the Purchase Price shall be withheld by Buyer pursuant to the Internal Revenue Code;

(c)    a Bargain and Sale deed with covenants conveying and selling the Premises to the Buyer free and clear of all claims, lies, taxes, adverse interests and all non-permitted Encumbrances;

(d)    an Assignment of Personal Property, Guarantees, Warranties, Permits, Licenses and Approvals;

(e)    Certified copy of the Approval Order;

(f)    All tax and other forms required by any federal, state, county or local government authority in connection with real estate transactions contemplated by this Contract of Sale;

(g)    Any document required by law to be executed by Seller in order to allow Buyer to record any transfer and conveyancing document in order to effectuate the sale of the Premises in Los Angeles, California;

(h)    A counterpart original closing statement showing all closing prorations; and

(i)    Any other documents required by this Contract of Sale, or reasonably requested by the Title Company to be delivered by Seller to the Buyer at the Closing in order to complete the transaction.

10.2.    Buyer shall deliver to Seller (duly executed where appropriate) at the Closing the following items:

(a)    Wire payment of the balance of the Purchase Price of $315,500,000, as adjusted pursuant to Section 11, due and payable at the Closing;

(b)    All tax and other forms required by any federal, state, county or local government authority in connection with the real estate transactions contemplated by this Contract of Sale;

(c)    Any document required by law to be executed by Buyer in order to allow Buyer to record any transfer and conveyancing documents;

   (d) A counterpart original closing statement showing all closing prorations; and

   (e) Any other documents required by this Contract of Sale, or reasonably required by the Title Company to be delivered by Buyer to the Seller at the Closing in order to complete the transaction.

11. **Adjustments and Costs**.

  11.1 Unless otherwise provided below, the following are to be adjusted and prorated between Seller and Buyer as of 12:01 A.M. (EST) on the Closing Date (the "**Effective Time**"), based upon a 365-day year, and the net amount thereof shall be added to (if such net amount is in favor of Seller,) or deducted from (if such net amount is in Buyer's favor) the Purchase Price payable at Closing:

   (a) Real Estate Taxes and all related assessments and obligations, on the basis of the fiscal period for which assessed together with any oil, gas, steam, electricity and other public utility charges relating to the Premises.

   (b) The amount of any unpaid Real Estate Taxes and all related assessments and obligations together with all oil, gas, steam, electricity and other utility charges relating to the Premises which Seller is obligated hereunder to discharge or satisfy, with any interest or penalties thereon, at the option of Seller, shall be a credit to Buyer at the Closing.

   (c) If on the Closing Date there are any liens which Seller is obligated hereunder to discharge or satisfy, Seller may use any portion of the Purchase Price to discharge or satisfy the same, or may deposit with the Title Company an amount sufficient to discharge or satisfy the same, provided that, upon such deposit, the Title Company "omits" same from Buyer's title report and policy. The existence of liens, encumbrances, Real Estate Taxes, assessments and obligations or any utility related charges shall not be an objection to title.

  11.3 Seller shall pay all expenses for examination of title, the premium for any title insurance policy issued to Buyer, and all other title, survey or other expenses incurred by Seller in connection with this Contract of Sale or the closing of title hereunder.

  11.4 To the extent not otherwise exempt pursuant to Section 1146(a) of the Bankruptcy Code, Seller shall, at the Closing, either pay, credit the Buyer or deposit in escrow with the Title Company, unless the Bankruptcy Court determines otherwise, the amount necessary, if any, to pay in full an amount equal to the applicable local and state transfer taxes payable by reason of the sale of the Premises. Seller and Buyer agree to execute, swear to, and cause to be filed any applicable transfer tax returns or other returns required in connection with the Closing.

  11.5 Seller and Buyer each shall pay their own attorneys' fees in connection with this Contract of Sale and the closing of title.

12.    **Bankruptcy Court Approval**. The Contract is subject to Bankruptcy Court approval upon application of the Seller and entry of the Approval Order authorizing the Seller to sell the Premises to Buyer in accordance with the terms hereof. This sale of the Premises shall be conducted as a private sale without competitive bidding unless the Bankruptcy Court orders otherwise. The Seller shall move for Bankruptcy Court approval of this Contract by way of a so-called "363 Sale Motion" and/or accompanying Plan of Reorganization and Disclosure Statement. Buyer acknowledges that the Bankruptcy Court may consider higher or better offers for the Premises, in which event Seller shall seek to declare the Buyer as the "stalking horse buyer" eligible for a break-up fee equal to $3.25 million and other mutually acceptable bid protections as may be approved by the Bankruptcy Court (collectively, the "**Bid Protection**"). If Buyer does not ultimately purchase the Premises because the Bankruptcy Court received a higher or better offer for the Premises, then, in addition to the Bid Protection, Seller shall (a) cause the Escrow Agent to refund the Deposit to Buyer, and (ii) refund Buyer's Expense for Title Examination, whereupon this Contract of Sale shall terminate and neither party shall have any further rights or claims against the other, except for those obligations which expressly survive termination of this Contract of Sale.

13.    **Conditions Precedent to Buyer's Obligation to Close**. Buyer's obligation to consummate the transactions described in this Contract of Sale is subject to the satisfaction, at or prior to such Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

13.1    The Property shall be in the same condition as it was on the date hereof, ordinary wear and tear excepted.

13.2    Buyer has completed the remaining due diligence as outlined above in Section 3.2 and a timely notice of termination has not been properly served upon Seller.

13.2    Seller has performed or complied in all material respects with all of the covenants and obligations required of Seller by this Contract of Sale.

13.3    The Approval Order shall have been entered which becomes immediately effective.

13.4    The Seller receives good and marketable title to the Property, pursuant to the Approval Order authorizing the sale of the Premises free and clear of all Encumbrances (except for Permitted Encumbrances).

If any of the conditions precedent contained in this Section 13 have not been satisfied by the Closing Date, then Buyer shall have the right to terminate this Contract by written notice to Seller, in which case Seller shall (i) cause the Escrow Agent to refund the Deposit to Buyer, and (ii) refund Buyer's Expense for Title Examination, and neither party shall have any further rights or claims against the other, except for those obligations which expressly survive termination of this Contract of Sale.

14.    **Conditions Precedent to Seller's Obligation to Close**. Seller's obligation to consummate the transactions described in this Contract of Sale, and to take the actions required to be taken by Seller at the Closing, is subject to the satisfaction, at or prior to such Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

14.1    Buyer has performed or complied with all of the covenants and obligations required of Buyer by this Contract of Sale.

14.2    The Bankruptcy Court Approval shall have been entered which becomes immediately effective.

15.    **Default**.  If Buyer shall fail to close the transaction contemplated hereby following entry of the Approval Order other than as a result of a breach of this Contract by Seller, then in such event, upon written notice to the Escrow Agent the Deposit shall be paid over to Seller as agreed upon liquidated damages, it being acknowledged that in such event Seller will suffer substantial damages, but such damages are incapable of exact calculation and the Deposit constitutes a reasonable approximation thereof.  After payment to Seller of the Deposit, neither party shall have any further rights or obligations hereunder except with respect to the provisions hereof which specifically survive termination.

16.    **Escrow Conditions**.

16.1    Concurrently with the execution of this Contract of Sale, Buyer has paid the Deposit by immediately available federal funds to Seller's counsel, Goldberg Weprin Finkel Goldstein ("**Escrow Agent**").

16.2    Escrow Agent shall hold the Deposit in an escrow account in accordance with this Contract of Sale. Escrow Agent hereby is authorized and directed to deliver the Deposit to Seller if, as and when title closes as provided herein. If Escrow Agent shall receive an instruction from Seller or Buyer as to the Deposit, Escrow Agent shall act in accordance with such instruction if the other party shall fail to notify Escrow Agent not to act in accordance with such instruction within ten (10) days after delivery of such instruction by Escrow Agent. Escrow Agent may deposit the Deposit with the Bankruptcy Court, whereupon Escrow Agent shall have no further responsibility or liability hereunder relating to the Deposit.  Escrow Agent may act upon any instruction or other writing believed by Escrow Agent in good faith to be genuine and to be signed or presented by the proper persons.

16.3    Seller and Buyer acknowledge that Escrow Agent shall not be liable for any act or omission unless taken or suffered in bad faith, in willful disregard of this Contract of Sale or involving gross negligence.  Seller and Buyer shall jointly and severally indemnify and hold Escrow Agent harmless from and against any reasonable costs and reasonable expenses incurred in connection with the proper performance of the Escrow Agent's duties hereunder.  If a dispute arises as to the holding of the Deposit, Seller and Buyer shall be jointly and severally liable for, and shall pay Escrow Agent, any reasonable costs of Escrow Agent incurred in connection therewith.

16.4    All instructions or notices given pursuant to this Section 16 shall be in writing and delivered in accordance with the requirements for notices pursuant to Section 18. Such instructions and notices shall be deemed delivered as provided in Section 18, except that no instruction or notice to Escrow Agent shall be deemed effectively delivered to Escrow Agent until actual receipt thereof by Escrow Agent.

16.5    Seller and Buyer acknowledge that Escrow Agent may continue as counsel to the Seller with respect to any disputes hereunder without creating an actual or potential conflict of interest.

17.    **Brokerage**.  Each party represents and warrants to the other that they have not dealt with any broker in connection with this sale except Seller has dealt with and will seek Bankruptcy Court approval to pay a commission to George Swain Investments (the "**Broker**") as a part of the Approval Order.  Seller agrees to pay, and indemnify and hold Buyer harmless from and against, any and all liability, claim, loss, damage or expense, including reasonable attorneys' fees, in connection with the Broker. The provisions of this Section 17 shall survive the Closing.

18.    **Notices**.  In order for the same to be effective, each and every notice, communication, request or demand permitted or required to be given by the terms and provisions of this Contract of Sale, or by any law or ordinance shall be given in writing, in the manner provided in this Section unless expressly provided otherwise elsewhere in this Contract of Sale.

18.1    In the case of notices given by Seller to Buyer, any such notice shall be addressed to Buyer at its address as stated on the first page of this Contract of Sale and copies to Buyer's counsel, Eric R. Decator, LLC, 561 Chateaux Bourne Drive, Barrington, IL 60010, Attention: Eric R. Decator, Esq., edecator@decatorlaw.com.

18.2    In the case of notices given by Buyer to Seller, any such notice shall be addressed to Seller at its address as stated on the first page of this Contract of Sale, and a copy to Seller's attorneys, Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, New York 10036, Attention:  Kevin J. Nash, Esq., kjnash@gwfglaw.com.

18.3    In the case of notices given by Buyer or Seller to Escrow Agent, any such notice shall be addressed to Escrow Agent at Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, New York 10036, Attention:  Kevin J. Nash, Esq., kjnash@gwfglaw.com.

18.4    Each party hereby authorizes its attorney named above or any successor attorney or managing agent designated by such party to give and receive any notice on its behalf.

18.5    Notices may be given by overnight courier with receipted delivery, or by any other manual or electronic means, or by hand delivery.  Notices so given shall be deemed served and given on the date of receipt if received before 7:00 P.M. prevailing New York time on a business day, or on the first business day following receipt if it is received at any other time.

18.6    Either party may, by notice as aforesaid, designate one or more different parties and addresses for notices in lieu of those specified above.  Such designation shall be valid only when notice of such designation is given in the manner required herein.

19.    **Representations, Warranties and Covenants of Seller**.  Buyer represents, warrants and covenants to Seller as follows:

11

19.1    Subject to the Bankruptcy Court Approval, Seller has the legal power, right and authority to enter into this Contract of Sale and the instruments referenced herein and to consummate the transaction contemplated thereby.

19.2    Except for the Bankruptcy Court Approval, no consent of filing with any Governmental Body is required for Seller to execute this Contract of Sale and perform the transactions described in this Contract of Sale by the Seller. The execution and delivery of this Contract of Sale by Seller does not violate any provisions of the Organizational Documents of Seller and will not result in a breach or violation or default under any Order or Governmental Authorization to which Seller is subject or result in a breach by Seller under any contract to which it is bound.

19.3    Except as otherwise expressly stated in this Contract of Sale, Seller makes no representation and warranty as to the Condition of the Premises, the operations of the Premises or the market conditions of the area in which the Premises is located and is conveying possession of the Premises to Buyer **AS IS, WHERE IS AND WITH ALL FAULTS** as of the date of this Contract, reasonable wear and tear, natural deterioration and damage by casualty excepted, and without representation or warranty of any kind or nature whether express or implied or arising by operation of law.  No adverse change in the Condition of the Premises prior to the date hereof shall give rise to any obligation on the part of Seller to remedy the condition.  Seller makes no representations whatsoever concerning the Buyer's ability to develop or build at the Premises, and Buyer has made an independent evaluation regarding the future use or development of the Premises.  Any prior due diligence material provided by Seller to Buyer was informational and Seller makes no representations regarding the accuracy or completeness of such material. For purposes of this Contract of Sale, the term "**Condition of the Premises**" shall mean all of the following:

(a)    The quality, nature and adequacy of the physical condition of the Premises, including (A) the quality of the design, labor and materials used to construct the improvements included in the Premises or in the construction of the Premises; (B) the condition of structural elements, foundations, roofs, glass, mechanical, sewer, plumbing, electrical, HVAC and utility components and systems; (C) the capacity or availability of sewer, water, telecommunication or other utilities; (D) the geology, flora, fauna, soils, subsurface conditions, groundwater, landscaping and irrigation of the Premises, and its location in or near any special taxing district, flood hazard zone, wetlands area, protected habitat, geological fault or subsidence zone, hazardous waste disposal or clean-up site, or other special area; (E) the existence, location or condition of ingress, egress access and parking; (F) the condition of any fixtures; the presence of any asbestos or other Hazardous Materials, dangerous, or toxic substance, material or waste in, on, under or about the Premises thereon; (G) any environmental, botanical, zoological, hydrological, geological, meteorological, structural or other condition or hazard or the absence thereof heretofore, now or hereafter affecting in any manner the Premises; (H) the development of the Premises; and (I) any other matter or thing related to the Premises.

12

(b)    The economic feasibility, suitability and adequacy of the Premises for its current use and purpose, and any condition at or which affects the Premises with respect to a particular use, purpose, development, potential or otherwise.

(c)    The compliance or failure to comply by Seller with (A) all legal requirements or Governmental Authorizations, including those relating to zoning, building, public works, parking, fire and police access, handicap access, life safety, subdivision and subdivision sales, and (B) all agreements, covenants, conditions, restrictions (public or private), development agreements, site plans, building permits, building rules and other instruments and documents governing or affecting the use, management and operation of the Land or Buildings.

(d)    The availability, cost, terms and coverage of liability, hazard, terrorism, comprehensive and any other insurance for the Premises or its operations.

19.4    Without limiting the generality of the foregoing, except for the representations and warranties of Seller contained in this Contract of Sale, the transactions described in this Contract of Sale are without statutory, express or implied warranty, representation, agreement, statement or expression of any opinion regarding the Condition of the Premises, including any and all statutory, express or implied representations or warranties related to their suitability for habitability, merchantability, or fitness for a particular purpose or created by any affirmation of fact or promise, by any description of the Premises or by operation of any legal requirements.

19.5    Seller has not entered into any service, maintenance, supply, leasing or other contracts relating to the Premises which will be binding upon Buyer after the Closing Date.

19.6    Seller is not a party to, subject to, or bound by the terms of any collective bargaining agreement or arrangement and has no employees.

19.7    There will be no leases or other occupancy agreements relating to the Premises.

19.8    All of Seller's representations, warranties and covenants set forth in this Contract of Sale shall be deemed made by Seller to Buyer as of the Closing Date.

20.    **Representations, Warranties and Covenants of Buyer**. Buyer represents, warrants and covenants to Seller (which representations, warranties and covenants shall not survive the Closing unless expressly provided otherwise herein) as follows:

20.1    Buyer will be a limited liability company, duly organized and existing under the laws of the State of its organization.  The Buyer will have the legal power, right and authority to enter into this Contract of Sale and the instruments referenced herein and to consummate the transaction contemplated hereby.

20.2    Buyer will have the power and authority to execute, deliver and perform this Contract of Sale, and has taken all actions required to authorize, execute, deliver and perform this Contract of Sale, including approval by the officers, directors or members of Buyer.  No

13

consent of filing with any Governmental Body is required for Buyer to execute this Contract of Sale and perform the transactions described in this Contract of Sale by the Buyer. The execution and delivery of this Contract of Sale by Buyer does not violate any provisions of the Organizational Documents of Buyer and will not result in a breach or violation or default under any Order or Governmental Authorization to which Buyer is subject or result in a breach by Buyer under any contract to which it is bound.  Neither the execution and the delivery of this Contract of Sale nor Buyer's compliance with the terms of this Contract of Sale will (a) violate any legal requirements applicable to Buyer, or (b) require the Consent or the making by Buyer of any declaration, filing or registration with any person.

20.3    In entering into this Contract of Sale, Buyer hereby represents to Seller that it has the financial wherewithal to pay the balance of the purchase price without a financing contingency.  Buyer's obligations under this Contract of Sale shall not be subject to any other contingencies, additional diligence or conditions except as expressly stated herein. Buyer represents that it has expertise in financial and business matters that enable Buyer to evaluate the merits and risks of the transactions described in this Contract of Sale.

20.4    All of the Buyer's representations, warranties and covenants set forth in this Contract of Sale shall be deemed made by Buyer to Seller as of the Closing Date.

21.    **No Assignment**.  This Contract of Sale may not be assigned by Buyer without the prior written consent of Seller, provided that Buyer may assign this Contract of Sale to one of its affiliates once such affiliate is formed.

22.    **Purchase Price, Costs, Transfer and Sales Taxes**.

22.1    Buyer agrees to (a) pay any sales, use and similar Tax payable with respect to any personal property transferred in connection with the Premises and to indemnify and hold harmless Seller from and against any and all liability, loss, cost, damage and expense (including, but not limited to, interest, penalties and attorneys' fees) which Seller may sustain by reason of the non-payment of such Tax and (b) file any sales, use or other Tax reports which may be required.

22.2    Buyer shall pay (a) the cost of performing any due diligence, (b) all costs and expenses of obtaining any financing Buyer may elect to obtain, including, but not limited to, any fees, financing costs, mortgage and recordation Taxes and intangible Taxes in connection therewith, and (c) the cost of its legal counsel, advisors and other professionals employed by Buyer in connection with its purchase of the Premises from Seller.

22.3    Seller shall pay (a) the cost of the Survey, (b) the cost of premiums on the Title Policy, (c) the cost of any recordation fees to put the Deed of record with the appropriate Governmental Body, (d) the cost of  its legal counsel, advisors and other professionals employed by Seller in connection with the sale of the Premises to Buyer, and (e) recordation fees, transfer taxes (unless exempt) and other expenses related to the discharge of any Encumbrance on the Premises that is not a Permitted Encumbrance.

23.    **Tax Exemption.**  The Approval Order and accompanying plan of reorganization shall provide that the sale and transfer of the Premises is being done in furtherance of a confirmed plan of

reorganization and shall be exempt from payment of all transfer and recording taxes that may be owed to a local, state or federal governmental unit, and shall further provide that the recorder of deeds or similar official in Los Angeles, California shall accept such instrument for recording without requiring the payment of any documentary stamp taxes or transfer taxes.

24.    **Risk of Loss**.

24.1    If, on or before the Closing Date, all or any of the Premises are (i) damaged or destroyed by fire or other casualty or (ii) taken as a result of any condemnation or eminent domain proceeding, Seller shall promptly notify the Buyer.  If the resulting casualty or condemnation would cause a restoration cost or diminution in value of the Land or Buildings of more than Five Million Dollars ($5,000,000) (the **"Threshold"**), taken in the aggregate either Seller or Buyer may terminate this Contract of Sale by delivery of notice of termination to the other within ten (10) days after the date that Buyer receives such notice from Seller of such casualty or condemnation, at which time Escrow Agent shall return the Deposit to the Buyer. If Seller or Buyer does not terminate this Contract of Sale prior to the expiration of such ten (10) day period, or such casualty or condemnation does not cause a restoration cost or diminution in value of the Land and Buildings of more than the Threshold, taken in the aggregate, Buyer shall remain obligated to close the acquisition of the Premises without reduction in the purchase price. Seller shall be responsible for filing and monitoring all claims for insurance or condemnation proceeds

24.2    At the Closing, Seller shall credit against the Purchase Price payable by Buyer an amount equal to the net proceeds, if any, received by Seller from such casualty and Seller shall be responsible to pay the applicable deductible under the subject insurance policy.  If, as of the Closing Date, Buyer has not elected to terminate this Contract of Sale pursuant to Section 24.1 above, and Seller has not received any such insurance proceeds, if any, then the parties shall, nevertheless, consummate the transactions described in this Contract of Sale on the Closing Date, without any deduction for such insurance proceeds, if any, and Seller shall, at the Closing, assign to Buyer all Seller's rights, if any, to the insurance proceeds, if any, and to all other rights or claims arising out of or in connection with such casualty and Seller shall, at Closing pay, or credit to Buyer, the applicable deductible.

25.    **Miscellaneous**.

25.1    All oral or written statements, representations, promises, and agreements of Seller and Buyer are merged into and superseded by this Contract of Sale, which alone fully and completely expresses their agreement, and this Contract of Sale contains all of the terms agreed upon by the parties with respect to the subject matter hereof.  This Contract of Sale has been entered into after full investigation.

25.2    None of the representations, warranties, covenants, or other obligations of parties hereunder shall survive the Closing, except as expressly provided herein.

25.3    This Contract of Sale may not be altered, amended, changed, waived, or modified in any respect or particular unless the same shall be in writing signed by Seller and

Buyer.  No waiver by any party of any Breach hereunder shall be deemed a waiver of any other or subsequent Breach.

25.4    Neither this Contract of Sale nor any memorandum thereof shall be recorded by Buyer.

25.5    This Contract of Sale shall not be considered an offer or an acceptance of an offer by Seller and shall not be binding upon Seller until executed and unconditionally delivered by Seller and Buyer and approved by the Bankruptcy Court under the Approval Order.

25.6    This Contract of Sale may be executed by facsimile or electronically and in any number of counterparts, all of which taken together shall constitute one and the same instrument.

25.7    Section titles or captions in this Contract of Sale are included for purposes of convenience only and shall not be considered a part of the Contract of Sale in construing or interpreting any of its provisions.  All references in this Contract of Sale to Sections shall refer to Sections of this Contract of Sale unless the context clearly otherwise requires.

25.8    The parties have participated jointly in the negotiation and drafting of this Contract of Sale.  If any ambiguity or question of intent or interpretation arises, no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Contract of Sale.

25.9    Unless the context otherwise requires, when used in this Contract of Sale, the singular shall include the plural, the plural shall include the singular, and all pronouns shall be deemed to refer to the masculine, feminine or neuter, as the identity of the person or persons may require.

25.10   The parties do not intend that this Contract of Sale shall confer on any third party any right, remedy or benefit or that any third party shall have any right to enforce any provision of this Contract of Sale.

25.11   Any dispute, claim or action arising in connection with this Contract of Sale shall be adjudicated by the Bankruptcy Court.

25.12   This Contract of Sale shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York without giving effect to any conflict of law rule or principles of the State of California or the State of New York.

25.13   Neither Seller nor Buyer nor any of their constituents have engaged in any dealings or transactions, directly or indirectly, (a) in contravention of any U.S., international or other money laundering regulations or conventions, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S. C. §1 *et seq.*, as amended), or any foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B,

16

Chapter V, as amended) or any enabling legislation or executive order relating thereto, or (b) in contravention of Executive Order No. 13224 dated September 24, 2001 issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with persons Who Commit, Threaten to Commit, or Support Terrorism), as may be amended or supplemented from time to time ("**Anti-Terrorism Order**"), or on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization of Economic Cooperation and Development, Financial Action Task Force, U.S. Office of Foreign Assets Control, U.S. Securities & Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, or any country or organization, all as may be amended from time to time. Neither Seller nor Buyer nor any of their constituents (i) are or will be conducting any business or engaging in any transaction with any person appearing on the U.S. Treasury Department's Office of Foreign Assets Control list of restrictions and prohibited persons, or (ii) are a person described in section 1 of the Anti-Terrorism Order, and to the best of each party's knowledge, neither Seller nor Buyer nor any of their Affiliates have engaged in any dealings or transactions, or otherwise been associated with any such person.

[Signature Page Follows]

**IN WITNESS WHEREOF**, Seller and Buyer have duly executed this Contract of Sale on the date first above written.

**BANKRUPTCY ESTATE OF BROADBRIDGE LA LLC, as SELLER**

By: _____

Name: _Joel Schreiber_

Title: _Manager_

**CAPRI INVESTOR, LLC, as BUYER**

By: _____

Quintin E. Primo III

Its Manager

GOLDBERG WEPRIN FINKEL GOLDSTEIN hereby executes this Contract of Sale for the sole purpose of agreeing to serve as Escrow Agent in accordance with the provisions of Article 16 of this Contract of Sale.

**GOLDBERG WEPRIN FINKEL GOLDSTEIN**

By: _____

Kevin J. Nash

## SCHEDULE 1

## Defined Terms

"Anti-Terrorism Order" shall have the meaning assigned to it in Section 25.13.

"Approval Order" shall have the meaning assigned to it in Section 2.1.

"Bankruptcy Court" means the United States Bankruptcy Court, Eastern District of New York, supervising the Seller's pending Chapter 11 case encaptioned, *In re: Broadbridge LA LLC*, Case No. 22-72048-LAS.

"Bankruptcy Court Approval" means the Approval Order has been entered by the Bankruptcy Court in the bankruptcy case or by any other court exercising competent jurisdiction over the Seller provided that such order:  (i) has become final and no longer subject to appeal or reconsideration; or (ii) if an appeal or reconsiderations has been filed, either the Bankruptcy Court or such appellate court has not stayed the sale to be consummated hereunder, (or if stayed, the stay has been lifted).

"Bid Protection" shall have the meaning assigned to it in Section 12.

"Broker" shall have the meaning assigned to it in Section 17.

"Building" shall have the meaning assigned to it in Section 2.1.

"Buyer" shall have the meaning assigned to it in the Preamble.

"Buyer's Expense for Title Examination" shall have the meaning assigned to it in Section 5.7.

"Closing" shall have the meaning assigned to it in Section 9.1.

"Closing Date" shall mean the date of the Closing.

"Condition of the Premises" shall have the meaning assigned to it in Section 19.3.

"Contract" or "Contract of Sale" shall have the meaning assigned to it in the Preamble.

"Deposit" shall have the meaning assigned to it in Section 3.1(a).

"Due Diligence Period" shall have the meaning assigned to it in Section 3.2.

"Effective Time" shall have the meaning assigned to it in Section 11.1.

"Encumbrance" means any charge, claim, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environmental Claims" means any assertion by any person of a cause of action with respect to the Premises in connection with the presence of any Hazardous Materials or violation of any Environmental Law, whether or not reduced to a judgment.

"Environmental Law" means all Legal Requirements and all Contractual obligations concerning public health and safety, employee health and safety, and pollution or protection of the environment, (including indoor or outdoor air, surface water, groundwater, land surface or subsurface) or the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, management, remediation or abatement of any Hazardous Materials, each as amended and as now or hereafter in effect.

"Escrow Agent" shall have the meaning assigned to it in Section 16.1.

"Governmental Body" means any (a) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or Entity and any court or other tribunal); (d) multi-national organization or body; or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or Taxing authority or power of any nature.

"Hazardous Materials" means any waste or other substance that is listed, defined, designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any mixture or solution thereof, and specifically Including petroleum and all derivatives thereof or synthetic substitutes therefore and asbestos or asbestos-containing materials.

"Land" shall have the meaning assigned to it in Section 2.1.

"Lender" shall have the meaning assigned to it in Section 8.

"Mandatory Cure Items" shall have the meaning assigned to it in Section 4.

"New Title Defects" shall have the meaning assigned to it in Section 5.5.

"Organizational Documents" shall mean (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (e) any amendment to any of the foregoing.

"Permitted Encumbrances" shall have the meaning assigned to it in Section 4.

"Personalty" shall have the meaning assigned to it in Section 2.1.

"Pre-Contract Violations" shall have the meaning assigned to it in Section 6.

"Premises" shall have the meaning assigned to it in Section 2.1.

"Property" shall have the meaning assigned to it in Section 2.1.

"Post-Contract Violations" shall have the meaning assigned to it in Section 6.

"Purchase Price" shall have the meaning assigned to it in Section 3.1.

"Seller" shall have the meaning assigned to it in the Preamble.

"Seller's Response" shall have the meaning assigned to it in Section 5.1.

"Survey" shall have the meaning assigned to it in Section 5.1.

"Threshold" shall have the meaning assigned to it in Section 24.1.

"Title Company" shall have the meaning assigned to it in Section 5.1.

"Title Defects" shall have the meaning assigned to it in Section 5.1.

"Title Objection Notice" shall have the meaning assigned to it in Section 5.1.

"Title Objection Notification Date" shall have the meaning assigned to it in Section 5.1.

"Title Updates" shall have the meaning assigned to it in Section 5.1.

"Violations" shall have the meaning assigned to it in Section 6.